1 DANIEL J. BERMAN
BERMAN O'CONNOR & MANN
2 Suite 503, Bank of Guam Building
111 Chalan Santo Papa
3 Hagåtña, Guam 96910
Telephone: (671) 477-2778
4 Facsimile: (671) 477-4366

5 JAMES P. WALSH (PRO HAC VICE)
DAVIS WRIGHT TREMAINE LLP
6 505 Montgomery Street, Suite 800
San Francisco, CA 94111-6533
7 Tel: (415) 276-6556
Fax: (415) 276-6599
8

9 Attorneys for Defendant and Claimant:
*MARSHALLS 201 and MARSHALL*
10 *ISLANDS FISHING COMPANY*

**FILED**
DISTRICT COURT OF GUAM

OCT 2 9 2007

JEANNE G. QUINATA
Clerk of Court

11 **UNITED STATES DISTRICT COURT**

12 **FOR THE TERRITORY OF GUAM**

13

14 UNITED STATES OF AMERICA,　　　) CIVIL CASE NO. 06-00030
　　　　　　　　　　　　　　　　　)
15 　　　　　　　Plaintiff,　　　　 )
　　　　　　　　　　　　　　　　　)
16 　　　　v.　　　　　　　　　　　) **DEFENDANT'S MOTION TO DISMISS**
　　　　　　　　　　　　　　　　　) **FOR LACK OF SUBJECT MATTER AND**
17 　　　　　　　　　　　　　　　　) **IN REM JURISDICTION;**
　　　　　　　　　　　　　　　　　) **MEMORANDUM OF POINTS**
18 MARSHALLS 201,　　　　　　　 ) **AND AUTHORITIES IN SUPPORT**
　　　　　　　　　　　　　　　　　) **THEREOF**
19 　　　　　　　Defendant.　　　 )
　　　　　　　　　　　　　　　　　)
20 _____)

21 **DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION**

22 　　　　Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure ("FRCP"), the Defendant,

23 the vessel F/V MARSHALLS 201 (or the "Vessel"), and its owner, the Marshall Islands Fishing

24 Company, hereby move to dismiss the Complaint for Forfeiture, and void the Order of Arrest of

25 the Vessel, for lack of jurisdiciton because the United States lacks legal authority to claim and

26 enforce a 200-mile exclusive economic zone ("EEZ") around Baker and Howland Islands in the

27 Pacfic Ocean, the alleged legal basis for the Complaint and Order of Arrest in this case.

28 E:\Jean\Plds\DJB\Marshalls\Mtn Dismiss EEZ (New).wpd

**ORIGINAL**

1.     The United States of America seized the Vessel alleging that, on September 7, 8 and 9, 2006, the MARSHALLS 201, a vessel flying the flag of the Republic of the Marshall Islands, was unlawfully engaging in fishing in an ocean area claimed by the United States as its 200 nautical mile EEZ. At the time of the seizure, the Vessel was fishing pursuant to fishing licenses issued by the Republic of the Marshall Islands and the Republic of Kiribati.

2.     The claim of the United States, which has never been formally agreed to by any other nation in a treaty or otherwise, is based on territorial possession of two small uninhabited islands, Baker Island and Howland Island, located near the Equator between 1,300 and 1,700 nautical miles south to southwest from the State of Hawaii. The United States claims exclusive fishery management jurisdiction within 200 nautical miles around these remote small islands pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), 16 U.S.C. § 1811, and Presidential Proclamation 5030, 48 Fed. Reg. 10605 (March 10, 1983).

3.     The Republic of Kirbati has claimed a 200-mile zone within which it exercises exclusive fishery management jurisdiction. But for the claim of the United States, the ocean area where the Government of the United States asserts fishery management authority in this enforcement case against the Vessel would be included within the 200-mile EEZ of the Republic of Kiribati.

4.     Under customary international law and Article 121(3) of the United Nations Law of the Sea Convention, Dec. 10, 1982, U.N. Doc. A/CONF.62/122, Baker and Howland Islands are considered "rocks" which cannot sustain human habitation or economic life of their own. As such, Baker and Howland Islands, as a matter of law, do not provide the basis for a claim of a 200-mile EEZ around them by the United States.

