[[Page **H2047**]]

have become a reality had the cause not been adopted by Orrin Hatch, the chairman of the Senate Committee on the Judiciary; and Pat Leahy, the committee's ranking member. I owe a debt of gratitude to the Senators and their staffs for succeeding in crafting a bill that could get through the Senate and yet retain all the necessary elements of reform.

I must thank Senators Sessions and Schumer and their staffs for negotiating in the utmost good faith in helping craft a bill that both reforms our forfeiture laws and yet leaves civil forfeitures as an important crime-fighting tool for Federal, State, and local law enforcement.

Similar thanks must go to Attorney General Reno and Assistant Attorney General Robert Raben. They can all be proud of what they helped to accomplish.

I also must thank our former colleague Bob Bauman and Brenda Grantland of Forfeiture Endangers American Rights for their long and dedicated work on behalf of forfeiture reform, and Chicago Tribune columnist Stephen Chapman for first alerting me to the great abuses of forfeiture laws.

And I must thank David Smith, who has been there since the beginning. David helped me draft my first forfeiture reform bill, the Civil Asset Forfeiture Reform Act of 1993, and helped draft Senators Leahy's and Hatch's reform bill and helped draft the Senate-passed bill we are considering today. This bill is truly his accomplishment.

And finally, George Fishman of our Committee on the Judiciary staff has been tireless in helping shepherd this legislation through the House and Senate.

Let me briefly outline the main points of H.R. 1658 as passed by the Senate. The bill makes eight fundamental reforms:

(1) The bill requires the Government to prove by a preponderance of the evidence that the property is subject to forfeiture. Currently, when a property owner goes to Federal court to challenge a seizure of property, all the Government needs to do is make an initial showing of probable cause that the property is subject to civil forfeiture. The owner then must establish that the property is innocent.

(2) The bill provides that if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a crime or was involved in the commission of a crime, the Government must show that there was a substantial connection between the property and the crime.

(3) The bill provides that property can be released by a Federal court pending final disposition of a civil forfeiture case if continued possession by the Government would cause the property owner substantial hardship, such as preventing the functioning of a business or leaving an individual homeless, and the likely hardship outweighs the risks that the property will be destroyed, damaged, lost, concealed or transferred if returned to the owner.

(4) The bill provides that property owners who substantially prevail in court proceedings challenging the seizure of their property will receive reasonable attorney's fees. In addition, the bill allows a court to provide counsel for indigents if they are represented by appointed counsel in related criminal cases. Currently, property owners who successfully challenge the seizure of their property almost never are awarded attorney's fees. In addition, indigents have no right to appointed counsel in civil forfeiture cases.

(5) The bill eliminates the cost bond requirement, under which a property owner must now post a bond of the lesser of $5,000 or 10 percent of the value of the property seized merely for the right to

Case 1:06-cv-00030    Document 05-3    Filed 10/29/2007    Page 1 of 21

contest a civil forfeiture in Federal court. The bill provides that if a court finds that a claimant's assertion of an interest in property was frivolous, the court may impose a civil fine.

  (6) The bill creates a uniform innocent owner defense for all Federal civil forfeiture statutes. Importantly, the defense protects property owners who have given timely notice to the police of the illegal use of their property and have in a timely fashion revoked or made a good faith attempt to revoke permission to use the property from those engaging in the illegal conduct.

  (7) The bill allows property owners to sue the Federal Government for compensation for damage to their property when they prevail in civil forfeiture actions. Currently, the Federal Government is exempt from liability for damage caused during the handling or storage of property being detained by law enforcement officers.

  (8) The bill provides a uniform definition of the forfeitable proceeds of criminal acts. In cases involving illegal goods or services, unlawful activities and telemarketing and health care fraud schemes, proceeds are properties obtained directly or indirectly as a result of the commission of the offenses giving rise to forfeiture, and any properties traceable thereto, and are not limited to the net gain or profit realized from the offenses. In cases involving lawful goods or services that are sold or provided in an illegal manner, proceeds are money acquired through the illegal transactions less the direct costs incurred in providing the goods or services.

  H.R. 1658 also contains a number of provisions addressing the needs of the Justice Department and State and local law enforcement.

                            {time}  1345

  These include increasing the availability of criminal forfeiture and the civil forfeiture of the proceeds of crimes, relaxing the statute of limitations governing civil forfeiture actions, allowing Federal courts discretionary use of the fugitive disentitlement doctrine, allowing Federal courts to enhance forfeiture judgments of foreign nations, allowing Federal courts to impose sanctions up to and including dismissal of an owner's claim if property owners who have filed claims in civil forfeiture cases refuse to provide the government with access to potentially material financial records in foreign countries, and allowing Federal courts to issue civil restraining orders against property where there is a substantial probability the government will prevail in civil forfeiture actions.

  This bill is one we can all be proud of. It returns civil asset forfeiture to the ranks of respected law enforcement tools that can be used without risk to the civil liberties and property rights of American citizens. We are all better off that this is so.

  Mr. Speaker, I insert into the Record at this point a Congressional Budget Office letter on this matter. I urge my colleagues to support this bill today.

                                            U.S. Congress,


                              Congressional Budget Office,

                                   Washington, DC, April 5, 2000.
  Hon. Orrin G. Hatch,
  Chairman, Committee on the Judiciary,
  U.S. Senate, Washington, DC.
    Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 1658, the Civil

Asset Forfeiture Reform Act of 2000.
   If you wish further details on this estimate, we will be
pleased to provide them. The CBO staff contacts are Lanette
J. Keith (for federal costs), who can be reached at 226-2860,
and Shelley Finlayson (for the state and local impact), who
can be reached at 225-3220.
      Sincerely,

                                    Barry B. Anderson
                          (For Dan L. Crippen, Director).
   Enclosure.


           congressional budget office cost estimate

H.R. 1658--Civil Asset Forfeiture Reform Act of 2000
   Summary: H.R. 1658 would make many changes to federal asset
forfeiture laws that would affect the processing of about
60,000 civil seizures conducted each year by the Department
of justice (DOJ) and the Department of the Treasury. (The
Treasury Department makes an additional 50,000 seizures
annually that would not be affected by this act.) Assuming
appropriation of the necessary amounts, CBO estimates that
implementing H.R. 1658 would cost $9 million over the 2001-
2005 period to pay for additional costs of court-appointed
counsel that would be authorized by this legislation. In
addition, enacting the legislation would affect direct
spending and receipts; therefore, pay-as-you-go procedures
would apply.
   Because CBO expects that enacting H.R. 1658 would result in
fewer civil seizures by DOJ and the Treasury Department, we
estimate that governmental receipts (i.e., revenues)
deposited into the Assets Forfeiture Fund and the Treasury
Forfeiture Fund would decrease by about $115 million each
year beginning in fiscal year 2001. Under current law, both
forfeiture funds are authorized to collect revenue and spend
the balance without further appropriation. Thus, the
corresponding direct spending from the two funds would also
decline, but with some lag. CBO estimates that enacting this
provision would decrease projected surpluses by a total of
$46 million over the fiscal years 2001 and 2002 (the
difference between lower revenues and lower direct spending
over those years),

[[Page H2048]]

   but that by fiscal year 2003 the changes in receipts and
spending would be equal, resulting in no net budgetary impact
thereafter.
   H.R. 1658 also would require the Legal Services Corporation
(LSC) to represent certain claimants in civil forfeiture
cases and would require the federal government to reimburse
the LSC for its costs. CBO estimates that this provision
would increase direct spending by $5 million over the 2001-
2005 period.
   In addition, H.R. 1658 would make the federal government
liable for any property damage, attorney fees, and pre-
judgment and post-judgment interested payments on certain
assets to prevailing parties in civil forfeiture proceedings.
CBO cannot estimate either the likelihood or the magnitude of
such awards because there is no basis for predicting either

the outcome of possible litigation or the amount of
compensation.

