# EXHIBIT "K"

The Library of Congress > THOMAS Home > Committee Reports > Search Results

THIS SEARCH  THIS DOCUMENT  GOTO
Next Hit      Forward        New Search
Prev Hit      Back           Home Page
Hit List      Full Display   Help
              Contents Display

### House Report 106-192 – CIVIL ASSET FORFEITURE REFORM ACT

| Full Display | Related Information |
|---|---|
| PDF \| Printer Friendly Display | Bill Summary and Status \| Full Text of Bill |

69-006

## 106TH CONGRESS

*REPORT*

### *HOUSE OF REPRESENTATIVES*

*1st Session*

106-192
CIVIL ASSET FORFEITURE REFORM ACT

> JUNE 18, 1999- Committed to the Committee of the Whole House on the State of the Union and ordered to be printed
>
> Mr. HYDE, from the Committee on the Judiciary, submitted the following
>
> R E P O R T
>
> together with
>
> DISSENTING VIEWS
>
> [To accompany H.R. 1658]
>
> [Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 1658) to provide a more just and uniform procedure for Federal civil forfeitures, and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

TABLE OF CONTENTS

|                                                              | Page |
|--------------------------------------------------------------|------|
| The Amendment                                                | 2    |
| Purpose and Summary                                          | 2    |
| Background and Need for the Legislation                      | 2    |
| Hearings                                                     | 19   |
| Committee Consideration                                      | 20   |
| Vote of the Committee                                        | 20   |
| Committee Oversight Findings                                 | 20   |
| Committee on Government Reform Findings                      | 21   |
| New Budget Authority and Tax Expenditures                    | 21   |
| Committee Cost Estimate                                      | 21   |
| Constitutional Authority Statement                           | 21   |
| Section-by-Section Analysis and Discussion                   | 21   |
| Changes in Existing Law Made by the Bill, as Reported        | 27   |
| Dissenting Views                                             | 34   |

The amendments (stated in terms of the page and line numbers of the introduced bill) are as follows:

Page 6, line 7, strike `receive' and insert `acquired'.

Page 6, line 8, insert `or inheritance' after `probate'.

Page 6, line 9, strike `receipt' and insert `acquisition'.

Page 10, beginning on line 17 strike `**CONFORMING**' and all that follows through `**AND**' on line 18 and insert `**AMENDMENT**'.

Page 10, strike line 20 and all that follows through page 11, line 13.

Page 11, line 14, strike `(b) CONTROLLED SUBSTANCES ACT- '.

# PURPOSE AND SUMMARY

H.R. 1658, as reported by the Committee, would create general rules relating to federal civil forfeiture proceedings designed to increase the due process safeguards for property owners whose property has been seized.



# BACKGROUND AND NEED FOR THE LEGISLATION

*I. Antecedents of Civil Asset Forfeiture*

Civil asset forfeiture is based on the legal fiction that an inanimate object can itself be `guilty' of wrongdoing, regardless of whether the object's owner is blameworthy in any way. This concept descends from a medieval English practice whereby an object

responsible for an accidental death was forfeited to the king, who `would provide the [proceeds, the `deodand'] for masses to be said for the good of the dead man's soul . . . or [would] insure that the deodand was put to charitable uses.' 1

[Footnote]

[*Footnote 1: Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U.S. 663, 681 n.16 (1974).]

The immediate ancestor of modern civil forfeiture law is English admiralty law. As Oliver Wendell Holmes noted, `a ship is the most living of inanimate things. . . . [E]very one gives a gender to vessels. . . . It is only by supposing the ship to have been treated as if endowed with personality, that the arbitrary seeming peculiarities of the maritime law can be made intelligible.' 2

[Footnote]

[*Footnote 2:* Holmes, Jr., *The Common Law* 25 (1881).]

Justice Holmes used this example:

> A collision takes place between two vessels, the Ticonderoga and the Melampus, through the fault of the Ticonderoga alone. That ship is under a lease at the time, the lessee has his own master in charge, and the owner of the vessel has no manner of control over it. The owner, therefore, is not to blame, and he cannot even be charged on the ground that the damage was done by his servants. He is free from personal liability on elementary principle. Yet it is perfectly settled that there is a lien on his vessel for the amount of the damage done, and this means that the vessel may be arrested and sold to pay the loss in any admiralty court whose process will reach her. If a livery-stable keeper lets a horse and wagon to a customer, who runs a man down by careless driving, no one would think of claiming a right to seize the horse and the wagon. 3

[Footnote]

[*Footnote 3: Id.*]

Holmes then provided the rationale:

> The ship is the only security available in dealing with foreigners, and rather than send one's own citizens to search for a remedy abroad in strange courts, it is easy to seize the vessel and satisfy the claim at home, leaving the foreign owners to get their indemnity as they may be able. 4

[Footnote]

[*Footnote 4: Id.* at 26.]

*II. Federal Civil Asset Forfeiture Statutes*

Soon after the creation of the United States, ships and cargo violating the customs laws were made subject to federal civil forfeiture. 5

[Footnote] Such forfeiture was vital to the federal treasury for, at that time, customs duties constituted over 80% of federal revenues. 6

[Footnote]

[*Footnote 5: See* Act of July 31, 1789, secs. 12, 36, 1 Stat. 39, 47.]

[*Footnote 6: See* Piety, *Scorched Earth: How the Expansion of Civil Forfeiture Doctrine Has Laid Waste to Due Process,* 45 U. Miami L. Rev. 911, 940 n.137 (1991).]

Today, there are scores of federal forfeiture statutes, both civil and criminal. 7

[Footnote] They range from the forfeiture of animals utilized in cock-fights and similar enterprises, 8

[Footnote] to cigarettes seized from smugglers 9

[Footnote] to property obtained from violations of the Racketeer Influenced and Corrupt Organizations Act. 10

[Footnote]

[*Footnote 7:* Criminal forfeiture requires an antecedent criminal conviction of the property owner.]

