# EXHIBIT "3"

## DECLARATION OF VICE-PRESIDENT VUKAS

1.      I voted in favour of the Tribunal's findings contained in paragraph 95 of the Judgment since I agree with these findings with regard to their main objective, that is the release of the *Volga*.

2.      However, I dissociate myself from all statements or conclusions in the Judgment which are based on the proclaimed exclusive economic zone around Heard Island and the McDonald Islands.

I took the same position in the *"Monte Confurco" Case*, questioning on the basis of international law the appropriateness of the establishment of the exclusive economic zone around the Kerguelen Islands.[1] I expressed serious doubts as to whether the establishment of the exclusive economic zone off the shores of those "uninhabitable and uninhabited" islands[2] was in accordance with the reasons which prompted the Third United Nations Conference on the Law of the Sea (UNCLOS III) to create that specific legal régime and with the letter and spirit of the provisions on the exclusive economic zone contained in the United Nations Convention on the Law of the Sea (LOS Convention).

In the present case, an exclusive economic zone has been proclaimed by Australia off the coasts of two uninhabited islands which are much smaller than the Kerguelen Islands. As I did not do so in my Declaration attached to the Judgment in the *"Monte Confurco" Case*, I feel obliged to explain my position concerning the appropriation of vast areas of the oceans by some States which possess tiny uninhabited islands thousands of miles from their own coasts.

**The reasons for the establishment of the exclusive economic zone régime**

3.      Many coastal States have considered it just and equitable to secure for their coastal population some priority in the fisheries even beyond the outer limits of their territorial sea. As a consequence of such a tendency, a resolution adopted at the 1958 United Nations Conference on the Law of the Sea considered the special situation of countries whose coastal population depended "upon coastal fisheries for their livelihood or economic development in an area of the high seas adjacent to the territorial sea of the coastal State ...".[3]

At the Second United Nations Conference on the Law of the Sea (Geneva, 1960) a proposal claiming preferential rights for the fisheries of the coastal State in the high seas adjacent to its waters if "the exploitation of the living resources of the high seas in that area [was] of fundamental importance to the economic development of the coastal State or the feeding of its population" was widely supported.[4]

---

[1] *"Monte Confurco" (Seychelles v. France), Prompt Release, Judgment, ITLOS Reports 2000*, Declaration of Judge Vukas, p. 122.
[2] These were the words used to describe the Kerguelen Islands by Captain Yves de Kerguelen-Trémarec, who discovered them: The Kerguelen Islands, Southern Indian Ocean, www.btinternet.com/~sa_sa/kerguelen_islands.html.
[3] Resolution VI, "Special situations relating to coastal fisheries", *First United Nations Conference on the Law of the Sea, Official Records*, Vol. II (Doc. A/CONF.13/38), p. 144.
[4] Doc. A/CONF.19/L.12, "Brazil, Cuba, and Uruguay: amendments to the second proposal in document A/CONF.19/L.4", *Second United Nations Conference on the Law of the Sea, Official Records*, Vol. I (Doc. A/CONF.19/8), p. 173.

4.    "[T]he concept of preferential rights of fishing in adjacent waters in favour of the coastal State in a situation of special dependence on its coastal fisheries" was in 1974 confirmed by the International Court of Justice as being a concept crystallized as customary international law.[5]

5.    The insistence of developing coastal States that the preferential fishing rights of their population be recognized in an area beyond their territorial waters – already confirmed by the domestic legislation of some of those States – resulted at UNCLOS III in the adoption of the régime of the exclusive economic zone.

The scope of the creation of this new international régime at sea is clearly stated by René-Jean Dupuy:

> The notion of an economic zone, in the view of the developing coastal States, has the purpose of helping them gain access to the resources they previously could not claim; it therefore has unquestionable merit from the standpoint of promoting their interests.[6]

Thus, the protection of the economic interests of the coastal States, and in particular of their population in the coastal areas, has been the essential factor in establishing this new régime at sea. This is clear not only from the name of the new legal régime itself, but also from the main provisions on the exclusive economic zone in the LOS Convention. The basic rule (article 56, paragraph 1(a)) proclaims the sovereign rights of coastal States "for the purpose of exploring and exploiting, conserving and managing the natural resources, whether living or non-living". The conservation and management measures undertaken for the maintenance of the living resources in the zone have to take into account, *inter alia*, "the economic needs of coastal fishing communities" (article 61, paragraph 3).

### The characteristics of Heard Island and the McDonald Islands

6.    All these economic interests and concerns do not exist in respect of uninhabited islands such as Heard Island and the McDonald Islands. There can be no "coastal fishing communities", as "[t]here is no permanent habitation".[7] According to the same source (UNEP – Protected Areas Programme), "Heard Island is visited infrequently, and the McDonald Islands very rarely."

According to *Encyclopaedia Britannica* "[m]uch of its [Heard Island's] surface is covered with snow and ice ... The McDonalds are a group of uninhabited rocky islets 25 miles (40 km) west of Heard Island".[8]

---

[5] *Fisheries Jurisdiction (United Kingdom v. Iceland), Merits, Judgment, I.C.J. Reports 1974,* p. 23.

[6] René-Jean Dupuy, "The Sea under National Competence", René-Jean Dupuy and Daniel Vignes (eds), *A Handbook on the New Law of the Sea,* 1, Martinus Nijhoff Publishers, Dordrecht/Boston/Lancaster, 1991, p. 281.

