# EXHIBIT "7"

Country List | World Factbook Home

# The World Factbook

 

## United States Pacific Island Wildlife Refuges





Case 1:06-cv-00030     Document 96-3     Filed 10/29/2007     Page 2 of 29

**Introduction**     **United States Pacific Island Wildlife Refuges**

**Background:**     The following US Pacific island territories constitute the Pacific Remote
Islands National Wildlife Refuge Complex and as such are managed by
the Fish and Wildlife Service of the US Department of Interior. These
remote refuges are the most widespread collection of marine- and
terrestrial-life protected areas on the planet under a single country's
jurisdiction. They protect many endemic species including corals, fish,
shellfish, marine mammals, seabirds, water birds, land birds, insects, and
vegetation not found elsewhere.

*Baker Island:* The US took possession of the island in 1857, and its
guano deposits were mined by US and British companies during the
second half of the 19th century. In 1935, a short-lived attempt at
colonization began on this island but was disrupted by World War II and
thereafter abandoned. The island was established as a National Wildlife
Refuge in 1974.

*Howland Island:* Discovered by the US early in the 19th century, the
island was officially claimed by the US in 1857. Both US and British
companies mined for guano until about 1890. In 1935, a short-lived
attempt at colonization began on this island, similar to the effort on
nearby Baker Island, but was disrupted by World War II and thereafter
abandoned. The famed American aviatrix Amelia EARHART
disappeared while seeking out Howland Island as a refueling stop during
her 1937 round-the-world flight; Earhart Light, a day beacon near the
middle of the west coast, was named in her memory. The island was
established as a National Wildlife Refuge in 1974.

*Jarvis Island:* First discovered by the British in 1821, the uninhabited
island was annexed by the US in 1858, but abandoned in 1879 after tons
of guano had been removed. The UK annexed the island in 1889, but
never carried out plans for further exploitation. The US occupied and
reclaimed the island in 1935 until it was abandoned in 1942 during
World War II. The island was established as a National Wildlife Refuge
in 1974.

*Johnston Atoll:* Both the US and the Kingdom of Hawaii annexed
Johnston Atoll in 1858, but it was the US that mined the guano deposits
until the late 1880s. Johnston and Sand Islands were designated wildlife
refuges in 1926. The US Navy took over the atoll in 1934, and
subsequently the US Air Force assumed control in 1948. The site was
used for high-altitude nuclear tests in the 1950s and 1960s, and until late
in 2000 the atoll was maintained as a storage and disposal site for
chemical weapons. Munitions destruction is now complete. Cleanup and
closure of the facility was completed by May 2005. The Fish and
Wildlife Service and the US Air Force are currently discussing future
management options; in the interim, Johnston Atoll and the three-mile
Naval Defensive Sea around it remain under the jurisdiction and
administrative control of the US Air Force.

*Kingman Reef:* The US annexed the reef in 1922. Its sheltered lagoon
served as a way station for flying boats on Hawaii-to-American Samoa
flights during the late 1930s. There are no terrestrial plants on the reef,
which is frequently awash, but it does support abundant and diverse
marine fauna and flora. In 2001, the waters surrounding the reef out to 12

nm were designated a US National Wildlife Refuge.

*Midway Islands:* The US took formal possession of the islands in 1867. The laying of the trans-Pacific cable, which passed through the islands, brought the first residents in 1903. Between 1935 and 1947, Midway was used as a refueling stop for trans-Pacific flights. The US naval victory over a Japanese fleet off Midway in 1942 was one of the turning points of World War II. The islands continued to serve as a naval station until closed in 1993. Today the islands are a National Wildlife Refuge and are the site of the world's largest Laysan albatross colony.

*Palmyra Atoll:* The Kingdom of Hawaii claimed the atoll in 1862, and the US included it among the Hawaiian Islands when it annexed the archipelago in 1898. The Hawaii Statehood Act of 1959 did not include Palmyra Atoll, which is now partly privately owned by the Nature Conservancy with the rest owned by the Federal government and managed by the US Fish and Wildlife Service. These organizations are managing the atoll as a wildlife refuge. The lagoons and surrounding waters within the 12 nm US territorial seas were transferred to the US Fish and Wildlife Service and designated as a National Wildlife Refuge in January 2001.

| | |
|---|---|
| **Geography** | **United States Pacific Island Wildlife Refuges** |
| **Location:** | Oceania |

*Baker Island:* atoll in the North Pacific Ocean 1,830 nm (3,389 km) southwest of Honolulu, about half way between Hawaii and Australia
*Howland Island:* island in the North Pacific Ocean 1,815 nm (3,361 km) southwest of Honolulu, about half way between Hawaii and Australia
*Jarvis Island:* island in the South Pacific Ocean 1,305 nm (2,417 km) south of Honolulu, about half way between Hawaii and the Cook Islands
*Johnston Atoll:* atoll in the North Pacific Ocean 717 nm (1,328 km) southwest of Honolulu, about one-third of the way from Hawaii to the Marshall Islands
*Kingman Reef:* reef in the North Pacific Ocean 930 nm (1,722 km) south of Honolulu, about half way between Hawaii and American Samoa
*Midway Islands:* atoll in the North Pacific Ocean 1,260 nm (2,334 km) northwest of Honolulu near the end of the Hawaiian Archipelago, about one-third of the way from Honolulu to Tokyo
*Palmyra Atoll:* atoll in the North Pacific Ocean 960 nm (1,778 km) south of Honolulu, about half way between Hawaii and American Samoa

**Geographic coordinates:**
*Baker Island:* 0 13 N, 176 28 W
*Howland Island:* 0 48 N, 176 38 W
*Jarvis Island:* 0 23 S, 160 01 W
*Johnston Atoll:* 16 45 N, 169 31 W
*Kingman Reef:* 6 23 N, 162 25 W
*Midway Islands:* 28 12 N, 177 22 W
*Palmyra Atoll:* 5 53 N, 162 05 W

