# ORIGINAL

LEONARDO M. RAPADAS
United States Attorney
MIKEL W. SCHWAB
Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagatna, Guam 96910
Tel: 671-472-7332
Fax: 671-472-7215

Paul Ortiz
Senior Attorney
Office of General Counsel
National Oceanic and Atmospheric Administration
501 West Ocean Blvd.
Suite 4470
Long Beach, California 90802
Tel: 562 980 4069

Attorneys for the United States of America

**FILED**
DISTRICT COURT OF GUAM

DEC 2 8 2007

**JEANNE G. QUINATA**
**Clerk of Court**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE TERRITORY OF GUAM

| UNITED STATES OF AMERICA, | ) | CIVIL CASE NO. 06-00030 |
|---|---|---|
| Plaintiff, | ) | |
| | ) | **PLAINTIFFS' OPPOSITION TO** |
| | ) | **CLAIMANT'S MOTION FOR** |
| vs. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| MARSHALLS 201, | ) | |
| Defendant. | ) | |

**FEDERAL CASES**

ANDERSON V. LIBERTY LOBBY, INC.,
  477 U.S. 242, 248, 250 (1986)..................................................................................4

BATEMAN V. U.S. DEPARTMENT OF COMMERCE,
  768 F. SUPP. 805 (S.D. FL 1991)..............................................................................8

COUNTY OF TUOLUMNE V. SONORA CMTY. HOSP.,
  236 F.3D 1148, 1154 (9TH CIR. 2001)......................................................................4

NORTHERN WIND V. DALEY,
  200 F. 3D 13(1ST CIR. 1999).....................................................................................6

UNITED STATES V. 2001 HONDA ACCORD EX,
  245 F. SUPP. 2D 602, 607 (M.D. OHIO 2005)..........................................................5

UNITED STATES V. 144,744 POUNDS OF BLUE CRAB,
  410 F. 3D 1131 (9TH CIR. 2005)..............................................................................16

UNITED STATES V. FIFITY-THREE (53) ECLECTUS PARROTS,
  685 F. 3D 1131, 1137 (9TH CIR. 2005)......................................................................7

UNITED STATES V. FOUR JARS OF BELUGA STURGEON CAVIAR,
  NO. 05-011040-RBC (D. MASS. DEC. 12, 2006).......................................................7

UNITED STATES V. KAIYO MARU NO. 53,
  503 F. SUPP. 1075 (D. AK 1980).........................................................................8, 15

UNITED STATES V. NISSAN VAN,
  1994 U.S. APP. LEXIS 37052 (9TH CIR. 1994)..........................................................7

UNITED STATES V. ROUTE 2, BOX 472,
  60 F.3RD 1523, 1528 (11TH CIR. 1994) (UNPUBLISHED)..........................................7


**NOAA ADMINISTRATIVE CASES**

IN RE ALBA,
  2 O.R.W. 670, 673 (NOAA
  1982)..........................................................................................................................6

IN RE EL JEFE,
  5 O.R.W. 453, 455 (NOAA
  1989)..........................................................................................................................6

IN RE MEREDITH FISH CO.,
  4 O.R.W. 66, 67 (NOAA 1985) ................................................................................6

-i-

1   IN RE THE MATTER OF BLUE HORIZON, INC.,
       6 O.R.W. 467 (NOAA 1991).................................................................................9

2
   IN RE THE MATTER OF ATLANTIC SPRAY CORP.,
3       1996 WL 1402870 (NOAA 1998)......................................................................9

4   IN RE THE MATTER OF JODY DOMINGO AND ELDEN DOMINGO,
       2000 WL 33174647 (NOAA 2000) ...................................................................9

5
   IN RE THE MATTER SAM MILLIS AND MISS CHARLOTTE, INC.,
6       4 O.R. W. 340 (NOAA
   1985).................................................................................................................8, 9

7
   IN RE THE MATTER OF TIMOTHY WHITNEY,
8       6 O.R.W. 479, 483 (NOAA 1991)......................................................................6

9   **UNITED STATES CODES**

10   TITLE 16, UNITED STATES CODE
       SECTION 1857(1)(G)........................................................................................16
11       SECTION 1857(2)...............................................................................................1
       SECTION 1857(4)(A)..................................................................1, 6, 8, 11, 14, 16
12       SECTION 1857(4)(B)..................................................................1, 6, 8, 11, 14, 16
       SECTION 1860(A).......................................................................................4, 16
13       SECTION 1860(E)(1)........................................................................................16

14   TITLE 18, UNITED STATES CODE
       SECTION 983....................................................................................................4
15       SECTION 983(D).................................................................................................5
       SECTION 983(D)(1)............................................................................................5
16       SECTION 983(D)(2)(A).......................................................................................5
       SECTION 983(D)(2)(A)(II)................................................................................14
17       SECTION 983(D)(2)(B)(I)................................................................................14
       SECTION 986(D)(4).........................................................................................21
18       SECTION 986(D)(6)...........................................................................................7
       SECTION 983(D)(6)(A)......................................................................................5

19

20   **ACTS**

21   CIVIL ASSET FORFEITURE REFORM ACT OF 2000
       (CAFRA)..................................................................................1, 4-7, 9, 14-16

22
   ENDANGERED SPECIES ACT.................................................................................7

23   **OTHER**

24
   Wikipedia, http://en.wikipedia.org/wiki/vessel_monitoring_system ...........................12

25
   EEZ of the U.S., Presidential Proclamation No. 5030 (March 10, 1983)
26       42 F.R. 12937.40 (March 7, 1977)......................................................................1

27

28                                -ii-

U.S. EEZ adjacent to Howland/Baker Islands,
    60 F.R. 43825( August 23, 1995)................................................................................1

**RULES**

FED. R. CIV. P. 56(C)..............................................................................................................4

-iii-

# I. INTRODUCTION

The Court should deny Claimant Marshall Islands Fish Company's Motion for Summary Judgment because there is a genuine issue of material fact as to whether the Claimant qualifies as an innocent owner under the Civil Asset Forfeiture Reform Act, 18 U.S.C. § 983.

# II. FACTUAL BACKGROUND

On September 7, 2006, law enforcement personnel from the National Oceanic and Atmospheric Administration (NOAA) were conducting a fisheries patrol aboard a United States Coast Guard (USCG) aircraft. The purpose of this patrol was to conduct surveillance of the Exclusive Economic Zone (EEZ)[1] of the United States adjacent to the U.S. National Wildlife Refuges of Howland and Baker Islands in order to detect illegal fishing activity. During that flight, law enforcement personnel sighted a 215' purse seiner later identified as the F/V MARSHALLS 201 at coordinates 02-29.0S 176-43.0W, a position within the EEZ of the United States. At that time, the vessel's boom was lowered and its purse seine fishing net was not covered or properly stowed, as prohibited by the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. § 1857 (4)(A) and (B).

On September 9, 2006, a second aircraft patrol was conducted by the USCG and NOAA law enforcement personnel. The F/V MARSHALLS 201 was again observed, this time at position 02-06.1S 176-00.5W - approximately 1.9 nautical miles within the EEZ adjacent to Howland and Baker Islands. At the time of the sighting, the vessel was actively fishing with approximately 10% of its net in the water filled with fish. In addition, two small tender vessels were assisting with the retrieval of the net. Fishing within the U.S. EEZ by a foreign fishing vessel without authorization from NOAA is prohibited by the Magnuson Act, 16 U.S.C. § 1857(2).

---

[1] The EEZ of the United States was established by Presidential Proclamation No. 5030, (March 10, 1983), creating an area of ocean over which the United States exercises exclusive jurisdiction and sovereign rights for the purpose of exploring, exploiting, conserving and managing natural resources. The outer limits of the EEZ are 200 nautical miles from the baseline from which the U.S. territorial sea is measured, unless otherwise specified. The specific coordinates for the US EEZ adjacent to Howland and Baker Islands is published by the U.S. Department of State in the Federal Register on August 23, 1995. 60 F.R. 43825. However, under the Magnuson Act the United States has claimed an exclusive fishery zone around these islands since 1977. 42 F.R. 12937-40 (March 7, 1977).

-1-

1   The USCG aircrew immediately contacted the USCG Cutter WALNUT (WALNUT) to

2   intercept and conduct a boarding on the FV MARSHALLS 201. The WALNUT was also in the

3   area conducting a fisheries patrol.

