# Attachment D

LEONARDO M. RAPADAS
United States Attorney
MIKEL W. SCHWAB
Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagatna, Guam 96910
Tel: 671-472-7332
Fax: 671-472-7215

Paul Ortiz
Senior Attorney
Office of General Counsel
National Oceanic and Atmospheric Administration
501 West Ocean Blvd.
Suite 4470
Long Beach, California 90802
Tel: 562 980 4069

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE

TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL CASE NO. 06-00030 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **DECLARATION OF** |
| | ) | **JEFFREY M. POLLACK** |
| MARSHALLS 201, | ) | |
| | ) | |
| Defendant. | ) | |

1

Attachment
D

I, JEFFREY M. POLLACK, being duly sworn, do hereby depose and state:

## I.   **INTRODUCTION**

1. I am a Special Agent ("SA") with the U.S. Department of Commerce, National

Oceanic and Atmospheric Administration, National Marine Fisheries Service, Office of

Law Enforcement ("NOAA OLE"), presently assigned to the Honolulu Field Office,

Honolulu, Hawaii. I have been a SA with NOAA OLE since June 2004. Part of my duties

consists of investigating violations of United States fisheries laws codified under the

Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens

Act"), and its related regulations, which include prohibitions on foreign fishing vessels

fishing in United States fishing waters without a valid permit. Before becoming a NOAA

OLE SA, I was an Immigration and Customs Enforcement SA for around three years, and

an Internal Revenue Service Criminal Investigation SA for over six years, and in that

approximate twelve year time period, I investigated numerous fraud and money laundering

investigations in the Central District of California, and fishery violation cases in the

Pacific area. My formal education includes a Bachelor of Science in accounting.

## II.   **PURPOSE OF DECLARATION**

2. In conducting my investigative duties as a NOAA OLE SA, I was assigned to

investigate the illegal fishing activities of the KOO'S 108, for engaging in non-permitted

2

fishing activity in the United States exclusive economic zone ("EEZ") around the U.S.

island possessions of Howland and Baker in the central Pacific. This illegal fishing

activity occurred during the month of January 2004. The KOO'S 108 was a Republic of

the Marshall Islands ("RMI") flagged purse seine fishing vessel, owned by the KOO'S

FISHING COMPANY ("KFC"), a RMI based company. Further, more recently, I was

assigned to assist in the investigation of the MARSHALLS 201, a RMI flagged purse

seine fishing vessel for illegally fishing in the U.S. EEZ around Howland and Baker

Islands in September 2006. The KFC has an ownership interest in the MARSHALL

ISLANDS FISHING COMPANY ("MIFC"), the company which owns the MARSHALLS

201.

 3. In conducting these investigations, I carried out research on the KFC, the history

of the vessel/s held by the MIFC and the KFC, and the ownership of the KFC. The

information I learned from a multitude of sources has led me to believe, to the best of my

knowledge, that KWANG-MING KOO, a Taiwanese citizen, has been materially

involved in the management aspects of the MIFC and the KFC, as well as in the control of

the vessel/s of those companies. This declaration thus helps establish that KWANG-

MING KOO has not just been an investor in the KFC, and thus the MIFC, but that he has

been materially involved in the management of those companies.

### III. THE KOO'S FISHING COMPANY & KWANG-MING KOO

 4. During the course of my investigations, I learned that the KFC, a registered RMI

3

company with its office location in the RMI, was involved with the operation of the MIFC, and that KWANG-MING KOO was materially involved in the KFC.

5. Based on my review of a Joint Venture Agreement between the KFC and the Marshall Islands Marine Resources Authority ("MIMRA"), I learned that the KFC is a resident domestic corporation duly organized under RMI laws, and that its head office is located at Box 321, Majuro, MH 96960. I learned from the agreement that the KFC holds a 51% stake in the allocation of profits and losses from this joint venture, under which the MARSHALLS 201 has operated. The agreement established that the KFC was the managing partner of the joint venture, and also established a joint venture management committee. The agreement established that a duty and responsibility of the committee was to resolve any special problems which could arise in carrying out the work covered by the agreement. The agreement listed members of this committee, and one of the listed members for the KFC was KWANG-MING KOO. Further, the agreement's signature page provided a signature space for someone from the KFC, as well as for someone from MIMRA. The KFC signature space lists the name of KWANG-MING KOO, and mentions his title as the Chairman of the KOO'S FISHING COMPANY, LTD.