5.     Lacking jurisdition supported by prevailing principles of international law, the

3   United States Government has no legal authority to enforce unilaterally its fishery management

4   authorities against the Vessel, which is subject exclusively to the fishery management jurisdiction

5   of the Republic of the Marshall Islands, as its flag nation, and the Republic of Kiribati, from

6   which it received a license to fish in the ocean area in question.

7           6.      The Vessel and its owner are entitled to judgment, as a matter of law, on the issue

8   of whether the United States had legal authority to seize the Vessel and its catch of fish and bring

9   legal proceedings to forfeit the owner's interest in the Vessel and its catch of fish. Under binding

10  international law, the United States had no such jurisdiction in this case. Consequently, this case

11  must be dismissed as this Court lacks subject matter jurisdiction and in rem jurisdiction over the

12  Vessel.

13          7.      This motion is based on the attached Memorandum of Points and Authorities, the

14  Declaration of Eugene Muller, the Declaration of Professor Jon Van Dyke, the Declaration of

15  Scott Edmonds, the Declaration of James P. Walsh, and all the pleadings and other materials in

16  the file of this case.

17

18
### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
19
### OF DEFENDANT'S MOTION TO DISMISS

20
### I. INTRODUCTION AND SUMMARY OF MOTION

21          The enforcement action taken by the United States in this case—stoppage, boarding, and

22  arrest of a vessel not flagged in the United States for fishing violations—is predicated on the

23  "territorial principle" in international law. Restatement (Third) Foreign Relations Law of the

24  United States, § 402, comment c (1987), *see*, Exhibit "8", attached to Declaration of Claimant's

25  Counsel; *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). In this case, the

26  United States asserts, based on customary intertnational law and Articles 55 and 56 of the Law

27

28  E:\Jean\Plds\DJB\Marshalls\Mtn Dismiss EEZ (New).wpd      Page -3-

of the Sea Convention ("LOS Treaty"), "sovereign rights for the purpose of ...conserving and managing the natural resources" in a 200-mile EEZ around the isolated Baker and Howland Islands in the middle of the Pacific Ocean. Restatement (Third) Foreign Relations Law of the United States, §§ 511, 514 and 517 (1987) (EEZ is customary international law: § 514, comment a), *see*, Exhibit "8"; *also,* Schoenbaum, *Admiralty and Maritime Law*, 4th Ed., § 2-16 (2007) *see*, Exhibit "9", attached to Declaration of Claimant's Counsel; *also,* 16 U.S.C. § 1811(a) (assertion of sovereign rights and exclusive fishery management jurisdiction in the EEZ). The U.S. claim is unilateral and has not been agreed to by any country. Under customary international law and the LOS Treaty, Article 57, the breadth of the EEZ is to extend not more than 200 miles from the baseline from which the breadth of the territorial sea is measured.

The EEZ claimed by the U.S. around Baker and Howland Islands was set at an equidistant location because of the abutting, and overlapping, claim of the Republic of Kiribati. Declaration of Scott Edmonds at ¶4. Unlike other U.S. maritime boundaries, the U.S. and Kiribati have not agreed to the delimitation of this shared boundary. Id. Lacking such agreement, the U.S. claim is not recognized as binding under international law. Restatement (Third) Foreign Relations Law of the United States, § 517(1) (1987) (delimitation of EEZ between states with opposite and adjacent coasts is to be effected by agreement), Exhibit "8". Moreover, without such agreement, delimitation is to be achieved by the application of equitable principles, taking into account the circumstances of the area concerned. Id. at § 517(2), Exhibit "8". The U.S. claim to an EEZ around Baker and Howland Islands was not determined in accordance with these principles.

Customary international law, and the LOS Treaty, do not recognize that every oceanic geographic structure possessed by a nation that breaks the surface of the sea is entitled to provide the basis for a 200-mile EEZ. In particular, "rocks that cannot sustain human habitation or economic life of their own shall have no exclusive economic zone or continental shelf." LOS

Treaty, Article 121(3). *See*, Exhibit "10", attached to Declaration of Claimant's Counsel. This delimitation rule with respect to small islands that are "rocks" reflects customary international law.

More importantly, this rule is binding on the United States because it has signed, and indicated its intent to ratify, the LOS Treaty. Furthermore, because of its signature on the LOS Treaty, the United States is obligated to refrain from any acts that would defeat the object and purpose of the Convention. Restatement (Third) Foreign Relations Law of the United States, § 312(3) (1987); *The Paquette Habana*, 175 U.S. 677 (1900) (reversing decision allowing the taking of a fishing vessel as a prize of war because it was contrary to customary international law).