   H.R. 1658 contains no intergovernmental or private-sector
mandates as defined in the Unfunded Mandates Reform Act
(UMRA), but CBO expects that enacting this legislation would
lead to a reduction in payments to state and local
governments from the Assets Forfeiture Fund and the Treasury
Forfeiture Fund.

   Description of the Act's major provisions: H.R. 1658 would
make various changes to federal laws relating to the
forfeiture of civil assets. In particular, the act would:

   Establish a short statutory time limit for the federal
government to notify interested parties of a seizure and to
file a complaint;

   Eliminate the cost bond requirement, whereby claimants have
to post bond in an amount of the lesser of $5,000 or 10
percent of the value of the seized property (but not less
than $250) to preserve the right to contest a forfeiture;

   Permit federal courts to appoint counsel for certain
indigent claimants;

   Increase the federal government's burden of proof to a
preponderance of the evidence;

   Require the federal government to compensate prevailing
claimants for property damage;

   Establish the federal government's liability for payment of
attorney fees and pre-judgment and post-judgment interest;
and

   Authorize the use of forfeited funds to pay restitution to
crime victims.

   Estimated cost to the Federal Government: As shown in the
following table, CBO estimates that implementing H.R. 1658
would increase discretionary spending for court-appointed
counsel by $9 million over the 2001-2005 period, assuming
appropriation of the necessary funds. (For the purposes of
this estimate. CBO assumes that spending for this purpose
would be funded with appropriated amounts from the
Defender Services account.) In addition, we estimate that
over the 2001-2005 period, the reductions in direct
spending of funds from forfeited assets would be smaller
than the reductions in revenues estimated to occur as a
result of enacting H.R. 1658, resulting in a net cost of
$46 over the five-year period. Finally, CBO estimates that
additional payments to the Legal Services Corporation
would be about $1 million each year. The costs of this
legislation fall within budget function 750
(administration of justice).

|  | By fiscal year, i | | |
|---|---|---|---|
|  | 2000 | 2001 | 2002 |

Spending subject to appropriation

| | | | |
|---|---|---|---|
| Spending Under Current Law Defender Services: | | | |
| Estimated Authorization Level \1\..................... | 375 | 387 | 39 |
| Estimated Outlays.................................... | 373 | 389 | 39 |
| Proposed Changes: | | | |
| Estimated Authorization Level........................ | 0 | 1 | |

```
    Estimated Outlays...................................      0       1
Spending Under H.R. 1658 for Defender Services:
    Estimated Authorization Level \1\.................... 375     388      39
    Estimated Outlays...................................  373     390      39
```

                                Changes in revenues and direct spending

```
Changes in Forfeiture Receipts:
    Estimated Revenues..................................      0    -115     -11
Spending of Forfeiture Receipts:
    Estimated Budget Authority..........................      0    -115     -11
    Estimated Outlays...................................      0     -76     -10
Payments to the Legal Services Corporation:
    Estimated Budget Authority..........................      0       1
    Estimated Outlays...................................      0       1
```
--------------------------------------------------------------------------------
\1\ The 2000 level is the amount appropriated for that year. The estimated authoriza
   2005 reflect CBO baseline estimates, assuming adjustments for anticipated inflatio

> Basis of estimate: For purposes of this estimate, CBO
> assumes that H.R. 1658 will be enacted by the end of fiscal
> year 2000 and that the necessary amounts will be appropriated
> for each fiscal year. We also assume that outlays for
> defender services and the use of forfeiture receipts will
> continue to follow historical patterns.
> Spending subject to appropriation
> H.R. 1658 would allow for court-appointed counsel for
> certain parties contesting a forfeiture who already have been
> appointed counsel in a related criminal case. The act also
> would eliminate the requirement that claimants post bond
> before the case is tried in federal court. Consequently, CBO
> anticipates that enacting H.R. 1658 would make it easier for
> people whose assets have been seized to challenge the
> forfeiture of such assets. Based on information from DOJ, we
> estimate that the percentage of seizures that would result in
> contested civil cases would increase from 5 percent annually
> to at least 20 percent in fiscal year 2001. As the defense
> bar becomes increasingly aware of and more familiar with the
> provisions of H.R. 1658, CBO expects that the percentage of
> contested civil cases would increase to about 30 percent each
> year.
> While the decision to appoint counsel would be at the
> discretion of the judge assigned to each case, CBO expects
> that judges would not want to encourage litigation in many
> cases. Moreover, CBO expects that many of the contested cases
> would involve larger assets, and such cases usually do not
> involve indigent claimants who would need court-appointed
> counsel. Based on information from DOJ, CBO estimates that a
> small number of indigent claimants in civil forfeiture cases
> would also have a criminal case pending. Specifically, we
> estimate that court-appointed counsel would be provided in
> about 5 percent of contested civil cases. In addition,
> because forfeiture cases involve property, the courts might
> have to appoint more than one attorney to represent multiple
> claimants in the same case. Historical data suggest an
> average of 1.5 claims per case.
> While H.R. 1658 does not specify a level of compensation
> paid to court-appointed counsel for a civil forfeiture case,
> CBO expects such payment would be equivalent to amounts paid
> in criminal cases. Based on information from the

Case 1:06-cv-00230  Document 25-3   Filed 10/29/2007   Page 5 of 21

Administrative Office of the United States Courts, CBO
estimates that court-appointed counsel would be paid about
$3,000 per claimant per case. In total, we estimate that
additional defender services related to civil asset
forfeiture proceedings would cost about $9 million over the
next five years.

In addition, other discretionary spending could be affected
by this act. On the one hand, the federal court system could
require additional resources in the future if additional
cases are brought to trial and the amount of time spent on
each case increases. On the other hand, some savings in
law enforcement resources could be realized if fewer
seizures and conducted each year. While CBO cannot predict
the amount of any such costs or savings, we expect that,
on balance, implementing the act would result in no
significant additional discretionary spending other than
the increases for court-appointed counsel.

Revenues and direct spending

Based on information from DOJ and the Treasury Department,
CBO estimates that about 23,000 seizures that would otherwise
occur each year under current law would be eliminated under
H.R. 1658. (Such seizures primarily involve assets whose
value is less than $25,000.) The various changes to civil
forfeiture laws under this act would make proving cases more
difficult and more time-consuming for the federal government.
In many instances, law enforcement agencies, including the
state and local agencies that work on investigations jointly
with the federal government and then receive a portion of the
receipts generated from the forfeitures, many determine that
certain cases, especially those with a value less than
$25,000, may no longer be cost-effective to pursue. While the
federal government and other law enforcement agencies would
take a few years following enactment of the legislation to
realize the full effects of its provisions on the forfeiture
and claims process, CBO expects that the total number of
seizures would decrease by nearly 40 percent. CBO estimates
that such a reduction in seizures would reduce total
forfeiture receipts by about $115 million in fiscal year 2001
and by $575 million over the 2001-2005 period.