[*Footnote 8: See* 7 U.S.C. Sec. 2156.]

[*Footnote 9: See* 18 U.S.C. Sec. 2344.]

[*Footnote 10: See* 18 U.S.C. Sec. 1963.]

The Comprehensive Drug Abuse Prevention and Control Act of 1970 made civil forfeiture a weapon in the war against drugs. The Act provides for the forfeiture of:

> [a]ll controlled substances which have been manufactured, distributed, dispensed, or acquired in violation of this subchapter . . . [a]ll raw materials, products, and equipment of any kind which are used, or intended for use, in manufacturing . . . delivering, importing, or exporting any controlled substance[s] . . . in violation of this subchapter . . . [a]ll property which is used, or intended for use, as a container for [such controlled substances, raw materials, products or equipment] . . . [a]ll conveyances, including aircraft, vehicles or vessels, which are used, or intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment [of such controlled substances, raw materials, products or equipment]. 11

[Footnote]

[*Footnote 11:* 21 U.S.C. Sec. 881(a).]

In 1978, the Act was amended to provide for civil forfeiture of:

[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter . . . .' 12

[Footnote]

[*Footnote 12:* Section 301(a)(1) of the Psychotropic Substances Act of 1978 (found at 21 U.S.C. Sec. 881(a)(6)).]

In 1984, the Act was amended to provide for the forfeiture of:

> [a]ll real property . . . which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment. . . . 13

[Footnote]

[*Footnote 13:* Section 306(a) of the Comprehensive Crime Control Act of 1984 (found at 21 U.S.C. Sec. 881(a)(7)).]

*III. The Success--and Abuse--of Forfeiture*

Prior to 1984, the monies realized from federal forfeitures were deposited in the general fund of the United States Treasury. Now they primarily go to the Department of Justice's Assets Forfeiture Fund 14

[Footnote] and the Department of the Treasury's Forfeiture Fund. 15

[Footnote] The money is used for forfeiture-related expenses and various law enforcement purposes. 16

[Footnote]

[*Footnote 14: See* 28 U.S.C. Sec. 524(c)(4)).]

[*Footnote 15: See* 31 U.S.C. Sec. 9703.]

[*Footnote 16: See* 28 U.S.C. Sec. 524(c)(1)).]

In recent years, enormous revenues have been generated by federal forfeitures. The amount deposited in Justice's Assets Forfeiture Fund (from both civil and criminal forfeitures) increased from $27 million in fiscal year 1985 to $556 million in 1993 and then decreased to $449 million in 1998. 17

[Footnote] Of the $338 taken in 1996, $250 million was in cash and $74 million was in proceeds of forfeitable property; $163 million of the total was returned to state and local law enforcement agencies who helped in investigations. 18

[Footnote] As of the end of 1998, a total of 24,903 seized assets valued at $1 billion were on deposit--7,799 cash seizures valued at $349 million, 1,181 real properties valued at $205 million, 45 businesses valued at $49 million, and 15,878 other assets valued at $398 million. 19

[Footnote]

[*Footnote 17: See* Office of National Drug Control Policy, *National Drug Control Strategy: Budget Summary 1999,* at 107 (hereinafter cited as `*National Drug Control Strategy*'); *Civil Asset Forfeiture Reform: Hearing Before the House Comm. on the Judiciary,* 105th Cong., 1st Sess. 116 (1997)(statement of Stefan Cassella)(hereinafter cited as `*1997 Hearing*'); U.S. Dept. Of Justice, *Asset Forfeiture Fact Sheet* (1993); *Annual Report of the Dept. Of Justice Asset Forfeiture Program: 1993,* at 15.]

[*Footnote 18: See 1997 Hearing* at 116 (statement of Stefan Cassella). Under `adoptive forfeiture', state and local law enforcement officers seize property and then bring it to a federal agency for forfeiture (provided that the property is forfeitable under federal law). The federal government then returns as much as 80% of the net proceeds to the state or local agency that initiated the case. Also, state and local law enforcement agencies that have cooperated in federal law enforcement actions often receive a percentage of the net proceeds.]

The Committee is concerned about two aspects of adopted forfeiture. The first is that since property or funds returned to state or local law enforcement agencies through adoptive forfeiture can be kept by these entities, the process can be used to bypass provisions of state laws or state constitutions that dictate that property forfeited (pursuant to state forfeiture provisions) should be used for non-law enforcement purposes such as elementary and primary education. A recent series in the *Kansas City Star* highlighted this problem in Missouri. *See* Karen Dillon, *Missouri Police Find Ways to Keep Cash Meant for Schools,* Kansas City Star, Jan. 2, 6, 11, 20, 21, Feb. 5, 9, 10, 12, 27, Mar. 14, 25, Apr. 23, May 7, 8, 1999. Second, while the property returned through adoptive forfeiture must be used for law enforcement purposes, state and local governing bodies do not exercise their normal oversight role over how the property is used since it is not appropriated through the normal legislative process. Consequently, there have been many disturbing reports of state and local law enforcement using forfeited property, or the proceeds from its sale, for unnecessary or needlessly extravagant expenditures and uses. *See, e.g., Hyde, Forfeiting Our Property Rights: Is Your Property Safe from Seizure?* 37 (1995)(hereinafter cited as `*Forfeiting Our Property Rights*'). The Committee plans to continue to closely monitor these two issues. In addition, the Committee urges state and local law enforcement agencies to use forfeited property only for legitimate purposes and urges local communities to engage in oversight over the use by their law enforcement agencies of forfeited property (while not unduly limiting the flexibility of law enforcement).

[*Footnote 19: See National Drug Control Strategy* at 108.]