[7] Protected Areas Programme, World Heritage Sites, Commonwealth of Australia, Heard Island and McDonald Islands (HIMI), <http://www.wcmc.org.uk/protected_areas/data/sample/0399w.htm>.

[8] "Heard and McDonald Islands" *Encyclopaedia Britannica* <http://search.eb.com/eb/article?eu=40541>.

Taking into account all these data, one should not ignore article 121, paragraph 3, of the LOS Convention, where we find many of the elements obviously present in this group of Australian islands/isles/islets/rocks: "Rocks which cannot sustain human habitation or economic life of their own shall have no exclusive economic zone or continental shelf."

Although the terminology used in article 121, paragraph 3, is vague, and the relationships between the components of this rule are rather unclear, taking into account the legislative history of this provision, we must agree with the conclusions arrived at by Barbara Kwiatkowska and Alfred H. A. Soons:

> As the term "rocks" should be construed as not implying any specific geological features, the essential element of the definition is the second one ..., namely that it covers only rocks (islands) "which cannot sustain human habitation or economic life of their own".[9]

### The exclusive economic zone and the preservation of marine resources in the Southern Ocean

7.     In view of the above-mentioned absence of permanent habitation and the geographical and climatic characteristics of Heard Island and the McDonald Islands, it comes as no surprise that some interests and/or concerns other than economic ones are pointed to as the reason for establishing the exclusive economic zone around these islands. Thus, Dr David Bennett, Solicitor-General of the Respondent, said that the establishment of the exclusive economic zone was useful for the more effective preservation of the marine resources in the rather shallow waters surrounding these islands.[10]

Notwithstanding the importance of preservation of marine resources, the argument advanced by Dr Bennett does not sound very convincing, particularly in relation to the sea area in question.

8.     There are two sets of international treaty rules generally applicable to the conservation of the living resources of the high seas: the 1958 Convention on Fishing and Conservation of the Living Resources of the High Seas, and Part VII, section 2, of the LOS Convention, entitled "Conservation and Management of the Living Resources of the High Seas". Both Conventions call for cooperation between States whose nationals exploit the same marine areas. One of the best examples of such cooperation is the conclusion of the Convention on the Conservation of Antarctic Marine Living Resources (CCAMLR - Canberra, 20 May 1980). The Commission for the Conservation of Antarctic Marine Living Resources established under the Convention (article VII) has been entrusted with the adoption of conservation measures and the establishment and implementation of a system of observation and inspection (article IX, paragraph 1(f) and (g)). This system includes, *inter alia*,

> procedures for boarding and inspection by observers and inspectors designated by the Members of the Commission and procedures for flag

---

[9] Barbara Kwiatkowska and Alfred H. A. Soons, "Entitlement to Maritime Areas of Rocks Which Cannot Sustain Human Habitation or Economic Life of Their Own", XXI, *Netherlands Yearbook of International Law*, 1990, p. 153.
[10] ITLOS/PV.02/02, p. 24.

state prosecution and sanctions on the basis of evidence resulting from such boarding and inspections ... (article XXIV, paragraph 2(a)).

It is therefore unnecessary and confusing if individual States adopt and apply their own measures in the exclusive economic zone they have proclaimed inside the area of application of the CCAMLR. In this sense, referring to the French exclusive economic zone, Bruce W. Davis remarked that "consistency has had to give way to the requirements for internal acceptance".[11]

9.      The Report of the Meeting of the Standing Committee on Observation and Inspection (SCOI) of the Commission for the Conservation of Antarctic Marine Living Resources held from 21 to 24 October 2002 provides information about an Australian proposal based on the existence of its exclusive economic zone in the CCAMLR area.[12]  Australia proposed that article 73, paragraph 2, of the LOS Convention be modified to allow the coastal States to "set a bond for the release of an apprehended vessel at a level that was sufficient to deter further illegal fishing", instead of determining a "reasonable bond".  This modification

would apply primarily in the case of fishing vessels that are arrested by the authorities of CCAMLR Member States that exercise jurisdiction and control over maritime areas that are located within the CCAMLR Convention area.

While one might have some sympathy for the Australian proposal as it did not concern the crew ("the requirement for a detaining State to promptly release detained crew would continue to apply"), what is unforgivable is the "specific" interpretation of the text of the LOS Convention:

Australia said that in its view Article 311(3) of UNCLOS allows that two or more States may conclude agreements modifying or suspending the operation of provisions of UNCLOS.

It comes as no surprise that the Australian proposal, including the interpretation of article 311, paragraph 3, of the LOS Convention, was not supported by other members of the Commission.  Three States (Chile, the United Kingdom and New Zealand) politely indicated that the Australian proposal "went beyond the mandate of SCOI" and that it should be discussed directly by the Commission. The Committee endorsed this view.

**Final remark**

10.     The purpose of this brief text is to explain my belief that the establishment of exclusive economic zones around rocks and other small islands serves no useful purpose and that it is contrary to international law.

It is interesting to note that Ambassador Arvid Pardo − the main architect of the contemporary law of the sea − warned the international community of the danger of such a development back in 1971. In the United Nations Seabed Committee he stated:

---

[11] Bruce W. Davis, "The legitimacy of CCAMLR", Olav Schram Stokke and Davor Vidas (eds), *Governing the Antarctic*, Cambridge University Press, 1996, p. 244.

[12] Doc. CCAMLR − XXI/26, 27 October 2002 (pp. 21-22, paras. 5.100-5.106), contained in the Respondent's list of authorities (as document No. 3) submitted to the Tribunal on 11 December 2002.