**Map references:** Oceania

**Area:** total - 6,959.41 sq km; emergent land - 22.41 sq km; submerged - 6,937 sq km

*Baker Island:* total - 129 sq km; emergent land - 2.1 sq km; submerged - 127 sq km
*Howland Island:* total - 139 sq km; emergent land - 2.6 sq km; submerged - 136 sq km
*Jarvis Island:* total - 152 sq km; emergent land - 5 sq km; submerged - 147 sq km
*Johnston Atoll:* total - 276.6 sq km; emergent land - 2.6 sq km; submerged - 274 sq km
*Kingman Reef:* total - 1,958.01 sq km; emergent land - 0.01 sq km; submerged - 1,958 sq km
*Midway Islands:* total - 2,355.2 sq km; emergent land - 6.2 sq km; submerged - 2,349 sq km
*Palmyra Atoll:* total - 1,949.9 sq km; emergent land - 3.9 sq km; submerged - 1,946 sq km

**Area - comparative:** *Baker Island:* about two and a half times the size of The Mall in Washington, DC
*Howland Island:* about three times the size of The Mall in Washington, DC
*Jarvis Island:* about eight times the size of The Mall in Washington, DC
*Johnston Atoll:* about four and a half times the size of The Mall in Washington, DC
*Kingman Reef:* a little more than one and a half times the size of The Mall in Washington, DC
*Midway Islands:* about nine times the size of The Mall in Washington, DC
*Palmyra Atoll:* about 20 times the size of The Mall in Washington, DC

**Land boundaries:** none

**Coastline:** *Baker Island:* 4.8 km
*Howland Island:* 6.4 km
*Jarvis Island:* 8 km
*Johnston Atoll:* 34 km
*Kingman Reef:* 3 km
*Midway Islands:* 15 km
*Palmyra Atoll:* 14.5 km

**Maritime claims:** *territorial sea:* 12 nm
*exclusive economic zone:* 200 nm

**Climate:** *Baker, Howland, and Jarvis Islands:* equatorial; scant rainfall, constant wind, burning sun
*Johnston Atoll and Kingman Reef:* tropical, but generally dry; consistent northeast trade winds with little seasonal temperature variation
*Midway Islands:* subtropical with cool, moist winters (December to February) and warm, dry summers (May to October); moderated by prevailing easterly winds; most of the 1,067 mm (42 in) of annual rainfall occurs during the winter
*Palmyra Atoll:* equatorial, hot; located within the low pressure area of the Intertropical Convergence Zone (ITCZ) where the northeast and

|  | southeast trade winds meet, it is extremely wet with between 4,000-5,000 mm (160-200 in) of rainfall each year |
|---|---|
| **Terrain:** | low and nearly level sandy coral islands with narrow fringing reefs that have developed at the top of submerged volcanic mountains, which in most cases rise steeply from the ocean floor |
| **Elevation extremes:** | *lowest point:* Pacific Ocean 0 m<br>*highest point:* Baker Island, unnamed location - 8 m; Howland Island, unnamed location - 3 m; Jarvis Island, unnamed location - 7 m; Johnston Atoll, Sand Island - 10 m; Kingman Reef, unnamed location - less than 1 m; Midway Islands, unnamed location - 13 m; Palmyra Atoll, unnamed location - 2 m |
| **Natural resources:** | terrestrial and aquatic wildlife |
| **Land use:** | *arable land:* 0%<br>*permanent crops:* 0%<br>*other:* 100% (2005) |
| **Natural hazards:** | *Baker, Howland, and Jarvis Islands:* the narrow fringing reef surrounding the island can be a maritime hazard<br>*Kingman Reef:* wet or awash most of the time, maximum elevation of less than 1 m makes Kingman Reef a maritime hazard<br>*Midway Islands, Johnston, and Palmyra Atolls:* NA |
| **Environment - current issues:** | *Baker, Howland, and Jarvis Islands, and Johnston Atoll:* no natural fresh water resources<br>*Kingman Reef:* none<br>*Midway Islands and Palmyra Atoll:* NA |
| **Geography - note:** | *Baker, Howland, and Jarvis Islands:* scattered vegetation consisting of grasses, prostrate vines, and low growing shrubs; primarily a nesting, roosting, and foraging habitat for seabirds, shorebirds, and marine wildlife<br>*Johnston Atoll:* Johnston Island and Sand Island are natural islands, which have been expanded by coral dredging; North Island (Akau) and East Island (Hikina) are manmade islands formed from coral dredging; the egg-shaped reef is 34 km in circumference<br>*Kingman Reef:* barren coral atoll with deep interior lagoon; closed to the public<br>*Midway Islands:* a coral atoll managed as a national wildlife refuge and open to the public for wildlife-related recreation in the form of wildlife observation and photography<br>*Palmyra Atoll:* the high rainfall and resulting lush vegetation make the environment of this atoll unique among the US Pacific Island territories; it supports one of the largest remaining undisturbed stands of Pisonia beach forest in the Pacific |

**People**     **United States Pacific Island Wildlife Refuges**

| **Population:** | no indigenous inhabitants |
|---|---|

*note:* public entry is by special-use permit from US Fish and Wildlife Service only and generally restricted to scientists and educators; visited annually by US Fish and Wildlife Service
*Johnston Atoll:* in previous years, an average of 1,100 US military and civilian contractor personnel were present; as of May 2005 all US government personnel had left the island
*Midway Islands:* approximately 40 people make up the staff of US Fish and Wildlife Service and their services contractor living at the atoll
*Palmyra Atoll:* four to 20 Nature Conservancy and US Fish and Wildlife staff

## Government        United States Pacific Island Wildlife Refuges

**Country name:**   *conventional long form:* none
*conventional short form:* Baker Island; Howland Island; Jarvis Island; Johnston Atoll; Kingman Reef; Midway Islands; Palmyra Atoll