4       Approximately seventy minutes later, the WALNUT arrived on scene and USCG

5   personnel detected the F/V MARSHALLS 201 both visually and by radar. The WALNUT's

6   radar identified the vessel's position at 02-05.387S 175-59.253W, a position approximately 2

7   nautical miles inside the U.S. EEZ. The lookout on the WALNUT reported seeing the vessel

8   hauling in its purse seine fishing net containing fish and two small tender vessels were in the

9   water assisting the retrieval of the net. Once it was determined the F/V MARSHALLS 201  was

10  actively fishing within the EEZ, both the WALNUT and the USCG aircrew continuously

11  attempted to hail the F/V MARSHALLS 201 via radio and ordered the vessel to heave to and

12  prepare to be boarded. The F/V MARSHALLS 201 failed to comply with this command, and

13  five minutes after the arrival of the WALNUT, the F/V MARSHALLS 201 fled towards the

14  EEZ boundary line with her nets still hanging from the boom. The WALNUT began an

15  immediate hot pursuit. After several minutes, the WALNUT hauled up the flaghoist "LIMA" -

16  a black and yellow checkered flag which is the internationally recognized signal code flag for

17  "stop instantly". They also sounded the signal  from the International Code of Signals on their

18  starboard yardarm for "LIMA" with the ship's whistle. The F/V MARSHALLS 201 responded

19  with two short blasts and continued its hasty departure out of the U.S. EEZ.

20      After approximately twenty minutes, the F/V MARSHALLS 201 exited the U.S. EEZ

21  with the WALNUT maintaining hot pursuit. Someone aboard the F/V MARSHALLS 201

22  eventually responded to the hailing by the USCG via radio by stating "no speak English" and

23  "me no inside work" several times. Eight minutes after exiting the US EEZ, the vessel stopped

24  briefly while the crew of the F/V MARSHALLS 201 finished stowing her gear and tender

25  vessels, but quickly resumed making way away from the U.S. EEZ boundary line. During this

26  time, the commanding officer of the WALNUT ordered the 50 caliber machine guns to be

27  mounted, though they were not pointed at the F/V MARSHALLS 201 at any time.  Within

28  minutes, the F/V MARSHALLS 201 came to full stop in the water, and someone on board the

-2-

vessel radioed "you come over my boat."

A boarding team from the WALNUT boarded the F/V MARSHALLS 201 and immediately secured the vessel for an investigation into the illegal fishing activity. The boarding team identified thirty-six crew members on board the F/V MARSHALLS 201. During the investigation it was determined that: 1) the Captain of the vessel was Mr Wen Yueh Lu ("Captain Lu"), a Taiwanese citizen; 2) the F/V MARSHALLS 201 did not possess a permit to fish within the U.S. EEZ, and; 3) the vessel caught 110 metric tons of tuna from the illegal fishing set on September 9, 2006.

On September 10, 2006, law enforcement personnel of the WALNUT seized the F/V MARSHALLS 201, and her catch, and began escorting the vessel to Guam. The vessel was escorted by the WALNUT until relieved by the USCG Cutter SEQUOIA on September 16, 2006.

A boarding team from the SEQUOIA relieved the boarding team from the WALNUT in order to escort the F/V MARSHALLS 201 to Guam and conduct additional investigation. During that investigation, Captain Lu began to make voluntary, unsolicited statements in broken English to the boarding team. Captain Lu stated that he was not fishing inside the line, but had set his gear three miles outside the line, and had then drifted inside the line while hauling his gear. On September 20, 2006, the SEQUOIA reached port in Guam and secured the F/V MARSHALLS 201 at the Cassamar Pier in Apra Harbor.

A complete survey of the vessel and catch of tuna was completed which estimated the current market value of the vessel to be $2,650,000, and the current market value of the tuna on board to be $350,000. On October 10, 2006, the U.S. filed a Complaint for Forfeiture of the vessel and catch based on the two violations of the Magnuson Act. On October 13, 2006, a release bond for $2,950,000 was filed in the forfeiture matter, and the vessel departed Guam soon thereafter.

The F/V MARSHALLS 201 is registered in the Republic of the Marhsall Islands, and is owned by the Marshall Islands Fish Company ("Claimant" or "MIFCO"). MIFCO has just two shareholders - the Koo's Fishing Company and the Marshall Islands Marine Resources

-3-

Authority (a division of the Government of the Republic of the Marshall Islands). Koo's Fishing Company (KFC) is registered in the Republic of the Marshall Islands, with offices in Majuro, Republic of the Marshall Islands and Taipei, Taiwan.

During the same September 7th overflight patrol that discovered the F/V MARSHALLS 201, two additional foreign fishing vessels were detected within the EEZ adjacent to Howland and Baker Islands. They were the F/V KOO'S 101 and the F/V KOO'S 108. These vessels are owned by KFC.

## III. LEGAL STANDARD

Summary judgment is appropriate only if the evidence demonstrates "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). All justifiable inferences must be viewed in the light most favorable to the non-moving party. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Anderson*, 477 U.S. at 248. A fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*

## IV. ARGUMENT

**A.    A GENUINE ISSUE AS TO A MATERIAL FACT EXISTS THAT CLAIMANT IS AN INNOCENT OWNER UNDER THE CIVIL ASSET FORFEITURE REFORM ACT**

This underlying action arose out of the seizure of the purse seine fishing vessel F/V MARSHALLS 201, it's gear, engine, appurtenances and catch of fish on September 10, 2006. On October 4, 2006, the government filed this civil forfeiture action against the Defendant Property, alleging that it is subject to forfeiture under the Magnuson Act, 16 U.S.C. §1860(a). This forfeiture proceeding was initiated after the effective date of the Civil Asset Forfeiture Reform Act (CAFRA), therefore the procedures and requirements set forth in 18 U.S.C. § 983

-4-

apply to this proceeding. The U.S. concurs with Claimant's assertion that CAFRA applies to forfeiture proceedings brought under the Magnuson Act. Claimant's Memorandum re Summary Judgment, p. 12 ("Claimant's Memorandum").

Under CAFRA, a claimant may defeat a forfeiture by showing that it is an "innocent owner." Section § 983(d) sets forth the requirements of the innocent owner defense. 18 U.S.C. § 983(d)(1). CAFRA places the burden of proof on the Claimant to prove by a preponderance of the evidence that it is an innocent owner. 18 U.S.C. § 983(d)(1); *see United States v. 2001 Honda Accord EX*, 245 F. Supp. 2d 602, 607 (M.D. Ohio 2005) (CAFRA preserved the rule that the burden of proof shifts to the claimant to establish innocent owner defense).

In order to assert an innocent owner defense, the claimant must meet the threshold requirement that it qualify as an owner of the defendant property. Subsection § 983(d)(6)(A) defines "owner" as "a person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest." The U.S. does not dispute the Claimant's position that it is the sole qualified owner of the Defendant Property for the purposes of CAFRA. Claimant's Memorandum, p. 14-15.

The uniform innocent owner provision of CAFRA, 18 U.S.C. § 983(d), distinguishes between owners whose property interest was in existence at the time of the illegal conduct giving rise to the forfeiture action occurred, and owners whose interest was acquired after the conduct giving rise to the forfeiture occurred. The U.S. does not dispute Claimant's position that it is an owner whose property interest was in existence at the time of the illegal conduct giving rise to the forfeiture action. Under CAFRA, such an owner can be considered an "innocent owner" only if that party "(i) did not know of the conduct giving rise to the forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A).

Claimant's Motion for Summary Judgment must be denied because MIFCO cannot be considered an innocent owner under either standard.

### i)  MIFCO IS NOT AN INNOCENT OWNER BECAUSE IT KNEW OF THE CONDUCT GIVING RISE TO THE FORFEITURE.

The first prong of the CAFRA innocent owner defense requires Claimant to prove that it did not know of the illegal acts giving rise to the forfeiture.  Claimant presents several factual arguments to support a claim that MIFCO had no knowledge of the illegal activity because two particular officers had no knowledge of it.  This argument fails because the undisputed facts of the case demonstrate that the knowledge of its employee, Captain Lu, who was conducting the illegal activity is imputed to MIFCO.