6. On August 10, 2005, I interviewed Dike Poznanski, who had been a Pacific Islands Forum Fisheries Agency ("FFA") observer onboard the KOO'S 108 during the entire voyage within which the KOO'S 108 engaged in illegal fishing activity inside the United States' EEZ. From NOAA OLE SA Kevin Painter I learned that the different FFA

4

member nations have individuals who are trained as FFA observers, and these individuals attend formal FFA training where they learn about fishing operations, navigation, and other subjects that allow them to perform observer duties onboard fishing vessels.

7. Dike Poznanski informed me at the time of the interview that he was currently a observer supervisor, and that he worked closely with the KFC. Dike Poznanski explained that KFC did have an office space in the RMI. Further, Dike Poznanski told me that the KFC was owned by Mr. KOO, who lived in Taiwan, and that the KFC was a Taiwanese company.

8. Based on information I found on Taiwanese government websites, specifically websites containing information from the Taiwanese Government Information Office, I learned that KWANG-MING KOO was the chairman of the KFC since 1996.

9. Based on September 4, 2006 Pacific Magazine articles that I found on the internet, I learned from information found between the two articles that KWANG-MING KOO was identified as being the owner of Majuro based KFC, as well as its chairman, and that he operated one purse seiner in a joint venture with MIMRA.

10. Based on an August 18, 2006 Taipei Times article and an August 16, 2006 BBC News article, both of which I found on the internet, I learned from information found in the articles how a KFC vessel rescued three lost Mexican fisherman on August 9, 2006, who had drifted around 8,000 kilometers in a disabled fishing boat. The Taipei Times

5

article mentioned how the company's owner, KOO KWANG-MING[1], had ordered the KOO'S vessel to return straight to Majuro following the three Mexican men's ordeal.

11. Based on an internet news article attributed to the Marianas Variety News from January 21, 2000, I found information in the article that identified that KWANG-MING KOO, who headed Taipei based KOO Holdings Co. Ltd, owned five purse seine fishing vessels, and that he wanted to make Majuro, RMI, the home port for his fleet.

## IV. Information on KFC Vessels, their Previous Names, & Owning Companies

12. From conducting my investigation into the KOO'S 108, I learned of an earlier incident involving another KFC vessel, the KOO'S 103, which engaged in non-permitted fishing activity in the United States EEZ around Howland and Baker Islands in August 2000.

13. From information I learned from SA Kevin Painter, who boarded the KOO'S 103 in Majuro lagoon on September 27, 2000, the vessel was previously know as the Niugini 103, and registered in Vanuatu. According to SA Painter, at the time of the boarding, the vessel was having its name and registration changed from the Niugini 103 to the KOO'S 103. Further, at the time that the vessel caused the violations in the U.S. EEZ, the vessel was under the name Niugini 103, owned by the Niugini Fishing Company Pty Ltd., and had its home office in Taiwan.

14. On July 19, 2005, I received a copy of an FFA application for registration of

---

[1]KWANG-MING KOO's name was listed last name first in the Taipei Times article.

6

the Niugini 103 from SA Painter. The second page of the application had a space for the name of the applicant, and typed in that space was the name KWANG-MING KOO.

15. Based on documents I obtained from NOAA's Office of General Counsel, which were the result of its effort to settle the violations caused by the KOO'S 103/Niugini 103, I learned the following:

    a. Responding to NOAA documents seeking a settlement to the KOO'S 103/Niugini 103 violations, an individual named Ju Tzu Juang responded back to NOAA's counsel office, representing himself as the former agent for the Niugini Fishing Company.

    b. Ju Tzu Juang mentioned in the correspondence that he would coordinate for the Niugini Fishing Company in regards to the violations. Ju Tzu Juang mentioned that the Niugini Fishing Company had been dissolved, and that its vessels had been re-flagged and put under a new business entity. Through correspondence, Ju Tzu Juang ultimately alluded to the successor company for the Niugini 103 as being the KFC, and that the vessel was based in the Marshall Islands. Further, Ju Tzu Juang mentioned in a correspondence that Mr. KOO was the owner of the vessel.