Because the United States is prevented from asserting an EEZ around Baker and Howland Islands, as contrary to international law, this Court lacks subject matter jurisdiction over this case and in rem jurisdiction over the Vessel (and the bond filed in lieu of its arrest). Therefore, Claimant requests that the Complaint of Forfeiture filed by the United States be dismissed under FRCP, Rule 12(b).

## II. FACTUAL BACKGROUND

### A.    PROCEDURAL HISTORY OF THE CASE

On September 9, 2006, enforcement officials from the United States Coast Guard vessel WALNUT, a buoy tender, boarded and arrested the fishing vessel MARSHALLS 201 for fishing in an area alleged to be part of the 200-mile EEZ of the United States. Complaint for Forfeiture ("Comp."), ¶ 7; Affidavit of John Barylsky ("Barylsky") in support of Comp., ¶ 12. It is claimed by the United States Government that the Vessel was fishing without a proper permit in violation of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1824(a), 1857(1)(A), 1857(2)(B), and 1857(4)(A), and (B), and related regulations. Comp. ¶ 1.

E:\Jean\Plds\DJB\Marshalls\Mtn Dismiss EEZ (New).wpd      Page -5-

The Vessel is flagged and licensed for fishing by the Republic of the Marshalls Island. Declaration of Eugene Muller ¶17. The Vessel also holds a license from the Republic of Kiribati to fish within its EEZ. Id. at ¶18.

At the time, the Vessel was located in an area claimed to be within 200 nautical miles of the uninhabited Baker and Howland Islands, possessions of the United States, an area bordering waters claimed by the Republic of Kiribati as part of its 200-mile EEZ. Marine Zones (Declaration) Act of 1983, No. 7 of 16 May 1983, Republic of Kiribati, attached Exhibit "1" to Declaration of Claimant's Counsel.

Following its arrest, the Vessel was taken about 1,500 miles to Guam by the arresting Coast Guard vessel and another Coast Guard vessel, the SEQUOIA, which relieved the WALNUT during the transit.

On October 4, 2006, this Court issued an Order of Arrest of the Vessel and its catch of fish, plus all appurtenances, fishing gear, furniture, stores, cargo, and electronic and documentary records (including plotters, fax machines, and other devices). The U.S. Marshal executed the Order and took control of the Vessel shortly thereafter.

On October 10, 2006, the Marshall Islands Fishing Company, the owner of the Vessel, filed a Verified Statement of Right or Interest in the Vessel pursuant to Supplemental (Admiralty) Rule C(6)(a) of the Federal Rules of Civil Procedure ("FCRP").

On October 13, 2006, pursuant to Local Rule 65.1 and Admiralty Rule E(5)(C), an Order was issued approving the release of the Vessel and its catch of fish upon the posting of a bond of $2,950,000. The Vessel and crew then departed Guam.

Claimant and its owner filed their Answer to the Complaint and Counterclaim on October 18, 2006. As one of the defenses, Claimant and its owner alleged that the United States did not have jurisdiction over the Vessel because the claim to an EEZ around Baker and Howland Islands

was not supported by applicable international law. If the United States is not entitled, under international law, to assert fishery management jurisdiction in the geograhic area at issue in the case, then the United States had no authority to stop, inspect and arrest the Vessel. The United States neither asked for, nor received, the permission of the Republic of the Marshall Islands to stop and inspect the MARSHALLS 201 on September 9, 2006. Declaration of Eugene Muller ¶19.

On December 18, 2006, the United States answered Claimant's Counterclaim, denying all claims.

At the time of the filing of this Motion, fact discovery in the case has closed and the parties are in the process of deposing experts designated for trial. The trial of this case is set to commence on November 26, 2007.