The receipts deposited into the Assets Forfeiture Fund and
the Treasury Forfeiture fund are used to pay for all costs
associated with the operation of the forfeiture program, the
payment of equitable shares of proceeds to foreign, state,
and local law enforcement agencies, and other expenses not
directly associated with a forfeiture case, such as payment
of awards to informants. In recent

[[Page H2049]]

years about 67 percent of total asset forfeiture receipts
collected in a given year are spent in the same year in which
they are collected; therefore, we estimate that enacting H.R.
1658 would result in a decrease in federal spending of $76
million in fiscal year 2001, $108 million in 2001, and $115
million annually in subsequent years.

In addition, H.R. 1658 would require the Legal Service
Corporation to represent claimants in financial need and
whose claim involves an asset that is the claimant's primary
residence. Under H.R. 1658, the court must enter a judgment
in favor of the LSC for the cost of legal representation.

Based on historical data, CBO estimates that such judgments
would increase direct spending by about $1 million a year.
Additional potential budgetary impacts
    In addition, this act would make the federal government
liable for any property damage, attorney fees, and pre-
judgment and post-judgment interest payments on certain
assets to prevailing parties in civil forfeiture proceedings.
However, CBO cannot estimate either the likelihood or the
magnitude of such awards because there is no basis for
predicting either the outcome of possible litigation or the
amount of compensation. Compensation payments could come from
appropriated funds or occur without further appropriation
from the Judgment Fund, or from both sources.
    Pay-as-you-go considerations: The Balanced Budget and
Emergency Deficit Control Act sets up pay-as-you-go
procedures for legislation affecting direct spending or
receipts. The following table summarizes the estimated pay-
as-you-go effects of H.R. 1658. For the purposes of enforcing
pay-as-you-go procedures, only the effects in the current
year, the budget year, and the succeeding four years are
counted.

| | 200 | 201 | 202 |
|---|---|---|---|
| Changes in outlays.................................... | 0 | -75 | -107 |
| Changes in receipts................................... | 0 | -115 | -115 |

    Estimated impact on state, local, and tribal governments:
H.R. 1658 contains no intergovernmental mandates as defined
in UMRA. However, because CBO expects that the seizure of
assets would decline under the act, CBO estimates that
payments to state and local law enforcement agencies from the
Assets Forfeiture Fund and the Treasury Forfeiture Fund would
decline by about $230 million over the 2001-2005 period.
State and local law enforcement agencies receive, on average,
about 40 percent of the receipts in these forfeiture funds
either because they participate in joint investigations that
result in the seizure of assets, or because they turn over
assets seized in their own investigations to the federal
government, which conducts the civil asset forfeiture case.
In both cases the receipts from a seizure are accumulated in
the funds and a portion is distributed to state and local
agencies according to their involvement.
    Estimated impact on the private sector: This act would
impose no new private-sector mandates as defined in UMRA.
    Previous CBO transmitted a cost estimate for H.R. 1658 as
reported by the House Committee on the Judiciary on June 18,
1999. While the two versions of the legislation are similar,
we estimate they would have different costs. CBO estimates
the House version would result in a greater loss of
forfeiture receipts, by $25 million annually, than the
version approved by the Senate Committee on the Judiciary
because the House version would place the burden of proof in
assets forfeiture cases more heavily on the federal
government.
    In addition, the House version of H.R. 1658 would not

Case 1:06-cv-00030    Document 25-3    Filed 10/29/2007    Page 7 of 21

require payments to the Legal Services Corporation for
representation of certain claimants whose principal residence
has been seized. Finally, CBO estimates that the Senate
version of the legislation would authorize less spending than
the House version for the legal representation of indigent
claimants because it restricts the eligibility requirements
for this service more than the House legislation. We estimate
this representation would cost about $2 million annually
under the Senate version and about $13 million annually under
the House version.
    Estimate prepared by: Federal Costs: Lanette J. Keith.
Impact on State, Local, and Tribal Governments: Shelley
Finlayson. Impact on the Private Sector: John Harris.
    Estimate approved by: Peter H. Fontaine, Deputy Assistant
Director for Budget Analysis.
  Mr. Speaker, since no Committee Report was filed for H.R. 1658 by the
Senate Judiciary Committee, the House Judiciary Committee Report
remains the best legislative history as to the bill. See H.R. Rep. No.
106-192 (1999). However, since new provisions were added to the bill in
the Senate and other provisions were modified from their original House
form, it will be useful for me to make a number of clarifying points.


        standard of proof (section 2--creating 18 U.S.C. sec. 983(c))

  H.R. 1658, as amended by the Senate, reduced the standard of proof
the government has to meet in civil asset forfeiture cases from clear
and convincing evidence to a preponderance of the evidence. While this
is obviously a lower standard, Congress remains extremely dubious as to
the probative value of certain types of evidence in meeting this
standard.
  First, as noted in the Committee Report to H.R. 1658, Congress is
very skeptical that a person's carrying of ``unreasonably large''
quantities of cash is indicative of involvement in the drug trade. See
H.R. Rep. No. 106-192 at 8. Many federal courts have ruled that a
person's carrying of large amounts of cash does not even meet the
current government burden of probable cause. The Seventh Circuit so
ruled in U.S. v. $506,231 in U.S. Currency, 125 F. 3d 442 (7th Cir.
1997). The court found that ``[a]s far as we can tell, no court in the
nation has yet held that, standing alone, the mere existence of
currency, even a lot of it, is illegal. We are certainly not willing to
be the first to so hold.'' Id. at 452. The court also found it
necessary to remind a U.S. Attorney that ``the government may not seize
money, even half a million dollars, based on its bare assumption that
most people do not have huge sums of money lying about, and if they do,
they must be involved in narcotics trafficking or some other sinister
activity.'' Id. at 454 (emphasis in original). The Ninth Circuit found
similarly. See U.S. v. $191,910 in U.S. Currency, 16 F.3d 1051, 1072
(9th Cir. 1994) (``[A]ny amount of money, standing alone, would
probably be insufficient to establish probable cause for
forfeiture.''); See also U.S. v. One Lot of U.S. Currency ($36,634),
103 F.3d 1048, 1055 n.9 (1st Cir. 1997); U.S. v. $121,100, 999 F.2d
1503, 1507 (11th Cir. 1993). Congress disagrees with those courts that
have suggested otherwise. See U.S. v. $37,780 in U.S. Currency, 920
F.2d 159, 162 (2nd Cir. 1990). Clearly, if large amounts of cash do not
meet the probable cause standard, they do not meet the higher standard
of preponderance of the evidence.
  The government can rely on large amounts of cash in conjunction with
other evidence in attempting to meet its standard of proof. For
instance, large amounts of cash found in proximity to drugs are often

relied upon. However, the probative value of this evidence is much lower when the amount of drugs found is consistent with personal use. See U.S. v. Real Property Located at 110 Collier Dr., 793 F. Supp. 1048, 1052 (N.D. Ala. 1992) (``The simultaneous presence of $8,861 in mildewed currency and a small amount of drugs for personal use . . . does not establish probable cause that the currency was intended to be used for the exchange of drugs.'')

In any event, the relative evidentiary contribution of cash in meeting a standard of proof, especially one raised above mere probable cause, should rarely be significant. Why? As the court found in U.S. v. One Lot of U.S. Currency Totalling $14,665, 33 F. Supp.2d 47 (D. Mass. 1998), reliance on cash can involve invidious assumptions: ``[m]any immigrants and Americans with limited means--hard working and law abiding--prefer to use cash in lieu of bank accounts and credit cards. * * * Indeed, the whole notion that carrying cash is indicative of illegal conduct reflects class and cultural biases that are profoundly troubling.'' Id. at 53-54.