So, federal forfeiture has proven to be a great monetary success. And, as former

Attorney General Richard Thornburgh said: `[I]t is truly satisfying to think that it is now possible for a drug dealer to serve time in a forfeiture-financed prison, after being arrested by agents driving a forfeiture-provided automobile, while working in a forfeiture-funded sting operation.' 20

[Footnote]

[*Footnote 20:* Richard Thornburgh, Address Before the Cleveland City Club Forum Luncheon (May 11, 1990).]

The purposes of federal forfeiture were set out by Stefan Cassella, Assistant Chief, Asset Forfeiture and Money Laundering Section, Criminal Division, U.S. Department of Justice, in testimony before this Committee: 21

[Footnote]

[*Footnote 21: 1997 Hearing* at 112.]

> Asset forfeiture has become one of the most powerful and important tools that federal law enforcement can employ against all manner of criminals and criminal organizations--from drug dealers to terrorists to white collar criminals who prey on the vulnerable for financial gain. . . .

> Federal law enforcement agencies use the forfeiture laws for a variety of reasons, both time-honored and new. . . . [They] allow the government to seize contraband--property that it is simply unlawful to possess, such as illegal drugs, unregistered machine guns, pornographic materials, smuggled goods and counterfeit money.

> Forfeiture is also used to abate nuisances and to take the instrumentalities of crime out of circulation. If drug dealers are using a `crack house' to sell drugs to children as they pass by on the way to school, the building is a danger to the health and safety of the neighborhood. Under the forfeiture laws, we can shut it down. If a boat or truck is being used to smuggle illegal aliens across the border, we can forfeit the vessel or vehicle to prevent its being used time and again for the same purpose. The same is true for an airplane used to fly cocaine from Peru into Southern California, or a printing press used to mint phony $100 bills.

> The government also uses forfeiture to take the profit out of crime, and to return property to victims. No one has any right to retain the money gained from bribery, extortion, illegal gambling, or drug dealing. With the forfeiture laws, we can separate the criminal from his profits--and any property traceable to it--thus removing the incentive others may have to commit similar crimes tomorrow. And if the crime is one that has victims--like carjacking or fraud--we can use the forfeiture laws to recover the property and restore it to the owners far more effectively than the restitution statutes permit.

> Finally, forfeiture undeniably provides both a deterrent against crime and a measure of punishment for the criminal. Many criminals fear the loss of their

vacation homes, fancy cars, businesses and bloated bank accounts far more than the prospect of a jail sentence.

However, a number of years ago, as forfeiture revenues were approaching their peaks, some disquieting rumblings were heard. The Second Circuit stated that `[w]e continue to be enormously troubled by the government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for due process that is buried in those statutes.' 22

[Footnote] Newspaper and television exposes appeared alleging that apparently innocent property owners were having their property taken by federal and local law enforcement officers with nothing that could be called due process. 23

[Footnote]

[Footnote 22: United States v. All Assets of Statewide Auto Parts, Inc., 971 F.2d 896, 905 (2nd Cir. 1992).]

[Footnote 23: See, e.g., Brazil & Berry, Tainted Cash or Easy Money?, Orlando Sentinel, June 14-17, 1992; Schneider & Flaherty, Presumed Guilty: The Law's Victims in the War on Drugs, Pitt. Press, Aug. 11-16, 1991; Poor & Rose, Hooked on the Drug War, St. Louis Post-Dispatch, Apr. 28-May 5, 1991, Oct. 6-11, 20, 1991.]

Congress investigated these charges through a series of hearing held by the House Committee on Government Operations' Subcommittee on Legislation and National Security under then-Chairman John Conyers 24

[Footnote] and then by this Committee. 25

[Footnote]

[Footnote 24: See Review of Federal Asset Forfeiture Program: Hearing Before the Subcomm. on Legislation and National Security of the House Comm. on Government Operations, 103rd Cong., 1st Sess. (1993); Department of Justice Asset Forfeiture Program: Hearing Before the Subcomm. on Legislation and National Security of the House Comm. on Government Operations, 102nd Cong., 2nd Sess. (1992).]

[Footnote 25: See 1997 Hearing; Civil Asset Forfeiture Reform Act: Hearing Before the House Comm. on the Judiciary, 104th Cong., 2nd Sess. (1996)(hereinafter cited as `1996 Hearing').]

The stories of two of the witnesses at the Judiciary Committee hearings provide a sampling of the types of abuses that have surfaced. Willie Jones (and his attorney E.E. (Bo) Edwards III) testified before the Judiciary Committee on July 22, 1996. Mr. Jones' testified as follows: 26

[Footnote]

[Footnote 26: 1996 Hearing at 12-14.]

[Chairman] Hyde: Would you please state your name and where you live.

Mr. Jones: My name is Willie Jones. I live in Nashville, Tennessee.

1Mr. Hyde: Very well, sir. Would you tell us your story involving asset forfeiture.

Mr. Jones: Yes. On February 27, 1991, I went to the Metro Airport to board a plane for Houston, TX, to buy nursery stock. I was stopped in the airport after paying cash for my ticket.

Mr. Hyde: What business are you engaged in or were you engaged in?

Mr. Jones: I am engaged in landscaping.

Mr. Jones: I paid cash for a round-trip ticket to Houston, TX, and I was detained at the ticket agent. The lady said no one ever paid cash for a ticket. And as I went to the gate, which was gate 6, to board the plane, at that time three officers came up to me and called me by my name, and asked if they could have a word with me, and told me that they had reason to believe that I was carrying currency, had a large amount of currency, drugs. So at that time----

Mr. Hyde: Proceeds of a drug transaction; you had money that was drug money then, that's what they charged you with?

Mr. Jones: Yes, sir.

Mr. Hyde: Were you carrying a large amount of cash?

Mr. Jones: Yes, sir. I had $9,000.

Mr. Hyde: $9,000 in cash. Why was that, sir? Was your business a cash business?