If a 200 mile limit of jurisdiction could be founded on the possession of uninhabited, remote or very small islands, the effectiveness of international administration of ocean space beyond national jurisdiction would be gravely impaired.[13]

The annexed map showing Australia's exclusive economic zone around Heard Island and the McDonald Islands, provided by the Agent of the Respondent, confirms that Ambassador Pardo's fear has been borne out.

*(Signed)*     Budislav Vukas

---

[13] UN Sea-Bed Committee, Doc. A/AC.138/SR.57, p. 167.

# EXHIBIT "4"



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH



For Immediate Release
Office of the Press Secretary
May 15, 2007

## President's Statement on Advancing U.S. Interests in the World's Oceans

I am acting to advance U.S. interests in the world's oceans in two important ways.

         **White House News**

First, I urge the Senate to act favorably on U.S. accession to the United Nations Convention on the Law of the Sea during this session of Congress. Joining will serve the national security interests of the United States, including the maritime mobility of our armed forces worldwide. It will secure U.S. sovereign rights over extensive marine areas, including the valuable natural resources they contain. Accession will promote U.S. interests in the environmental health of the oceans. And it will give the United States a seat at the table when the rights that are vital to our interests are debated and interpreted.

Second, I have instructed the U.S. delegation to the International Maritime Organization (IMO) to submit a proposal for international measures that would enhance protection of the Papahānaumokuākea Marine National Monument, the area including the Northwestern Hawaiian Islands.

Last June, I issued a proclamation establishing the Monument, a 1,200-mile stretch of coral islands, seamounts, banks, and shoals that are home to some 7,000 marine species. The United States will propose that the IMO designate the entire area as a Particularly Sensitive Sea Area (PSSA) — similar to areas such as the Florida Keys, the Great Barrier Reef, and the Galapagos Archipelago — which will alert mariners to exercise caution in the ecologically important, sensitive, and hazardous area they are entering. This proposal, like the Convention on the Law of the Sea, will help protect the maritime environment while preserving the navigational freedoms essential to the security and economy of every nation.

# # #

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2007/05/20070515-2.html



Case 1:06-cv-00030    Document 96-2    Filed 10/29/2007    Page 8 of 43

# EXHIBIT "5"

<ins>DATE: May 17, 2007 16:54:26 EST</ins>

**FOR IMMEDIATE RELEASE**

*Office of Public Affairs*
**U.S. Coast Guard**

**U.S. Department of
Homeland Security
United States
Coast Guard**

# Press Release

Date: May 17, 2007

Contact: Cmdr. Jeff Carter
(202) 372-4635

## STATEMENT BY ADM. THAD ALLEN, COMMANDANT OF THE COAST GUARD, ON THE CONVENTION ON THE LAW OF THE SEA

WASHINGTON – Adm. Thad Allen, commandant of the U.S. Coast Guard, issued the following statement today reiterating long-standing Coast Guard support for joining the Convention on the Law of the Sea.

"Becoming a party to the 1982 United Nations Convention on the Law of the Sea would greatly enhance our global position in maritime affairs. Because of our maritime security and law enforcement missions, the Coast Guard has long been a proponent of achieving a comprehensive and stable regime with respect to traditional uses of the oceans. The convention greatly enhances our ability to protect the American public as well as our efforts to protect and manage fishery resources and to protect the marine environment. From the Coast Guard's perspective, we can best maintain a public order of the oceans through a universally accepted law of the sea treaty that preserves and promotes critical U.S. national interests.

"The convention strikes the appropriate balance between the interests of

countries in controlling activities off their coasts with the interests of all countries in protecting freedom of navigation. The convention provides the framework under which the Coast Guard is able to interdict illicit drug traffickers and illegal immigrants far beyond our own waters. The convention also gives the coastal state the right to protect its marine environment, manage its fisheries and off-shore oil and gas resources within the 200-nautical mile exclusive economic zone, and secure sovereign rights over resources of the continental shelf beyond 200 nautical miles.

"U.S. military forces, including Coast Guard units, already rely heavily on the freedom of navigation principles codified in the convention. These principles allow the use of the world's oceans to meet changing national security requirements, including those necessary to fight the global war on terrorism. Becoming a party to the convention will enhance our ability to carry out the many maritime missions of the Coast Guard, refute excessive maritime claims, and participate in interpreting and applying the convention to day-to-day realities."

### 

*The U.S. Coast Guard is a military, maritime, multi-mission service within the Department of Homeland Security dedicated to protecting the safety and security of America.*

printer friendly

# EXHIBIT "6"

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

UNITED STATES OF AMERICA,      ) CIVIL CASE NO. CV06-00030
                               )
                   Plaintiff,  )
                               )
          vs.                  )        **◻ COPY**
                               )
MARSHALLS 201,                 )
                               )
                   Defendant.  )

DEPOSITION OF WEN-YUEH LU

Taken on Behalf of the Plaintiff

BE IT REMEMBERED That, pursuant to the Guam Rules of Civil Procedure, the deposition of WEN-YUEH LU was taken before Veronica F. Reilly, Certified Shorthand Reporter, on Thursday, the 7th day of December 2006, at 9:30 o'clock a.m. and on Friday, the 8th day of December 2006, at 10:00 o'clock a.m. at the law offices of Berman O'Connor & Mann, Suite 503, Bank of Guam Building, 111 Chalan Santo Papa, Hagatna, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: (671) 734-1041 Fax: (671) 734.1045
E-mail: veronica.reilly@hotmail.com