**Dependency status:**   unincorporated territories of the US; administered from Washington, DC, by the Fish and Wildlife Service of the US Department of the Interior as part of the National Wildlife Refuge system
*note on Palmyra Atoll:* incorporated Territory of the US; partly privately owned and partly federally owned; administered from Washington, DC, by the Fish and Wildlife Service of the US Department of the Interior; the Office of Insular Affairs of the US Department of the Interior continues to administer nine excluded areas comprising certain tidal and submerged lands within the 12 nm territorial sea or within the lagoon

**Legal system:**   the laws of the US, where applicable, apply

**Flag description:**   the flag of the US is used

## Economy        United States Pacific Island Wildlife Refuges

**Economy - overview:**   no economic activity

## Transportation  United States Pacific Island Wildlife Refuges

**Airports:**   *Baker Island:* one abandoned World War II runway of 1,665 m covered with vegetation and unusable
*Howland Island:* airstrip constructed in 1937 for scheduled refueling stop on the round-the-world flight of Amelia EARHART and Fred NOONAN; the aviators left Lae, New Guinea, for Howland Island but were never seen again; the airstrip is no longer serviceable
*Johnston Atoll:* one closed and not maintained
*Kingman Reef:* lagoon was used as a halfway station between Hawaii and American Samoa by Pan American Airways for flying boats in 1937 and 1938
*Midway Islands:* 3 - one operational (2,409 m paved); no fuel for sale except emergencies
*Palmyra Atoll:* 1 - 1,846 m unpaved runway; privately owned (2006)

Case 1:06-cv-00030    Document 96-3    Filed 10/29/2007    Page 7 of 29

| | |
|---|---|
| **Ports and terminals:** | *Baker, Howland, and Jarvis Islands, and Kingman Reef:* none; offshore anchorage only<br>*Johnston Atoll:* Johnston Island<br>*Midway Islands:* Sand Island<br>*Palmyra Atoll:* West Lagoon |

## Military

**United States Pacific Island Wildlife Refuges**

**Military - note:** defense is the responsibility of the US

## Transnational Issues

**United States Pacific Island Wildlife Refuges**

**Disputes - International:** none

This page was last updated on 20 September, 2007

# EXHIBIT "8"

DAVIS WRIGHT TREMAINE
LIBRARY
2600 CENTURY SQUARE
1501 FOURTH AVENUE
SEATTLE, WASHINGTON 98101

RESTATEMENT OF THE LAW THIRD

———

THE AMERICAN LAW INSTITUTE

———

# RESTATEMENT OF THE LAW

## THE

# FOREIGN RELATIONS LAW

## OF THE

# UNITED STATES

Volume 1

§§ 1–488

*As Adopted and Promulgated*

BY

THE AMERICAN LAW INSTITUTE
AT WASHINGTON, D.C.

May 14, 1986



ST. PAUL, MINN.
AMERICAN LAW INSTITUTE PUBLISHERS

cluding entities whose status is challenged by a substantial number of states. This policy was followed generally in the 1970's.

The Conference also debated whether there might be dependent states lacking treaty-making authority, but this concept aroused intense opposition in the less-developed world.

Despite the terms of the Vienna Convention, a number of international agreements are open to entities not possessing all the qualities of states. See, e.g., Article 305 of the Law of the Sea Convention, Part V; § 201, Reporters' Note 6.

2. *Federal states.* The draft prepared by the International Law Commission provided that a state that was a member of a federal union had treaty-making capacity if the federal constitution so provided. Some countries (*e.g.*, Canada) feared that the provision might permit an outside body to interpret their constitutions; the paragraph was eliminated. On the authority of States of the United States, see Comment *a* and § 302, Comment *f.*

3. *Full powers in United States practice.* The United States practice with regard to full powers is outlined in Circular 175, § 732, 11 Foreign Affairs Manual ch. 700, [1974] Digest of U.S. Practice in Int'l L. 199, 209 as updated.

4. *Apparent authority to conclude agreements.* Decisions of the Permanent Court of International Justice support the rule that a state is bound by apparent authority where lack of authority is not obvious to outside parties, Subsection (3). For example, in the Legal Status of Eastern Greenland, P.C. I.J. ser. A/B, No. 53 (1933), at 71, the Court stated: "it [is] beyond all dispute that a reply of this nature given by the Minister of Foreign Affairs on behalf of his Government in response to a request by the diplomatic representative of a foreign Power, in regard to a question falling within his province, is binding upon the country to which the Minister belongs." See also Free Zones of Upper Savoy and the District of Gex, P.C.I.J. ser. A/B, No. 46 (1932) (undertaking by agent of Switzerland to agent of France during oral argument before Court held binding). Subsection (3) is analogous to national laws as to the authority of agents.

5. *Previous Restatement.* Subsection (1) had no counterpart in the previous Restatement. Subsection (2) is in accord with previous Restatement § 123, Comment *c.* Subsection (3) is generally consistent with § 123 of the previous Restatement, which used principles of "actual" and "apparent" authority derived from Anglo-American agency law to describe the power of agents to bind a state. That under the present Restatement a violation of internal law must be "manifest" may make escape from obligations more difficult than under the rule as stated in the previous Restatement.

## § 312.  Entry into Force of International Agreements

(1) An international agreement enters into force when all the negotiating states have expressed consent to be bound, or as otherwise provided in the agreement.

171

Case 1:06-cv-00030    Document 96-3    Filed 10/29/2007    Page 11 of 29

(2) Consent of a state to be bound may be expressed by means provided in the agreement, or may be indicated in the full powers of the state representatives, or by other evidence of the state's intentions.

(3) Prior to the entry into force of an international agreement, a state that has signed the agreement or expressed its consent to be bound is obliged to refrain from acts that would defeat the object and purpose of the agreement.

**Source Note:**

Subsection (1) follows Article 24 of the Vienna Convention. Subsection (2) condenses provisions of Articles 11 to 16 of the Convention. Subsection (3) follows Article 18 of the Convention.