Claimant has raised no factual dispute to the violations set forth in the Government's Complaint for Forfeiture: 1) that the F/V MARSHALLS 201, under the operation of Captain Captain Lu,  was operating within the U.S. EEZ on September 7, 2006, with its gear readily available for fishing in violation of the Magnuson Act, 16 U.S.C. § 1857(4)(A) and (B), and; that the F/V MARSHALLS 201, under the operation of Captain Lu, was engaged in purse seine fishing within the U.S. EEZ on September 9, 2006, without a required permit in violation of the Magnuson Act, 16 U.S.C. § 1857(2).[2]

There is also no dispute by the Claimant that at the time of the violation, Captain Lu was an employee of MIFCO.  Given that MIFCO is in the business of catching fish and had just one vessel with which to do so, Captain Lu was MIFCO's most important employee.  MIFCO entrusted Captain Lu with extraordinary responsibilities: to care for and operate MIFCO's multi-million dollar vessel; to ensure the safety and livelihood of the thirty-five MIFCO employees on the vessel; and, to catch as much tuna as possible for MIFCO.  The more tuna that Captain Lu caught, the greater the profit to MIFCO.  As such, when Captain Lu was

---

[2] Because Magnuson Act violations are conservation related, there is no scienter requirement.  See *Northern Wind v. Daley*, 200 F. 3d 13 (1st Cir. 1999 ) ("Finally, scienter is not an element of a civil defense under the [Magnuson Act]. Because conservation-related offenses under the [Magnuson Act] are strict liability offenses, [Northern Wind]'s protests as to [its] state of mind are irrelevant") (citing *In re Whitney*, 6 O.R.W. at 483 (quoting *In re Alba*, 2 O.R.W. 670, 673 (NOAA 1982)); *accord In re El Jefe*, 5 O.R.W. 453, 455 (NOAA 1989); *In re Meredith Fish Co.*, 4 O.R.W. 66, 67 (NOAA 1985)).

1  fishing, he was doing exactly what MIFCO hired him to do, which was to catch fish for the

2  benefit of MIFCO and its employees.

3      While CAFRA included a uniform innocent owners defense, it did not overturn

4  longstanding precedent imputing the knowledge of an employee of illegal acts to the

5  corporation.  The CAFRA innocent owner defense does not protect a person from the

6  consequences of his/her own wrongdoing, even if that person  claims it was unaware that the

7  conduct was unlawful.  More importantly, it does not protect a company from the consequences

8  of the wrongdoing of its agents and employees  for which the company is legally responsible.

9  The wrongdoer, or the person liable for the acts of the wrongdoer, can never himself assert an

10  innocent owner defense. *United States v. Fifty-Three (53) Eclectus Parrots*, 685 F. 2d 1131,

11  1137 (9th Cir. 1982).  *United States v. Four Jars of Beluga Sturgeon Caviar*, No. 05-011040-

12  RBC (D. Mass. Dec. 12, 2006) held that the individual who violated the Endangered Species

13  Act by personally importing beluga sturgeon caviar cannot be an innocent owner under Section

14  983(d)(6).

15      Claimant attempts to ignore the substantial body of civil and administrative case law

16  holding that the knowledge of an employee is imputed to the employer when that employee is

17  acting within the scope of his/her employment and with the intent to benefit the employer.

18  Thus, an employer cannot be an innocent owner in a forfeiture action when the employee's

19  actions are within the scope of employment and of some benefit to the owner.  *United States v.*

20  *Nissan Van*, 1994 U.S. App. Lexis 37052 (9th Cir. 1994).  *United States v. Route 2, Box 472*, 60

21  F.3[rd] 1523, 1528 (11th Cir. 1994) aptly illustrates this principle.  One of the shareholders was

22  cultivating marijuana on the family farm, which had been incorporated.  The business of the

23  farm was to raise fish and livestock, and none of the other shareholders knew of the cultivation.

24  The court refused to impute the individual shareholder's knowledge of the illegal activity to the

25  corporation, because the cultivation took place apart from the corporation, none of the other

26  corporate members knew of it, the corporation did not reap any benefits from it, and there was

27  no intent to benefit the corporation.

28

This same principle has been applied to the Magnuson Act and other commercial fishery related violations. A vessel owner is liable for the acts of its employees and agents even when the employee/agent was instructed by the owner to abide by the law. *United States v. Kaiyo Maru No. 53*, 503 F. Supp. 1075 (AK 1980) (affirmed, 699 F.2d 989 (9th Cir. 1983)). In *Kaiyo Maru*, the United States sought forfeiture of a Japanese flagged fishing trawler and its catch for violating the Magnuson Act by possessing an unauthorized fish species and for fishing in an unauthorized area. As with MIFCO here, the owner of the F/V KAIYO MARU fired the captain of the vessel after they were informed of the illegal acts. Regardless, the court found the vessel owner liable for the acts of the Captain based on the need for effective enforcement of the Magnuson Act and the fact that the statute has a regulatory program designed to punish the vessel and its owners. *Id* at 90. The seminal issue in such forfeitures has been whether the illegal activities of the employee benefits the employer. In *Bateman v. U.S. Department of Commerce*, 768 F. Supp. 805 (S.D. Fl 1991) the vessel owner had hired a captain to catch shrimp, on a "catch-share" basis. When the captain was caught illegally taking stone crabs for personal consumption, the government attempted to forfeit the fishing vessel. The court upheld the innocent owner defense, because the owners did not stand to make a direct gain from the captain's illegal conduct. Had the vessel been illegally taking shrimp, the captain's knowledge of illegal conduct would have been imputed to them because his illegal acts would have benefitted the owners.

This same principle is also applied in the National Oceanic & Atmospheric Administration's civil penalty administrative decisions concerning commercial fishing. In *In the Matter of Sam Millis and Miss Charlotte, Inc.*, 4 O.R.W. 340 (NOAA 1985), the vessel owner and master were jointly and severally charged for use of illegal gear and possession of shrimp from a closed area. The Administrative Law Judge found both the owner and vessel liable, and stated:

> It is not necessary that the owner exercise detailed control over the operations of the vessel in order for it to be held liable for the illegal activities of its master and crew.

-8-

It is sufficient that . . . the owner of the vessel and the major beneficiary of its operations authorized the expedition which was illegally conducted. Since it acquires a share of the vessel's production, so must it bear a major responsibility, along with the captain, for the latter's unlawful acts. To hold otherwise would be to allow vessel owners to escape responsibility for the transgressions of the captains that they hire, authorize to operate their boats, and have the authority to fire. Such a holding would substantially inhibit the effective enforcement of the Magnuson Act and the applicable regulations thereunder.

The same reasoning was applied in *In the Matter of Blue Horizon, Inc.*, 6 O.R.W. 467 (NOAA 1991); *In the Matter of Atlantic Spray Corporation*, 1996 WL 1402870 (NOAA 1998); and *In the Matter of Jody Domingo and Elden Domingo*, 2000 WL 33174647 (NOAA 2000).

Because Captain Lu was an employee of MIFCO at the time of the offense, operating within the scope of his employment and with the intent to benefit MIFCO, MIFCO knew of his illegal activity and hence must be considered the wrongdoer. Accordingly, MIFCO cannot claim that some other party was using its vessel unlawfully. There was no other party; the wrongdoer was MIFCO itself.

ii)     **CLAIMANT'S FACTUAL ASSERTIONS FAIL TO ESTABLISH ITS ALLEGED LACK OF KNOWLEDGE**

Claimant puts forth a series of factual claims in an effort to support it's innocent owner claim under the "knowledge" prong of CAFRA. As discussed below, there are sufficient facts to contradict all of the Claimant's factual assertions for a Court to determine that there are genuine issues of material fact in the case.

Claimant first asserts that neither Eugene Muller, manager of MIFCO, nor Jutzu Juang, the President of MIFCO, had any prior or then-present knowledge of the illegal activities of the F/V MARSHALLS 201. But Claimant relies solely on the unsubstantiated sworn declarations of the two MIFCO officers, Chuang and Muller, to support its claim. See Claimant's Memorandum, Declaration E. Muller, Declaration J. Chuang. Unfortunately, Claimant has provided no evidence that either of those officers had official duties which included oversight of

-9-

the at-sea operations of the MIFCO or KFC fleets. Id. In fact, both Captain Lu and Muller agree that MIFCO employed a "fleet manager" (Mr. Chun Mu Wang) to speak with the vessel masters in Chinese. Muller deposition (transcript forthcoming), Lu Deposition, p. 161 (Attachment A). Indeed, Captain Lu relied on contacts with Mr. Wang to such an extent that he could not even recall Mr. Muller's name during his deposition. Lu Deposition, p. 47 and 49 (Attachment A). Clearly, the lack of knowledge by just two MIFCO officers cannot be sufficient for the standards of the innocent owner defense.