16. During the interview of Poznanski on August 10, 2005, Poznanski informed me that the KFC currently had six vessels based out of RMI, and they were the KOO'S 101, 102, 103, 106, 107, and the 108.

## V.    Meeting with the KFC Regarding the KOO'S 108

17. On February 16, 2006, a meeting was held at the MIMRA office in Majuro,

7

RMI, between representatives of the U.S. Government, MIMRA, and the KFC, to discuss the violations of the KOO'S 108. The U.S. Government representatives included Assistant United States Attorney Mikel Schwab, NOAA General Counsel Attorney Paul Ortiz, and myself. Representing MIMRA was Glen Joseph, and representing the KFC was Eugene Muller, who explained in the meeting that he was the local, RMI based, manager for the KFC.

18. During the course of the meeting, Eugene Muller was allowed to look over court documents pertaining to the KOO'S 108 that were ready to be filed which detailed violations of the Magnuson Stevens Act committed by the KOO'S 108 for illegal fishing activity in the United States EEZ. Further, during the meeting, Eugene Muller stated to the people present at the meeting that he had talked to his superiors, and that they were aware of the previous violation, but not the current violation.

## VI.    KWANG-MING KOO's Involvement at Settlement Meetings

19. During the week of September 24th through the 29th, 2006, negotiations occurred between representatives of the U.S. Government and the MIFC, as a result of the MARSHALLS 201 being seized by the U.S. government for illegally fishing in the U.S. EEZ. Representatives for the MIFC consisted of members of the RMI government and representatives from the KFC. I was among the representatives for the U.S. Government.

20. The purpose of the meetings was to attempt to negotiate a settlement for the illegal fishing activity of both the MARSHALLS 201 and the KOO'S 108 for their illegal

8

fishing activity in the U.S. EEZ surrounding Howland and Baker Islands.

21. KWANG-MING KOO arrived at the settlement negotiation meetings while they were ongoing, and personally became engaged in the discussions and negotiations. During the negotiations in which KWANG-MING KOO was present, I heard KWANG-MING KOO say in substance the following, either directly in English, or through JOHNSON CHUANG, who occasionally translated for KWANG-MING KOO:

 a. When talking about how Taiwan was an island country, he (KWANG-MING KOO) mentioned how he brought his fishing business to the Marshall Islands to help develop that country's fishing industry.

 b. When he (KWANG-MING KOO) was discussing the circumstances of the U.S. seizing the MARSHALLS 201, he mentioned how the U.S. sat and waited while the vessel was in U.S. waters, and discussed the issue as to why the U.S. didn't warn the vessel.

 c. At one point, KWANG-MING KOO expressed to everyone at the negotiation table that in regards to the idea of having $500,000.00 set aside to pay for increased observer coverage on KFC vessels, that he felt that part of that money should instead be used to pay for getting more Marshall Island fishermen on the vessels, instead of it all going for observers.

## VII. CONCLUSION

22. Based on the information contained herein, I believe that KWANG-MING

9

KOO has been materially involved in the management of the MIFC, the KFC, and the vessel/s of those companies. Over time, as observed through documents and KWANG-MING KOO's own admissions, KWANG-MING KOO has been seen to be involved in the directing of the KFC vessels, from where they would be home-ported, to when a vessel would return to port. His name has appeared in documents relating to his vessels, he has been listed as the Chairman of the KFC, a top level company position, and he was one of the listed members for the Joint Venture Agreement's joint venture management committee. Further, KWANG-MING KOO's appearing at the settlement negotiation for the MARSHALLS 201, and his involvement in those discussions, revealed that he had specific knowledge about the events of that vessel's seizure, and showed his involvement in the KFC and the MIFC. The totality of all the information I have learned on KWANG-MING KOO shows that he has been materially involved in the MIFC and the KFC, and the vessel/s of those companies.

Further Declarant Sayeth Naught.

Dated this 28 day of December, 20007

BY: _____
Special Agent Jeffrey M. Pollack

10

# Attachment E

1    setting on the 8th?