**B.      CLAIMS OF THE UNITED STATES**

**1.      The EEZ Jurisdictional Claim.**

Baker and Howland Islands are unincorporated island territories of the United States and are part of the Pacific Islands National Wildlife Refuge Complex. The Central Intelligence Agency's _World Factbook_ at https://www.cia.gov/library/publications/the-world-factbook/print/um.html; U.S. Fish and Wildlife Service, U.S. Department of the Interior, http://www.fws.gov/pacificislands/wnwr/pbakernwr.html; 72 Fed. Reg. 53260-53261 (Sept. 18, 2007) (Notice of availability of draft comprehensive conservation plans and associated environmental assessments).[1] The _World Factbook_ states the following about the two islands:

_____

[1]      All factual information relating to Baker and Howland Islands used in this Memorandum is available in the public domain and is presumably undisputed by the United States. As such, the Court may take judicial notice of such generally known and undisputed factual information. _Barnes v. Indep. Auto Dealers' Ass'n of Calif. Health & Benefit Plan_, 64

3        *Baker Island*: The U.S. took possession of the island in 1857, and its guano

4   deposits were mined by the U.S. and British companies during the second half of the 19th Century.

5   In 1935, a short-lived attempt at colonization began on the island but was disrupted by World War

6   II and thereafter abandoned.  The island was established as a National Wildlife Refuge in 1974.

7   Its location coordinates are 0° 13' N, 176° 28' W. Emergent land comprises 2.1 square kilometers;

8   submerged land is 127 square kilometers.  Baker Island is about two and a half times The Mall

9   in Washington, D.C.  The climate is equatorial; scant rainfall; constant wind; and burning sun.

10  The highest point on Baker Island is eight meters. The island has no natural fresh water resources.

11       *Howland Island*:  Discovered by the U.S. early in the 19th Century, the island was

12  officially claimed by the U.S. in 1857.  Both U.S. and British companies mined for guano until

13  about 1890.  In 1935, a short-lived attempt at colonization began on the island, similar to the

14  effort on nearby Baker Island, but was disrupted by World War II and thereafter abandoned.  The

15  famed American aviatrix, Amelia Earhart disappeared while seeking out Howland Island as a

16  refueling stop during her 1937 round-the-world flight; Earhart Light, a day beacon near the

17  middle of the west coast, was named in her memory.  The island was established as a National

18  Wildlife Refuge in 1974.  Its location coordinates are 0° 48' N, 176° 38' W.  Emergent land

19  comprises 2.6 square kilometers; submerged land is 136 square kilometers.  Howland Island is

20  about three times the size of The Mall in Washington, D.C.  The climate is equatorial; scant

21  rainfall; constant wind; and burning sun.  The highest point on Howland Island is three meters.

22  The island has no natural fresh water resources.

23       The United States claims a 12 nautical mile territorial sea and a 200 mile EEZ around both

24  Baker and Howland Islands.  Notice of the 200-mile claim under the Magnuson-Stevens Act,

25

26  F.3d 1389, 1395 fn. 2 (9th Cir. 1995).  See CIA's World FactBook, attached as Exhibit "7" to

27  Declaration of Claimant's Counsel.

28

made without prejudice to any negotiations with neighboring countries or to any positions which may have been or may be adopted respecting the limits of maritime jurisdiction, was last made in a Federal Register Notice issued by the U.S. Department of State on August 23, 1995. *See* 60 Fed. Reg. 43825-43829, Exhibit "2", attached to Declaration of Claimant's Counsel. The coordinates of the claimed EEZ with respect to Baker and Howland Islands are found at 60 Fed. Reg. 43829.

## C.    ACTIONS AGAINST THE VESSEL

On September 9, 2006, according to the allegations of the Complaint, the MARSHALLS 201 was observed by an aircraft and a Coast Guard vessel with its net in the water at position coordinates alleged to be within the claimed 200-mile EEZ of the United States. Comp. ¶¶ 6, 7, 8. The Coast Guard vessel then signaled the Vessel to stop, which eventually it did. Barylsky Affidavit ¶14, g., p. 8, filed October 4, 2006. The Vessel was boarded, its captain interrogated, and its records and navigation equipment reviewed by the boarding officers. Eventually, after a period of delay, the Vessel and its crew were arrested. *See* Warrant of Arrest, filed October 4, 2006. The captain of the Vessel cooperated with the boarding officials and allowed them to take charge of the Vessel. At the time of the arrest, the Vessel had 500 tons of fish on board. Declaration Muller, ¶¶28-29.

The Complaint against the Vessel is stated generally and alleges a variety of violations, not broken into separate counts, against the Vessel and its catch. The United States seeks to forfeit the entire value of the Vessel and the catch of fish it had on board at the time of its arrest.