Of especially little probative value is the method by which cash is carried. As the court found in One Lot of U.S. Currency Totalling $14,665:

> I do not doubt that drug couriers and dealers use rubber bands to bundle their illgotten gains. However, drug dealers also presumably use belts to hold up their trousers; under the government's analysis, if [the claimant] was wearing a belt at the time of the seizure, it would suggest his involvement with illegal activity. Although many courts appear to disagree, I find that the government's `rubber band' hypothesis doesn't stretch quite that far. Id. at 54 (footnotes omitted). See also $506,231 in U.S. Currency, 125 F.3d at 452.

The second type of evidence whose probative value is questioned by Congress is the fact that airline tickets are purchased with cash. See H.R. Rep. No. 106-192 at 8. See also One Lot of U.S. Currency ($36,634), 103 F.3d at 1055 n. 9. U.S. v. $40,000 in U.S. Currency, 999 F. Supp. 234, 238 (D.P.R. 1998); U.S. v. Funds in the Amount of $9,800, 952 F. Supp. 1254, 1261 (N.D. III. 1996).

The third type of disfavored evidence is narcotic dog alerts on currency. As one commentator has noted:

> It has been estimated that one out of every three circulating bills has been involved in a cocaine transaction. Cocaine and other drugs attach to the oily surface of currency in a variety of ways. Each contaminated bill contaminates others as they pass through cash

[[Page H2050]]

> registers, cash drawers, wallets, and counting machines. If, in fact, a substantial part of the currency in this country will cause a trained dog to alert, then the alert obviously has no evidentiary value.

Smith, 1 Prosecution and Defense of Forfeiture Cases sec. 4.03, p. 4-82.3 (footnotes omitted). The author cites experts finding that 70-97% of all currency is contaminated with cocaine. Id. at sec. 4.03, p. 4-82.1-4-82.2.

Many federal courts have agreed as to the low probative value of dog

alerts. See, e.g., $506,231 in U.S. Currency, 125 F.3d at 453; Muhammed v. Drug Enforcement Agency, 92 F.3d 648, 653 (8th Cir. 1996)(``The fact of contamination, alone, is virtually meaningless and gives no hint of when or how the cash became so contaminated.''); U.S. v. $5,000 in U.S. Currency, 40 F.3d 846, 849 (6th Cir. 1994) (``[T]he evidentiary value of narcotics dog's alert [is] minimal.'') (footnote omitted); U.S. v. U.S. Currency, $30,060, 39 F.3d 1039 (9th Cir. 1994) (`` `[T]he continued reliance of courts and law enforcement officers on [drug dog alerts] to separate `legitimate' currency from `drug-connected' currency is logically indefensible.' '' Id. at 1043, quoting Jones v. U.S. Drug Enforcement Administration, 819 F. Supp. 698, 721 (M.D. Tenn. 1993) (footnote omitted)); U.S. v. $53,082 in U.S. Currency, 985 F.2d 245 (6th Cir. 1993) (``[A] court should `seriously question the value of a dog's alert without other persuasive evidence. . . .' '' Id. at 250-51 n.5, quoting U.S. v. $80,760 in U.S. Currency, 781 F. Supp. 462, 476 (N.D. Tex. 1991), aff'd, 978 F.2d 709 (5th Cir. 1992); One Lot of U.S. Currency Totalling $14,665, 33 F. Supp.2d at 58. See also U.S. v. $639,558 in U.S. Currency, 955 F.2d 712, 714 n.2 (D.C. Cir. 1992). Dog alerts of little value in meeting a standard of probable cause, and are of even less value in meeting a standard of preponderance of the evidence.

    Adding the above factors together, ``[t]he government must come forward with more than a `drug-courier profile' and a positive dog sniff [to meet the standard of probable cause].'' Funds in the Amount of $9,800, 952 F. Supp. at 1261.'' As the court ruled in $80,760 in U.S. Currency, 781 F. Supp. at 475, ``[p]rofile characteristics are of little value in the forfeiture context without other persuasive evidence establishing the requisite substantial connection.'' See also Jones, 819 F. Supp. at 719 (``The mere fact that a traveler matches some elements of a drug courier profile does not amount to even articulable suspicion, much less probable cause.''). The same holds true, to an even greater extent, when the standard is preponderance of the evidence.
    Lastly, ``[a]n owner does not have to prove where he obtained money until the government demonstrates that it has [met its burden] to believe the money is forfeitable.'' $506,231 in U.S. Currency, 125 F.3d at 454.
    I should also note that while hearsay may be used to establish probable cause for seizure, see U.S. v. One 56 Foot Motor Yacht Named Tahuna, 702 F.2d 1276, 1282-83 (9th Cir. 1983), it is not admissible to establish the forfeitability of property by a preponderance of the evidence. And, while the government may use evidence obtained after the forfeiture complaint is filed to establish the forfeitability of the property by a preponderance of the evidence, the government must still have had enough evidence to establish probable cause at the time of filing (or seizure, if earlier). The bill is not intended to limit the right of either party to bring a motion for summary judgment after the filing of the complaint pursuant to Fed. R. Civ. P. 56(a) or 56(b).


    facilitating property (section 2--creating 18 U.S.C. sec. 983(c))

    While H.R. 1658 as it was introduced and originally passed in the House contained no provision reforming the standards regarding ``facilitation'' forfeiture, this is an issue about which I have been long concerned. See Hyde, Forfeiting Our Property Rights: Is Your Property Safe From Seizure? 61 (1995) I am gratified that it is addressed in the Senate amendment to H.R. 1658.
    There are many facilitation-type civil forfeiture provisions in the

U.S. Code. Most importantly, the federal drug laws make subject to civil forfeiture ``[a]ll conveyances . . . which are used, or intended for use . . . in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances] . . . .'' 21 U.S.C. sec. 881(a)(4). They also make subject to forfeiture ``[a]ll moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter . . . .'', 21 U.S.C. sec. 881(a)(6), and ``[a]ll real property . . . which is used, or intended to be used, in any manner or part, to . . . facilitate the commission of a violation of this subchapter punishable by more than one year's imprisonment . . . [,]'' 21 U.S.C. sec. 881(a)(7). Also, federal law make subject to civil forfeiture ``[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [certain money laundering laws] . . . .'' 18 U.S.C. sec. 981(a)(1)(A).

How strong need the connection be between the ``facilitating'' property and the underlying crime? As to 881(a)(6), courts have interpreted its legislative history as requiring there to be a ``substantial connection'' between the property and the crime. See Psychotropic Substances Act of 1978, Joint Explanatory Statements of Titles II and III, 95th Cong., 2nd Sess., reprinted in 1978 U.S. Code Cong. & Admin News 9518, 9522.

As to 881(a)(7), many courts require there to be a substantial connection. See, e.g., U.S. v. Parcel of Land & Residence at 28 Emery St., 914 F.2d 1, 3-4 (1st Cir. 1990); U.S. v. 26.075 Acres, Located in Swift Creek Township, 687 F. Supp. 1005 (E.D.N.C. 1988), aff'd sub nom. U.S. v. Santoro, 866 F.2d 1538, 1542 (4th Cir. 1989); U.S. v. Forfeiture, Stop Six Center, 781 F. Supp. 1200, 1205-06 (N.D. Tex. 1991). Others do not. The Seventh Circuit has ruled that the facilitating property need only have ``more than an incidental or fortuitous connection to criminal activity . . . .'' U.S. v. Real Estate Known as 916 Douglas Ave., 903 F.2d 490, 493 (7th Cir. 1990), cert. denied sub nom. Born v. U.S. 498 U.S. 1126 (1991). See also U.S. v. Property at 4492 S. Livonia Rd., 889 F.2d 1258, 1269 (2nd Cir. 1989) (test is ``sufficient nexus'').