Mr. Jones: Well, it was going to be if I had found the shrubbery that I liked, by me being--going out of town, and the nursery business is kind of like the cattle business. You can always do better with cash money.

Mr. Hyde: They would rather be paid in cash than a check, especially since you are from out of town?

Mr. Jones: That is correct.

Mr. Jones: So we proceeded to go out of the airport. . . . I was questioned about had I ever been involved in any drug-related activity, and I told them, no, I had not. So they told me I might as well tell the truth because they was going to find out anyway. So they ran it through on the computer after I presented my driver's license to them, which everything was--I had--it was all in my name. And he ran it through the computer, and one officer told the other one, saying, he is clean. But instead, they said that the dogs hit on the money. So they told me at that time they was going to confiscate the money.

Mr. Hyde: They determined from the dog's activities that there were traces of drugs on

the money?

*Mr. Jones: That is what they said.*

*Mr. Hyde: That is what they claimed? 27*

[Footnote]

[*Footnote 27:* A federal court later found that `[t]he presence of trace narcotics on currency does not yield any relevant information whatsoever about the currency's history. A bill may be contaminated by proximity to a large quantity of cocaine, by its passage through the contaminated sorting machines at the Federal Reserve Banks, or by contact with other contaminated bills in the wallet or at the bank.' *Jones* v. *U.S. Drug Enforcement Administration,* 819 F. Supp. 698, 720 (M.D. Tenn. 1993)(citation omitted).]

*Mr. Jones: Yes, sir.*

*Mr. Hyde: Therefore, they kept the money?*

*Mr. Jones: They kept the money.*

*Mr. Hyde: Did they let you go?*

*Mr. Jones: They let me go.*

*Mr. Hyde: Were you charged with anything?*

*Mr. Jones: No. I asked them to, if they would, if they would count the money and give me a receipt for it. They refused to count the money, and they took the money and told me that I was free to go, that I could still go on to Texas if I wanted to; that the plane had not left.*

*Mr. Hyde: Of course, your money was gone. You had no point in going to Texas if you can't buy shrubs.*

*Mr. Jones: No.*

Willie Jones did not challenge the forfeiture under the normal mechanism provided by law 28

[Footnote] because he could not come up with the 10% cost bond required. 29

[Footnote] He instead filed suit in federal district court alleging that his Fourth Amendment right to be secure against unreasonable searches and seizures had been violated. 30

[Footnote] The court determined that the `frisk' which produced the $9,000 in currency was an unconstitutional search, 31

Case 1:06-cv-00030    Document 25-4    Filed 10/29/2007    Page 11 of 22

[Footnote] and that the seizure of the currency was undertaken with no probable cause and therefore an unconstitutional seizure. 32

[Footnote] The court did determine that there was `insufficient proof that the officers' investigation of Mr. Jones [who is African-American] himself was racially motivated[,]' but that other investigations were so motivated. 33

[Footnote]

[*Footnote 28:* The money was seized pursuant to 21 U.S.C. Sec. 881(a)(6), under which `[a]ll moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . .' are subject to civil forfeiture. If Jones challenged the forfeiture, he would have the burden of proving by a preponderance of the evidence that the currency was not subject to forfeiture, provided that the government first showed probable cause that the currency was subject to forfeiture. *See* 19 U.S.C. 1615.]

[*Footnote 29: See 1996 Hearing* at 15 (statement of E.E. (Bo) Edwards III). *See* 19 U.S.C. Sec. 1608.]

[*Footnote 30: Jones,* 819 F. Supp. at 716.]

[*Footnote 31: See id.* at 718.]

[*Footnote 32: See id.* at 721. Probable cause is `a reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion.' *Id.* (citation omitted).]

[*Footnote 33: See id.* at 723.]

The court's final comments gave rise for pause:

> The Court also observes that the statutory scheme as well as its administrative implementation provide substantial opportunity for abuse and potentiality for corruption. [Drug Interdiction Unit] personnel encourage airline employees as well as hotel and motel employees to report `suspicious' travelers and reward them with a percentage of the forfeited proceeds. The forfeited monies are divided and distributed by the Department of Justice among the Metropolitan Nashville Airport and the Metropolitan Nashville Police Department partners in the DIU and itself. As to the local agencies, these monies are `off-budget' in that there is no requirement to account to legislative bodies for its receipt or expenditure. Thus, the law enforcement agency has a direct financial interest in the enforcement of these laws. The previous history in this country of an analogous kind of financial interest on the part of law enforcement officers--i.e., salaries of constables, sheriffs, magistrates, etc., based on fees and fines--is an unsavory and embarrassing scar on the administration of justice. The obviously dangerous potentiality for abuse extant in the forfeiture scheme should trigger, at the very least, heightened scrutiny by the courts when a seizure is contested. 34

[Footnote]

[*Footnote 34: Id.* at 724.]

Mr. Jones's case typifies the kind that this Committee is gravely concerned about--except that this time there was a happy ending. Individuals very likely innocent of any crime justifying forfeiture meet some sort of `drug courier' profile [here, by buying an airplane ticket with cash] and are subject to a search or investigation. If they have large sums of cash, it is seized. They may not be tried for a crime (Civil forfeiture requires no related criminal conviction or even criminal charge. However, if there is a prosecution, acquittal does not bar a subsequent forfeiture action. The government need only show probable cause for the seizure to justify a civil forfeiture.). To get their property back, owners have to overcome tremendous procedural hurdles such as posting a cost bond and having to prove their property was `innocent' (once probable cause has been shown). The abuse seems even worse under certain state forfeiture laws. 35

[Footnote]

[*Footnote 35: See Forfeiting Our Property Rights* at 38-40.]