Case 1:06-cv-00030 Document 96-2 Filed 10/29/2007 Page 13 of 43

APPEARANCES


Appearing on behalf of the plaintiff:

        UNITED STATES DEPARTMENT OF JUSTICE
        UNITED STATES ATTORNEY'S OFFICE
        Sirena Plaza, Suite 500
        108 Hernan Cortez Avenue
        Hagatna, Guam 96910
        By: Mr. Mikel Schwab, Esq.
        Phone: 671.472.7332


Appearing on behalf of the defendant:

        BERMAN O'CONNOR & MANN
        Suite 503, Bank of Guam Building
        Hagatna, Guam 96910
        By: Mr. Daniel Berman, Esq.
        Phone: 671.477.2778



                ALSO PRESENT


Mr. Ju-Tzu Chuang, Marshalls 201 Representative

Mr. George Castro, Depo Resources Videographer

Mr. Joshua Ahlgren, Depo Resources Videographer

Mr. Jesse Chen, Translator

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
Email: veronica.reilly@hotmail.com

Case 1:06-cv-00008   Document 96-2   Filed 10/29/2007   Page 14 of 43

# INDEX

## EXAMINATION

|              | Direct | Cross | Redirect | Recross |
|--------------|--------|-------|----------|---------|
| Mr. Berman:  | 6      |       | 134      |         |
| Mr. Schwab:  |        | 78    |          | 148     |

## EXHIBITS

                                                                    Page

Exhibit 1: Second Amended Notice.........................5
Exhibit 2: Order.........................................6
Exhibit 3: Copy of Passport..............................6
Exhibit 4: Map..........................................14
Exhibit 4A: Map.........................................15
Exhibit 5: Return of Property Receipt...................22
Exhibit 6: Map..........................................23
Exhibit 7: Return of Property Receipt...................26
Exhibit 8: Federal Register.............................27
Exhibit 9: Map..........................................29
Exhibit 10: Affidavit of John Barylsky..................32
Exhibit 11: Ship's Log..................................35
Exhibit 12: Computer....................................66
Exhibit 12A: Photo of Machine...........................66
Exhibit 13: Computer....................................67
Exhibit 13A: Photo of Computer..........................68

Exhibit 13B: Photo of Computer.........................68

Exhibit 13C: Photo of Computer.........................68

Exhibit 13D: Photo of Computer.........................69

Exhibit 13E: Photo of Computer.........................69

Exhibit 14: Return of Property Receipt.................72

Exhibit 15: Seized Property Receipt....................72

Exhibit 16: Diagram....................................77

Exhibit 17: Diagram...................................144

Exhibit 18: Diagram...................................144

Exhibit A: Signal Code Flags...........................86

Exhibit B: Drawing.....................................98

Exhibit C: Koo's Fishing Company Ltd...................98

Exhibit D: September 7, 2006 Coordinate...............132

Exhibit E: September 9, 2006 Coordinate...............133

Exhibit F: September 9, 2006 Cordinate................133

1     A.   Mr. Lu L-U.

2     Q.   Mr. Lu, do you have a social security number?

3     A.   No, I don't have that.

4          TRANSLATOR:  Excuse me, let me translate.

5     A.   I don't have American numbers.  I don't have

6   American social security number.

7     Q.   Do you have a Taiwan social security number?

8     A.   Yes.  Start with X-1-0-0-4-3-1-0-3-1.

9     Q.   Where were you born?

10    A.   I was born in Taiwan.

11    Q.   What is your citizenship?

12    A.   Republic of China, Taiwan.

13    Q.   Where is your home?

14    A.   Now I'm residing in -- my home was in Ponghu,

15  Taiwan.  My residence now in Kaohsiung, Taiwan.

16    Q.   Do you have a wife?

17    A.   Yes.

18    Q.   Do you have children?

19    A.   Two.

20    Q.   Where do your wife and children live?

21    A.   They also live with me in Kaohsiung.

22    Q.   What is your job now?

23    A.   I'm jobless now.

24    Q.   What was your last job?

25    A.   I'm the fish master of Marshall #201.

1       A.    B class captain's certificate.

2       Q.    And what approximate tonnage can you vessel with a

3   captain's certificate?

4       A.    For the B class, it's from one thousand to two

5   thousand tons.

6       Q.    Has your B class certificate as captain ever been

7   taken away or suspended?

8       A.    No, never.

9       Q.    What government issued your B certificate for

10  captain status?

11      A.    This is the Fishery Department of Republic of China,

12  Taiwan.

13      Q.    Have you ever had a collision at sea while being a

14  captain?

15      A.    No.

16      Q.    Have you ever been stopped in the ocean by the

17  United States Coast Guard?

18      A.    Never.

19      Q.    Have you ever been arrested for illegal activity at

20  sea?

21      A.    No, never.

22      Q.    Have you ever been convicted of a crime in any

23  court?

24      A.    Never.

25      Q.    Have you ever been arrested for any crime before?

1    A.    Never.

2    Q.    What was the first name of your ship and employer as

3  a captain?

4    A.    The ship name is Shimbao when I was twenty-seven

5  age, years of age.

6    Q.    And who was the employer?

7    A.    The name is Azilla, the employer, the name is

8  Azilla.

9    Q.    Do you know what is the meaning of the word fish

10 master?

11   A.    Yes, I understand.

12   Q.    Please explain what is the meaning of fish master.

13   A.    My duty is to catch fish.  My responsibility is to

14 write on the log for the voyage and for the log information

15 recorded on the log and also the fish, how much the fish,

16 catch fish situation on the log, to record it on the log.