**Comment:**

a. *Establishment of text of multilateral agreement.* The first step toward formalizing a multilateral international agreement is the establishment of a text. The text of an international agreement is established as authentic and definitive (a) by the procedure provided in the text, or agreed upon by the states participating in an international conference; or (b) if no such procedure is provided or agreed, by signature, signature *ad referendum,* or initialing, of the text of the agreement or the final act of a conference incorporating the text. Vienna Convention, Article 10. Normally, the adoption of the text of an agreement takes place by consent of all states participating in its drafting. The adoption of a text at an international conference takes place by a vote of two-thirds of the states present and voting, unless by the same majority the conference decides to apply a different rule. Vienna Convention, Article 9.

b. *Entry into force.* A multilateral international agreement enters into force when all negotiating states have agreed to be bound or when a lesser number stipulated in the agreement has so agreed. If a state consents to be bound after the agreement has come into force, the agreement enters into force for that state as of the date of its consent unless the agreement otherwise provides. The provisions of an agreement regulating the authentication of its text, the manner in which the consent of states to be bound is to be established, the manner or date of entry into force, reservations, the functions of the depositary, and other matters arising necessarily before the entry into force of the agreement apply from the time of adoption of its text.

172

the known or presumed intent of Congress, in the light of changing understandings. See, *e.g.*, § 415, Reporters' Note 4, § 416, Reporters' Note 1. Courts in other countries, and the Court of Justice of the European Communities, have also considered the rules, sometimes in construing the reach of the legislation of their own states, or the Community, sometimes in considering the reach of United States law. See, *e.g.*, § 415, Reporters' Note 9. Inevitably, the rules themselves have changed, reflecting transformations in global communications, in the level and variety of transnational activity, and in perceptions of the way states interact with one another.* In a number of contexts the question of jurisdiction to prescribe resembles questions traditionally explored under the heading of conflict of laws or private international law. This chapter, however, concentrates on so-called public law—tax, antitrust, securities regulation, labor law, and similar legislation. The issues addressed may arise in private litigation, but the rules stated in this chapter do not necessarily apply to controversies unrelated to public law issues. Some other issues often discussed in the framework of international conflict of laws are addressed in other chapters of this part, *e.g.*, Chapters 2 and 8.

Territoriality and nationality remain the principal bases of jurisdiction to prescribe, but in determining their meaning rigid concepts have been replaced by broader criteria embracing principles of reasonableness and fairness to accommodate overlapping or conflicting interests of states, and affected private interests. Courts and other decision makers, learning from the approach to comparable problems in private international law, are increasingly inclined to consider various interests, examine contacts and links, give effect to justified expectations, search for the "center of gravity" of a given situation, and develop priorities. This Restatement follows this approach in adopting the principle of reasonableness.

## § 402. Bases of Jurisdiction to Prescribe

Subject to § 403, a state has jurisdiction to prescribe law with respect to

    (1) (a) conduct that, wholly or in substantial part, takes place within its territory;

        (b) the status of persons, or interests in things, present within its territory;

---

* See, generally, Lowenfeld, "Public Law in the International Arena: Conflict of Laws, International Law, and Some Suggestions for Their Interaction," 163 Hague Academy, Recueil des Cours 311 (1979).

Case 1:06-cv-00030   Document 96-3   Filed 10/29/2007   Page 13 of 29

     (c) conduct outside its territory that has or is intended to have substantial effect within its territory;

  (2) the activities, interests, status, or relations of its nationals outside as well as within its territory; and

  (3) certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests.

**Comment:**

   *a. Bases of jurisdiction to prescribe.* International law recognizes links of territoriality, Subsection (1), and nationality, Subsection (2), as generally justifying the exercise of jurisdiction to prescribe. But these links are not sufficient in all cases: not all activities within a state's territory, nor all activities of a state's nationals, may reasonably be subjected to its legislation. See § 403. The links indicated in this section are universally recognized. Other links may also be sufficient to support jurisdiction in limited circumstances. See, *e.g.,* Comment *g* to this section and § 414.

   Subsection (3) recognizes a special basis of jurisdiction to prescribe which permits a state to safeguard a limited class of state interests, Comment *f.* For exceptional universal jurisdiction by all states, see § 404.

   *b. Overlap of bases of jurisdiction.* Territoriality and nationality are discrete and independent bases of jurisdiction; the same conduct or activity may provide a basis for exercise of jurisdiction both by the territorial state and by the state of nationality of the actor. Territoriality is considered the normal, and nationality an exceptional, basis for the exercise of jurisdiction. In some situations the existence of both links may be important to make the exercise of jurisdiction reasonable. An exercise of jurisdiction on the basis of effect in the territory (Subsection (1)(c)), for example, may be more acceptable with respect to nationals of the state exercising jurisdiction than with respect to nonresident aliens. The exercise of jurisdiction both by the state of nationality and by the territorial state may result in overlap or conflict, actual or potential, and may call for evaluation of the competing interests by a standard of reasonableness, as set forth in § 403(3) and Comment *e* to that section.

   *c. The principle of territoriality.* The territorial principle is by far the most common basis for the exercise of jurisdiction to

Case 1:06-cv-00030    Document 96-3    Filed 10/29/2007    Page 14 of 29

prescribe, and it has generally been free from controversy. However, in some circumstances there may be controversy as to whether a person or property can properly be deemed present in the state's territory for purposes of jurisdiction, or whether the territorial principle can be satisfied without the physical presence of the person or thing being subjected to jurisdiction. Some states, including the United States, have asserted jurisdiction over goods or technology located abroad on the basis of their origin in the state exercising jurisdiction. See, *e.g.*, § 431, Reporters' Note 3. States have sometimes exercised jurisdiction with respect to foreign companies outside their territory on the basis of the state's control over affiliates present in the territory. See, *e.g.*, § 412, Comment *e* and Reporters' Note 7; § 414, Comment *a* and Reporters' Note 2. For the effects principle as an aspect of territoriality, see Comment *d*.