Further undermining Claimant's professed lack of knowledge is the apparent recognition by the MIFCO Board of Directors that an employee besides Captain Lu had a role in the illegal activity. Specifically, the Office Manager of KFC was terminated for his/her role in this case. The Minutes of the MIFCO Board of Directors meeting confirms that this was the case by stating: "In light of the Chairman's remarks on the issue, Johnson informed the board that the Taipei office Manager and the Captain of the vessel had been terminated and penalized." MIFCO 2nd Regular Board Meeting Minutes, Muller Depo (transcript forthcoming), Defendant's Response to Plaintiff's Request for Production of Documents, Bates No. 00045 (Attachment B) (emphasis added). All three of the Chairman's Remarks in the MIFCO Board Minutes relate to this forfeiture action. *Id.* If MIFCO fired Captain Lu for his role in the illegal conduct, it follows that the KFC Office Manager in Taipei, Taiwan was also fired for his/her role in the illegal conduct. This is a clear admission by MIFCO that two employees, not just Captain Lu as mentioned in Claimant's Memorandum, had some role in the illegal activity and were terminated and penalized for it. Claimant's Memorandum, p. 19. The firing of Captain Lu and the KFC Office Manager for reasons related to the illegal activity further undermines Claimant's argument that MIFCO was unaware of the illegal activity. Claimant cannot cherry-pick MIFCO employees to put forth sworn assertions of lack of knowledge to effectively support an innocent owner claim. KFC is the managing partner of MIFCO, and is responsible for all at-sea operations of the KFC fleet and the MARSHALLS 201. Clearly, the home office of KFC had some direct involvement in, or knowledge of, the illegal activity at issue in this case.

-10-

1    Claimant next asserts that it had "no reason to suspect that any illegal conduct was going

2    to occur because there had been no prior arrests or convictions of either Captain Lu, Vessel

3    Marshall No. 201 or MIFCO." Claimant's Memorandum, p. 18. The U.S. agrees with Claimant

4    that there have been no previous "arrests or convictions" by the United States of those parties,

5    but strongly disagrees with MIFCO's conclusion that MIFCO had no reason to suspect illegal

6    conduct. MIFCO had reason to suspect illegal conduct because of both prior and pending

7    enforcement actions against KFC vessels by the United States for illegal fishing activities. As

8    detailed below, KFC officers and employees were well aware of these illegal activities.

9    · On May 20, 2002, the United States and the Niugini Fishing Company entered into an

10   agreement to settle a Magnuson Act based civil penalty action for illegal fishing activity in the

11   U.S. EEZ by the F/V NIUGINI 103. Notice of Violation and Settlement Agreement for Niugini

12   Fish Company (Attachment C). As part of that agreement, the Niugini Fishing Company

13   admitted liability for the illegal acts, and paid a civil penalty of $50,000. *Id.* In the settlement

14   itself, JuTzu Chuang, the President of both KFC and MIFCO, acknowledged that the vessel had

15   been renamed the F/V KOO'S #103 and that KFC was now acting on behalf of the Niugini

16   Fishing Company. *Id.* Investigators from the National Marine Fisheries Service later

17   determined that the Niugini Fishing Company was dissolved and reformed into the Koo's

18   Fishing Company. Declaration of Special Agent Jeff Pollack (Attachment D).

19        On February 15, 2006, Eugene Muller - the manager of KFC and Vice President of

20   MIFCO – was informed by the U.S. Government of a pending Magnuson Act based

21   enforcement action by the United States against the F/V KOO'S 108 for illegal fishing activity

22   in the U.S. EEZ adjacent to Howland and Baker Islands. *Id.* At that time, the F/V KOO'S 108

23   was a sister vessel of the F/V KOO'S 106. *Id.* Just thirteen days later, on February 28, 2006,

24   the title of the F/V KOO'S 106 would be transferred to MIFCO, and the vessel would be

25   renamed the F/V MARSHALLS 201. Lu Deposition, p. 80 (Attachment A), Claimant's

26   Memorandum, p. 15. The same KFC management that ran the F/V KOO'S 106 in

27   coordination with the entire KFC fleet was still running the F/V MARSHALLS 201 with no

28   apparent changes in at-sea operations. KFC knew the United States was seeking to arrest one

-11-

1  of their purse seine vessels for illegal fishing in the very same area of EEZ at issue in this case

2  and the F/V NIUGINI #103 case.

3       Knowledge of these two violations in the same US EEZ is more than a sufficient basis

4  for MIFCO/KFC to suspect that any of their vessels might, at any time, be involved in illegal

5  fishing activity in that area. The idea that KFC did not inform MIFCO of the illegal actions of

6  their vessels is ludicrous. Mr. Chuang and Mr. Muller need only have reminded themselves of

7  what they already knew.

8       Claimant next asserts that the only information available to MIFCO was a weekly

9  voyage summary report of the MARSHALLS 201 and weekly reports from the Vessel

10 Monitoring System (VMS)[3] on board the vessel. However, Captain Lu contradicts this assertion

11 when he stated under oath that he communicated catch results to MIFCO "everyday" (Lu

12 Deposition, p. 81 - Attachment A). In fact, he compared this reporting requirement with that of

13 previous jobs - "Before other boss, I never have to report to that. But this new job, 201, I report

14 everyday to them the caught of the fish." *Id.* In a second exchange, Captain Lu again confirms

15 that he contacts MIFCO daily:

16       Q - And does that fax tell the company where you are?

17       A - Yes.

18       Q - How often does he send the fax?

19       A - Once everyday.

20 Lu Deposition, p. 158 (Attachment A). Clearly, there is a significant discrepancy on the record

21 regarding the levels of communication between the F/V MARSHALLS 201 and MIFCO. From

22 this discrepancy, the Court can infer that there is a genuine issue of material fact that needs to be

23 resolved at trial.

24

25

26       [3] A VMS consists of a transmitter placed on the vessel that automatically determines the vessels position using Global Positioning System satellites, and transmits that data to a communications service provider. The communications service provider receives the transmission and relays it to those parties that have been authorized to receive the data. While most VMS are utilized by flag nations or regional fishery management organizations, all the equipment and communications are available to vessel owners commercially. See generally, Wikipedia, Vessel Monitoring Systems, http://en.wikipedia.org/wiki/vessel_monitoring_system (Attachment J).

27

28

-12-

1    Also, to state, as MIFCO has done, that the voyage summary and VMS data were the

2    only information available to MIFCO is disingenuous. It is more appropriate to say that this

3    information is the only information MIFCO sought regarding the whereabouts and activity of

4    their vessel. Any vessel owner that chooses to do so can get real-time VMS coordinate position

5    with accuracy to within 30 meters, and with reporting a whatever time interval (e.g. hour,

6    minute, second) they choose to pay for. Had MIFCO sought additional VMS data on their own,

7    they would have been able to determine that their vessel had spent approximately seven hours

8    operating in a non-transit mode within the U.S. EEZ on September 8, 2006 - just 12 hours prior

9    to the illegal fishing at issue here. Stephenson Deposition, p.104-106 (Attachment E), Silva

10   Deposition Exhibit 14 (Attachment F). They would have also been able to determine that the

11   vessel was inside the U.S. EEZ in the early morning hours of September 9, 2006, at the

12   approximate time of Captain Lu's eight previous fishing sets.[4] Vessel logbook, Silva Depo.,

13   Exhibit 1 (Attachment F). With modest oversight of readily available information, Claimant

14   could have had sufficient information to be aware of potential illegal fishing operations by

15   Captain Lu.

16        Lastly, Claimant argues that it took "substantial and reasonable steps to prevent any

17   violations of the United States fishing laws." Claimant's Memorandum, p. 19. In support of this

18   claim, they state that they provided Captain Lu with a copy of a single map purporting to show

19   the various EEZs in the Central and Western Pacific Ocean. *Id.* We can only surmise the map

20   was intended by MIFCO to show Captain Lu where he was, and was not, authorized to fish. In

21   that regard, the map is totally inadequate because the scale of the map is such that it cannot be

22   used for navigation. In addition, the map was created by the U.S. Department of State for

23   illustrative purposes only, and it was never intended that anyone would use it for navigation.