2        A    I think on the 8th, he was in Kiribati.  I

3    think he set right down here, and then he ran up and he

4    was up here in the afternoon and he spent --

5        Q    You set right down here.  Can you tell us

6    you mean right down on the Kiribati?

7        A    On the Kiribati side, right.  And then he

8    ran across the border, across the line on the US side.

9    He came over and then he circled around here which is

10   about 6:30 in the afternoon, and then he ran down and

11   he crossed the line.

12           Here is the line here.  I'm looking at

13   number 201-782.  And he crossed the line and he came

14   down here and he drifted.

15       Q    And you can see a drift based on --

16       A    You can see the pattern of the drift.

17       Q    Tell us what document you're pointing at

18   now.

19       A    This is 201-780, and this is where he came

20   down here in the afternoon and he started drifting and

21   he drifted here all night long.

22       Q    Now, going back, what do you think he was

23   doing at 6:00 p.m. on the 8th, can you tell that?

24       A    6:00 p.m.?

25       Q    Approximately 6:00 p.m. on the 8th.

P A U L S O N

REPORTING & LITIGATION SERVICES
WWW.PAULSONREPORTING.COM

Attachment
E

1        A       He was up here and --

2        Q       What was he doing in US waters to the best

3    of your knowledge and your --

4        A       In the afternoon, he was probably looking

5    at a school of fish on a FAD, looking and saying,

6    "Maybe I got 120 ton of fish here.  It looks very good.

7    I'm going to come down, go across the line, I'm going

8    to stop.  I'm going to drift," and if you look at this,

9    you can see here where he made a little circle here

10   that he was looking at something.

11       Q       Again, tell us what document you're

12   pointing at.

13       A       That's number 201-782.  And this is an

14   overlay.  It shows where he came down and he made a

15   circle here, probably looked at a FAD with 120 ton of

16   jumbos, came down here, stopped, drifted.

17              If you look at the drift where he drifted

18   here, this is five miles here, and he started drifting.

19   And then in the morning on the 9th, he got up, he ran

20   up in here.  If you look at the drift, it's almost the

21   same as the FAD.

22              The FAD drifted down and he drifted down,

23   not much difference.  A little bit because there was

24   probably 10- or 15-mile-an-hour wind pushing a little

25   bit more but the FAD drifted this way.  And then he was

1   right in line to come across here and make his set at

2   5:40 in the morning.

3          Q    So a boat captain would check his FAD in

4   the afternoon.  And then why wouldn't he wait right

5   there all night?

6          A    Well, you can't wait.  We never drift next

7   to the FAD.  We move away from the FAD because the boat

8   can actually suck the fish away from the FAD.  And then

9   if the chief wants to pump out, you got to pump out.

10  You don't want to put anything in the water.  You don't

11  want anybody throwing anything overboard because

12  anything like that can suck the fish away from your

13  FAD.

14         So we always run seven, eight miles away

15  from the FAD so that -- or we drift.  We're drifting

16  independently from the FAD so we don't suck the fish

17  away from the FAD.

18         Q    So what you're seeing here appears to be a

19  drift for the evening while they wait for the next

20  morning?

21         A    Yes.  Plus the fact he's drifting in an

22  area that he has a license for.

23         Q    And is that drift pattern coinciding with

24  what you --

25         A    Coincided almost identical to the pattern

1   you use this map alone?

2        A     No.  I would use this for a general chart

3   but not to navigate on, no.

4        Q     If a boat owner gave this to one of his

5   captains and said, "I want you to navigate by this,

6   this is all the information I give you --"

7        A     That would be pretty hard.  You couldn't

8   navigate by it.  You could take this chart and maybe

9   pick out points and transfer those onto -- you see,

10  because these blocks here are one degree.  Look how

11  small this one degree is in comparison to one degree

12  here.  You see this here?  This is one degree.  This is

13  10 degrees.  This is 10 times smaller.

14       Q     So what does a boat captain do when he has

15  this map but needs to navigate in those waters, what

16  does he do?

17       A     You use a plotting sheet.

18       Q     A plotting sheet.  Have you brought a

19  plotting sheet with you today?

20       A     And these are readily available.  I've

21  never been on a boat, and I've been on boats for over

22  50 years that they don't have a plotting sheet.  We all

23  have plotting sheets because this is what we use

24  because they don't make charts way out in the ocean.