3
4

### D.  ENFORCEMENT AUTHORITIES UNDER
###      THE MAGNUSON-STEVENS ACT

5      The Magnuson-Stevens Act, and its implementing regulations, define a wide variety of

6   prohibited acts which apply within the 200-mile EEZ of the United States. 16 U.S.C. § 1857; 50

7   C.F.R. Part 600. These prohibited acts include fishing without a properly issued fishing license.

8   Another prohibited act applies to any operation of a vessel within the 200-mile EEZ without

9   storing fishing gear properly so that it is either "not readily available for fishing" or "unusable for

10  fishing." 16 U.S.C. § 1857(4)(A) and (B).

11     The Magnuson-Stevens Act also contains a civil forfeiture provision, which reads in part

12  as follows:

13          Any fishing vessel (including its fishing gear, furniture,
            appurtenances, stores, and cargo) used, and any fish (or the fair
14          market value thereof) taken or retained in any manner, in
            connection with or as a result of any act prohibited by section 307
15          (other than an act for which the issuance of a citation under
            Section 311(c) is sufficient sanction) shall be subject to forfeiture
16          to the United States. All or part of such vessel may, and all such
            fish (or the fair market value thereof) shall, be forfeited to the
17          United States pursuant to a civil proceeding under this section.

18  16 U.S.C. § 1860(a); *U.S. v. Kaiyo Maru No. 53*, 699 F.2d 989, 1000 (9th Cir. 1983) (district court

19  has discretion to impose forfeiture of less than the whole vessel or its monetary equivalent). It

20  is this provision that provides this Court with subject matter jurisdiction in this case, assuming

21  the arrest of the vessel was based on lawful authority of the United Staes. The United States may

22  seize, and bring enforcement action against, a foreign flag vessel fishing vessel if such action is

23  taken "in conformity with the prevailing consensus of international law and practice." *Cook v.*

24  *U.S.*, 288 U.S. 102 (1933) (United States, lacking power to seize because of territorial limitation

25  on its enforcement authority, lacked power to subject vessel to our laws); *U.S. v. Taiyo Maru No.*

26  *28*, 395 F.Supp. 413 (D.Me. 1975) (United States' seizure of foreign fishing vessel, following hot

27

28

pursuit, was consistent with international law).

### F.     LOCATION OF THE VESSEL

According to the United States Coast Guard, on September 7 and 9, 2006, the MARSHALLS 201 was sighted fishing at a location within the U.S. EEZ. Comp. ¶¶ 6, 7. It is alleged that the Vessel was fishing without a valid permit to fish issued by the United States. *Id.* at ¶ 8. According to the Affidavit of John Barylsky, ¶ 14, e., a Coast Guard aircraft, at 00:42 Z, reported a contact on its radar that turned out to be the MARSHALLS 201. Mr. Barylsky stated that the postion of the contact was 02-29.0S 176-43.0W, a "position within the Baker and Howland Islands EEZ." *Id.*[2] On September 9, 2006, Barylsky alleges that an aircraft sighing location, plotted by the Coast Guard vessel WALNUT placed the vessel at 02-06.1S 176-00.5W, or two nautical miles within the Baker and Howland Islands EEZ. *Id.* at ¶ 14, d. and e.

If the United States is not entitled to claim an EEZ around Baker and Howlands Islands under international law, the positions for the Vessel alleged for September 7 and 9, 2006 by the United States would be well within the EEZ of the Republic of Kiribati. Declaration of Scott Edmonds ¶5, together with his attached Map Appendix A.

### III. ARGUMENT

### A.     BAKER AND HOWLAND ISLANDS
###           ARE "ROCKS" IN THE LEGAL SENSE

The term "rock" is a term of art under the LOS Treaty and international law and is a type of island. Declaration of Prof. Jon Van Dyke, dated October 26, 2007 ¶¶2, 3 and 4. The relevant

---

[2]     Claimant does not concede that any of these allegations are correct but will, for purposes of this Motion, presume them to be true.