How significant is the difference? The Seventh Circuit in 916 Douglas Ave. has found that ``[t]he difference between th[e substantial connection] approach and our own appears largely to be semantic rather than practical.'' 903 F.2d at 494. This might be the case--the Fourth Circuit has ruled that under the substantial connection test, ``[a]t minimum, the property must have more than an incidental or fortuitous connection to criminal activity[!]'' U.S. v. Schifferli, 895 F.2d 987, 990 (4th Cir. 1990). Some courts don't even feel the need to choose between the tests, ruling that facilitation has been shown in particular cases under either test. See U.S. v. Rd 1, Box 1, Thompsontown, 952 F.2d 53, 57 (3rd Cir. 1991); U.S. v. Real Property and Residence at 3097 S.W. 111th Ave., 921 F.2d 1551, 1556 (11th Cir. 1991), cert. denied, 111 S.Ct. 1090 (1991).

As to 881(a)(4), some courts have applied the substantial connection test. See U.S. v. 1966 Beechcraft Aircraft, 777 F.2d 947, 953 (4th Cir. 1985); U.S. v. One 1979 Porsche Coupe, 709 F.2d 1424, 1426 (11th Cir. 1983). Others have not. See U.S. v. 1964 Beechcraft Baron Aircraft, 691 F.2d 725, 727 (5th Cir. 1982), cert. denied, 461 U.S. 914 (1983).

H.R. 1658 provides that the substantial connection test should be used whenever facilitating property is subject to civil forfeiture under the U.S. Code. And the test is intended to mean something, it is intended to require that facilitating property have a connection to the underlying crime significantly greater than just ``incidental or fortuitous.''

In one area in particular, courts have been much too liberal in

finding facilitation. An especially high standard should have to be met
before we dispossess a person or family of their home. A primary
residence should be accorded far greater protection than mere personal
property. See U.S. v. Certain Lots in Virginia Beach, 657 F. Supp.
1062, 1065 (E.D. Va. 1987). But, courts have not always felt this way
in applying section 881(a)(7). In U.S. v. Premises and Real Property at
250 Kreag Rd., 739 F. Supp. 120, 124 (W.D.N.Y. 1990), the court found a
home forfeitable because the owner grew 17 stalks of marijuana in his
backyard of home for personal use (standard used was unclear). See also
U.S. v. One Parcel of Real Property, 960 F.2d 200, 205 (1st Cir. 1992).
The court in 916 Douglas Ave. found a home forfeitable on the basis of
three phone calls made to or from it regarding the sale of two ounces
of cocaine. ``The loss of one's home for the sale of a small amount of
cocaine is undoubtedly a harsh penalty'', but that is what Congress
intended. 903 F.2d at 494 (no substantial connection needed). In U.S.
v. Plescia, 48 F.3d 1452, 1462 (7th Cir. 1995), one phone call to set
up a large drug deal resulted in the forfeiture of a home (no
substantial connection needed). See also U.S. v. Zuniga, 835 F. Supp.
622 (M.D. Fla. 1993) (Under a ``substantial connection'' or lesser
test, ten calls involving drug offenses resulted in the forfeiture of a
house (under a criminal forfeiture statute with an ``identical'' burden
as 881(a)(7)).). None of these cases would meet the substantial
connection test provided in H.R. 1658.
    Under the substantial connection test, should an entire bank account
be forfeitable because some of its assets were involved in money
laundering? In U.S. v. All Monies ($477,048.62 in account #90-3617-3,
754 F. Supp. 1467 (D.Haw. 1991), the court ruled that under sec.
881(a)(6) and 18 U.S.C. sec. 981(a)(1)(A), the government showed
probable cause that an entire bank account worth approximately $477,000
was forfeitable for being involved in/facilitated drug and money
laundering offenses, not just the approximately $242,000 in the account
representing the proceeds of a drug crime. The court found that ``both
the legitimate and tainted money in the

[[Page H2051]]

account aided [the laundering of drug proceeds]. The account provided a
repository for the drug proceeds in which the legitimate money could
provide a `cover' for those proceeds, thus making it more difficult to
trace the proceeds.'' Id. at 1475-76 (substantial connection required).
    Such a doctrine can quickly lead to unfair and disproportionate
results. The 10th Circuit presents the proper limitation:

    [T]he mere pooling or commingling of tainted and untainted
    funds in an account does not, without more, render the entire
    contents of the account subject to forfeiture. . . .
    [F]orfeiture of legitimate and illegitimate funds commingled
    in an account is proper as long as the government
    demonstrates that the . . . [owner] pooled the funds to
    facilitate, i.e., disguise the nature and source of, his
    scheme. * * *

    U.S. v. Bornfield, 145 F.3d 1123, 1135 (10th Cir. 1998) (criminal
forfeiture under 18 U.S.C. sec. 982(a)(1)) (citations omitted)
(standard used was unclear). See also U.S. v. Contents of Account, 847
F. Supp. 329, 335 (S.D.N.Y. 1994) (``The facilitation theory is
appropriate in the present case where [the owner] established and
controlled the [accounts], and commingled legitimate and illegitimate
funds in these accounts, for the purpose of disguising the nature and
source of the proceeds of [the] scheme.'') (forfeiture under 18 U.S.C.

sec. 981(a)(1)(A)) (standard used was unclear).

    Under H.R. 1658's substantial connection test, in order for an entire
bank account composed of both tainted and untainted funds to be
forfeitable, a primary purpose of its establishment or maintenance must
be to disguise a money laundering scheme. This rule should also apply
when the government seeks to forfeit an entire business because tainted
funds were laundered in a firm bank account. For the business to be
forfeitable, a primary purpose for the establishment or maintenance of
the entire business must be to disguise a money laundering scheme. See
U.S. v. Any and All Assets of Shane Co., 816 F. Supp. 389, 401
(M.D.N.C. 1991) (Business that was a front for money laundering was
forfeitable.) (forfeiture under 18 U.S.C. sec. 981(a)(1)(A)
(substantial connection required).


        proportionality (section 2--creating 18 U.S.C. sec. 983(g))

    This provision is designed to codify U.S. v. Bajakajian 524 U.S. 321
(1998).