Billy Munnerlyn testified before the Judiciary Committee on June 11, 1997. Following is a short summary of his experience with federal civil forfeiture laws:

> For years Billy Munnerlyn and his wife Karon owned and operated a successful air charter service out of Las Vegas, Nevada. In October 1989, Mr. Munnerlyn was hired for a routine job--flying Albert Wright, identified as a `businessman,' from Little Rock, Arkansas, to Ontario, California. When the plane landed, DEA agents seized Mr. Wright's luggage and the $2.7 million inside. Both he and Mr. Munnerlyn were arrested. The DEA confiscated the airplane, the $8,500 charter fee for the flight, and all of Munnerlyn's business records. Although drug trafficking charges against Mr. Munnerlyn were quickly dropped for lack of evidence, the government refused to release his airplane. (Similar charges against Mr. Wright--who, unbeknownst to Munnerlyn, was a convicted cocaine dealer--were eventually dropped as well.) Mr. Munnerlyn spent over $85,000 in legal fees trying to get his plane back, money raised by selling his three other planes. A Los Angeles jury decided his airplane should be returned because they found Munnerlyn had no knowledge Wright was transporting drug money--only to have a U.S. district judge reverse the jury verdict. Munnerlyn eventually was forced to settle with the government, paying $7,000 for the return of his plane. He then discovered DEA agents had caused about $100,000 of damage to the aircraft. Under federal law the agency cannot be held liable for damage. Unable to raise enough money to restart his air charter business, Munnerlyn had to declare personal bankruptcy. He is now driving a truck for a living. 36

[Footnote]

[*Footnote 36: Id.* at 12 (based on reporting by Schneider & Flaherty & Miniter, `Property Seizures on Trial,' *Insight,* Feb. 22, 1993, at 10, 33).]

For Mr. Munnerlyn, there was no happy ending.

Neither the state of the law nor its usage have improved in recent years. Since 1974,

many observers assumed that the Constitution mandated an `innocent owner' defense to a civil forfeiture. However, in 1996, the Supreme Court in *Bennis* v. *Michigan* 37

[Footnote] ruled that the defense was mandated by neither the due process clause of the Fourteenth Amendment (and presumably that of the Fifth Amendment) nor the just compensation clause of the Fifth Amendment. The Court found that `a long and unbroken line of cases holds that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to such use.' 38

[Footnote]

[*Footnote 37:* 516 U.S. 442 (1996).]

[*Footnote 38: Id.* at 446.]

The dissenting justices in *Bennis* argued that:

> The logic of the Court's analysis would permit the States to exercise virtually unbridled power to confiscate vast amounts of property where professional criminals have engaged in illegal acts. Some airline passengers have marijuana cigarettes in their luggage; some hotel guests are thieves; some spectators at professional sports events carry concealed weapons; and some hitchhikers are prostitutes. The State surely may impose strict obligations on the owners of airlines, hotels, stadiums, and vehicles to exercise a high degree of care to prevent others from making illegal use of their property, but neither logic nor history supports the Court's apparent assumption that their complete innocence imposes no constitutional impediment to the seizure of their property simply because it provided the locus for a criminal transaction. 39

[Footnote]

[*Footnote 39: Id.* at 458-59 (Stevens, J., Souter, J., and Breyer, J., dissenting).]

And, Justice Thomas stated in his concurrence that, `[i]mproperly used, forfeiture could become more like a roulette wheel employed to raise revenue from innocent but hapless owners whose property is unforeseeably misused, or a tool wielded to punish those who associate with criminals, than a component of a system of justice.' 40

[Footnote]

[*Footnote 40: Id.* at 456 (Thomas, J., concurring).]

The Seventh Circuit recently issued a decision containing a stinging rebuke of the federal government's use of civil forfeiture. *United States* v. *$506,231 in U.S. Currency* 41

[Footnote] involved the Congress Pizzeria in Chicago. In 1997, the court ordered the return to Anthony Lombardo, the owner and proprietor of this family-owned business, of over $500,000 in currency improperly seized by police from the restaurant in 1993. The

court found the need to remind a U.S. Attorney that `the government may not seize money, even half a million dollars, based on its bare assumption that most people do not have huge sums of money lying about, and if they do, they must be involved in narcotics trafficking or some other sinister activity.' 42

[Footnote] The court also found the need to say that `[w]e are certainly not the first court to be 'enormously troubled by the government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for due process that is buried in those statutes.' 43

[Footnote]

[Footnote 41: 125 F.3d 442 (7th Cir. 1997).]

[Footnote 42: Id. at 454 (emphasis in original).]

[Footnote 43: Id., quoting U.S. v. All Assets of Statewide Auto Parts, 971 F.2d at 905.]

Civil asset forfeiture does not just impact civil liberties and property rights. It can work at total cross purposes with the professed public policy goals of the federal government. Few will argue against the proposition that more private investment needs to be made in our inner cities in order to offer residents hope of a better life. How, then, would anyone explain the actions in 1998 of the U.S. Attorney's Office in Houston in seizing a Red Carpet Motel in a high-crime area of the city? 44

[Footnote] There were no allegations that the hotel owners participated in any crimes. Indeed, motel personnel called the police to the establishment dozens of times to report suspected drug-related activity in the motel's rooms by some of its overnight guests. However, the government claimed the hotel deserved to be seized and forfeited because management had failed to implement all of the `security measures' dictated by law enforcement officials, such as raising room rates. This failure to agree with law enforcement about what security measures were affordable and wise from a legitimate business-operating standpoint was deemed to be `tacit approval' of illegality, subjecting the motel to forfeiture. The U.S. Attorney bragged to the press that he envisioned using current civil asset forfeiture laws in the same fashion against similar types of legitimate commercial enterprises, such as apartment complexes.

[Footnote 44: See Deborah Tedford, Hotel Owners Agree to Beef Up Security, Houston Chron., July 18, 1998; Steve Brewer, Seizure of Hotel Sets Precedent, Houston Chron., March 7, 1998; Deborah Tedford, No Vacancy for Drug Dealers: Feds Seize Hotel, Houston Chron., Feb. 18, 1998.]