17   Q.    What do you do, for example, with actual fishing or

18 use of nets?

19   A.    If you talk about the net, fish net, I'm the one who

20 lie down the fish into the water.

21            MR. SCHWAB:  Lie down the net?

22            TRANSLATOR:  The net, yes.

23 BY MR. BERMAN: (CONTINUING)

24   Q.    Do you supervise other crew on the ship?

25   A.    Yeah, all of the employees and the staffs, they all

1          A.     (Witness complied.)

2          Q.     The record will reflect the witness is indicating

3     with highlighter yellow circle in the middle of Exhibit 4.

4          A.     This area, I circle it, name is Howland Island,

5     Baker Island, belong to US.

6          Q.     Thank you, Mr. Lu.  Is this Exhibit No. 4 the same

7     map that you own or is it a copy of a map that you owned

8     before?

9                    TRANSLATOR:  Repeat your question again.

10         Q.     Is map Exhibit 4 a copy of a map that you owned or

11    is it your original map?

12         A.     Yes, yes.  It's supplied by my company I work with.

13    They supply me this marked No. 4, this map.

14                   MR. BERMAN:  Maybe there's a problem with

15    translation.  My question, Mr. Chen, to Mr. Lu is, is the

16    Exhibit No. 4 in front of us on this table the original map

17    of Mr. Lu or is it a copy of a map Mr. Lu had before.

18         A.     Yeah, on my ship was color, not black and white like

19    this.

20         Q.     And when you say like this, you're pointing to some

21    other document.  What are you pointing at, Mr. Lu?  Mr. Lu,

22    what are you pointing at?

23         A.     This map is all the economic zones of all different

24    nations.

25         Q.     Let me mark what is in front of you as Exhibit 4A

1    and ask you, Mr. Lu, do you recognize Exhibit 4A?

2        A.    Yes, yes, I know.

3        Q.    Have you seen Exhibit 4A before today?

4        A.    Yes, I saw it.

5        Q.    Is Exhibit 4 below it a copy of Exhibit 4A?

6        A.    Yes, this is a copy.

7        Q.    Mr. Lu, before today, did you have your own map that

8    was like Exhibit 4A?

9        A.    Yes, I have.

10       Q.    Where did you last see your personal original map,

11   Exhibit 4A?

12       A.    I had this original in my possessions more than ten

13   years ago.

14       Q.    Did you have an original of Exhibit 4A map with you

15   on the Marshalls 201?

16       A.    Yes, I had this one on the Marshalls 201 ship.

17       Q.    What happened to your personal map?

18       A.    It was held, taken away by Coast Guard.

19       Q.    Mr. Lu, look only at Exhibit 4 now and tell us, what

20   does the solid black line - and I'll indicate with you with

21   bright orange ink - what does that solid black line mean?

22       A.    This is the line we call economic zones within the

23   two hundred miles.

24       Q.    And now, Mr. Lu, let me mark a different line that's

25   dotted instead of straight black with orange ink.  Do you

1      A.    I'm using No. 4 and the 4A.

2      Q.    How did you first receive this map, Exhibit 4?

3      A.    That should be more than ten years ago.

4      Q.    From who did you receive the map?

5      A.    My company.

6      Q.    What was the name of the man and the company who

7    gave you the map, Exhibit 4?

8      A.    The name is Ching Shin Sun.

9      Q.    What place was Mr. Ching when he gave you the map?

10     A.    It's from Taiwan, he gave me in Taiwan.

11     Q.    Do you know who created and published this map,

12   Exhibit 4?

13     A.    I think probably United States.

14     Q.    What was the date that the Marshalls 201 was stopped

15   in the ocean in order to turn about and go to Guam?

16     A.    It's September 9, 2006.

17     Q.    Who ordered the Marshalls 201 to stop sailing and

18   who came onboard to search and directed you to go to Guam?

19     A.    Coast Guard.

20     Q.    Where is your personal and original map, Exhibit 4?

21     A.    Taken away by Coast Guard.

22     Q.    Let me show you Exhibit marked 5, a copy for

23   opposing counsel.  Please look at Exhibit 5.  Have you seen

24   Exhibit 5 before?

25     A.    Yes, I did saw.

1     Q.    Thank you.  Now, Mr. Lu, I'm going to use the

2    straight edge just to point for me.  There's a circle and a

3    number 2, is that correct, where you just placed a point?

4     A.    No.  The one below the number two circles, this one,

5    not the circle with the two.  It's this one.

6     Q.    If I may make an arrow.  Mr. Lu, where I made a red

7    arrow, is that the point on Exhibit 9?

8     A.    Yes.

9     Q.    Let me make a more complete arrow.  For the record,

10   Mr. Lu, where I made a red, straight line arrow, is that the

11   point where you drew from page 8 of Exhibit 10?

12    A.    Right.

13    Q.    And to clarify on page 6 of Exhibit 10, line 28, you

14   made a white dot on the lower hash mark and when that white

15   paint drys, I'll ask you to make a red ink arrow that's

16   larger.  You understand?

17    A.    Yes, okay, understand.

18    Q.    Let me ask you to look at another Exhibit, Mr. Lu.

19   Let me show you what's marked Exhibit 11, copy for opposing

20   counsel.  Do you recognize Exhibit 11?

21    A.    Yes, I am familiar with it.

22    Q.    Have you seen it before today?

23    A.    Yes, I did.

24    Q.    Do you know what is it?

25    A.    This is my sailing log.

1        Q.    Is it a copy or original?

2        A.    This is copies.

3        Q.    Is it a fair and accurate copy of your original

4    ship's log?