*d. Effects principle.* Jurisdiction with respect to activity outside the state, but having or intended to have substantial effect within the state's territory, is an aspect of jurisdiction based on territoriality, although it is sometimes viewed as a distinct category. The effects principle is not controversial with respect to acts such as shooting or even sending libelous publications across a boundary. It is generally accepted with respect to liability for injury in the state from products made outside the state and introduced into its stream of commerce. Controversy has arisen as a result of economic regulation by the United States and others, particularly through competition laws, on the basis of economic effect in their territory, when the conduct was lawful where carried out. This Restatement takes the position that a state may exercise jurisdiction based on effects in the state, when the effect or intended effect is substantial and the exercise of jurisdiction is reasonable under § 403.

Cases involving intended but unrealized effect are rare, but international law does not preclude jurisdiction in such instances, subject to the principle of reasonableness. When the intent to commit the proscribed act is clear and demonstrated by some activity, and the effect to be produced by the activity is substantial and foreseeable, the fact that a plan or conspiracy was thwarted does not deprive the target state of jurisdiction to make its law applicable. See cases cited in § 403, Reporters' Note 8.

*e. Nationality, domicile, and residence.* International law has increasingly recognized the right of a state to exercise jurisdiction on the basis of domicile or residence, rather than nationality, especially in regard to "private law" matters such as the law of wills and succession, divorce and family rights, and, in some cases,

Case 1:06-cv-00030    Document 96-3    Filed 10/25/2007    Page 15 of 29

DAVIS WRIGHT TREMAINE
LIBRARY
2600 CENTURY SQUARE
1501 FOURTH AVENUE
SEATTLE WASHINGTON 98101

RESTATEMENT OF THE LAW THIRD

THE AMERICAN LAW INSTITUTE

# RESTATEMENT OF THE LAW

## THE

# FOREIGN RELATIONS LAW

### OF THE

# UNITED STATES

Volume 2

§§ 501–End

TABLES and INDEX

*As Adopted and Promulgated*

BY

THE AMERICAN LAW INSTITUTE

AT WASHINGTON, D.C.

May 14, 1986



ST. PAUL, MINN.

**AMERICAN LAW INSTITUTE PUBLISHERS**

1987

# Chapter Two

# RIGHTS AND DUTIES OF COASTAL AND PORT STATES

Section

511. Coastal State Authority in Zones of Adjacent Sea
512. Coastal State Sovereignty over Territorial Sea
513. Passage Through Territorial Sea, Straits, and Archipelagic Waters
514. Exclusive Economic Zone
515. Continental Shelf
516. Delimitation of Territorial Sea
517. Delimitation of Exclusive Economic Zone and Continental Shelf

## § 511. Coastal State Authority in Zones of Adjacent Sea

Subject to §§ 512–15, a coastal state may exercise jurisdiction over the following coastal zones:

(a) The territorial sea: a belt of sea that may not exceed 12 nautical miles, measured from a baseline that is either the low-water line along the coast or the seaward limit of the internal waters of the coastal state or, in the case of an archipelagic state, the seaward limit of the archipelagic waters;

(b) The contiguous zone: a belt of sea contiguous to the territorial sea, which may not extend beyond 24 nautical miles from the baseline from which the breadth of the territorial sea is measured;

(c) The continental shelf: the sea-bed and subsoil of the submarine areas that extend beyond the coastal state's territorial sea

　(i) throughout the natural prolongation of the state's land territory to the outer edge of the continental margin, subject to certain limitations based on geological and geographical factors; or

　(ii) to a distance of 200 nautical miles from the baseline from which the breadth of the territorial sea is measured, where there is no continental margin off the coast or where

25

the continental margin does not extend to that distance;

(d) **The exclusive economic zone: a belt of sea beyond the territorial sea that may not exceed 200 nautical miles from the baseline from which the breadth of the territorial sea is measured.**

**Source Note:**

Subsections (a) and (b) combine elements of Articles 1(1), 3, and 5 of the 1958 Convention on the Territorial Sea and the Contiguous Zone, and of Articles 2(1), 3, 5, and 8(1) of the LOS Convention. Subsection (c) follows Article 76 of the LOS Convention (modifying considerably Article 1 of the 1958 Convention on the Continental Shelf). Subsection (d) follows Articles 55 and 57 of the LOS Convention; there was no such provision in the 1958 Conventions.

**Comment:**

*a. Different coastal state authority in different zones.* The authority of the coastal state is different in the different zones defined in this section. The coastal state exercises sovereignty in the territorial sea; limited policing rights in the contiguous zone; sovereign rights over the natural resources of the continental shelf and over economic exploitation of the exclusive economic zone; and limited jurisdiction within the exclusive economic zone with regard to marine scientific research, the protection and preservation of the marine environment, and artificial islands and certain installations and structures. *Compare* § 512 and § 513 *with* § 514 and § 515. With respect to matters falling within its authority in the particular zone, the coastal state generally has jurisdiction to prescribe, to adjudicate, and to enforce by nonjudicial measures, but such jurisdiction is not necessarily exclusive. See Introductory Note to Part IV.

*b. "Sovereignty" and "sovereign rights."* A state has complete sovereignty over the territorial sea, analogous to that which it possesses over its land territory, internal waters, and archipelagic waters. See § 512; LOS Convention, Article 2(1). See also the 1958 Convention on the Territorial Sea and the Contiguous Zone, Article 1(1). The sovereignty over the territorial sea is subject, however, to the right of innocent passage for foreign vessels (*id.* Articles 1(2) and 14(1); LOS Convention, Articles 2(3) and 17; see § 513(1) and (2)). The territorial sea within a strait or adjacent to archipelagic waters is also subject to the right of transit passage or archipelagic sea lanes passage (LOS Convention, Articles 38 and 53(1); see § 513(3) and (4)).

26

## § 514. Exclusive Economic Zone

In the exclusive economic zone (§ 511(d)):

(1) The coastal state has

(a) sovereign rights for the purpose of exploring, exploiting, conserving, and managing the natural resources of the sea-bed and subsoil and of the superjacent waters, and engaging in other activities for the economic exploration and exploitation of the zone, and

(b) authority, subject to limitations, to regulate (i) the establishment and use of artificial islands, and of installations and structures for economic purposes; (ii) marine scientific research; and (iii) the protection of the marine environment.