24   Expert Witness Report for Dr. Robert Smith, p. 3-4 (Attachment G). Experts for both parties in

25   this case agree that the map MIFCO provided to Captain Lu cannot be used to navigate a vessel

26   _____

27   [4] The previous eight fishing sets for the F/V MARSHALLS 201 all occurred between 5:40am and 6:40am
     (local time). Vessel Purse Seine Logbook, Silva Depo. Exh. 9 (Attachment F). The illegal set in this case was made
28   at 5:40 am (local time). *Id.*

-13-

with any accuracy. See, Edmunds Deposition, p. 27 (Attachment H); Timmel Deposition, p. 76-77 (Attachment I), and; Stephenson Deposition, p. 124 (Attachment E). To assert that providing this map to Captain Lu is a "substantial and reasonable" step to prevent fishing violations is simply risible.

Claimant also notes that it has instituted a written policy not to violate any EEZs. Claimant's Memorandum, p. 19. Unfortunately for Claimant, the written policy was adopted on April 16, 2007 - seven months after the violation and two months after Claimant's attorney first raised the CAFRA innocent owner defense as an issue. Id., and see First Amended Answer to Complaint for Forfeiture of Vessel (dated February 9, 2007). Such a self-serving, post violation, action by MIFCO is not a "substantial and reasonable step" to prevent violations of the Magnuson Act.

### iii) MIFCO FAILED TO TAKE ALL REASONABLE ACTS EXPECTED UNDER THE CIRCUMSTANCES TO TERMINATE USE OF THE PROPERTY.

The second prong of the CAFRA innocent owner defense for property owners with a property interest at the time the illegal acts took place requires that party to prove that "upon learning of the conduct giving rise to the forfeiture, [the owner] did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A)(ii). CAFRA further provides that an owner can show it "did all that reasonably could be expected" includes a demonstration that the owner "gave timely notice to an appropriate law enforcement agency of information that led the person to know the conduct giving rise to a forfeiture would occur or has occurred; and (II) in a timely fashion revoked or made a good faith attempt to revoke permission for those engaging in such conduct to use the property or took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the property." 18 U.S.C. § 983(d)(2)(B)(i).

Claimant attempts to establish compliance with this requirement by noting that MIFCO terminated Captain Lu after the violation and provided warnings to Captain Lu's replacement

-14-

1 not to violate U.S. law. Claimant's Memorandum, p. 19-20. As discussed above, such action
2 cannot be used to effectively assert an innocent owner defense under CAFRA

3      As with the first prong of the CAFRA innocent owner defense detailed in the previous
4 section, this defense does not apply in a situation where the wrongdoer is the claimant. One
5 cannot avoid forfeiture by asserting that he took all reasonable steps to prevent himself from
6 using his own property to commit a crime. The all reasonable steps defense applies to third
7 parties who have the opportunity to prevent the wrongdoer from using the third party's property
8 illegally. MIFCO is liable for the acts of its agent/employee, therefore it is the wrongdoer and
9 cannot avail itself of the all reasonable steps defense.

10      In addition, the NOAA case law detailed above makes it clear that in the world of
11 commercial fishing, a post-violation termination of the vessel captain will not suffice to avoid
12 liability to the owner. As was mentioned above, a court considering the effect of a post
13 violation discharge of a vessel captain in the commercial fishery context found that the
14 discharge was not a sufficient ground for a vessel owner to avoid liability. *United States v.*
15 *Kaiyo Maru No. 53*, 50 3 F. Supp. 1075 (D. Alaska 1980)(aff'd, 699 F. 2d 989 (9th Cir. 1983).

16      The Claimant has failed to establish the elements of the CAFRA innocent owner defense
17 in light of the facts set forth by the U.S. showing actual and circumstantial evidence to the
18 contrary. The burden of proof for the innocent owner defense rests with the Claimant, and it has
19 failed to prove that there are no genuine issues as to any material fact in this case, the Court
20 should find that there is insufficient evidence on the record to support Claimant's summary
21 judgment motion.

22 **B.    A GENUINE ISSUE OF MATERIAL FACTS EXISTS AS TO WHETHER
        CLAIMANT CAN CLAIM AN INNOCENT OWNER DEFENSE ON FISH THAT
23      WAS ILLEGAL TO POSSESS**

24      In addition to the value of the vessel, the release bond in this case includes the value of
25 the seized catch, valued at $350,000.00. Claimant's Motion for Summary Judgment, p. 2. The
26 position of the United States is that the fish on board the F/V MARSHALLS 201 is property that
27 was illegal for MIFCO to possess, and therefore does not fall within the protections of the
28 CAFRA innocent owner defense.

-15-

1    CAFRA prohibits the innocent owner defense to be applied to "contraband <u>or other</u>

2    <u>property that is illegal to possess</u>." 18 U.S.C. 983(d)(4)(emphasis added). The contraband

3    exemption to the innocent owner defense is not limited to inherently illegal property, but also

4    includes property "that may be legally possessed in some circumstances but that becomes illegal

5    to possess in others." . See *U.S. v. 144,744 Pounds of Blue Crab*, 410 F. 3d 1131 (9th Cir.

6    2005)(cert denied, 2005 U.S. Lexis 9259).

7         Claimant has raised no dispute in its Motion for Summary Judgment that the illegal

8    fishing of the F/V MARSHALLS 201 on September 9, 2006, took place as charged in the

9    Government's Complaint for Forfeiture.   The Magnuson Act requires that all fish taken in

10   connection with a violation must be forfeited, and it includes a rebuttable presumption that all

11   fish found on board a vessel which is seized for a violation of the Act were taken in violation of

12   the Act.  16 U.S.C. § 1860(a), 16 U.S.C. § 1860(e)(1).

13        The Magnuson Act explicitly prohibits possession of any fish taken in violation of the

14   Act.  16 U.S.C. § 1857(1)(G).  There is no dispute that the $350,000.00 worth of tuna caught

15   during the illegal fishing activity of the F/V MARSHALLS 201was possessed in violation of the

16   Magnuson Act.  Accordingly, summary judgment for the value of the $350,000 in catch based

17   on an innocent owner defense is contrary to law, and Claimant's Motion for Summary Judgment

18   as it applies to the value of the seized catch must be denied.

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27

28                              **V. CONCLUSION**

-16-

1   For the foregoing reasons, Plaintiff requests the Court to deny Claimant's Motion for

2   Summary Judgment.

3       RESPECTFULLY SUBMITTED this 28th day of December, 2007.

4

5                               LEONARDO M. RAPADAS
                                United States Attorney
6                               Districts of Guam and NMI

7

8

9                               MIKEL W. SCHWAB
                                Assistant U.S. Attorney
10

11                              Paul Ortiz
                                Senior Attorney
12                              Office of General Counsel
                                National Oceanic and Atmospheric Administration
13                              501 West Ocean Blvd.
                                Suite 4470
14                              Long Beach, California 90802
                                Tel: 562-980-4069
15

16

17

18

19

20

21

22

23

24

25

26

27

28

-17-

# Attachment A

1    does business?

2        A.    Mainly in pacific.

3            TRANSLATOR:  He said Kiribati and Papua New

4    Guinea, which is PNG, that's Papua New Guinea.

5            MR. SCHWAB:  Kiribati?

6            TRANSLATOR:  Kiribati, yes.

7            MR. SCHWAB:  Kiribas, Kiribati.

8        A.    Nauru, Solomon Islands.

9    BY MR. BERMAN:  (CONTINUING)

10       Q.    Do you know who is Eugene Muller?

11       A.    Don't know anyone.

12       Q.    The Marshalls Islands 201 was a ship; is that

13   correct?

14       A.    Yes.

15       Q.    And who was the owner of the ship, Marshalls 201?

16       A.    That's called Marshall Fishing Company owns the

17   ship.

18       Q.    Did the owner of the ship, the Marshalls Islands

19   Fishing Company, ever offer you bonus money?

20           MR. SCHWAB:  Objection.  You're telling him who

21   the owner is.  He's already said Mr. Koo is the owner.