25  There is no chart available for the middle of the ocean

b212cdaa-7545-4925-93a8-9520d732d0cc

# Attachment F

SOUTH PACIFIC REGIONAL PURSE-SEINE LOGSHEET 南太平洋棒網漁船記錄表

"Marshalls 201"

DEPOSITION
EXHIBIT

PENGAD 800-631-6989

Attachment
F

# About.com : Geography

## How To Convert a Decimal to Sexagesimal

You'll often find degrees given in decimal degrees (121.135°) instead of the more common degrees, minutes, and seconds (121°8'6"). However, it's easy to convert from a decimal to the sexagesimal system.

**Difficulty Level:** average    **Time Required:** 5 minutes

### Here's How:

1. The whole units of degrees will remain the same (i.e. in 121.135° longitude, start with 121°).
2. Multiply the decimal by 60 (i.e. .135 * 60 = 8.1).
3. The whole number becomes the minutes (8').
4. Take the remaining decimal and multiply by 60. (i.e. 1 * 60 = 6).
5. The resulting number becomes the seconds (6"). Seconds can remain as a decimal.
6. Take your three sets of numbers and put them together, using the symbols for degrees (°), minutes ('), and seconds (") (i.e. 121°8'6" longitude)

### Tips:

1. You can choose between decimal degrees and degrees, minutes, and seconds on your GPS
2. Once you have degrees, minutes, and seconds, it's often easier to find your location on most maps (especially topographic maps)
3. Though there are 360 degrees in a circle, each degree is divided into sixty minutes and each minute is divided into sixty seconds.

### Related Features:

- Latitude & Longitude Resources
- Latitude & Longitude Article
- Distances & Coordinate Systems Resources
- GPS Resources

From Matt Rosenberg,
Your Guide to Geography.
FREE Newsletter. Sign Up Now!



DEPOSITION
EXHIBIT
9
Silva

PENGAD 800-631-6989



# Attachment G

# REPORT ON THE
## MARSHALLS 201 SEPTEMBER 2006
## INCIDENT AND ITS RELATIONSHIP
## TO THE UNITED STATES 200 NAUTICAL MILE
## EXCLUSIVE ECONOMIC ZONE LIMIT

### DR. ROBERT W. SMITH[1]
### AUGUST, 2007

### Summary

1. This paper examines the fishing enforcement, boarding and investigation by the United States Coast Guard against the fishing vessel MARSHALLS 201 on 9 September 2006. This report analyzes the location of this enforcement action with regards to the exclusive economic zone limit claimed and published by the United States. The conclusions reached are 1) the limits of the U.S. exclusive economic zone have been published in the official U.S. *Federal Register* and available to the international community, and, 2) the location where the U.S. Coast Guard reports that the Marshall 201 was fishing illegally is within the U.S. exclusive economic zone.

### The Enforcement Action

2. On 9 September 2006 the Marshall 201, a foreign fishing vessel flagged in the Marshall Islands, was detected fishing illegally in U.S. waters by the U.S. Coast Guard (USCGC Walnut). The location of the violation was reported by the Coast Guard at:

**02-05.667 S., 175- 59.531W.**[2]

This location is southeast of Baker Island, a U.S. possession in the central Pacific Ocean. The location is more than two nautical miles inside the U.S. exclusive economic limit.[3]

### The United States claim to an Exclusive Economic Zone

3. The United States claim to an exclusive economic zone (EEZ) was made by Presidential Proclamation No. 5030 on March 10, 1983. The outer limit of the EEZ is a line established in "such a manner that each point on it is 200 nautical miles from the baseline from which the breadth of the territorial sea is measured."[4] In areas where the

---

[1] My resume is attached in the Annex to this Report.
[2] Summary of ECDIS Data Log From 091931Z SEP 2006 to 100130Z SEP 2006, p. 201-642.
[3] The calculation was performed, in my presence, by the Navigator of the USCGC Healy (WAGB-20), 28 August 2007 on a Sperry VMS, ECDIS-N.
[4] *Federal Register*, Vol. 60, No. 163, August 23, 1995, at 43825.