LOS Treaty provision, Article 121—Regime of Islands, reads as follows:

> 1. An island is a naturally formed area of land, surrounded by water, which is above water at high tide.
>
> 2. Except as provided for in paragraph 3, the territorial sea, the contiguous zone, the exclusive economic zone and the continental shelf of an island are determined in accordance with the provisions of this Convention applicable to other land territory.
>
> 3. Rocks which cannot sustain human habitation or economic life of their own shall have no exclusive economic zone or continental shelf.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1965 (1971) defines a rock as "[a] mass of stone lying at or near the surface of the water" and a "barren islet." *See also,* Jonathan I. Charney, *Rocks that Cannot Sustain Human Habitation,* AMERICAN JOURNAL OF INTERNATIONAL LAW 863, 870 (1999) (the legal definition of rocks need not conform to scientific definitions). Whether a particular island or "islet" is a rock is to be determined by applying the principles in the LOS Treaty, in light of other international legal precedents. Declaration of Prof. Jon Van Dyke ¶8.

A principal determinant is whether a particular island or "islet" can sustain human habitation or economic life of its own. In Professor Van Dyke's view, this habitation must "exists for its own sake, as part of an ongoing community that sustains itself and continues through the generations" Declaration of Prof. Van Dyke ¶5. As such, it would also provide support for a nearby stable community, such as those fishing from nearby islands. *Id.* at ¶6. It is not enough that there is an occasional visit by scientists studying the flora and fauna on the island.

Baker and Howland Islands are now part of a wildlife refuge, without permanent or even occasional occupation by U.S. citizens seeking to sustain themselves with any of the resources of the islands, including marine resources found within the claimed 200-mile EEZ. The islands

have no source of fresh water and earlier attempts to "colonize" the islands were abandoned long

ago. These islands, remote from any population center in the United States, cannot sustain

economic life of their own, or in fact any economic life. Based on all the facts known about the

two islands (which cannot be disputed by anyone), and the policy of the United States that they

are to be wildlife refuges for the foreseeable future, Baker and Howland Islands satisfy the

international legal definition of "rocks" which do not provide the basis for a viable EEZ claim

in international law.

### B.    UNDER INTERNATIONAL LAW, "ROCKS" ARE NOT ENTITLED TO AN EEZ

Section 121(3) of the LOS Treaty is clear:  if an island qualifies as a "rock" because it

cannot sustain human life or economic life of its own, that island "shall have no exclusive

economic zone or continental shelf." *See*, Exhibit "10", attached to Declaration of Claimant's

Counsel. A former Geographer of the U.S. State Department, Robert D. Hodgson, stated the issue

as follow:

> A 200-mile boundary about Clipperton or Ascension, for example allocates to each approximately 125,000 square miles of seabed. Do they warrant such great areas with the corresponding reduction in the international zone?[3]

Professor Charney answered this question by saying that "the primary purpose of Article

121(3) was to ensure that insignificant features, particularly those far from other states, could not

generate broad zones of national jurisdiction in the middle of the ocean."[4]

A concise statement under international law as to the reason for using isolated "rocks" to

---

[3]      Robert D. Hodgson, *Islands and Special Circumstances*, in THE LAW OF THE SEA:  THE EMERGING REGIME OF THE OCEANS, 137, 196 (J. Gamble, ed.)

[4]      Charney, *supra* at 12, at 866.

E:\Jean\Plds\DJB\Marshalls\Mtn Dismiss EEZ (New).wpd      Page -13-

create large EEZ areas far from a coastal nation is found in the Declaration of Vice-President Budislav Vukas in *Russian Federation v. Australia* (The Volga Case), International Tribunal for Law of the Sea (2002). *See* Exhibit "3" to Declaration of Claimant's Counsel. Vice-President Vukas stated his view that the establishment of EEZs around rocks and other small islands is contrary to international law. He noted, at ¶¶ 3, 4 and 5, that the rationale behind the concept of an EEZ was to recognize preferential rights for fishing for coastal states "in a situation of special dependence on its coastal fisheries."[5]

Thus, because of Article 121(3) of the LOS Treaty, and customary international law, a small island that qualifies as a "rock" may not possess an EEZ, particularly, where, as here, the nation that is claiming the extended jurisdiction has no population on the "rock" dependent on harvesting any resources for economic activity. Instead, the United States, which has claimed jurisdiction over as much ocean area under the EEZ concept as any coastal nation in the world, is extremely wealthy and depends on fish imports for more than half of its domestic market demand for fish products. In contrast, the Republic of the Marshalls Islands and the Republic of Kiribati, the other nations involved in this dispute, are small countries far more dependent on their ocean resources. Equity does not favor the United States when viewing its claim to a 200-mile EEZ on two small, isolated islets far from any population center.