                    Statute of Limitations (section 11)

    This provision amends 19 U.S.C. sec. 1621, enlarging the time in
which the government may commence a civil forfeiture action by allowing
the government to commence an action within five years after the time
the alleged offense was discovered, or two years after the time when
the involvement of the property in an offense is discovered, whichever
is later. 19 U.S.C. sec. 1621 has been construed as requiring the
government to exercise reasonable care and diligence in seeking to
learn the facts disclosing the alleged wrong. Thus, the courts have
held under sec. 1621 that the time begins to run as soon as the
government is aware of facts that should trigger an investigation
leading to discovery of the offense. See Smith, 1 Prosecution and
Defense of Forfeiture Cases sec. 12.02. This construction will require
the government to exercise reasonable diligence in seeking discovery of
assets involved in an offense once the offense is discovered.
    The provision should not be read as extending the statute of
limitations in cases that are already time-barred as of the date of
enactment of the bill.


                    uniform definition of proceeds (section 20)

    S. 1931's uniform definition of proceeds is self-explanatory.
However, it is important to note Congress' disapproval of the ``ink
drop'' test for proceeds forfeiture developed by the Eleventh Circuit.
In U.S. v. One Single Family Residence, 933 F.2d 976, 981 (11th Cir.
1991) (proceeds forfeiture under 21 U.S.C. sec. 881(a)(6)), the court
ruled that ``[a]s to a wrongdoer, any amount of the invested proceeds
traceable to drug activities forfeits the entire property. We have
never held that as to a wrongdoer only the funds traceable to illegal
activities may be forfeited.'' To the contrary, only that portion of a
piece of property purchased with tainted funds is forfeitable.


                    destruction or removal of property (section 12)

    18 U.S.C. sec. 2232 is amended to expand the scope of conduct which
constitutes an offense for damaging or removing property which is

subject to a lawful search or seizure. Subsection (a), which makes it a
crime to damage or remove property which has not yet been seized,
should be interpreted in a commonsense fashion to apply to a person or
persons who had knowledge that a law enforcement agency is attempting,
has attempted, or was about to attempt to seize the property.
Subsection (b), which has been added to this section, makes it an
offense to remove or destroy property which is already the subject of
the in rem jurisdiction of a United States District Court.


                    effective date (section 21)

    For purposes of the effective date provision, the date on which a
forfeiture proceeding is commenced is the date on which the first
administrative notice of forfeiture relating to the seized property is
sent. The purpose of this provision is to give the Justice Department
and the U.S. courts four months from the date of enactment of the bill
to educate their employees as to the bill's changes in forfeiture law.
    Mr. Speaker, I reserve the balance of my time.
    Ms. JACKSON-LEE of Texas. Mr. Speaker, I yield myself such time as I
may consume.
    (Ms. JACKSON-LEE of Texas asked and was given permission to revise
and extend her remarks.)
    Ms. JACKSON-LEE of Texas. Mr. Speaker, this legislation has been long
in coming. I know on behalf of the gentleman from Michigan (Mr.
Conyers), we want to thank the gentleman from Illinois (Mr. Hyde)
because this is legislation that the gentleman from Illinois has worked
on extensively and without rest. The gentleman from Illinois has worked
in a bipartisan manner. He has those of us who have had disagreements
sometimes rally around this legislation because in every single one of
our districts we found someone's mother, someone's wife, someone's
sister, some innocent person who has been law abiding but because we
are part of a great family, have found some family member outside of
the law who has brought down the heavy hand of the law on hardworking
people who have retained, if you will, or worked hard for the
properties that they have.
    I want to pay tribute to the gentleman; and I know the gentleman from
Michigan would because, as I just heard a few moments ago, this is
truly a bipartisan bill. I want to distinguish the fact that this is on
the suspension calendar because we have had some vigorous debates here
just earlier this morning about the process of suspensions bypassing
committee, and I would not want this legislation to be defined
accordingly.
    This bill has been worked and worked and worked and your staff,
George, we thank you, we know you have been on the battle line working
hard to make sure that this comes together. I want to acknowledge Perry
Apelbaum and Cori Flam likewise and say that we rise in support of this
legislation, a bipartisan bill that is a result of extensive
negotiations and deliberations with our colleagues in the Senate,
Senators Hatch, Leahy, Sessions and Schumer as well as the Department
of Justice. I might do a slight editorial note and say that out of the
bipartisan effort, the bill from the House may not be the exact same
and I might have wanted the bill from the House maybe because I am a
House Member but we are gratified that we finally resolved it and it
has come back for a vote.
    Mr. Speaker, the Civil Asset Forfeiture Reform Act makes common sense
changes to our civil asset forfeiture laws to make these procedures
fair and more equitable. H.R. 1658 strikes the right balance between
the needs of law enforcement and the right of individuals to not have
their property forfeited without proper safeguards. I recall that we

actually had hearings on this, and I recall some of the really horrific stories of individuals losing their only house, their only source of income because of this law.

Would you believe that under current law, the government can confiscate an individual's private property on the mere showing of probable cause? That is under current law. Then even though that person has never been arrested, much less convicted of a crime, the government requires a person to file action in a Federal court to prove that the property is not subject to forfeiture just to get the property back. Well, that is true.

We can imagine that the gentleman from Michigan enthusiastically embraced and worked with the gentleman from Illinois on this legislation. There is no question that forfeiture laws can, as Congress intended, serve legitimate law enforcement purposes. My own police department, a simple and small example, promotes and utilizes or has utilized civil forfeiture laws as relates to drug intervention and drug crimes. But they are currently susceptible to abuse. That is why the bill makes reforms to the current civil forfeiture regimen.

To highlight a few examples, the bill places the burden of proof where it belongs, with the government agency

[[Page H2052]]

that performed the seizure, and it protects individuals from the difficult task of proving a negative, in other words, proving that their property was not subject to forfeiture. H.R. 1658 also permits the awarding of attorney's fees if the claimant substantially prevails, creates an innocent owner defense and permits a court to provisionally return property to a claimant on a showing of substantial hardship where, for example, the forfeiture crippled the functioning of a business, prevented an individual from working or left an individual homeless. Is that not justice for Americans? These reforms simply balance the scales so that innocent people have a level playing field on which to challenge improper seizures.

H.R. 1658 also makes certain changes to help law enforcement crack down on criminal activities. For example, the bill permits courts to enter restraining orders to secure the availability of the property subject to civil forfeiture, and it clarifies that the law prohibiting the removal or destruction of property to avoid prosecution applies to seizures as well as forfeitures.

As I see the ranking member on the floor of the House, I know that he will have much to say about this bipartisan effort. But I am hoping that this bill, although it appears on the suspension calendar, will evidence the hard work that we have done collectively on the Committee on the Judiciary on this very issue. I thank both the chairman and the ranking member for their efforts. I am very proud to support this bill today personally and to ask my colleagues to join us in supporting this important legislation.

Mr. Speaker, I am in support of this bill which calls for civil asset forfeiture reform. This is a good bipartisan bill which now shifts the burden of proof to the government to prove by clear and convincing evidence when seizing property and permits the appointment of counsel for indigent claimants while protecting innocent owners.

Unlike criminal forfeiture, civil forfeiture requires no due process before a property owner is required to surrender their property.

Studies suggest that minorities are acutely affected by civil asset forfeitures. As we are well aware by now, racial profiling by the police has alarmingly increased the number of cases of minorities involved in traffic stops, airport searches and drug arrests. These cases afford the government, sometimes justifiably, with the

Case 1:06-cv-00029 Document 45-2 Filed 10/29/2007 Page 15 of 21

opportunity to seize property. Since 1985, the justice department's asset forfeiture fund increased from $27 million to $338 million.

Since a deprivation of liberty is not implicated in a civil forfeiture, the government is not bound by the constitutional safeguards of criminal prosecution. The government needs only show probable cause that the property is subject to forfeiture. The burden shifts to property owner to prove that the property is not subject to forfeiture.

The property owner may exhaust his or her financial assets in attorney's fees to fight for the return of property. If the financial burden of attorney's fees is not rushing enough, the owner has to post a bond worth 10 percent of the value of the property, before contesting the forfeiture. Independent owners are not entitled to legal counsel.

Interestingly enough, persons charged in criminal cases are entitled to a hearing in court and the assistance of counsel. The government need not charge a property owner with a crime when seizing property under civil laws. The result is that an innocent person, or a person not charged with a crime, has fewer rights than the accused criminal. This anomaly must end.