A Houston Chronicle editorial pointed to the absurdity and danger of this government forfeiture theory against legitimate business: `Perhaps another time, the advice will be to close up shop altogether.' 45

[Footnote] The editorial then correctly noted that:

[Footnote 45: U.S. Attorney Here Overstepped Bounds in Motel Seizure, Houston Chron., Mar. 12, 1998.]

> More than due to shortcomings of the motel owners, this situation appears to be the result of ineffective police work and of . . . prosecutors' inability to build cases against scofflaws operating in an open drug market.
>
> The prosecution's action in this case is contrary not only to the reasonable exercise of government, but it contradicts government-supported enticements to businesses that locate in areas where high crime rates have thwarted development. Good people should not have to fear property seizure because they operate business in high-crime areas. Nor should they forfeit their property because they have failed to do the work of law enforcement.
>
> . . . . This case demonstrates clearly the need for lawmakers to make a close-re-examination of federal drug forfeiture laws.

After much bad publicity, the government dropped its forfeiture proceedings after exacting a written `agreement' with the motel owners as to certain security measures that the owners would undertake. The motel owners had lost their motel to the government's seizure for several months, suffered a significant loss of good business reputation, and were forced to spend substantial amounts of time and money on hiring an attorney and defending against the government's forfeiture action, which should never have been undertaken in the first place. The resolution does not detract from the fact that business owners who dare to invest in high crime areas are at the complete mercy of our civil asset forfeiture laws and the predilections of prosecutors.

*IV. H.R. 1658, the Civil Asset Forfeiture Reform Act*

H.R. 1658 is designed to make federal civil forfeiture procedures fair to property owners and to give owners innocent of any wrongdoing the means to recover their property and make themselves whole after wrongful government seizures. H.R. 1658 amends the rules governing all civil forfeitures under federal law except those contained in the Tariff Act of 1930 or the Internal Revenue Code of 1986.

*The Eight Core Reforms of H.R. 1658*

# 1. BURDEN OF PROOF

When a property owner goes to federal court to challenge the seizure of property under a federal civil forfeiture law, the government is required to make an initial showing of probable cause that the property is subject to forfeiture. Under current law, the property owner must then establish by a preponderance of the evidence that the property is not subject to forfeiture. 46

[Footnote] The government can meet its burden without having obtained a criminal conviction or even having charged the owner with a crime. Since the government doesn't need the proof beyond a reasonable doubt required for a criminal conviction, even the acquittal of the owner does not bar forfeiture of the property allegedly used in a crime. The probable cause the government needs is the lowest standard of proof in the criminal law. It is the same standard required to obtain a search warrant and can be established by evidence with a low indicia of reliability such as hearsay. 47

[Footnote]

[*Footnote 46: See* 19 U.S.C. Sec. 1615.]

[*Footnote 47: See United States* v. *A Single Family Residence and Real Property Located at 900 Rio Vista Blvd., Ft. Lauderdale,* 803 F.2d 625, 629 n.2 (11th Cir. 1986).]

Allowing property to be forfeited upon a mere showing of probable cause can be criticized on many levels:

> [T]he current allocation of burdens and standards of proof requires that the [owner] prove a negative, that the property was not used in order to facilitate illegal activity, while the government must prove almost nothing. This creates a great risk of erroneous, irreversible deprivation. `The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact finding, is to `instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' *Addington* v. *Texas,* 441 U.S. 418, 423 . . . (1979) . . . The allocation of burdens and standards of proof implicates similar concerns and is of greater importance since it decides who must go forward with evidence and who bears the risk of loss should proof not rise to the standard set. In civil forfeiture cases, where claimants are required to go forward with evidence and exculpate their property by a preponderance of the evidence, all risks are squarely on the claimant. The government, under the current approach, need not produce any admissible evidence and may deprive citizens of property based on the rankest of hearsay and the flimsiest evidence. This result clearly does not reflect the value of private property in our society, and makes the risk of an erroneous deprivation intolerable. 48

[Footnote]

[*Footnote 48: United States* v. *$12,390,* 956 F.2d 801, 811(8th Cir. 1992)(Beam, J., dissenting).]

Some federal courts have even intimated that probable cause is an unconstitutional standard:

> The Supreme Court . . . has recently expanded the constitutional protections applicable in forfeiture proceedings to include those of the Eighth Amendment. . . . We therefore agree with the Second Circuit: `*Good* and *Austin* reopen the question of whether the quantum of evidence the government needs to show in order to obtain a warrant in rem allowing seizure --probable cause--suffices to meet the requirements of due process.' *United States* v. *One Parcel of Property Located at 194 Quaker Farms Road,* 85 F.3d 985, 990 (2nd Cir.), *cert denied* . . . 117 S. Ct. 304 . . . (1996).

> [W]e observe that allowing the government to forfeit property based on a mere showing of probable cause is a `constitutional anomaly. . . .' As the Supreme Court has explained, burdens of proof are intended in part to `indicate the relative importance attached to the ultimate decision.' . . . The stakes are exceedingly high in a forfeiture proceeding: Claimants are

threatened with permanent deprivation of their property, from their hard-earned money, to their sole means of transport, to their homes. We would find it surprising were the Constitution to permit such an important decision to turn on a meager burden of proof like probable cause. 49

[Footnote]

[*Footnote 49: United States* v. *$49,576,* 116 F.3d 425, 429 (9th Cir. 1997)(citations omitted).]

This Committee finds probable cause too low a standard of proof for the government to meet. Therefore, H.R. 1658 provides that the burden of proof should not shift to a property owner upon a showing of probable cause, but should remain with the government with a standard of clear and convincing evidence that the property is subject to forfeiture.