5        A.    Yes, identical.

6        Q.    Could you turn to page 41.

7              MR. BERMAN:  Oh, let's go off the record.  He

8    needs to change the tape for the video.

9                              (Off the record.)

10                             (Back on the record.)

11   BY MR. BERMAN:  (CONTINUING)

12       Q.    Mr. Lu, I asked you to turn to page 41 of Exhibit

13   11.  Did you find page 41?

14       A.    Yes.

15       Q.    And did you have personal responsibility for taking

16   care of the ship's log for the Marshalls 201?

17       A.    Yes.

18       Q.    Did the ship's log have your notes for September

19   2006?

20       A.    Yes.

21       Q.    When you navigate, do you write down points or

22   positions?

23       A.    Yes.

24       Q.    What kind of other notes go into the ship's log?

25       A.    For instance, the weather, the climate, it was very

1   bad, we cannot operate.  Or as I understand, it's a

2   mechanical problems.

3       Q.    Do you write the notes personally or do you tell

4   some crewman to write the notes?

5       A.    I personally record it.

6       Q.    Does your ship's log continue with notes through

7   September 9, 2006 when you were stopped by the United States

8   Coast Guard?

9       A.    Yeah, I think two more days after the 9.

10      Q.    What is the September 7, 2006 point entered into the

11  ship log for position of Marshalls 201?

12              **TRANSLATOR:**  September 7, right, your question?

13              **MR. BERMAN:**  Yes.

14      A.    The time is fourteen p.m. forty minutes and log here

15  is SJ 57.  That's a ship, skiff jack.  Fifty tons.  This

16  below the line is the longitude and latitude.

17      Q.    Who wrote the longitude and latitude?

18      A.    I wrote it.

19      Q.    Can you plot that on map Exhibit 9?

20      A.    (No response.)

21      Q.    Mr. Lu, it's just a yes or no question.

22      A.    I can do that.

23      Q.    What is written on September 9, 2006?

24      A.    That's the time I put down the net into the water.

25  I make the -- record first and then I physically throw the

1  net into the ocean.

2      Q.    Is there a location for September 9?

3      A.    Yeah, I have two points, two locations.

4      Q.    Why do you have two points and not one point?

5      A.    Because when the Coast Guard on my ship, so I wrote

6  the seven ton to make sure, that's the time I pick up my net.

7      Q.    To clarify, Mr. Lu, the first point on September 9,

8  2006, what are you and the ship doing when you entered that

9  first point?

10     A.    The first line, besides the September 9, I put

11  sixteen hour and forty minutes and then I wrote down the

12  following on the same line, then I put down the net.

13     Q.    For the first point on September 9 -- Mr. Lu, do you

14  need a break?  Are you okay?

15     A.    Yeah, continue please.

16     Q.    Mr. Lu, for the first point on your September 9,

17  2006 ship's log, what are you and the ship doing at that

18  moment?

19     A.    That's when I'm going to throw the net.  I wrote

20  this before I throw down the net.

21     Q.    And the second point on September 9, 2006, what are

22  you and the ship doing at the time of the second point

23  location?

24     A.    At that time, when the net is hoisted, I wrote down

25  this in trying to record the harvest.

1    Q.   When you say hoisting the net, what more exactly do

2    you mean?

3    A.   At that time, I put the net from the ocean and with

4    the fish is on the board -- on the deck.

5    Q.   At the time the ship is in location of the second

6    point noted on September 9, 2006, is the net completely on

7    the ship or is the net still in the water?

8    A.   He said the second time I put down time whatever is

9    the time we are going to use our troller to start doing

10   operations.

11            MR. BERMAN:  Skiff S-K-I-F-F.

12   A.   The second line is we trying to use the skiff to

13   start the skiff operations.

14   Q.   So to clarify, Mr. Lu, at the time that the

15   Marshalls 201 and you registered the second point on the

16   ship's log, the ship is doing exactly what?  What is the ship

17   exactly doing?

18   A.   So the time the moment is our first catch is already

19   on deck and we are try to start with the skiff, that time, I

20   wrote the second line there.

21   Q.   Just to clarify then, at the time of the second

22   point on September 9, 2006 is noted in the ship's log, the

23   net is completely on deck but you have not retrieved the

24   skiff's boats?  You're retrieving the skiff's boats at that

25   time; is that right?

1    A.    The job is done.  This is the time I already hoist

2   my net and then put back on the ship on the deck and then

3   that's why I wrote down this to indicate the fishing is

4   finished.  Job is done.

5    Q.    What was the source of your position, information

6   that you relied upon to write down the points on September 7

7   and the two points on September 9?  What was the source of

8   your information to write down the points of location of

9   September 7, September 9, 2006?

10    A.    On the 7th, that's our daily work, routine work.

11    Q.    For the September 7, what instrument gave you the

12   information that you recorded as your location point?

13    A.    On the 7th is before my operations, I write down --

14   wrote down all this information there, then I lay down my net

15   into the waters.

16        MR. BERMAN:  Maybe there's a problem with

17   translation, Mr. Chen.  I'm asking for the word instrument.

18   What instrument of navigation provided him the information of

19   the location that was recorded in the ship's log?

20    A.    Those are GPS.

21    Q.    What is the meaning of the letters GPS?

22    A.    That's in a voyage to spot your situations.

23        MR. BERMAN:  I don't understand your English,

24   Mr. Chen.

25        TRANSLATOR:  That's the best I can interpret

1    into English.