(2) All states enjoy, as on the high seas, the freedoms of navigation and overflight, freedom to lay submarine cables and pipelines, and the right to engage in other internationally lawful uses of the sea related to these freedoms, such as those associated with the operation of ships or aircraft.

### Source Note:

This section is based on Articles 56 and 58 of the LOS Convention, but "authority" is used here instead of "jurisdiction" to avoid confusion with the uses of the term "jurisdiction" in Part IV of this Restatement.

### Comment:

a. *Exclusive economic zone as customary law.* Recent practice of states, supported by the broad consensus achieved at the Third United Nations Conference on the Law of the Sea, has effectively established as customary law the concept of the exclusive economic zone, the width of the zone (up to 200 nautical miles), and the basic rules governing it. These are binding, therefore, on states generally even before the LOS Convention comes into effect and thereafter even as to states not party to the Convention. In those respects the Convention is an authoritative statement of customary law. See Introductory Note to this Part and § 511, Reporters' Note 7. Some of the detailed provisions in the Convention, however, do not reflect customary law (as of 1987) and will be binding only when the Convention comes into effect and only on states parties to the Convention. See Comment *j.*

56

This section applies only to the territorial sea; for the delimitation of the continental shelf and the exclusive economic zone, see § 517.

   *b. Special circumstances.* The existence of a "historic title" may be established by appropriate evidence. It is uncertain what other "special circumstances" would justify a state in extending its territorial sea beyond the median line. In practice, delimitation has taken into account special geographic factors such as islands so located that they distort the effects of a median-line delimitation. See also § 517, Comment *c.*

### REPORTERS' NOTES

   1. *Delimitation of territorial sea not controversial.* Unlike the principles governing delimitation of the exclusive economic zone and the continental shelf (§ 517), the principle embodied in this section, as formulated by the First United Nations Conference on the Law of the Sea, was accepted without difficulty by the Third Conference. For various delimitation issues faced by the United States, and agreements on the subject among adjacent states, see 4 Whiteman, Digest of International Law 309–11, 326–27, 333–35 (1965).

   2. *Previous Restatement.* Article 12 of the 1958 Convention on the Continental Shelf, substantially identical with this section, was set forth in § 15, Reporters' Note 3, of the previous Restatement without comment.

## § 517.   Delimitation of Exclusive Economic Zone and Continental Shelf

   **(1) The delimitation of the exclusive economic zone or the continental shelf between states with opposite or adjacent coasts is to be effected by agreement.**

   **(2) In the absence of agreement, such boundary is the line resulting from the application of equitable principles that produces an equitable result, taking into account the circumstances of the area concerned.**

### Source Note:

   This section departs to some extent from the language but not the spirit of Articles 74 and 83 of the LOS Convention, adopting the interpretation of these articles by the Chamber of the International Court of Justice in the Case Concerning Delimitation of the Maritime Boundary in the Gulf of Maine Area (Canada/United States), [1984] I.C.J. Rep. 246, 299–300.

Case 1:06-cv-00030     Document 96-3     Filed 10/29/2007     Page 20 of 29

# EXHIBIT "9"

# ADMIRALTY AND MARITIME LAW

## Fourth Edition

By

### Thomas J. Schoenbaum

*Professor of International Studies,*
*International Christian University, Tokyo*
*Visiting Professor of Law, George Washington University*
*Dean and Virginia Rusk Professor of Law Emeritus,*
*University of Georgia*

## Volume 1

## Chapters 1–10

### PRACTITIONER TREATISE SERIES®

**THOMSON**
———✳———™
**WEST**

Mat # 40165372

the Law of the Sea Convention, the contiguous zone may not extend more than 24 miles from the baseline.[2]

Under United States law, a U.S. customs official may board any vessel within United States "customs waters" to search and inspect its cargo.[3] On September 2, 1999, President William J. Clinton issued a Proclamation formally extending the contiguous zone of the United States to 24 miles from the baseline.[4]

## § 2-16.  The Exclusive Economic Zone

One of the most important concepts agreed upon at the Third Conference on the Law of the Sea was the Exclusive Economic Zone (EEZ).[1] This area begins at the outer limit of the territorial sea[2] and extends 200 miles from the baseline of the coastal state.[3] Within this area, the coastal state may exercise "sovereign rights" over mineral and fisheries and other living resources in the waters, in the subsoil, and on the seabed.[4] Such sovereign rights also extend to "other economic activities, such as the production of energy from the water, currents, and winds."[5] In addition, the coastal state is granted "jurisdiction" over (1) the establishment and use of artificial islands, installations, and other structures; (2) marine scientific research; and (3) the protection of the marine environment.[6]

The primary impetus for the concept of the EEZ was to establish coastal state jurisdiction over offshore fisheries resources. Each coastal state has the right to determine the allowable catch and exploitation of fisheries within its EEZ and the duty to use "best scientific evidence" to ensure the proper conservation and management of living resources.[7] Populations of harvestable fisheries must be maintained and restored at levels to produce the "maximum sustainable yield" (that level of fishing at which the maximum tonnage of the stock can be harvested without stock depletion), qualified by relevant economic and environmental factors such as the needs of coastal fishing communities and special requirements of developing countries in the region.[8] The coastal state must also promote the optimum utilization of fishery stocks. Where it does not have the capacity to harvest the entire allowable catch, other states must be given access to the surplus.[9] The coastal state may also

**2.** LOS Convention, Art. 33(2).

**3.** 19 U.S.C. § 1581(a).

**4.** Contiguous Zone of the United States by the President of the United States of America, Presidential Proclamation 7219, September 2, 1999, 1999 AMC 2995, 64 Fed.Reg. 48701 (1999).

### § 2-16

**1.** For the origin and history of this concept, see Restatement (Revised) of the Foreign Relations Law of the United States § 511, Reporters' Notes (1987).