22   BY MR. BERMAN:  (CONTINUING)

23       Q.    The question is about your payments.  Did you ever

24   receive a check from your employer for your payment for your

25   money, salary?

Attachment
A

December 7, 2006:  Mr. Wen-Yueh Lu

1    TRANSLATOR:  He said, answer your question, in

2  Majuro Islands, there's a manager there, it's a local natives

3  but his name is English name, I don't remember.  He said it's

4  the native of the Majuro natives.

5      Q.    Let me change this to -- Mr. Lu, please look at

6  Exhibit 4.

7      A.    (Witness complied.)

8      Q.    When you were fishing on the Marshalls 201, did you

9  use a map identical to Exhibit 4?

10     A.    You mean the sea map, right?  It's not a land map.

11     Q.    Exhibit 4 map.

12     A.    When I use it, it's similar to this but the other

13  maps or whatever is more enlarged.

14     Q.    Did you use a copy of map Exhibit 4 to fish in

15  Kiribati waters?

16     A.    No, I'm using this kind, that one.  Not the copies.

17     Q.    Show me what kind.  You're pointing to say what

18  kind; show me what kind exactly.

19     A.    Exactly like this.

20     Q.    Mr. Lu, are you pointing at Exhibit 4A?

21     A.    Yes.

22     Q.    Whose waters do you believe you were fishing when

23  you were stopped by the US Coast Guard on September 9, 2006?

24         TRANSLATOR:  Your question again, sir.

25     Q.    Whose waters do you believe you were fishing when

1   company.

2       Q.   Were you working on this boat when you were working

3   for Mr. Koo's company?

4       A.   No, no, not at the same time.

5       Q.   What boat were you on?

6       A.   Koo's 106.  I work for Mr. Koo's ship 101.  That's

7   one of the ship, another one, 106.

8            TRANSLATOR:  He want to reemphasize about the

9   job on the 201, it's not from Mr. Koo.  It's from the native

10  Marshallese, the manager on that Majuro, he contact him, he

11  got the job.

12      Q.   And the name of this vessel, before it was Marshalls

13  201, was what?

14      A.   That was the same, the 201 before the old name was

15  Koo's 106.

16      Q.   And you worked on this boat when you worked for

17  Mr. Koo?

18      A.   Right.

19      Q.   And then they changed the name to the Marshalls 201?

20      A.   Right.

21      Q.   And who did that change?

22      A.   I know it's by the Marshallese company.  They change

23  the name.

24      Q.   Mr. Koo never told you the name was changing?

25      A.   No.

1      Q.    When you worked for Mr. Koo, who did you report to?

2      A.    Johnson.

3      Q.    You looked at Mr. Johnson and you said Johnson, but

4    you didn't know his name?

5      A.    Before.

6            TRANSLATOR:  He was looking around to find that

7    name --

8    BY MR. SCHWAB: (CONTINUING)

9      Q.    But that's who you reported to but you don't

10   remember the name right away?

11     A.    Because my English is not that -- so because he's

12   above me so I have to call him Mr. Johnson.

13     Q.    Oh.

14     A.    That's a long time ago.  Now my direct boss is the

15   manager on the Majuro, the Marshallese natives.

16     Q.    Do you remember that name?

17     A.    I don't understand.  He's the fish company manager.

18   So everyday I report to him how much we caught.

19     Q.    What do you call him when you report to him?

20           TRANSLATOR:  Let me finish.

21     A.    Before other boss, I never have to report to that.

22   But this new job, 201, I report everyday to them the caught

23   of the fish.

24     Q.    Who was the other boss?

25     A.    Mr. Koo of course.  I use a fax.

1    TRANSLATOR:  You mean on the boat, 201?

2    Regularly on the boat, right?

3        MR. SCHWAB:  Yes.

4    A.    Yes, you're correct.

5    Q.    And does that fax tell the company where you are?

6    A.    Yes.

7    Q.    How often does he send that fax?

8    A.    Once everyday.

9    Q.    And does it tell the company all of the locations

10   for that day that he's been at?

11       TRANSLATOR:  Before I translate, I will ask you,

12   you said -- he said once, you said okay, did you whatever,

13   I'm going to ask you, on that split second of that moment,

14   then when you fax the moment, your company will know your

15   position?

16       MR. SCHWAB:  Good point.

17   Q.    My question should be, when you fax, what is

18   reflected on that fax?  What information?

19   A.    This machine is you can set up at right time.  So

20   our practice, I set up time certain hours.  They will

21   automatically send the fax out telling how much we are in the

22   latitude and how much on the longitude.

23   Q.    What time did he set it for?

24   A.    Greenwich time zero point -- zero zero four zero.

25   Q.    Zero zero four zero?

1    Q.    By telephone?

2    A.    Yeah, telephone.

3    Q.    To whom?

4    A.    I talked with telephone to a person who can speak

5  Chinese with me.  He is the member work with our company,

6  this person.

7    Q.    Where?

8            TRANSLATOR:  In Majuro.

9    A.    So I talk to him in Chinese and let him know they

10 are inspect me or whatever.  Then I ask him to transmit --

11 transfer this message into this Majuro native manager.

12   Q.    Who is the person you spoke to who speaks Chinese?

13   A.    He can speak English, too, he said.  Wan Chun Mo.

14   Q.    W-A-N?

15           TRANSLATOR:  Can be A-N, can be O-N.  Chun

16 C-H-U-N, Mo M-O.

17   Q.    Did he speak to anybody else, call anyone else?

18           TRANSLATOR:  Him?

19           MR. SCHWAB:  Uh-huh.

20           TRANSLATOR:  He said I talk in Chinese with this

21 Mr. Wan Chun Mo, he's the only one, to answer your question,

22 nobody else.  And then at that time, he's saying because the

23 Coast Guard ask me to drive my car into the Guam and I make a

24 protest to him, because I wasn't in the American waters, so I

25 protest that.  That's what he said.

# Attachment B

# Marshall Islands Fishing Co.

P.O. Box 1138
Majuro, Marshall Islands 96960
Tel : (692) 625-7410
Fax: (692) 625-7411
Email: mifco@ntamar.net

## 2nd Regular Board Meeting
## March 29, 2007

1. **call to order**:
   a. Johnson Chuang called to order the meeting and welcomed everyone to the 2nd regular meeting of the Board of Directors of MIFCO.
   b. Agenda adopted.

2. **Present**:
   a. Mr. Kwang Ming Koo, Chairman
   b. Mr. Johnson Chuang, member
   c. Minister John M. Silk, member
   d. Mr. Glen Joseph, member

3. **Apologies**:
   a. Johnson apologized for the absence of Mr. Shimizu, as he is in Japan for operations and marketing work.

4. **Chairman's remarks**:
   a. Mr. Koo made opening remarks and made apologies for the U.S. case against the joint venture vessel F/V Marshalls 201.
   b. Mr. Koo pointed out that a settlement with the U.S. was not reached in Guam due to excessive demands by the U.S. and the negative impression U.S. has on the company.
   c. Further, Mr. Koo reiterated that the vessel is in its first year of operation under the joint venture and the U.S. case contributes to its negative performance.

5. **Response to Chairman's remarks**:
   a. Minister Silk, as chairman of the MIMRA Board, welcomed Mr. Koo and Johnson and thanked Mr. Koo for his remarks. Further, Minister Silk thanked Mr. Koo for the opportunity for MIMRA through the joint venture, noting that it made a profit even in its first year of operation.

6. **Review of 2006 operations**:
   a. In light of the Chairman's remarks on the issue, Johnson informed the Board that the Taipei office Manager and the Captain of the vessel have been terminated and penalized.
   b. Johnson presented the FSMA Eligibility Criteria assessment that was conducted by Deloitte and Touche, noting that Marshalls 201 qualified for 35 points under the FSM Arrangement.

Attachment
B

**00045**

# Attachment C



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
Office of General Counsel
Southwest Regional Office
Long Beach Federal Building
501 W. Ocean Blvd., Suite 4470
Long Beach, CA 90802-4213
Telephone: (562) 980-4069
Fax: (562) 980-4084

May 20, 2002

Ju Tzu Juang
Zung Shing Company Limited
3F, 96, Chien-Kuo N. Road
Sec. 2
Taipei, Taiwan

     Re:  NOAA Case No. SW000201A

Dear Mr. Juang:

This letter acknowledges receipt of check No. 10305 dated May 17, 2002, in the amount of $50,000.00 and the signed Settlement Agreement. This check represents complete payment of the amount owed to the United States Government in the above-referenced case. This case is now closed. I am returning a copy of the signed Settlement Agreement for your records.