Attachment G

United States EEZ overlap the EEZ claims of foreign neighboring States the United States has stated the following:

"The Government of the United States of America has been, is, and will be, engaged in consultations and negotiations with governments of neighboring countries concerning the delimitation of areas subject to the respective jurisdiction of the United States and of these countries.

The limits of the exclusive economic zone of the United States as set forth below are intended to be without prejudice to any negotiations with these countries or to any positions which may have been or may be adopted respecting the limits of maritime jurisdiction in such areas."[5]

4. The limit of the United States EEZ seaward of Howland and Baker Islands is described in the 1995 *Federal Register* notice as follows:[6]

"The seaward limit of the exclusive economic zone is a line 200 nautical miles from the baseline from which the territorial sea is measured, except to the southeast and south of the Howland and Baker Islands the limit of the exclusive economic zone shall be determined by straight lines connecting the following points:

1.  0° 14' 30" N., 173° 08 '00" W.
2.  0° 14' 32" S., 173° 27' 28" W.
3.  0° 43' 52" S., 173° 45' 30" W.
4.  1° 04' 06" S., 174° 17' 41" W.
5.  1° 12' 39" S., 174° 31' 02" W.
6.  1° 14' 52" S., 174° 34' 48" W.
7.  1° 52' 36" S., 175° 34' 51" W.
8.  1° 59' 17" S., 175° 45' 29" W.
9.  2° 17' 09" S., 176° 13' 58" W.
10. 2° 32' 51" S., 176° 38' 59" W.
11. 2° 40' 26" S., 176° 51' 03" W.
12. 2° 44' 49" S., 176° 58' 01" W.
13. 2° 44' 53" S., 176° 58' 08" W.
14. 2° 56' 33" S., 177° 16' 43" W.
15. 2° 58' 45" S., 177° 26' 00" W."

---

[5] *Ibid.*

[6] *Ibid*, at 43829. Prior to the 1983 EEZ Proclamation, the U.S. had implemented the Magnuson Fishery Conservation and Management Act on 7 March 1977 which claimed an exclusive fishery zone off the 50 U.S. states and off its territories and possessions. The geographic description of the outer limit of the exclusive fishing zone was published in Public Notice 526, *Federal Register*, Vol. 42, No. 44, March 7, 1977, 12937-40. The *Federal Register* notice has been updated on several occasions and the most current edition that provides geographic coordinates defining the outer limit of the United States exclusive economic zone limit is *Federal Register*, Vol. 60, No. 163, August 23, 1995, 43825-43829. This notice cites all the earlier *Federal Register* notices. It is the 1995 *Federal Notice* that will be cited in this report.

5. The international community was put on notice by the publishing of the geographical coordinates in the **Federal Register** and it was expected that any users were responsible to know the extent of the United States EEZ off the 50 U.S. states and the territories and possessions of the United States. I understand that U.S. law (title 44 U.S. Code Section 1507) provides that publication of a document, such as the US EEZ limits, in the **Federal Register** is sufficient to give notice of the contents of the document to a person subject to or affected by it.

6. Any ship navigating in the high seas, such as in the area of the U.S. EEZ limit to the southeast of Howland and Baker islands, would have a Global Positioning System (GPS) and/or a GPS-based plotter on board. At the time of the enforcement action, the MARSHALLS 201 had this equipment available for use by the captain and crew of the vessel.[7] Thus, using the list of geographical coordinates, as given in paragraph 4 above, a navigator knows precisely where he was with regards to the United States EEZ limit.

7. This list of 15 points shown in paragraph 4 above is a median line between the United States (Howland and Baker Islands) and Kiribati (which include Gardner Island, McKean Island and Canton Island). A median line is that line which is equally distant along its entire length between the coastlines of the two States. The median line, as defined in paragraph 4 above, was calculated using the best information available that depicted the coastlines of the United States and Kiribati.