## C.    U.S. CLAIM TO EEZ JURISDICTION IS CONTRARY TO INTERNATIONAL LAW

The jurisdiction in this case is based on the assertion that the United States can enforce its domestic fishery management and enforcement laws within 200 nautical miles of Baker and

---

[5]     Leticia Diaz, et al., *When Is a "Rock" an "Island"?—Another Unilateral Declaration Defines Norms of International Law*, 15 Mich.St.J.Int'l L. 519, 543-544 (2007),

Howland Islands. However, because the United States' claim to this extended jurisdiction is not supported in the LOS Treaty, or customary international law, subject matter jurisdiction and *in rem* jurisdiction in this case is lacking.

The principle that customary international law limits a nation's assertion of jurisdiction at sea is well established. In 1900, the Supreme Court addressed the question of whether the seizure of two fishing vessels, one the PAQUETTE HABANA and the other the LOLA, both flying the Spanish flag, could be captured as prizes of war by armed U.S. vessels and condemned. *Paquette Habana*, 175 U.S. 677 (1900). After extensively reviewing international practice on this issue, the Court concluded that the United States had no such power. On the question of discerning the international law to be applied, the Court said the following:

> International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves particularly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustwothy evidence of what the law really is.

175 U.S. at 700. The review of these authorities led the Court to the conclusion that "fishing vessels, with their implements and supplies, cargoes and crews, unarmed and honestly pursuing their peaceful calling of catching and bringing in fresh fish, are exempt from capture as prize of war." *Id.* at 708. As a result, the Court issued an order declaring and adjudging that the capture of the two vessels was "unlawful and without probable cause." Thus, asserting jurisdiction over ocean areas must comport with principles of customary international law. *See also, Hamdan v. Rumsfeld*, _____ U.S. _____, 126 S.Ct. 2749, 2797-2798 (2006) (military

3      commission authority violates customary international law by dispensing with an accused's right
4      to be present at trial).
5            In addition, the United States has stated that the territorial boundary principles in the LOS
6      Treaty are reflective of customary international law. *United States v. Alaska*, 503 U.S. 569, 588
7      fn. 10 (1992) (U.S. states that territorial baseline provisions in LOS Treaty, even without U.S.
8      ratification, reflect customary international law); *In re J.W. Westcott*, 266 F.Supp.2d 601
9      (E.D.Mich. 2003) (LOS Treaty, Article 37, applied as binding law to determine Detroit River was
10     an international strait). The United States has signed the LOS Treaty and President George Bush
11     has requested the U.S. Senate to ratify the Treaty in the near future. *See*, Statement of President
12     George W. Bush, May 15, 2007, attached as Exhibit "4" to Declaration of Claimant's Counsel;
13     *also*, State of Adm. Thad Allen, Commandant of the U.S. Coast Guard, May 17, 2007), attached
14     as Exhibit "5" to Declaration of Claimant's Counsel. Moreover, the United States is obligated
15     to refrain from any acts that would defeat the objective and purpose of the LOS Treaty. *See*
16     Restatement (Third) of Foreign Relations Law § 312(3); *The Paquette Habana*, cited above;
17     *Mayaguezanos por la Salud y el Ambiente v. U.S.*, 38 F.Supp.2d 168, 174 fn. 3 (D.P.R. 1999)
18     (provisions of LOS Treaty reflect customary international law), aff'd on other grounds, 198 F.3d
19     297 (1ˢᵗ Cir. 1999). *See also, U.S. v. Royal Caribbean Cruises, Ltd.*, 11 F.Supp.2d 1358 (S.D.Fla.
20     1998) and *U.S. v. Petraia Maritime, Ltd.*, 483 F.Supp.2d 34 (D.Me. 2007).
21
22           **D.      LACKING JURISDICTION, THE
23                     COURT MUST DISMISS THIS CASE**
24           In conclusion, the Court should rule that the United States lacked jurisdiction to stop,
25     board, and seize the MARSHALLS 201 because its claim to fishery management authority
26     between the territorial sea around Baker / Howland Islands and the Republic of Kiribati is
27

contrary to international law. This forfeiture claims of the United States should be dismissed with prejudice and Claimant's counter claims should be the subject of trial.