Reform of civil asset forfeiture laws is long overdue. I urge you to support this bill to ensure that innocent owners are provided some measure of due process before their property is seized.

Mr. Speaker, I reserve the balance of my time.

Mr. HYDE. Mr. Speaker, I yield such time as he may consume to the distinguished gentleman from Georgia (Mr. Barr).

Mr. BARR of Georgia. Mr. Speaker, I thank the distinguished chairman of the Committee on the Judiciary for yielding me this time. I would like to commend the gentleman from Illinois for his tremendous work over many years' time on reforming Federal asset forfeiture laws which, as we all know, are an important tool for Federal law enforcement and indirectly for local law enforcement which frequently because of their participation in cases resulting in seized assets participate in the disposition of those seized assets once they are forfeited.

Many of us, including myself as a former United States attorney, while having tremendous regard and respect for our civil asset forfeiture laws and what an important tool they are for law enforcement also recognize they are subject to abuse and have been abused. This legislation on which the gentleman from Illinois has been working for many years and which will be one of the most important hallmarks of his tenure as both chairman of the Committee on the Judiciary and his long and distinguished service as a Member of the House of Representatives will go a long way towards bringing back into balance a system that has become sorely out of balance. I commend the gentleman for his work, and I commend both sides of the aisle for bringing this forward in a bipartisan manner. I urge its adoption.

Mr. Speaker, I also rise today with the chairman of the Committee on the Judiciary to discuss the intent of section 983(a)(2)(C)(ii) which states, ``A claim shall state the claimant's interest in such property and provide customary documentary evidence of such interest if available and state that the claim is not frivolous.''

Mr. Speaker, I interpret this language to require only prima facie evidence to establish such an interest. I assume the gentleman from Illinois concurs with my representation but would like for the record to clarify what type of documentation would be necessary to establish this interest in the seized property, sufficient to make a claim under this legislation.

This documentary evidence should be fairly easy to obtain while still establishing the claimant has a legitimate, nonfrivolous interest in such property. This interest can be established by documents including but not limited to a copy of an automobile title, a loan statement for

a home, or a note from a bank for a monetary account. For property such as cash in which no documentary evidence is normally available, this provision would be loosely applied and there would be an assumption of the claimant's interest in such property by simply making a claim and asserting its nonfrivolous nature.

Mr. HYDE. Mr. Speaker, if the gentleman will yield, I thank the gentleman from Georgia for bringing this issue to the attention of the House. The gentleman's explanation is accurate and reflects the intent of the legislation. There was a need for such an explanation and I appreciate the gentleman from Georgia's clarification of this issue.

Mr. BARR of Georgia. I thank the gentleman for engaging in the colloquy.

Mr. HYDE. Mr. Speaker, I yield myself 30 seconds. I want to thank the gentlewoman from Texas for her very cordial remarks. I want to particularly thank the gentleman from Michigan and his staff and make a point. This Committee on the Judiciary in this House of Representatives can work together in a bipartisan fashion to turn out good legislation. This is one example. There are many others. This bill had its genesis in a newspaper article written by Steve Chapman of the Chicago Tribune several years ago. When I read what was going on under civil asset forfeiture, I thought it was more appropriate for the Soviet Union than the United States, and it has taken 7 years but we are there today and it is a great moment.

Mr. Speaker, I yield 2 minutes to the gentleman from New York (Mr. Sweeney).

Mr. SWEENEY. Mr. Speaker, I thank the gentleman for yielding me this time. I want to say, a year ago I rose on this floor with my colleagues the gentleman from Arkansas (Mr. Hutchinson) and the gentleman from New York (Mr. Weiner) in opposition to this bill. I come today in support of this particular provision. I rose in opposition a year ago because I was concerned about the effects on criminal justice and specifically the effects on law enforcement, but I have to point out that the chairman and the Committee on the Judiciary, as has been noted, in a bipartisan manner has done a tremendous job to ease those concerns.

They have provided us great improvements on the bill. The compromise provides important procedural protections to law-abiding property owners without compromising law enforcement's ability to shut down criminal enterprises. Specifically the bill shifts the burden of proof in forfeiture cases from

[[Page H2053]]

property owners to the government with the appropriate threshold of a preponderance of the evidence.

The compromise also limits the appointment of court-appointed lawyers to indigent claimants whose primary residence is subject to forfeiture. I want to say that there is one concern that I have and I think a couple of my colleagues have as well as it relates to this legislation, and, that is, that we have a continuing reservation that the removal of the cost bond requirement could impair the asset forfeiture program in the future.

We know that the Justice Department is already overwhelmed with challenges to asset seizures, and I am fearful that the removal of the cost bond could further paralyze that effort. But let me say this, I hope to and I know my colleagues who stood with me a year ago hope to work with the chairman and the committee to oversee the implementation of cost bond provisions requiring up-front certification and posthearing penalties and ensure that my fears do not become a reality for law enforcement. But overall, Mr. Speaker, this is a victory for the American people. I want to salute the Committee on the Judiciary

and its great chairman. I urge support for this bill.
  The SPEAKER pro tempore (Mr. Pease). Without objection, the gentleman
from Michigan (Mr. Conyers) will control the time previously granted to
the gentlewoman from Texas (Ms. Jackson-Lee).
  There was no objection.
  Mr. CONYERS. Mr. Speaker, I yield myself 2 minutes.
  I would like to begin by pointing out that the chairman of this
committee and I have worked together on this measure for at least a
couple of Congresses. I have been working on it, also, unbeknownst to
the gentleman from Illinois in the Committee on Government Reform. I
think we have come quite a long way. The bill retains the core of some
of the main reforms that was in Hyde-Conyers.
  We have adopted the Senate version. But the shifting of the burden of
proof is very important. The appointment of counsel is a critical
improvement. The return of property in case of substantial hardship is
very important. And the innocent owner defense is now strong in the
bill. The claim for property damages while in the government's custody
is a valid concern. And an award of interest. The bill allows
prejudgment interest to be awarded when cash is improperly seized by
the government. And we eliminate the cost of bond which would be a part
of the current requirement that a claimant challenging a civil asset
forfeiture file a cost of bond.
  Who would have believed that under our current law, the government
can confiscate an individual's private property on a mere showing of
probable cause? Then even though a person has never been arrested, not
to mention convicted, of a crime, the government requires the person to
file an action to prove that the property is not subject to forfeiture
to get the property back.

                              {time}  1400

  It is important that we have asset forfeiture, but this puts it under
controls that have not existed before.
  Mr. Speaker, I reserve the balance of my time.
  Mr. Speaker, I yield 1\1/2\ minutes to the gentleman from New York
(Mr. Weiner), a distinguished member of the Committee on the Judiciary.
  Mr. WEINER. Mr. Speaker, I rise in support of the Senate amendments
to H.R. 1658, and I want to commend the gentleman from Illinois
(Chairman Hyde), our chairman, for his year-long effort to reform our
asset forfeiture laws. The gentleman quite literally wrote the book on
the subject. When the history is written of his prodigious work in this
House, this certainly warrants mention.
  Last year, a somewhat divided House considered H.R. 1658. While it
garnered the support of the majority of our colleagues, it was
adamantly opposed by the administration, as well as by every major law
enforcement group. Because of this opposition, I offered, along with
the gentleman from Arkansas (Mr. Hutchinson) and the gentleman from New
York (Mr. Sweeney), a substitute version of H.R. 1658 on the floor of
the House.
  The substitute would have made needed reforms by placing the burden
of proof on the Government to prove by a preponderance of the evidence
that property seized was used in an illegal activity. It would have
allowed for counsel to be appointed in those proceedings. It would have
protected innocent owners, and it would have allowed property to be
returned to claimants in instances of hardship.
  It was, I thought, a balanced approach that had the support of all
major law enforcement organizations, as well as 155 of my colleagues.
That amendment failed, although it had some support, and many of us
voted against the base bill for that reason.
  Mr. Speaker, today's amendment, today's bill I am pleased to vote in

favor of. It puts the burden of proof where it should be, on the
Government; and it rightfully protects the owners and spouses and
children, if they can show they were not involved in illegal activity.