Why `clear and convincing evidence' and not `a preponderance of the evidence?' The Justice Department used to argue that federal civil forfeiture provisions were not designed to punish anybody. Justice argued that forfeiture served purely remedial functions--such as to remove the instruments of the drug trade and thereby protect the community from the threat of continued drug dealing, and to compensate the government for the expense of law enforcement activity and for its expenditure on societal problems resulting from the drug trade. The Department made this argument in order to provide a rationale for not applying to civil forfeitures the Eighth Amendment's prohibition against excessive fines. In its 1993 decision in *Austin* v. *United States,* 50

[Footnote] the Supreme Court rejected Justice's argument, finding that:

[*Footnote 50:* 509 U.S. 602 (1993).]

In light of the historical understanding of forfeiture as punishment, the clear focus of [the instant forfeiture provisions] on the culpability of the owner, and the evidence that Congress understood those provisions as serving to deter and to punish, we cannot conclude that [the provisions serve] solely a remedial purpose. We therefore conclude that forfeiture under these provisions constitutes `payment to a sovereign as punishment for some offense. . . .' 51

[Footnote]

[*Footnote 51: Id.* at 621-22 (footnote omitted), *quoting Browning-Ferris Industries of Vermont, Inc.* v. *Kelco Disposal, Inc.,* 492 U.S. 257, 265 (1989).]

One might ask, punishment for what? Clearly, the punishment is for a property owner's alleged involvement in drug trafficking. Civil forfeiture is being used to punish a property owner for alleged criminal activity. The general civil standard of proof--preponderance of the evidence--is too low a standard to assign to the government in this type of case. A higher standard of proof is needed that recognizes that in reality the government is alleging that a crime has taken place. As the Supreme Court has said, civil forfeiture actions are in essence `quasi- criminal in character' designed `like a criminal proceeding . . . to penalize for the commission of an offense against the law.' 52

[Footnote] Since civil forfeiture doesn't threaten imprisonment, proof beyond a reasonable doubt is not necessary. 53

[Footnote] The intermediate standard--clear and convincing evidence--is more appropriate.

[*Footnote 52: One 1958 Plymouth Sedan* v. *Pennsylvania,* 380 U.S. 693, 700 (1965).]

[*Footnote 53:* Some states do require proof beyond a reasonable doubt. The Supreme Court of Nevada has ruled that because of the `quasi-criminal nature of forfeiture actions,' `[p]roof beyond a reasonable doubt is therefore appropriate in order that the innocent not be permanently deprived of their property.' *A 1983 Volkswagen* v. *Country of Washoe,* 101 Nev. 222, 224, 699 P.2d 108, 109 (Nev. 1985). Others provide only for criminal forfeiture in most situations, which of course leads to the same result. *See, e.g.,* Cal. Health and Safety Code Sec. 11470.]

The Florida Supreme Court has ruled that the Florida Constitution mandates a clear and convincing evidence standard in civil forfeiture proceedings commenced under Florida law, stating that:

> In forfeiture proceedings the state impinges on basis constitutional rights of individuals who may never have been formally charged with any civil or criminal wrongdoing. This Court has consistently held that the [Florida] Constitution requires substantial burdens of proof where state action may deprive individuals of basic rights. 54

[Footnote]

[*Footnote 54: Department of Law Enforcement* v. *Real Property,* 588 So.2d 957, 967 (Fla. 1991). *See also* Cal. Health and Safety Code Sec. 11470 (clear and convincing evidence in cases involving drug proceeds over $25,000); N.Y. Civ. Prac. L. & R. 1311 (1), 1310(6) (clear and convincing evidence in drug cases); Wisc. Stat. Ann. 973.076(3) (requiring proof `satisfying or convincing to a reasonable certainty by the greater weight of the credible evidence').]

Under H.R. 1658, a property owner would still have the burden of proving affirmative defenses, such as the `innocent owner' defense, by a preponderance of the evidence. Also, property can still be initially seized by the government based on probable cause, and this standard is sufficient to effect forfeiture in cases where a claim to the seized property is not filed.

# 2. APPOINTMENT OF COUNSEL

There is no Sixth Amendment right to appointed counsel for indigents in civil forfeiture cases, since imprisonment is not threatened. 55

[Footnote] This is undoubtedly one of the primary reasons why so many civil seizures are not challenged. As the cochairs of the National Association of Criminal Defense Lawyers' Forfeiture Abuse Task Force stated before this Committee in 1996: `The reason they are so rarely challenged has nothing to do with the owner's guilt, and everything to do with

the arduous path one must journey against a presumption of guilt, often without the benefit of counsel, and perhaps without any money left after the seizure with which to fight the battle.' 56

[Footnote] This Committee believes that civil forfeiture proceedings are so punitive in nature that appointed counsel should be made available for those who are indigent, or made indigent by a seizure, in appropriate circumstances.

[Footnote 55: See United States v. $292,888.04 in U.S. Currency, 54 F.3d 564, 569 (9th Cir. 1995); United States v. 7108 West Grand Ave., Chicago, Illinois, 15 F.3d 632, 635 (7th Cir. 1994), cert. denied, 114 S. Ct. 2691 (1994).]

[Footnote 56: 1996 Hearing at 289-90 (statement of E.E. (Bo) Edwards III, David Smith, and Richard Troberman).]

H.R. 1658 provides that a federal court may appoint counsel to represent an individual filing a claim in a civil forfeiture proceeding who is financially unable to obtain representation. In determining whether to appoint counsel, the court shall take into account the claimant's standing to contest the forfeiture and whether the claim appears to be made in good faith or to be frivolous. Compensation for appointed counsel will be equivalent to that provided for court-appointed counsel in federal felony cases. Currently, maximum compensation would not exceed $3,500 per attorney for representation before a U.S. district court and $2,500 per attorney for representation before an appellate court. These maximums can be waived in cases of `extended or complex' representation where `excess payment is necessary to provide fair compensation and the payment is approved by the chief judge of the circuit.' 57

[Footnote]

[Footnote 57: 18 U.S.C. 3006A(d).]