2              MR. CHUANG:  GPS global position.

3    BY MR. BERMAN: (CONTINUING)

4        Q.   Mr. Lu, what's the meaning of the letters GPS?

5        A.   Yes.

6        Q.   What's that mean?

7        A.   That means within twenty-four hours, it's all have

8    the spots.

9        Q.   What's the meaning of G for GPS?

10       A.   I don't know.  That's already -- they are some on

11   the airplane, too.

12       Q.   Did the Marshalls 201 have an instrument called GPS?

13       A.   Yeah, there's a -- it's kind of instruments like a

14   meter or whatever.  We had that, GPS.

15       Q.   When you say we had that?

16             TRANSLATOR:  The ship had it.

17       Q.   When you say the ship, what ship do you mean?

18       A.   They use satellite to spot your locations.

19       Q.   When you say we or the ship had it, do you mean the

20   Marshalls 201?

21       A.   Yes, it's on the Marshalls 201.

22       Q.   Mr. Lu, on page 41 of Exhibit 11, September 7, I'll

23   highlight in yellow ink this point.  Were you able to plot

24   this point September 7 onto Exhibit 9?

25       A.   I can do that.

1    Q.   Down further in September 9, I'll highlight in
2  yellow ink, were you able to plot that point on Exhibit 9?

3    A.   Yeah, I can do both.

4    Q.   And September 9, there's a second point; were you
5  able to plot the second point, Mr. Lu?

6    A.   Yes, I can do that.

7    Q.   Let me switch a copy of Exhibit 11 of page 41 for
8  the big book, easier to work from.  On Exhibit 9, can you
9  find the location for September 7 from the ship's log,
10 Exhibit 11?

11           TRANSLATOR:  Start with 9 -- 7, right?

12           MR. BERMAN:  I said September 7.  I hand you a
13 blue ink pen.  Let the record reflect Mr. Lu has accessed a
14 compass to work on Exhibit 9.  Let the record reflect Mr. Lu
15 is, with blue ink pen, marked a point with a blue cross.

16           TRANSLATOR:  It's an X.

17 BY MR. BERMAN: (CONTINUING)

18    Q.   Let me highlight, Mr. Lu, with a straight edge ruler
19 a blue arrow, and if you can, with the blue ink pen next to
20 the arrow, mark SL for ship's log and also indicate 9/7.
21 With the same blue ink pen next to the SL, would you write
22 9/7 to represent September 7?

23           MR. BERMAN:  This is the 9th.  Don't point
24 there.  Thank you, Mr. Chen.

25    A.   Yes, I already put down.  I put SL now.

 1          MR. BERMAN:  Sixty is fine.

 2                          (Lunch break taken at 12:20 p.m.)

 3                          (Back on the record at 1:40 p.m.)

 4          MR. CASTRO:  The time is 1:42.  You may proceed.

 5          MR. BERMAN:  Thank you.

 6   BY MR. BERMAN:  (CONTINUING)

 7       Q.    After lunch recess, Mr. Lu, I had a few more

 8   questions for you.  Let me ask you some brief history

 9   regarding your past.  Have you ever testified in a court

10   under oath before?

11       A.    No.

12       Q.    Have you ever been charged with illegal fishing

13   before?

14       A.    No.

15       Q.    Have you ever violated the fishing laws of any

16   country before?

17       A.    No.

18       Q.    Who was your manager in operation of the Marshalls

19   201?

20       A.    Koo Kwan Ming, that's very famous guy in Taiwan.

21   This Mr. Koo has a fish company.

22       Q.    Do you know what is the Marshall Islands Fishing

23   Company?

24       A.    The main business is the fishing, that company.

25       Q.    Do you know where Marshall Islands Fishing Company

1  A.  His wife has account in certain Taiwan company, they

2  pay the money into that account.  Yeah, that's their

3  tradition is for your families, whatever, put the money.

4  Q.  Did you ever receive bonus money?

5  A.  They have a system, it's a tradition; they encourage

6  you to catch fish, try your best, and important, don't

7  violate the laws.  If any like that, they will have some

8  bonus or whatever to give to you, depends on your catching or

9  whatever.

10  Q.  Did your boss ever warn you to not fish in the US

11  waters?

12  A.  Yes, yes, he told us.

13  Q.  Did your boss ever warn you that you may be punished

14  if you fished in the US waters?

15  MR. SCHWAB:  I object because we don't know who

16  the boss is that we're referring to.

17  MR. BERMAN:  Finish the translation.

18  A.  They warn us, they give us warnings.  He said if

19  ever you violate those laws, we'll cut off our relation to

20  you.  In other words, you are fired.

21  BY MR. BERMAN: (CONTINUING)

22  Q.  Who is, to your understanding, your boss?

23  A.  Still Mr. Koo Kwan Ming is the gentleman.

24  Q.  And when we talk about your work for the company,

25  who would you report to in Majuro, Marshall Islands?

1    BY MR. SCHWAB:

2        Q.    Mr. Lu, I think I've met you before.  We met on the

3    vessel; correct?

4        A.    Yes.

5        Q.    And you're the one with the big cabin, right?

6        A.    Yes.

7        Q.    Because you're in charge of the boat?

8        A.    Yes, also fish master, not the captain.

9        Q.    But the word captain isn't relevant to the fact that

10   you're the one that everyone has to listen to?

11       A.    Yes.

12       Q.    Now, you say you're no longer working for Mr. Koo?

13       A.    No, I used to work for the Marshall Fish Company.

14       Q.    And did someone tell you, you were no longer working

15   for the Marshall Fish Company?