See also the Special Issue—The Exclusive Economic Zone, 19 Ocean Dev. and Int'l L.J. 431 (1988).

**2.** LOS Convention, Art. 55.

**3.** Id., Art. 57.

**4.** Id., Art. 56(1)(a).

**5.** Id.

**6.** Id., Art. 56(1)(b).

**7.** LOS Convention, Art. 61(1).

**8.** Id., Art. 61(2) and (3).

**9.** Id., Art. 62.

Case 1:06-cv-00030    Document 96-3    Filed 10/29/2007    Page 23 of 29

adopt extensive regulations for the fisheries in the EEZ.[10] If a dispute arises between parties to the Convention on the Law of the Sea relating to these duties, a non-binding but compulsory conciliation procedure may be invoked "when it is alleged that:

> (i) a coastal State has manifestly failed to comply with its obligations to ensure through proper conservation and management measures that the maintenance of the living resources in the exclusive economic zone is not seriously endangered;

> (ii) a coastal State has arbitrarily refused to determine, at the request of another State, the allowable catch and its capacity to harvest living resources with respect to stocks which that other State is interested in fishing; or

> (iii) a coastal State has arbitrarily refused to allocate to any State * * * the whole or part of the surplus it has declared to exist." [11]

Where the same stock or species of fish occurs within the EEZs of two or more states or in an adjacent area of the high seas, the states concerned must cooperate either directly or through appropriate regional or international organizations.[12] Such cooperation is also mandated with respect to so-called "highly migratory species," chiefly tuna, that range over large areas of the ocean and are of concern to many states.[13] With respect to anadromous and catadromous species, the coastal state has primary responsibility, but must cooperate with other concerned states

---

**10.** Id., Art. 62(4). Such laws may relate to the following: (a) licensing of fishermen, fishing vessels and equipment, including payment of fees and other forms of remuneration, which, in the case of developing coastal States, may consist of adequate compensation in the field of financing, equipment and technology relating to the fishing industry; (b) determining the species which may be caught, and fixing quotas of catch, whether in relation to particular stocks or groups of stocks or catch per vessel over a period of time or to the catch by nationals of any State during a specified period; (c) regulating seasons and areas of fishing, the types, sizes and amount of gear, and the types, sizes and number of fishing vessels that may be used; (d) fixing the age and size of fish and other species that may be caught; (e) specifying information required of fishing vessels, including catch and effort statistics and vessel position reports; (f) requiring, under the authorization and control of the coastal State, the conduct of specified fisheries research programmes and regulating the conduct of such research, including the sampling of catches, disposition of samples and reporting of associated scientific data; (g) the placing of observers or trainees on board such vessels by the coastal State; (h) the landing of all or any part of the catch by such vessels in the ports of the coastal State; (i) terms and conditions relating to joint ventures or other co-operative arrangements; (j) requirements for the training of personnel and the transfer of fisheries technology, including enhancement of the coastal State's capability of undertaking fisheries research; (k) enforcement procedures.

**11.** Id., Art. 297(3)(b).

**12.** LOS Convention, Art. 63. For recent implementation measures, see Chapter 17 of Agenda 21, Report of the United Nations Conference on Environment and Development, UN Doc. A/Conf. 151/26 (1992) and the Agreement for the Implementation of the Provisions of the United Nations Convention on the Law of the Sea of 10 December 1982 relating to the Conservation and Management of Straddling Fish Stocks and Highly Migratory Fish Stocks, 4 August, 1995, 34 I.L.M. 1542 (1995).

**13.** LOS Convention, Art. 64. For discussion of problems in attaining international cooperation see Note, The Tuna War: Fishery Jurisdiction in International Law, 1981 U.Ill.L.Rev. 755 (1981).

to come to agreements regarding appropriate conservation measures.[14] Sedentary species, which are either immobile or which move in contact with the continental shelf, are not within the regime of the EEZ but are governed by the provisions of the Convention relating to the Continental Shelf.[15] The exploitation of marine mammals may be regulated more strictly by the coastal state than fisheries, and harvesting such creatures may be prohibited.[16]

The United States has promulgated its claim to a 200-mile Exclusive Economic Zone by Presidential decree.[17] Extensive legislation to implement fully the rights accorded by this concept has been enacted,[18] including conservation and management of fisheries [19] and marine mammals; [20] the exploitation of oil, gas, and other mineral resources; [21] deep water ports beyond the territorial sea; [22] ocean thermal energy conversion; [23] the establishment of marine sanctuaries; [24] the control of ocean dumping; [25] and spills and discharges into the marine environment.[26] All of these laws are operative in the entire 200-mile zone.

In order that the coastal state may exercise its rights in the EEZ, it has the exclusive right to construct and to authorize and regulate the construction and operation of artificial islands and other structures in the area. Safety zones up to 500 meters around such artificial islands and structures may be established where necessary. The coastal state has exclusive jurisdiction over these structures and their safety zones.[27]

States other than the coastal state have certain rights in the EEZ as well. There is freedom of navigation within these areas, but this is limited by the coastal state's rights.[28] All states also enjoy freedom of overflight and the right to lay submarine cables and pipelines in the EEZ.[29]

---

**14.** LOS Convention, Arts. 66 and 67.

**15.** Id., Arts. 68, 77.

**16.** Id., Art. 65. See generally, Carlson, The International Regulation of Small Cetaceans, 21 San Diego L.Rev. 577 (1984).

**17.** 48 Fed.Reg. 10605 (Mar. 10, 1983).

**18.** Many of these laws were passed before the promulgation of the EEZ by the President. For analysis, see H. Edwin Anderson III, The Nationality of Ships and Flags of Convenience: Economics, Politics and Alternatives, 21 Tul.Mar.L.J. 139 (1996); Julie A. Perkins, Ship Registers: An International Update, 22 Tul.Mar.L.J. 197 (2002).