Thank you for your cooperation in this matter.

                    Sincerely,

                    Paul A. Ortiz
                    Senior Enforcement Attorney

Enclosure:
  As stated.


Printed on Recycled Paper



Attachment
C



**GRAND**
**COMMERCIAL BANK**
17 CHENG TEH RD., SEC. 1,
TAIPEI TAIWAN R.O.C.

01305

NCAII2RD70047

DATE   2002/MAY/17          1-509-260
AMOUNT   USD50,000.00

PAY TO THE ORDER OF  US DEPARTMENT OF COMMERCE/NOAA

THE SUM OF   US DOLLARS FIFTY THOUSAND ONLY                    -

TO   **First Union National Bank**
     NY International Branch
     R/T 026005092

FOR   *GRAND COMMERCIAL BANK*

BY

AUTHORIZED SIGNATURE

⑈0000⥩305⑈ ⑈026005092⑈2000⥩9⥩2⥩5⥩55⑈

# UNITED STATES DEPARTMENT OF COMMERCE
## National Oceanic and Atmospheric Administration

## SETTLEMENT AGREEMENT

In settlement of the violations of the Magnuson-Stevens Fishery Conservation and Management Act as charged in the Notice of Violation and Assessment (NOAA Case No. SW000201A) TSUGUO UTSUMI and NIUGINI FISHING COMPANY, Respondents, and the National Oceanic and Atmospheric Administration, United States Department of Commerce (NOAA), do hereby stipulate and agree as follows:

1.    Respondents admit the violation charged in the Notice and waive their right to a hearing. Both parties acknowledge that the current owner of the F/V NIUGINI #103 (now the F/V KOOS #103) is the Koo's Fishing Company, and that Koo's Fishing Company is acting on behalf of the Niugini Fishing Company for purposes of this Settlement Agreement.

2.    Respondents agree to pay to the Department of Commerce/NOAA a civil penalty of US$50,000.00 and have enclosed with this settlement agreement a check or money order in this amount.

3.    NOAA accepts Respondents' payment as full settlement of all claims, charges and complaints by the United States arising from the violations described in the Notice.

4.    Respondents understand that this case shall not constitute a prior violation in NOAA's consideration of any penalty that may be assessed against them for any future violation.

5.    Respondents hereby waive, relinquish or otherwise abandon any and all interest in items or documents collected or seized as evidence in the investigation of this case.

6.    This Settlement Agreement is effective as of the date it is signed on behalf of the National Oceanic and Atmospheric Administration.

FOR TSUGUO UTSUMI:

_____     May 17, 2002
Respondent or Authorized Representative     Date

FOR NIUGINI FISHING COMPANY:

_____     May 17, 2002
Respondent or Authorized Representative     Date

FOR NOAA:

_____     5/20/02
Paul A. Ortiz     Date
NOAA Senior Enforcement Attorney

# FAX TRANSMISION

DATE: May17, 2002

TO: Mr. Paul A. Ortiz,
    Senior Enforcement Attorney, Office of General Counsel
    Southwest Regional Office, NOAA
    Long Beach Federal Building, 501 W. Ocean Blvd., Suite 4470
    Long Beach, CA 90802-4213
    Via fax : (562) 980 4084

RE: NOAA Case No. SW000201A

Dear Mr. Ortiz:

Per your instruction, I have included the $50,000.00 bank check, signed (myself as the representative) settlement agreement page and express mail out today (attached). You should receive this express shipping very soon.

Will further coordinate to the final upon your comments.

Sincerely yours,

JuTzu Juang

**ZUNG SHING COMPANY LIMITED** *(former agent for Niugini Fishing Company)*
**3F, 96, Chien-Kuo N. Road, Sec. 2, Taipei, Taiwan,   Fax: 886-2-25181577**





# UNITED STATES DEPARTMENT OF COMMERCE
## National Oceanic and Atmospheric Administration

## SETTLEMENT AGREEMENT

In settlement of the violations of the Magnuson-Stevens Fishery Conservation and Management Act as charged in the Notice of Violation and Assessment (NOAA Case No. SW000201A) TSUGUO UTSUMI and NIUGINI FISHING COMPANY, Respondents, and the National Oceanic and Atmospheric Administration, United States Department of Commerce (NOAA), do hereby stipulate and agree as follows:

1.      Respondents admit the violation charged in the Notice and waive their right to a hearing. Both parties acknowledge that the current owner of the F/V NIUGINI #103 (now the F/V KOOS #103) is the Koo's Fishing Company, and that Koo's Fishing Company is acting on behalf of the Niugini Fishing Company for purposes of this Settlement Agreement.

2.      Respondents agree to pay to the Department of Commerce/NOAA a civil penalty of US$50,000.00 and have enclosed with this settlement agreement a check or money order in this amount.

3.      NOAA accepts Respondents' payment as full settlement of all claims, charges and complaints by the United States arising from the violations described in the Notice.

4.      Respondents understand that this case shall not constitute a prior violation in NOAA's consideration of any penalty that may be assessed against them for any future violation.

5.      Respondents hereby waive, relinquish or otherwise abandon any and all interest in items or documents collected or seized as evidence in the investigation of this case.

6.      This Settlement Agreement is effective as of the date it is signed on behalf of the National Oceanic and Atmospheric Administration.

FOR TSUGUO UTSUMI:

_____        May 17, 2002
Respondent or Authorized Representative      Date

FOR NIUGINI FISHING COMPANY:

_____        May 17, 2002
Respondent or Authorized Representative      Date

FOR NOAA:

_____        _____
Paul A. Ortiz                           Date
NOAA Senior Enforcement Attorney



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
Office of General Counsel
Southwest Regional Office
Long Beach Federal Building
501 W. Ocean Blvd., Suite 4470
Long Beach, CA 90802-4213
Telephone:    (562) 980-4069
Fax:          (562) 980-4084

November 7, 2001

Tsuguo Utsumi
7F-3, No. 167 FU-HSIN N. Road
Taipei, Taiwan

Nuigini Fishing Company
7F-3, No. 167 FU-HSIN N. Road
Taipei, Taiwan

    Re:  NOAA Case No. SW000201A

Gentlemen:

This office represents the National Marine Fisheries Service
(NMFS), a part of the National Oceanic and Atmospheric
Administration (NOAA), and is responsible for enforcement of the
Magnuson-Stevens Fishery Conservation and Management Act
(Magnuson Act) and the regulations promulgated thereunder on
behalf of the Secretary of Commerce.

A report of an incident occurring on or about August 17, 2000,
has been referred to this office.  Based on that report, I have
determined that you violated the Magnuson Act on that date and,
therefore, I have issued the enclosed Notice of Violation and
Assessment (NOTICE).  The NOTICE states the factual basis for its
issuance, charges you with unlawful conduct and assesses a civil
penalty.

This is a civil, administrative action, not a criminal procedure.
The NOTICE and the enclosed copy of the 15 Code of Federal
Regulations Part 904, as amended (the applicable Federal
regulations governing civil procedures), explain your rights.
READ THIS NOTICE CAREFULLY.

As stated in the NOTICE, I have determined for the agency that
you should be assessed a total civil penalty of $75,000.00.  You,
your attorney, or other representative are invited to contact me
to discuss this matter, or to urge any modification of the NOTICE
which you may feel is warranted by the facts and circumstances.

Please note that a Settlement Agreement is included with the
NOTICE.  The National Oceanic and Atmospheric Administration will
consider the matter settled should you elect to waive your right


Printed on Recycled Paper

to a hearing and pay the civil penalty of $75,000.00 and agree to the terms of the Settlement Agreement. To settle the case at this point, you must sign and date one copy of the Settlement Agreement and return that copy with a check or money order payable to the "Department of Commerce/NOAA" for the civil penalty amount to NOAA-Office of General Counsel, 501 W. Ocean Blvd., Suite 4470, Long Beach, California 90802. The case will then be closed. This offer shall expire thirty (30) days from the date you receive this letter, unless later extended by this office.