### Map of Claimed and Potential Maritime Zones in the Central and South Pacific

8. The map titled, "Claimed and Potential Maritime Zones in the Central and South Pacific," as found on the MARSHALL 201, was first made by the author in the late 1980s, following the completion of a Pacific regional fisheries negotiations. It is a small-scale map with a geographical range from 29 degrees North latitude to 28 degrees South latitude and from 130 degrees West longitude to 135 degrees East longitude. It depicts the Limit of Treaty on Fisheries Between the Governments of Certain Pacific Island States and the Government of the United States of America, the 200 nautical mile exclusive economic zones, 200 nautical mile fishery jurisdictions, claimed archipelagic waters, negotiated maritime boundaries, potential maritime boundaries (with hypothetical median lines shown), and the United States Exclusive Economic Zone limits. There is a legend that lists the negotiated maritime boundaries with the date of signature and the date the treaty entered into force, if applicable. There is also a listing for those States claiming Exclusive Economic Zones and those claiming an Exclusive Fishing Zone.

9. This map of claimed and potential maritime zones in the central and south Pacific has been updated three times, with the 3rd revision dated July 2001. The primary reason for the updates was to show more agreed maritime boundaries. The intent of the map was, first and foremost, to provide United States government officials an illustrative map of the region and to show the extent of the newly-agreed upon Pacific fishery treaty. It has also been used by U.S. government officials to gain a general understanding of

---

[7] Condition and Evaluation Survey Report by Jurgen Unterberg, GUA-J-06-2842-CS

where U.S. maritime jurisdiction is exercised in this region. While the scale of the map does not allow precise plotting of positions, one purpose of the map was to show the general areas of all claimed EEZs and fishery zones in the Pacific. Actual boundaries take on no dimension.[8]

10. This map was produced by the State Department. However, the official claim by the United States to an exclusive economic zone is the list of geographic coordinates published in the *Federal Register*. This map has never been sold as a commercial product or intended to be used for navigational purposes. It was produced for illustrative purposes only. Over the years, copies of this illustrative map were requested by non-U.S. entities and printing of additional copies accompanied map revisions. It is believed that the map likely was distributed at certain international meetings, such as at the annual meeting of the Pacific fisheries treaty to illustrate EEZ areas within the fishery treaty area. The extent of the distribution of this map is unknown to the author.

### Kiribati EEZ Claim

11. The Government of Kiribati claimed a 200 nautical mile exclusive economic zone in its Maritime Zones (Declaration) Act, 1983, No. 7 of 16 May 1983. In areas where the Kiribati EEZ overlaps that of its neighboring foreign States its EEZ claim extends to the median line. Specifically, its 1983 law states, in Article 7(5):

"Where the median line is less than 200 nautical miles from the line which the breadth of the territorial sea is to be measured, the outer limits of the exclusive economic zone extend to the median line."

12. During my career at the State Department, from 1975 to March 2006, I was not aware of any diplomatic correspondence from the Government of Kiribati complaining about the median line that the United States established for the limits of its exclusive economic zone in the areas adjacent to Kiribati.

---

[8] As Professor Brownlie correctly points out in his treatise on African boundaries, "...a boundary has no breadth...."Ian Brownlie, *African Boundaries, A Legal and Diplomatic Encyclopedia*. C. Hurst and Company, London, 1979, pg.3.

# Attachment H

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE TERRITORY OF GUAM

3   UNITED STATES OF AMERICA,    ) CIVIL NO. 06-00030

4            Plaintiff,          )

5        vs.                     )

6   MARSHALLS 201,               )

7            Defendant.          )

8   _____)

9

10        DEPOSITION OF SCOTT BENTON EDMONDS

11   Taken on behalf of Plaintiff at the Offices of

12   NOAA Office of General Counsel, Suite 1110, 1601

13   Kapiolani Boulevard, Honolulu, Hawaii  96814,

14   commencing at 9:02 a.m., on Thursday, November 1st,

15   2007, pursuant to Notice.

16

17

18

19                          US Attorney's Office
                            Districts of Guam & NMI
20
                            NOV 2 ....
21                          Receiving name _____
                            Date keyed in Draft _____
22                          Entered into Draft by: _____

23   BEFORE:   PATRICIA ANN CAMPBELL, CSR 108

24            Certified Shorthand Reporter

25            Notary Public, State of Hawaii


       Ralph Rosenberg Court Reporters, Inc.
   2460 American Savings Bank, 1001 Bishop Street
       Honolulu, Hawaii  96822  (808) 524-2090

Attachment
H

1    miles, so quite a bit of play in there.