Dated: OCT. 29, 2007

DANIEL BERMAN
BERMAN O'CONNOR & MANN
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagatna, Guam 96910

JAMES P. WALSH (PRO HAC VICE)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California, 94111

Counsel for Claimant MARSHALLS 201 and Claimant MARSHALL ISLANDS FISHING COMPANY

# TABLE OF AUTHORITIES

## Cases                                                    Page

*Cook v. U.S.*
288 U.S. 102 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hamdan v. Rumsfeld*, ____
U.S. ____, 126 S.Ct. 2749, 2797-2798 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re J.W. Westcott*
266 F.Supp.2d 601 (E.D.Mich. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mayaguezanos por la Salud y el Ambiente v. U.S.*
38 F.Supp.2d 168, 174 fn. 3 (D.P.R. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Paquette Habana*
175 U.S. 677 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15, 16

*Russian Federation v. Australia (The Volga Case)*
International Tribunal for Law of the Sea (2002) . . . . . . . . . . . . . . . . . . . . . . . 13

*Schooner Exchange v. McFaddon*
11 U.S. (7 Cranch) 116, 136 (1812) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*U.S. v. Kaiyo Maru No. 53*
699 F.2d 989, 1000 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*U.S. v. Petraia Maritime, Ltd.*
483 F.Supp.2d 34 (D.Me. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*U.S. v. Royal Caribbean Cruises, Ltd.*
11 F.Supp.2d 1358 (S.D.Fla. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*U.S. v. Taiyo Maru*
No. 28, 395 F.Supp. 413 (D.Me. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Alaska*
503 U.S. 569, 588 fn. 10 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Statutes and Other Authorities**

16 U.S.C. § 1860(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

16 U.S.C. § 1811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

175 U.S. at 700 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

198 F.3d 297 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

AMERICAN JOURNAL OF INTERNATIONAL LAW
863, 870 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Article 121(3) of the United Nations Law of the Sea Convention,
Dec. 10, 1982, U.N. Doc. A/CONF.62/122 . . . . . . . . . . . . . . . . . . . . . . . . . 2

FRCP, Rule 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Local Rule 65.1 and Admiralty Rule E(5)(C) . . . . . . . . . . . . . . . . . . . . . . . 6

Law of the Sea Convention ("LOS Treaty")
Article 37, 55, 56, 57, 121(3) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 11, 12, 13, 14, 16

Magnuson-Stevens Fishery Conservation and Management Act,
16 U.S.C. §§ 1824(a), 1857(1)(A), 1857(2)(B), and 1857(4)(A), and (B) . . . . . . . 2, 5, 8, 10

Marine Zones (Declaration) Act of 1983,
No. 7 of 16 May 1983, Republic of Kiribati . . . . . . . . . . . . . . . . . . . . . . . . . 6

Presidential Proclamation 5030, 48 Fed. Reg. 10605 (March 10, 1983) . . . . . . . . . . . . . . . 2

Restatement (Third) of Foreign Relations Law
§ 312(3), § 517(1) (1987), § 402, comment c (1987),
§§ 511, 514 and 517 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 16

Rule 12(b) of the Federal Rules of Civil Procedure ("FRCP") . . . . . . . . . . . . . . . . . . . 1

Schoenbaum, *Admiralty and Maritime Law*
4th ed., § 2-16 (2007); 16 U.S.C. § 1811(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

State of Adm. Thad Allen, Commandant of the U.S. Coast Guard, May 17, 2007 . . . . . . . 16

Statement of President George W. Bush
May 15, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

The Central Intelligence Agency World Factbook
at https://www.cia.gov/library/publications/the-world-factbook/print/um.html . . . . . . . . . . 7

E:\Jean\Plds\DJB\Marshalls\Mtn Dismiss EEZ (New).wpd          -ii-

U.S. Fish and Wildlife Service, U.S. Department of the Interior,
http://www.fws.gov/pacificislands/wnwr/pbakernwr.html;
72 Fed. Reg. 53260-53261 (Sept. 18, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1965 (1971)
Jonathan I. Charney, Rocks that Cannot Sustain Human Habitation . . . . . . . . . . . . . . . . . . 12