Perhaps, most importantly, today's bill has the approval of the men
and women of law enforcement. Like our substitute, today's bill allows
civil asset forfeiture to continue to be used as a tool by police and
prosecutors across the country to shut down crack houses and seize
drug-running speedboats.

Mr. Speaker, I applaud the authors of this compromise and my
colleagues who voted in favor of reform originally.

Mr. CONYERS. Mr. Speaker, I yield myself such time as I may consume,
merely to point out in the colloquy between the gentleman from Georgia
and the gentleman from Illinois (Mr. Hyde), the distinguished chairman
of the committee, that I stand in agreement about the interpretation
given by the chairman of section 983A(2)(c)(2), which dealt with the
claimant's interests in such property and provide customary documentary
evidence of such evidence, if available, and state that the claim is
not frivolous.

Mr. Speaker, I just wanted to join in a clarification of the intent
that, for example, a person should not be barred from challenging an
improper forfeiture if he or she has misplaced a receipt or if the
person does not have the evidence on hand. I think that response is
consistent with the gentleman from Illinois (Mr. Hyde) and the
gentleman from Georgia, and I just wanted to weigh in on that.

This has taken quite awhile, but it is an important measure, and my
compliments are out to the gentleman from Illinois (Mr. Hyde), the
chairman of the committee, and to all of the Members who have gone
through a rethinking process to bring the bill to the kind of support
that I believe it is enjoying on the floor this afternoon.

Mr. Speaker, I began looking at this matter from the old Government
Operations Committee, and I was very pleased to learn that the
gentleman from Illinois had, indeed, studied the matter, had put
together his thoughts in a book on the matter, and it led us to
bringing forth a bill jointly that now has the imprimatur, I believe,
of most of the Members in both bodies.

It is in that spirit that we will want to make sure that it is
implemented fairly and that it adds to the good body of law that comes
out of the House Committee on the Judiciary.

Mr. Speaker, with those remarks, I reserve the balance of our time.

Mr. HYDE. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I wish to express my gratitude again to the gentleman
from Michigan (Mr. Conyers) and his staff and everyone who worked on
this bill. We did not mention Jon Dudas and Rick Filkins. I just want
to say, George Fishman who is sitting here, he was the single most
indispensable element of this bill, and I am grateful to him.

Mr. BARR of Georgia. Mr. Speaker, I would like to thank Mr. Hyde for
working so rigorously to come to a reasonable agreement with the Senate
on civil asset forfeiture reform. The compromise is fair and will
restore fairness to this process.

Civil asset forfeiture is a mechanism allowing law enforcement
authorities to seize assets such as homes, property, cash, and cars
that are used in furtherance of criminal activity. However, in recent
years, the laws have been used overly broadly, and have been cited by
civil libertarians as excessive and open to abuse.

One of the most important challenges Congress faces is balancing
individual liberties against the need for effective law enforcement.
Generally, our laws do this fairly well.

[[Page H2054]]

However, our civil asset forfeiture laws are tilted too far in one direction. Current civil asset forfeiture laws allow police to seize a person's assets, regardless of whether the person has been, or ever is, convicted of a crime, if police have nothing more than probable cause to believe the property was used for criminal purposes. You are presumed guilty until you can prove yourself innocent.

In effect, our current asset forfeiture system targets both criminals and law-abiding citizens, takes their cars, cash, homes, and property away, and then forces them to prove they are innocent in order to get their assets back. The goal of this reform legislation is to change a system that sometimes violates the rights of the law-abiding, while retaining those provisions that allow law enforcement to target criminals, and hit them where it hurts--in their pocket books.

As I know from my service as a federal prosecutor, the majority of jurisdictions in America use asset forfeiture laws sensibly and fairly. Unfortunately, in some cases, law enforcement officers intentionally target citizens and seize their assets, because they know proving innocence under the constraints of the current law is extremely difficult if not impossible. The burden of proof for the government is minimal, the person may have less than 2 weeks to file a defense, and they have to post a bond even though the government has seized their assets.

H.R. 1658 was introduced to address this matter of allowing law enforcement to use this important tool of asset forfeiture, while still requiring them to be more mindful of due process and individual rights.

This legislation enjoys wide bi-partisan support, and passed the House on June 24, 1999 by a vote of 375-48. Additionally, the 65,000 member Law Enforcement Alliance of America supports it, as do many other line officers and retired police chiefs from across America. It returns balance and fairness to an area of law that has been abused to violate the rights of innocent citizens for too long.

This reform legislation does not deny law enforcement the ability to seize and forfeit assets that truly are used for criminal endeavors. It does, however, more properly balance those powers against civil liberties.

Mr. UDALL of Colorado. Mr. Speaker, I strongly support this measure. Passage of this bill is long overdue, and I urge all Members to join me in voting to send it to the President for signing into law.

Since the House passed this bill last year, it has been the subject of intensive negotiations that have involved the administration and law enforcement organizations as well as Members of both the House and Senate. Those negotiations have resulted in the revised version of the bill now before the House. I am sure that it is not everything that some might want, but it is acceptable to all concerned, and I think it deserves approval.

Enactment of this bill will correct serious imbalances in the law regarding civil forfeitures--cases in which the government seizes property allegedly connected to a violation of law. Under current law, seized property won't be returned unless the person whose property was seized can prove either that the property was not connected to the alleged crime or that the owner did not know about or consent to the allegedly illegal use of the property.

This bill shifts the burden of proof to the government, where it belongs, so that it would be up to the government to show by preponderance of the evidence that an asset was sufficiently connected to a crime to be subject to civil forfeiture. While this is a somewhat less stringent requirement than in the bill as originally passed by the House, it is a great improvement over the current law.

The bill also makes a number of other important improvements over the current law. It will require that seizures be made pursuant to a

warrant. It will eliminate the need for people to post a bond in order to contest a civil-forfeiture case. It will create a uniform ``innocent owner'' defense for all civil-forfeiture cases. It will allow property to be released from government custody before final disposition of a case where continued custody would be a hardship to the owner outweighing any risk to the government. And it will allow people to seek to recover from the government if seized property is damaged while in custody.

    I congratulate all those whose hard work has made it possible for the bill to be on the floor today, and I urge its approval.

    Mr. Speaker, with great pleasure, I yield back the balance of my time.

    The SPEAKER pro tempore (Mr. Ose). The question is on the motion offered by the gentleman from Illinois (Mr. Hyde) that the House suspend the rules and concur in the Senate amendment to the bill, H.R. 1658.

    The question was taken; and (two-thirds having voted in favor thereof) the rules were suspended and the Senate amendment was concurred in.

    The motion to reconsider is laid on the table.

---

Case 1:06-cv-00030   Document 95-3   Filed 10/29/2007   Page 21 of 21