# 3. INNOCENT OWNER DEFENSE

The impact of Bennis 58

[Footnote] is limited by the fact that many federal civil forfeiture provisions contain statutory innocent owner defenses. For instance, real property used to commit or to facilitate a federal drug crime is forfeitable unless the violation was `committed or omitted without the knowledge or consent of [the] owner.' 59

[Footnote] Conveyances used in federal drug crimes are not forfeitable `by reason of any act or omission established by that owner to have been committed or omitted without the knowledge, consent, or willful blindness of the owner.' 60

[Footnote] Property involved in certain money laundering transactions shall not be forfeited `by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder.' 61

[Footnote] Other federal civil forfeiture statutes contain no innocent owner defenses. For instance, the statute providing for forfeiture of any property, including money, used in an

illegal gambling business contains no such defense. 62

[Footnote] Many courts require that to qualify as an innocent owner, an owner have done all that reasonably could be expected to prevent the illegal use of the property. 63

[Footnote]

[*Footnote 58:* 516 U.S. at 442.]

[*Footnote 59:* 21 U.S.C. 881(a)(7).]

[*Footnote 60:* 21 U.S.C. 881(a)(4)(C).]

[*Footnote 61:* 18 U.S.C. 981(a)(2).]

[*Footnote 62:* 18 U.S.C. 1955(d).]

[*Footnote 63: See, e.g., United States* v. *One Parcel of Property Located at 755 Forest Road, Northford, Connecticut*, 985 F.2d 70, 72 (2nd Cir. 1993); *United States* v. *One Parcel of Real Estate at 1012 Germantown Road, Palm Beach County, Fla.*, 963 F.2d 1496, 1506 (11th Cir. 1992).]

Not only are these statutory innocent owner defenses nonuniform, but the protections of the ones using the `committed or omitted' language have been seriously eroded by a number of federal courts ruling that qualifying owners must have had no knowledge of *and* provided no consent to the prohibited use of the property. 64

[Footnote] Such an interpretation means that owners who try to end the illegal use by others of their property cannot make use of the defense simply because they knew about such use.

[*Footnote 64: See, e.g., United States* v. *Lot 111-B, Tax Map Key 4-4-03-71(4)*, 902 F.2d 1443, 1445 (9th Cir. 1990) (per curiam). *See, contra, United States* v. *141st St. Corp. by Hersh*, 911 F.2d 870, 877-78 (2nd Cir. 1990), cert. denied, 111 S. Ct. 1017 (1991).]



Believing that a meaningful innocent owner defense is required by fundamental fairness, the Committee sets out an innocent owner defense in H.R. 1658 designed to provide such a defense for all federal civil forfeitures, to make that defense uniform, and to ensure that it offers protection in all appropriate cases.

The innocent owner defense in the bill provides that, with respect to a property interest in existence at the time the illegal conduct giving rise to the forfeiture took place, an innocent owner is an owner who did not know of this conduct or, upon learning of it, did all that reasonably could be expected under the circumstances to terminate such use of the property. One way in which an owner may show that he did all that reasonably could be expected is to demonstrate that he, to the extent permitted by law, (1) gave timely notice to an appropriate law enforcement agency of information that led the person to know the conduct would occur or has occurred, and (2) in a timely fashion revoked or attempted to revoke permission for those engaging in such conduct to use the property

or took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the property.

Thus, a safe harbor is created for an owner who notifies police and revokes or attempts to revoke (to the extent permitted by law) permission to use the property by those who are using it in the course of criminal activity. The owner's obligations end right there-- property owners should not have to assume the responsibilities of police to stop crime. In the Red Carpet Motel incident described earlier, the hotel owner could have taken advantage of the bill's safe harbor by (as he did) notifying police of drug sales taking place at the motel and making a good faith attempt to evict the responsible motel guests from their rooms. In the situation of an apartment building where a tenant is selling illegal drugs, the owner could take advantage of the safe harbor by notifying police and making a good faith attempt to evict the tenants. The term `good faith attempt' is used because in many instances, an owner may be constrained in revoking permission to use property because of provisions of local, state or federal law (i.e., contract or landlord-tenant law). For instance, in many parts of the country it is extremely difficult to evict a tenant because of allegations of illegal drug sales without the tenant having already been convicted of drug trafficking. 65 

[Footnote]

[*Footnote 65:* In some areas of the country, it might be generally agreed to be impossible to evict a tenant without a preexisting criminal conviction--in such a case, the bill would not require an owner to go through the futile motion of seeking eviction in order to enjoy the protection of the safe harbor.]

Finally, an owner is not required--in order to do `all that can reasonably be expected'--to take steps that he reasonably believes would be likely to subject any person (other than the wrongdoer) to physical danger.

With respect to a property interest acquired after the conduct giving rise to the forfeiture has taken place, an innocent owner is generally one who, at the time he acquired the interest in the property, was a bona fide purchaser or seller for value and reasonably without cause to believe that the property was subject to forfeiture. This formulation is required because much fraud could result were innocent donees allowed to be considered innocent owners. As Justice Kennedy noted in dissent in *United States* v. *A Parcel of Land (92 Buena Vista Ave.)*, 66

[Footnote] criminals would then be allowed to shield their property from forfeiture through transfers to relatives.

[*Footnote 66:* 113 S. Ct. 1126, 1146 (1993).]

However, the bill makes exceptions to this formulation in two instances to avoid unjust results. First, a person is considered to be an innocent owner if he acquired an interest in property through probate or inheritance, and was at the time of acquisition reasonably without cause to believe that the property was subject to forfeiture. The risk of a moral hazard here is slight. It is hardly likely that many criminals will commit suicide for the express purpose of foiling imminent seizures by having their property devolved to their heirs. And this policy has a sound basis. A person may have inherited property from a relative without cause to believe that it had been involved in some criminal activity.