16       A.    Yes.

17       Q.    Who told you, you were no longer working for the

18   Marshall Fish Company?

19       A.    There's a Marshallese natives, he is the manager of

20   Marshall Island -- Majuro.

21             TRANSLATOR:  He told him you are terminated.

22       Q.    Mr. Koo didn't talk to you directly?

23       A.    No.

24       Q.    Did he talk to you when you were hired?

25       A.    No.  My contact is direct with the Marshall Island,

1    Q.    Thank you.  Mr. Lu, I'm going to talk to you about

2  a different subject.  Do you remember the testimony yesterday

3  in discussion of the start-stop, start-stop again of the

4  Marshalls 201 after you brought the net onboard?

5    A.    Yes, I remember.

6    Q.    What was the date of that movement of the Marshalls

7  201 you were referring to?

8    A.    Okay.  I'm ready, you can ask my question now.

9    Q.    Do you remember what is the day of the year?

10   A.    Yes, I remember.

11   Q.    Mr. Lu, I have a copy of an Exhibit 16 for opposing

12  counsel and Exhibit 16.  Do you recognize Exhibit 16?

13   A.    Yes, I remember.

14   Q.    And in the middle of Exhibit 16, there is a point

15  with some numbers and letters and some periods.  Do you

16  recognize that underneath SL?

17   A.    Yes, I understand.

18   Q.    And who wrote the point in the middle under SL?

19   A.    I wrote it.

20   Q.    Did you work on this Exhibit 16?

21   A.    Yes, correct.

22   Q.    And do you understand the distances and the numbers

23  that are inside Exhibit 16?

24   A.    Yes.

25   Q.    Over on your left of the exhibit, and I'll point

1 | from my compass.

2 |     Q.    Mr. Lu, are you okay?  Do you need a drink?

3 |     A.    Okay, thank you.

4 |     Q.    What direction was the drift moving on September 9?

5 |     A.    It's floating toward to 285 degrees.

6 |     Q.    What speed was the drift moving?

7 |     A.    That's the speed that I wrote it here, it's 0.4 to

8 | 0.6.  That's in between that kind of speed.

9 |     Q.    Would you please continue your work to make the

10 | correction.  I see you used red ink to make a correction.

11 | It's hard to read.  Could you make it a stronger correction?

12 |     A.    (Witness complied.)  Because the drift speed cannot

13 | be constant a speed, 0.4 or further, and it's continuous

14 | motion, in a motion forms.  That's why I put down from 0.4 to

15 | 0.6.  That's a promise, my estimate.

16 |     Q.    Mr. Lu, toward the middle of the Exhibit 16, there's

17 | some Chinese characters or language.  Can you read the first

18 | line of Chinese characters?

19 |     A.    All the figures below there is all approximate

20 | figures and the distance.

21 |     Q.    The next Chinese line of characters, can you read it

22 | down three more lines?

23 |     A.    So all these things on this paper is not drawn

24 | according to a ratio scale like you draw in a map.  It's not

25 | such a system.  It's just -- it's not that accurate according

*DEPOSITION*
*DECEMBER 7, 2006*
*WEN YUEH LU*

*EXHIBIT "4"*

Claimed and Potential Maritime Zones in the Central and South Pacific

*DEPOSITION*
*DECEMBER 7, 2006*
*WEN YUEH LU*

*EXHIBIT "9"*



Mercator Projection

0   100   200   300   400   500 Kilometers

0   100   200   300   400   500 Statute Miles

KIRIB 3

(20) Baker I•
2881

2687

2905

Reef (rep 1954)

3050

Winslow Reef
1660
1870 (rep /943)
P A
2960
2740
2800
2650
2500

3013

2987

3300

3120

3140

3300

2880

660

550

2880

2660

2880

2950

(20) C

Mc Kean I
980
1770

2 °   1 °   0 °

3 °

0 °

*DEPOSITION
DECEMBER 7, 2006
WEN YUEH LU*


*EXHIBIT* ***"11"***



17:05　LOG SJ 30T

122°179,03 117ᵂ　其 SJ 20T

9/7　OTC 16-40　LOG SJ 50T

北 08°176 01,18ᵂ　其 300T SJ

9/8　OTC 16-40　LOG SJ 80T

0220 18°175 31,18ᵂ　　其 SJ 80T

9/9　OTC 16-40　　LOG SJ 120T

A　0509 3.18°175,05,121ᵂ　　其 SJ 100T

起網完畢 在 06,5.18° 175,57,021ᵂ OTC 1950

EXHIBIT
11

p.41

魚群濃淡
色特異狀況

魚　　　　獲

*DEPOSITION
DECEMBER 7, 2006
WEN YUEH LU*

*EXHIBIT* ***"16"***



E
N
S
W

285°
0.4 N 0.8 K

600 M
2 mi.
700 M
CALL
900 M
check position
1 LOAD
ENGINE STOP
EXIT
1 mi.
1 mi.
STOP 1 ENGINE
2 mi
STOP 2 ENGINE
1 mi.
S.L. 9/9 B

02.06.518ᴺ 175.57.021ᵂ

（各數字均為估計距離）
ALL POINTS AND DISTANCES
ESTIMATES ONLY

（此圖不完全照比例尺）
NOT DRAWN TO SCALE

（此圖表僅示船動向）
FOR ILLUSTRATION
OF MOVEMENTS

Ex. 4A / Ex. 4
E.E.Z.

5 to 5.5 Mi.

EXHIBIT
16