**19.** Fishery Conservation and Management Act of 1976 (as amended), 16 U.S.C. § 1801 et seq.

**20.** Marine Mammal Protection Act of 1972 (as amended), 16 U.S.C. § 1361 et seq.

**21.** The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq.

**22.** The Deepwater Port Act, 33 U.S.C. § 1501 et seq.

**23.** The Ocean Thermal Energy Conversion Act of 1980, 42 U.S.C. § 9101 et seq.

**24.** The Marine Protection, Research, and Sanctuaries Act, 16 U.S.C. § 1432 et seq.

**25.** Ocean Dumping Act, 33 U.S.C. § 1401 et seq. This act does not, however, regulate foreign dumping in the U.S. EEZ, see Comment, Extension of Ocean Dumping Legislation under the Marine Protection, Research and Sanctuaries Act to A United States Exclusive Economic Zone, 21 San Diego L.Rev. 733 (1984).

**26.** Clean Water Act, 33 U.S.C. § 1251 et seq., especially 33 U.S.C. § 1321.

**27.** LOS Convention, Art. 60.

**28.** Id., Art. 58. Freedom of navigation is more fully treated infra § 2-22.

**29.** LOS Convention, Art. 58. The exercise of these rights is subject to regulation by coastal states. Id., Art. 58(3).

States with short coastlines (geographically disadvantaged states) and land-locked states are given special rights to participate, on an equitable basis, in the exploitation of any fishery surplus in the EEZs of coastal states in their region. The details of these rights are to be elaborated by agreement.[30]

## § 2–17.   The Continental Shelf

The term *continental shelf,* unlike the exclusive economic zone, which has a purely legal meaning, refers to a geological structure adjacent to a coast. The *continental shelf* proper slopes gradually out to sea. At depths averaging 130 meters, the angle of descent increases markedly; this steeper slope, down to about 1,200 to 3,500 meters, is known as the *continental slope.* Beyond this slope there is a more gradual descent in many places, and this is called the *continental rise.* These three sections together are known as the *continental margin.* Because of the extensive oil and gas reserves in many places of the continental margins, the LOS Convention makes this a separate zone of marine jurisdiction, although it overlaps with other marine areas.[1]

The LOS Convention adopts an expansive definition of the continental shelf of a coastal state: "the seabed and the subsoil of the submarine areas that extend beyond its territorial sea throughout the natural prolongation of its land territory to the edge of the continental margin, or to a distance of 200 nautical miles from the baselines from which the breadth of the territorial sea is measured where the outer edge of the continental margin does not extend up to that distance." [2]

Thus, there are two parts to the doctrine of the continental shelf. The first is a purely legal concept, that the shelf corresponds to the coastal state's jurisdiction in the exclusive economic zone (EEZ), 200 miles, whether or not the shelf extends that far seaward. Second, the geological part of the definition grants rights to coastal states *beyond* 200 miles, but only where in fact the geological continental margin extends beyond 200 miles.[3]

The LOS Convention lays down several criteria for delimiting the seaward edge of the continental margin in connection with this second part of the definition. First, the coastal state shall establish the outer edge by using either (1) a line drawn by reference to points no more than 60 nautical miles from the foot of the slope (determined in the absence of evidence to the contrary as the point of maximum change in the gradient

**30.**  LOS Convention, Arts. 69 and 70. No rights to non-living resources in the EEZ are granted to such states.

**§ 2–17**

**1.**  The primary impetus for the doctrine of the continental shelf was the Truman Proclamation of 1945, in which President Truman proclaimed jurisdiction and control "over the natural resources of the subsoil and seabed contiguous to the United States". 10 Fed.Reg. 12303 (1945). The

doctrine was confirmed as international law by the 1958 Convention on the Continental Shelf, Art. 1, adopted at the first Conference on the Law of the Sea.

**2.**  LOS Convention, Art. 76(1).

**3.**  This is the case in many parts of the world including the east coast of the United States, Africa, Canada, and Australia. See Verzijl, 3 International Law in a Historical Perspective 77–78 (1970).

Case 1:06-cv-00030   Document 96-3   Filed 10/29/2007   Page 26 of 29

# EXHIBIT "10"



# The Law of the Sea

**Official Text
of the United Nations Convention
on the Law of the Sea
with Annexes and Index**

---

**Final Act
of the Third United Nations Conference
on the Law of the Sea**

---

**Introductory Material
on the Convention
and the Conference**



CROOM HELM  London & Canberra  ● ST. MARTIN'S PRESS  New York

Published in co-operation with the United Nations

# PART VIII

# REGIME OF ISLANDS

### *Article 121*
### *Régime of Islands*

1. An island is a naturally formed area of land, surrounded by water, which is above water at high tide.

2. Except as provided for in paragraph 3, the territorial sea, the contiguous zone, the exclusive economic zone and the continental shelf of an island are determined in accordance with the provisions of this Convention applicable to other land territory.

3. Rocks which cannot sustain human habitation or economic life of their own shall have no exclusive economic zone or continental shelf.


# PART IX

# ENCLOSED OR SEMI-ENCLOSED SEAS

### *Article 122*
### *Definition*

For the purposes of this Convention, "enclosed or semi-enclosed sea" means a gulf, basin or sea surrounded by two or more States and connected to another sea or the ocean by a narrow outlet or consisting entirely or primarily of the territorial seas and exclusive economic zones of two or more coastal States.

### *Article 123*
### *Co-operation of States bordering enclosed*
### *or semi-enclosed seas*

States bordering an enclosed or semi-enclosed sea should co-operate with each other in the exercise of their rights and in the performance of their duties under this Convention. To this end they shall endeavour, directly or through an appropriate regional organization:

(a) to co-ordinate the management, conservation, exploration and exploitation of the living resources of the sea;

(b) to co-ordinate the implementation of their rights and duties with respect to the protection and preservation of the marine environment;

(c) to co-ordinate their scientific research policies and undertake where appropriate joint programmes of scientific research in the area;

(d) to invite, as appropriate, other interested States or international organizations to co-operate with them in furtherance of the provisions of this article.

Case 1:02-cv-00039   Document 88-5   Filed 10/29/2007   Page 29 of 29