Should you decide not to settle at this time, you have thirty (30) days from receipt of the NOTICE to respond. During this time, you are entitled to request a hearing (like a trial) before an Administrative Law Judge by sending a written, dated request by certified mail to the address shown above. At the hearing the Judge will independently determine whether the violation occurred and what the penalty should be.

YOU ARE CHARGED JOINTLY AND SEVERALLY IN THIS NOTICE. Whether one of you pays the entire amount or each of you pay equal or unequal portions of the penalty is for you to determine. A HEARING REQUEST BY ONE NAMED RESPONDENT WILL BE DEEMED TO BE A HEARING REQUEST ON BEHALF OF ALL RESPONDENTS. This means that ALL Respondents will be bound by the decision of the Administrative Law Judge, whether or not they participate in the proceedings.

If you believe that you positively do not have the financial ability to pay the amount of the penalty assessed, contact me immediately to receive financial information request forms or interrogatories.

IF YOU DO NOT RESPOND, THE NOTICE AND THE PENALTY ASSESSMENT CONTAINED THEREIN WILL BECOME A FINAL ADMINISTRATIVE ORDER ENFORCEABLE IN UNITED STATES DISTRICT COURT.

Sincerely,

Paul A. Ortiz
Senior Enforcement Attorney

Enclosures
  As stated.

cc:  (w/NOVA)
     NMFS F/EN72, Kevin Painter
     NMFS F/EN7, Long Beach, CA

2

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration

NOTICE OF VIOLATION AND ASSESSMENT
OF ADMINISTRATIVE PENALTY

MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT

ISSUED TO:

Tsuguo Utsumi
7F-3, No. 167 FU-HSIN N. Road
Taipei, Taiwan

Nuigini Fishing Company
7F-3, No. 167 FU-HSIN N. Road
Taipei, Taiwan

CASE NO.: SW000201A

NOTICE: This is your official notice of the violation(s) and
assessment of administrative penalty described below. This is
not a criminal action. You, your attorney, or other represen-
tative have thirty (30) days from the date you receive this
Notice to respond. During this time you may:

    (1)   Accept the proposed settlement by signing the
        SETTLEMENT AGREEMENT attached below and making
        payment by check or money order made payable
        to the "Department of Commerce/NOAA" at:

            Office of General Counsel
            National Oceanic and Atmospheric Administration
            501 W. Ocean Boulevard, Suite 4470
            Long Beach, California 90802

    (2)   Seek to have this NOTICE modified to conform to the
        facts or the law as you see them, by contacting the
        Attorney listed below at the address set forth in
        paragraph (1) above;

    (3)   Request a hearing (like a trial) before an Adminis-
        trative Law Judge to deny or contest all, or any part
        of the violation charged and the civil penalty imposed.
        Such request must be dated and in writing, and must be
        served either in person or by certified or registered
        mail, return receipt requested, at the address set
        forth in paragraph (1) above. The request shall either
        attach a copy of this NOTICE or refer to the case
        number appearing in the heading of this NOTICE; or

(4) Take no action, in which case this NOTICE shall become
final in accordance with 15 C.F.R. § 904.104.

For good cause shown, you may, within the 30-day period specified
above, request an extension of time to respond.

WARNING: IF YOU SHOULD FAIL TO EXERCISE YOUR RIGHTS WITHIN
THIRTY (30) CALENDAR DAYS FOLLOWING RECEIPT OF THIS NOTICE, ALL
OF THE ALLEGATIONS AND THE PENALTY HEREIN WILL BE TAKEN AS
ADMITTED AND THIS ASSESSMENT WILL BECOME A FINAL ADMINISTRATIVE
ORDER ENFORCEABLE IN UNITED STATES DISTRICT COURT, as provided in
16 U.S.C. § 1858, the Magnuson-Stevens Fishery Conservation and
Management Act, and the implementing regulations in 15 C.F.R.
Part 904, copies of which are attached for your information and
guidance.

THE ATTACHED REGULATIONS GOVERN THESE CIVIL PROCEDURES AND
EXPLAIN YOUR RIGHTS. READ THEM CAREFULLY.

**FACTS CONSTITUTING VIOLATION:** On or about August 17, 2000,
inside the United States exclusive economic zone (EEZ) near
Howland and Baker Islands, Tsuguo Utsumi, operator of the F/V
NIUGINI #103 (YJQT9), and Niugini Fishing Company, owner of the
F/V NIUGINI #103 (RESPONDENTS), did violate the Magnuson-Stevens
Fishery Conservation and Management Act; to wit, RESPONDENTS used
a vessel, other than a vessel of the United States, to engage in
fishing within the exclusive economic zone of the United States
without a valid and applicable permit. Specifically, RESPONDENTS
deployed five fishing aggregating devices (FADs) inside the
United States EEZ. RESPONDENTS are both persons subject to the
jurisdiction of the United States.

**ASSESSED PENALTY:** $75,000.00

**SEIZED ITEM(S):** none.

**STATUTE/ REGULATION(S) VIOLATED:** 16 United States Code
§ 1857(2)(B).

**JOINT AND SEVERAL LIABILITY:** This civil penalty is assessed
jointly and severally against TSUGUO UTSUMI and NIUGINI FISHING
COMPANY. TSUGUO UTSUMI and NIUGINI FISHING COMPANY, jointly, and
each individually, are liable for the $75,000.00 assessed
penalty. Whether one pays the entire amount or both pay equal or
unequal portions of the penalty is for TSUGUO UTSUMI and NIUGINI
FISHING COMPANY to determine. This case will not, however, be

NOTICE OF VIOLATION AND ASSESSMENT, CASE NO. SW000201A, page 2

closed against either until the entire civil penalty amount is paid.

You may seek to have this penalty amount modified on the basis that you do not have the ability to pay the penalty assessed. Any request to have the penalty amount modified on this basis must be made in accordance with 15 C.F.R. § 904.102 and should be accompanied by supporting financial information.

**FINDINGS, CONCLUSIONS, AND ORDER:** Having considered all of the facts and circumstances presented in this NOTICE and taking into account the criteria for determining the amount of the civil penalty as provided in 16 U.S.C. § 1858(a), I do hereby find and conclude that the Respondents did violate the Magnuson-Stevens Fishery Conservation and Management Act as alleged, in every particular, and that a just and reasonable assessment for such violation(s) is a civil penalty of $75,000.00.  IT IS SO ORDERED.

FOR THE SECRETARY OF COMMERCE:

Paul A. Ortiz
Senior Enforcement Attorney

DATED: November 7, 2001

SEND REPLY OR MAKE INQUIRY TO:  Office of General Counsel, National Oceanic and Atmospheric Administration, 501 W. Ocean Boulevard, Suite 4470, Long Beach, California 90802, Telephone (562) 980-4069.

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration

## SETTLEMENT AGREEMENT

In settlement of the violations of the Magnuson-Stevens Fishery
Conservation and Management Act as charged in the Notice of
Violation and Assessment (NOAA Case No. SW000201A) TSUGUO UTSUMI
and NIUGINI FISHING COMPANY, Respondents, and the National
Oceanic and Atmospheric Administration, United States Department
of Commerce (NOAA), do hereby stipulate and agree as follows:

1.    Respondents admit the violations charged in the Notice and
waive their right to a hearing.

2.    Respondents agree to pay to the Department of Commerce/NOAA
a civil penalty of $75,000.00 and have enclosed with this
settlement agreement a check or money order in this amount.

3.    NOAA accepts Respondents' payment as full settlement of all
claims, charges and complaints by the United States arising from
the violations described in the Notice.

4.    Respondents understand that this case shall constitute a
prior violation in NOAA's consideration of any penalty that may
be assessed against them for any future violation.

5.    Respondents hereby waive, relinquish or otherwise abandon
any and all interest in items or documents collected or seized as
evidence in the investigation of this case.

6.    This Settlement Agreement is effective as of the date it
is signed on behalf of the National Oceanic and Atmospheric
Administration.

FOR TSUGUO UTSUMI:


_____        _____
Respondent or Authorized Representative         Date


FOR NIUGINI FISHING COMPANY:


_____        _____
Respondent or Authorized Representative         Date


FOR NOAA:


_____        _____
Paul A. Ortiz                                   Date
Senior Enforcement Attorney

SETTLEMENT AGREEMENT, CASE NO. SW000201A, page 1