2        Q.    But you don't know if that's what he was

3    using it for?

4        A.    Right, I'm not --

5        Q.    In fact, you can not --

6        A.    I'm not inside the mind of the captain,

7    no --

8        Q.    You can't imagine someone using it for

9    that, that's what you --

10       A.    I would say that it's inappropriate use

11   of that, clearly inappropriate.  It's not for

12   navigational purposes.

13       Q.    But you were told to do Exhibit Number 2

14   as though someone had done that?

15       A.    Right, I was assessing this map in

16   relation to the actual coordinates, and if you look

17   at the map number one in my report, that just shows

18   a blow up of the area.  That's number two.

19            MR. WALSH:  That's number two.

20       A.    If you look at -- no, no.  Maybe -- no,

21   number two, I'm sorry.  If you look at number two in

22   my report, that's it, and I have a color version if

23   you would like it.  It shows a sort of stylized wide

24   dash line which is the actual size of the line on

25   the State Department map when you blow it up to the

# Attachment I

UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM
CIVIL CASE NO. 06-00030

---

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )
vs.                             )
                                )
MARSHALLS 201,                  )
                                )
        Defendant.              )
                                )

---

DEPOSITION OF:     CAPTAIN JOHN CARTER TIMMEL

DATE:              November 5th, 2007

TIME:              1:00 p.m. - 4:00 p.m.

PLACE:             Orange Reporting
                   201 E. Kennedy Boulevard
                   Suite 950
                   Tampa, Florida  33602

TAKEN:             Notice by Counsel for the
                   Defendant for purposes of
                   Discovery, for use at trial, or
                   for such other purposes as are
                   permitted under the Florida Rules
                   of Civil Procedure

REPORTED BY:       Eve J. Barrett, RPR, CLR, FPR
                   State of Florida
                   Notary Public


Pages 1-84

Attachment
I



1    But by being involved in VMS systems, you do have access

2    to such information.

3         MR. SCHWAB:  I'm going to take a break for just

4       one second.

5              (Brief recess observed.)

6    BY MR. SCHWAB:

7       Q.   And I just have one last question for you, and

8    that's that you were shown a map here today that was of

9    the -- or questioned about a map on your direct about a --

10   that shows where the exclusive economic zones are

11   throughout the Pacific?

12      A.   I wasn't shown that today, but I happen to have a

13   copy.  I reviewed it earlier.

14      Q.   And that's the map that shows, that you referred

15   to earlier, as being produced by the State Department?

16      A.   Yes.  And I believe it was the map that Captain

17   Lou testified that he had seen for some 10 years or more

18   and was very familiar with.

19      Q.   Now, based on your background and experience in

20   the Maritime industry, if someone were to say that they

21   used that as their navigation in the exclusive economic

22   zone between Howland Baker and Karibati, would that be

23   reasonable and prudent to do?

24      A.   Absolutely not.  This is a map that's intended to

25   show -- give an indication of boundaries of economic zones

1   on a macro level. That's certainly not something you
2   would use. It would be irresponsible to navigate with
3   such a map as this.
4           To use an analogy, if you wanted to go somewhere,
5   you would look at a large-scale map; if you wanted to
6   drive somewhere, you'd look at a map of the country, and
7   then you'd get a map of the state, then you'd get a map of
8   the city. And you do the same thing in navigation.
9       Q.   So if a map of that scale showed a navigational
10  hazard of some sort, something that could damage the ship,
11  would it be prudent to only have that map and navigate by
12  that map?
13      A.   No, it would not be prudent at all.
14          I can share a real-life story. One time, sailing
15  with Exxon on one of their tankers, we're coming around
16  the Florida Keys, and we were hailed by a pleasure craft
17  that was adrift between -- somewhere between the east
18  coast of Florida and the Bahamas.
19          So we turned the vessel and came to being dead in
20  the water and came alongside -- maneuvered ourselves to
21  the point where we were alongside this pleasure craft.
22  And they had run out of gas. They were going to go to the
23  Bahamas, but they ran out of gas.
24          And upon questioning, we had found out they were
25  trying to go from Fort Lauderdale to the Bahamas by using