# ORIGINAL

1  LEONARDO M. RAPADAS
2  United States Attorney
   MIKEL W. SCHWAB
3  Assistant U.S. Attorney
   Sirena Plaza, Suite 500
4  108 Hernan Cortez Avenue
5  Hagatna, Guam 96910
   Tel: 671-472-7332
6  Fax: 671-472-7215
7
8  Paul Ortiz
   Senior Attorney
   Office of General Counsel
9  National Oceanic and Atmospheric Administration
10 501 West Ocean Blvd.
   Suite 4470
11 Long Beach, California 90802
12 Tel: 562-980-4069
13 Attorneys for the United States of America
14

**FILED**
DISTRICT COURT OF GUAM

DEC 2 8 2007

JEANNE G. QUINATA
Clerk of Court

15              **UNITED STATES DISTRICT COURT**

16              **FOR THE TERRITORY OF GUAM**

17

18 UNITED STATES OF AMERICA,          )       CIVIL CASE NO.  06-00030
19                                     )
                    Plaintiff,         )       **OPPOSITION OF THE UNITED**
20                                     )       **STATES TO DEFENDANT'S MOTION**
            vs.                        )       **TO DISMISS FOR LACK OF SUBJECT**
21                                     )       **MATTER AND IN REM**
22                                     )       **JURISDICTION**
   MARSHALLS 201,                      )
23                                     )
                    Defendant.         )
24 ─────────────────────────────────── )
25

26       The Defendant's Motion to Dismiss is a pernicious ploy to distract this Court from the

27 Defendant's clear violation of United States law by challenging well-founded United States

28 authority to establish its Exclusive Economic Zone.

# TABLE OF AUTHORITIES

**CASES**

Baker v. Carr,
     369 U.S. 186, 211-12 (1962)................................................. 10

Chicago & Southern Airlines Inc. v. Waterman Steamship Corp.,
     333 U.S. 103, 111 (1948)     ..................................... 10

DuPree v. United States,
     559 F.2d 1151, 1155 (9th Cir. 1977)....................................... 11

Eveland v. Director of CIA,
     843 F.2d 46, 49 (1st Cir. 1988)............................................. 10

Kolovrat v. Oregon,
     366 U.S. 187, 194 (1961) .................................................. 11

In re Extradition of Howard,
     996 F.2d 1320, 1330 n.6 (1st Cir. 1993)................................... 11

Oetjen v. Central Leather Co.,
     246 U.S. 297, 302 (1918)................................................... 10

Sumitomo Shoji America, Inc. v. Avagliano,
     457 U.S. 176, 184-185 (1982)............................................. 10

United States v. Jimenez-Nava,
     243 F.3d 192, 195 (5th Cir. 2001) .......................................... 9

United States v. Kin-Hong,
     110 F.3d 103 (1st Cir. 1997)............................................... 11

United States v. Li,
     206 F.3d 56, 60-61 (1st Cir. 2000) (en banc)............................. 10

United States v. Mann,
     829 F.2d 849, 852 (9th Cir. 1987)......................................... 10

United States v. Peterson,
     812 F.2d 486, 492 (9th Cir. 1987) ........................................ 10

United States v. Postal,
    589 F.2d 862, 878 (5th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 11

**FEDERAL STATUTES**

16 U.S.C. § 1801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1801 (a)(10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

16 U.S.C. § 1801 (a)(4) & (5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1801, Sec. 3 (30). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16 U.S.C. § 1824 (e)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16 U.S.C. § 1857 (4)(a) & (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1860 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16 U.S.C. § 1861, Sec. 301 (d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7


**LEGISLATIVE ACTS AND MATERIALS**

EEZ of the United States, Presidential Proclamation No. 5030,
    42 Fed. Reg. 12937-40 (Mar. 7, 1977). . . . . . . . . . . . . . . . . . . . . . . . . . 3

Exclusive Economic Zone and Maritime Boundaries,
    60 Fed. Reg. 43825, 43828, 43829 (Aug. 23, 1995) . . . . . . . . . . . . . . . . 8, 13, 14

Conv. on of the Law of the Sea,
    S. Exec. Rep. No. 110-9 at 18, 23 (110th Cong., 1st Ses. 2007) . . . . . . . . . . . . . . . . . . . 11

Magnuson-Stevens Fishery Conservation and Management Act,
    Public Law 94-265 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Sustainable Fisheries Act, Public Law 104-297 (1996). . . . . . . . . . . . . . . . . . . . . . . . . 6

Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006,
    Public Law 109-479 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8


**OTHER AUTHORITIES**

42 International Legal Materials 178-181 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

-ii-

Anthony Aust, Modern Treaty law and Practice 194 (Cambridge University Press, 2000) . . . . 12

Department of Defense, Maritime Claims Reference Manual, page 664 and Table C1.T286,
    http://www.dtic.mil/whs/direcives/corres/20051m_062305/United_States_America.doc . . . 14

Nicaragua v. Honduras Dispute, International Court of Justice, *available at*
http://www.icj-
    cij.org/docket/files/120/14075.pdf?PHPSESSID=be185f20d250a4ace1f4068d9ad9963c. . . 15

International Tribunal for the Law of the Sea,
    http://www.itlos.org/start2_en.html (then follow "Proceedings and Judgement"
    hyperlink to "List of Cases" hyperlink to case no. 11). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Pacific Island Travel, Kiribati,
    http://www.pacificislandtravel.com/Kiribati/about_destin/mckean.html. . . . . . . . . . . . . . 14

Restatement (Third) of the Foreign Relations of the United States § 326 (1987). . . . . . . . . . . 10

The Defendant's sweeping arguments must fail for several reasons. First, the Defendant does not have standing to assert violations of international law. Second, even if the Defendant did have such standing, the Defendant's international law arguments are idiosyncratic, unsupported and simply wrong. They fly in the face of the practice of States, including Kiribati, which has not objected to the United States' exercise of its jurisdiction in its Exclusive Economic Zone adjacent to Howland and Baker Islands. This court should reject the Defendant's arguments, which if accepted by this Court would lead to a massive loss of jurisdiction by both the United States and many other island nations in the Pacific such as the Northern Marianas Islands (NMI), the Marshall Islands, the Federated States of Micronesia, Palau, and Kiribati.

## I. FACTUAL BACKGROUND

The facts are straightforward. The United States Coast Guard caught Defendant fishing illegally in the United States Exclusive Economic Zone generated by Howland and Baker Islands on September 6, 2006.

Howland and Baker Islands form an important element in the U.S. Pacific Insular Areas. They have interesting and rich pasts, an important present, and, it is anticipated, a valuable future. They are of significant size (Baker is 1.4 square kilometers and Howland is 1.84 square kilometers). Amelia Earhart disappeared while flying to a runway at Howland. Baker joined the American Family in 1857. Both islands had a role in the early days of Whale hunting. The islands' guano deposits were mined by United States and British companies during the second half of the 19th Century. The islands were inhabited between 1935 and 1942, by Hawaiian students from Kamehameha School as part of an enthusiastic project that ended when the Japanese threatened the area at the start of World War II. The U.S. Coast Guard used the islands

-1-

during the War. Today, the islands are part of a U.S. National Wildlife Refuge, whose office is in Honolulu. The refuge provides nesting and roosting habitat for about 20 species of seabirds and shorebirds. Threatened sea turtles and endangered hawksbill sea turtles forage in the shallow waters of the reef with hundreds of species of fish, corals, and other invertebrates. Baker Island presently hosts a day beacon for navigation and an abandoned runway. Visitation is by special use permit.

On September 7, 2006, law enforcement personnel from the National Oceanic and Atmospheric Administration (NOAA) were conducting a fisheries patrol aboard a United States Coast Guard (USCG) aircraft. The purpose of this patrol was to conduct surveillance of the Exclusive Economic Zone (EEZ)[1] of the United States adjacent to the United States National Wildlife Refuges of Howland and Baker Islands in order to detect illegal fishing activity. During that flight, law enforcement personnel sighted a 215' purse seiner later identified as the F/V[2] MARSHALLS 201 at coordinates 02-29.0S 176-43.0W, a position within the EEZ of the United States. At that time, the vessel's boom was lowered and its purse seine fishing net was not covered or properly stowed, as prohibited by the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. § 1857 (4)(A) and (B). During this flight patrol,

---

1. The EEZ of the United States was established by Presidential Proclamation No. 5030, (March 10, 1983), creating an area of ocean over which the United States exercises exclusive jurisdiction and sovereign rights for the purpose of exploring, exploiting, conserving and managing natural resources. The outer limits of the EEZ are 200 nautical miles from the baseline from which the U.S. territorial sea is measured, unless otherwise specified. The specific coordinates for the US EEZ adjacent to Howland and Baker Islands is published by the U.S. Department of State in the Federal Register on August 23, 1995. 60 F.R. 43825. However, under the Magnuson Act the United States has claimed an exclusive fishery zone around these islands since 1977. EEZ of the U.S., Presidential Proclamation No. 5030, 42 F.R. 12937-40 (March 7, 1977).

2. F/V is the designation for "Fishing Vessel."

-2-

two additional foreign fishing vessels were detected within the EEZ adjacent to Howland and Baker Islands. They were the F/V KOO'S 101 and the F/V KOO'S 108.

On September 9, 2006, a second aircraft patrol was conducted by the USCG and NOAA law enforcement personnel. The F/V MARSHALLS 201 was again observed, this time at position 02-06.1S 176-00.5W - approximately 1.9 nautical miles within the EEZ adjacent to Howland and Baker Islands. At the time of the sighting, the vessel was actively fishing with approximately 10% of its net in the water filled with fish. In addition, two small tender vessels were assisting with the retrieval of the net. Fishing within the U.S. EEZ by a foreign fishing vessel without authorization of NOAA is prohibited by the Magnuson Act, 16 U.S.C. § 1857(2). The USCG aircrew immediately contacted the USCG Cutter WALNUT (WALNUT) to intercept and conduct a boarding on the FV MARSHALLS 201. The WALNUT was also in the area conducting a fisheries patrol.

Approximately seventy minutes later, the WALNUT arrived on scene and USCG personnel detected the F/V MARSHALLS 201 both visually and by radar. The WALNUT's radar identified the vessel's position at 02-05.387S 175-59.253W, a position approximately 2 nautical miles inside the U.S. EEZ. The lookout on the WALNUT reported seeing the vessel hauling in its purse seine fishing net containing fish as the two small tender vessels were in the water assisting the retrieval of the net. Once it was determined the F/V MARSHALLS 201 was actively fishing within the EEZ, both the WALNUT and the USCG aircrew continuously attempted to hail the F/V MARSHALLS 201 via radio and ordered the vessel to heave to and prepare to be boarded. The F/V MARSHALLS 201 failed to comply with this command, and five minutes after the arrival of the WALNUT, the F/V MARSHALLS 201 fled towards the EEZ boundary line

-3-

with her nets still hanging from the boom. The WALNUT began an immediate pursuit. After several minutes, the WALNUT hauled up the flag hoist "LIMA" - a black and yellow checkered flag which is the internationally recognized signal code flag for "stop instantly". They also sounded the signal from the International Code of Signals on their starboard yardarm for "LIMA" with the ship's whistle. The F/V MARSHALLS 201 responded with two short blasts and continued its hasty departure out of the U.S. EEZ.

After approximately twenty minutes, the F/V MARSHALLS 201 exited the U.S. EEZ with the WALNUT maintaining hot pursuit. Someone aboard the F/V MARSHALLS 201 eventually responded to the hailing by the USCG via radio by stating "no speak English" and "me no inside work" several times. Eight minutes after exiting the US EEZ, the vessel stopped briefly while the crew of the F/V MARSHALLS 201 finished stowing her gear and tender vessels, but she quickly resumed making way away from the U.S. EEZ boundary line. During this time, the commanding officer of the WALNUT ordered the 50 caliber machine guns to be mounted, though they were not pointed at the F/V MARSHALLS 201 at any time. Within minutes, the F/V MARSHALLS 201 came to full stop in the water, and someone on board the vessel radioed "you come over my boat."

A boarding team from the WALNUT boarded the F/V MARSHALLS 201 and immediately secured the vessel for an investigation into the illegal fishing activity. The boarding team identified thirty-six crew members on board the F/V MARSHALLS 201. During the investigation it was determined that: 1) the Captain of the vessel was Mr Wen Yueh Lu ("Captain Lu"), a Taiwanese citizen; 2) the F/V MARSHALLS 201 did not possess a permit to fish within

//

-4-

the U.S. EEZ, and; 3) the vessel caught 110 metric tons of tuna from the illegal fishing set on September 9, 2006.

On September 10, 2006, law enforcement personnel of the WALNUT seized the F/V MARSHALLS 201, and her catch, and began escorting the vessel to Guam. The vessel was escorted by the WALNUT until relieved by the USCG Cutter SEQUOIA on September 16, 2006.

A boarding team from the SEQUOIA relieved the boarding team from the WALNUT in order to escort the F/V MARSHALLS 201 to Guam and conduct additional investigation. During that investigation, Captain Lu began to make voluntary, unsolicited statements in broken English to the boarding team. Captain Lu stated that he was not fishing inside the line, but had set his gear three miles outside the line, and had then drifted inside the line while hauling his gear.

On September 20, 2006, the SEQUOIA reached port in Guam and secured the F/V MARSHALLS 201 at the Cassamar Pier in Apra Harbor. A complete survey of the vessel and catch of tuna was completed which estimated the current market value of the vessel to be $2,650,000, and the current market value of the tuna on board to be $350,000.

On October 10, 2006, the United States filed a Complaint for Forfeiture of the vessel and catch based on the two violations of the Magnuson Act. On October 13, 2006, a release bond for $2,950,000 was filed in the forfeiture matter, and the vessel departed Guam soon thereafter.

The F/V MARSHALLS 201 is registered in the Republic of the Marshall Islands, and is owned by the Marshall Islands Fish Company ("Claimant" or "MIFCO"). MIFCO has just two sharcholders - the Koo's Fishing Company and the Marshall Islands Marine Resources Authority (a division of the Government of the Republic of the Marshall Islands). Koo's Fishing Company is registered in the Republic of the Marshall Islands, with offices in Majuro, Republic of the

-5-

Marshall Islands and Taipei, Taiwan.

## II. THE LAWS OF THE UNITED STATES

The Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act") was enacted into law in 1994[3], Public Law 94-265, and was amended in 1996, 16 U.S.C. § 1801, et seq.  In its findings, at §2, it specifically mentioned, among others, the "highly migratory species of the high seas" and that "(i)f placed under sound management before over-fishing has caused irreversible effects, the fisheries can be conserved. ..." 16 U.S.C. § 1801 (a) (4) & (5); Sustainable Fisheries Act, Public Law 104-297 (1996). [4]  The Pacific Insular Areas are one of the focal points of the Magnuson Act: "Pacific Insular Areas contain unique historical, cultural, legal, political, and geographical circumstances, which make fisheries resources important in sustaining their economic growth." 16 U.S.C. § 1801 (a) (10).

The Act specifically places jurisdiction for enforcement of the EEZs for the Pacific Insular Areas substantially in the U.S. District Court for the District of Guam.[5] 16 U.S.C. § 1861, Sec. 301 (d).

---

[3]  The Fishery Conservation and Management Act of 1976 was first enacted March 1, 1977, and the Federal Register Notice was published March 7, 1977.

[4]  The relevant sections state, (4) International fishery agreements have not been effective in preventing or terminating the over-fishing of these valuable fishery resources.  There is danger that irreversible effects from over-fishing will take place before an effective international agreement on fishery management jurisdiction can be negotiated, signed, ratified, and implemented. (5) Fishery resources are finite but renewable.  If placed under sound management before over-fishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis.

[5]  JURISDICTION OF COURTS. In the case of Guam or any possession of the United States in the Pacific Ocean, the appropriate court is the United States District Court for the District of Guam, except that in the case of American Samoa, the appropriate court is the United States District Court for the District of Hawaii, and except that in the case of the Northern Mariana Islands, the appropriate court is the United States District Court for the District of the Northern Mariana Islands.  16 U.S.C. § 1861, Sec. 301 (d) (Emphasis Added).

-6-

The term "Pacific Insular Area" is defined to mean "America Samoa, **Guam**, the Northern Mariana Islands, **Baker Island, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Island, Wake Island**, or **Palmyra Atoll**, as applicable, and includes all islands and reefs appurtenant to such island, reef, or atoll." 16 U.S.C. § 1801, Sec. 3 (30) (those areas under Guam's District Court in bold).

This places the bulk of the United State's EEZ in the Pacific Insular Areas within the jurisdiction of the District Court on Guam. The islands stretch across a geographic constellation of ocean zones that cover an expanse equivalent to the width of the United States mainland, greater than 3,000 miles. The Insular Areas are highly valued and enjoy a rich history, and a bright future.

The ultimate enforcement in the Act is stated in the Civil Enforcement section, which states that an offending vessel "shall be subject to forfeiture to the United States." 16 U.S.C. § 1860 (a). [6]

The EEZ adjacent to Howland and Baker Islands is well defined, with geographic coordinates published in the Federal Register. The Federal Register states that "to the southeast and south of Howland and Baker Islands the limit of the exclusive economic zone shall be determined by straight lines connecting the following points: ...." Exclusive Economic Zone and Maritime Boundaries, 60 Fed. Reg. 43829 (Aug. 23, 1995). The Federal Register provides a list of 15 geographic coordinates such that the exact EEZ location can be accurately charted by

---

[6] Pacific Island Nations throughout the region proximate to the Pacific Insular Areas have parallel statutes. In the case of States such as the Republic of the Marshall Islands, the language of the Act's forfeiture section is substantially adopted into their law verbatim.

-7-

any vessel either manually or using electronic instruments such as GPS and charting devices.[7]

Vessels that fish in the U.S. EEZ without a license are clearly subject to forfeiture.

Congress has explicitly and affirmatively recognized the EEZ off of Howland and Baker Islands. See 16 U.S.C. § 1824(e)(8), as amended by Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, section 6, Pub.L. 109-479 (2007). The Magnuson Act provides, in part:

"In the case of violations by foreign vessels occurring within **the exclusive economic zones off** Midway Atoll, Johnston Atoll, Kingman Reef, Palmyra Atoll, Jarvis, **Howland, Baker**, and Wake Islands, amounts received by the Secretary attributable to fines and penalties

---

[7] "The seaward limit of the exclusive economic zone is a line 200 nautical miles from the baseline from which the territorial sea is measured, except to the southeast and south of Howland and Baker Islands the limit of the exclusive economic zone shall be determined by straight lines connecting the following points:

| 1. | 0° | 14'30" | N. | 173° | 08'00" | W. |
| 2. | 0° | 14'32" | S. | 173° | 27'28" | W. |
| 3. | 0° | 43'52" | S. | 173° | 45'30" | W. |
| 4. | 1° | 04'06" | S. | 174° | 17"41" | W. |
| 5. | 1° | 12'39" | S. | 174° | 31'02" | W. |
| 6. | 1° | 14'52" | S. | 174° | 34'48" | W. |
| 7. | 1° | 52'36" | S. | 175° | 34'51" | W. |
| 8. | 1° | 59'17" | S. | 175° | 45'29" | W. |
| 9. | 2° | 17'09" | S. | 176° | 13'58" | W. |
| 10. | 2° | 32'51" | S. | 176° | 38'59" | W. |
| 11. | 2° | 40'26" | S. | 176° | 51'03" | W. |
| 12. | 2° | 44'49" | S. | 176° | 58'01" | W. |
| 13. | 2° | 44'53" | S. | 176° | 58'08" | W. |
| 14. | 2° | 56'33" | S. | 177° | 16'43" | W. |
| 15. | 2° | 58'45" | S. | 177° | 26'00" | W. |

-8-

imposed under this Act, shall be deposited into" a named fund. Id. (Emphasis added.)

Accordingly, not only has the Executive Branch published the limits of the U.S. EEZ off of Howland and Baker in the Federal Register, but the United States Congress has endorsed the EEZ off of those islands.

In short, the United States duly established its Exclusive Economic Zone in the area around Howland and Baker Islands, pursuant to U.S. statute. Congress has explicitly acknowledged the EEZ around Howland and Baker Islands. Marshalls 201 was fishing in this U.S. EEZ without a license on September 9, 2006. The U.S. Coast Guard observed and intercepted Marshalls 201. Therefore, Marshalls 201 violated United States law, and the vessel is subject to forfeiture. This case is as simple as that. This Court should reject Defendant's reckless arguments that attempt to undermine U.S. law and escape responsibility for it's violations.

## III. DEFENDANT HAS NO STANDING TO DISPUTE THE EEZ OF THE UNITED STATES

Defendant has no standing to assert that the United States established its EEZ in contravention of international law. Rights under international law, including the law of the sea, accrue to sovereign nations. Allegations of inconsistency with international law are matters of international affairs, not judicial redress. Neither the United Nations Law of the Sea Convention (UNCLOS), nor international law in general, is invocable by the Defendant in this case. United States v. Jimenez-Nava, 243 F.3d 192, 195 (5th Cir. 2001); United States v. Postal, 589 F.2d 862, 878 (5th Cir. 1979). Accordingly, courts have precluded defendants in enforcement proceedings from invoking treaty-based defenses. United States v. Li, 206 F.3d 56, 60-61 (1st cir.

-9-

2000) (en banc); United States v. Mann, 829 F.2d 849, 852 (9ᵗʰ Cir. 1987). The rule applies even more strongly where the person asserting the treaty-based right is seeking dismissal. Li, 206 F.3d at 61.

The question of whether the United States has properly established its Exclusive Economic Zone under international law, the status of boundaries between the United States and its neighboring countries, and what interpretation and the United States should give to an unratified treaty, etc. — are matters that fall within the prerogative of the Executive Branch. Baker v. Carr, 369 U.S. 186, 211-12 (1962); Chicago & Southern Airlines Inc. v. Waterman Steamship Corp., 333 U.S. 103, 111 (1948) ("the very nature of executive decisions as to foreign policy is political, not judicial"); Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918) (conduct of foreign relations is committed by the Constitution to the executive and legislative departments); Eveland v. Director of CIA, 843 F.2d 46, 49 (1ˢᵗ Cir. 1988) (foreign policy concerns are not justiciable and "wholly confided by our Constitution to the political departments of the government, Executive and Legislative."); United States v. Peterson, 812 F.2d 486, 492 (9ᵗʰ Cir. 1987) (the ramifications of any violation of international law in a search conducted of defendant's ship were "largely political"). As the Supreme Court has often noted, the Executive Branch's interpretation of a treaty is entitled to great deference. Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184-185 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); Restatement (Third) of the Foreign Relations Law of the United States § 326 (1987); Kolovrat v. Oregon, 366 U.S. 187, 194 (1961); United States v. Kin-Hong, 110 F.3d 103 (1ˢᵗ Cir. 1997) ("[T]he executive branch's construction of a treaty, although not

-10-

binding upon the courts, is entitled to great weight."); In re Extradition of Howard, 996 F.2d 1320, 1330 n.6 (1st Cir. 1993) (deference to executive in extradition context stems, at least in part, from fact that executive wrote and negotiated operative documents); DuPree v. United States, 559 F.2d 1151, 1155 (9th Cir. 1977).

Further, the United States is not yet a party to the UNCLOS.  As such, UNCLOS is not a "treaty' under United States law and is, therefore, by definition, not a self-executing treaty.  Even if the United States were a party to the Law of the Sea Convention, it would not be invocable by the Defendant.  As reflected in the report of the Senate Foreign Relations Committee, the Convention (with certain exceptions not applicable here) would not be self-executing and, in the view of both the Committee and the Executive Branch, the Convention would not "create private rights of action or other enforceable individual legal rights in U.S. courts." Convention on the Law of the Sea, S. Exec. Rep. No. 110-9 at 18, 23 (110th Cong., 1st Sess. 2007).

The treaty would have to be self-executing, United States v. Postal, 589 F.2d at 876, and contain explicit language creating a private right of action or other judicially enforceable right, for it to be invocable by a Defendant.   Defendant has no standing to invoke UNCLOS in defense of the violation.

## IV.  THE U.S. EEZ CONFORMS TO INTERNATIONAL LAW

Even assuming, for the sake of argument, that Defendant has standing to invoke international law, the Defendant completely mischaracterizes international law.  It is simply incorrect to assert that Howland and Baker Islands may not generate an EEZ.

Defendant bases its argument on Article 121(3) of UNCLOS.   The full article provides that:

-11-

*1. An island is a naturally formed area of land, surrounded by water, which is above water at high tide.*

*2. Except as provided for in paragraph 3, the territorial sea, the contiguous zone, the exclusive economic zone and the continental shelf of an island are determined in accordance with the provisions of the present Convention applicable to land territory.*

*3. Rocks which **cannot** sustain human habitation or economic life of their own shall have no exclusive economic zone or continental shelf.* (Emphasis added).

Defendant concludes that Howland and Baker are "rocks" as that term is used in paragraph 3 of article 121. For several reasons, Defendant's radical reading of Article 121(3) is wrong, not least because his reading conflicts with the plain meaning of the words of Article 121. First, the Defendant and its expert, Professor Van Dyke, think that if there is no present human habitation on an island, then it "cannot sustain human habitation" and is thus a rock under Article 121(3). Van Dyke Deposition 71-74, 77-78, 84, 116-120 (Attachment D). The Defendant and Professor Van Dyke take the view that even if there had been habitation on an island in the past, if there is no habitation on the island today, then it is necessarily a rock. Id. In the professional opinion of J. Ashley Roach, the State Department's expert on law of the sea, this is not a correct interpretation of Article 121(3) and is contrary to the plain language of Article 121(3). Declaration of Mr. Roach at page 2 (Attachment A). Article 121(3) uses the formulation "cannot sustain human habitation," not "do not support human habitation." The question posed by Article 121(3) is whether the feature at issue is habitable. Robert Smith, who as the nation's former chief maritime geographer, has had direct experience with State's establishing EEZs adjacent to presently uninhabited islands (including those of Kiribati and many other Pacific Island nation States), agrees with the present Department of State position, as expressed by Mr. Roach. (Attachment B & C ). Contrary to the Defendant's view, there is no requirement that the

-12-

feature actually be inhabited. A review of the history of Howland and Baker shows that both islands have had periods of habitation in the relatively recent past and they have played a role in various economic ventures. Van Dyke Deposition 107-120 and Exhibits 8-15 (Attachment D). Further, there is no evidence in the record that they will be uninhabited in the future or have no economic life. Significantly, the Department of State does not view either island as a rock under Article 121(3). In sum, Defendant's reading of Article 121(3) conflicts with the plain meaning of that provision and the considered judgment of the U.S. Department of State.

Second, the Defendant and Professor Van Dyke rely heavily on what they assert is "State practice" showing that Howland and Baker are rocks under Article 121(3). Professor Van Dyke incorrectly portrays the facts and the concept of "State practice". As noted by Mr. Roach, State practice refers to the subsequent practice in the application of a treaty text which establishes the agreement of the parties regarding its application. It refers to the way a text is actually applied by the parties. If the practice is consistent and is common to, or accepted by, the parties, the subsequent practice is usually a good indication of what the parties understand the text to mean. Anthony Aust, Modern Treaty Law and Practice 194 (Cambridge University Press, 2000). Professor Van Dyke cites several cases involving disputes between countries as whether a particular feature is a rock under Article 121(3). Van Dyke Declaration (Attachment E); Van Dyke Deposition 35-36, 51-54 (Attachment D), citing Senkakus/Diaoyu Dao dispute; Okinotorishima dispute; Dokdo/Takeshima dispute, Spratly Islands dispute. The very fact that the proper characterization of these features is disputed completely undercuts Professor Van Dyke's assertion that state practice shows that these features are "rocks" under Article 121(3). It is entirely inappropriate to rely on disputed features as examples of state practice, for in each case

-13-

there is a state taking exactly the opposite position. The one unambiguous example of State

practice cited by Professor Van Dyke (Declaration - Attachment E; Deposition 29-34, 75-76 -

Attachment D), the UK's determination that Rockall is a rock and not an island, if anything,

supports the U.S. view that Howland and Baker are not rocks. Rockall is a tiny, sheer-walled

uninhabitable feature, a fraction of the size of Howland and Baker. Van Dyke Deposition 184

and Exhibits 2, 5, 25 (Attachment D); Smith Deposition 102, 104 (Attachment F). Thus,

Defendants misleadingly mischaracterizes and distorts State practice in support of its view,

which is in fact unsupportable.

Third, as Mr. Roach attests, State practice supports the U.S. view that Howland and

Baker are not rocks under Article 121(3). There are many examples of relatively small,

uninhabited features around or from which countries have established Exclusive Economic

Zones. Of direct relevance to this case, Kiribati has claimed its EEZ measured in part from

McKean Island, a feature quite similar to Baker Island. Edmonds Deposition 14-15 and Exhibits

1, 2 and 8 (Attachment G);

http://www.pacificislandtravel.com/Kiribati/about_destin/mckean.html.

Other examples include France, which in the Pacific and Indian Oceans, has established

EEZ's around islands in French Polynesia, French Southern Ocean islands (Kerguelen Islands);

Australia around Heard Island; islands of the Mozambique Channel, and Clipperton Island; Fiji,

which has established an EEZ around Ceva-i-Ra (Thjeva-i-Ra); Mexico, which has established

an EEZ around Clarion and Roca Portida islets in the Pacific; and Venezuela, which has

established an EEZ around Aves Island. (Van Dyke Deposition 23, 39 - Attachment D; Smith

Deposition 100 - Attachment F). The United States gave full effect to Aves Islands in the

-14-

Maritime Boundary Treaty between the United States and Venezuela of March 28, 1978, 23

U.S.T. 3100; in doing so, the United States recognized Venezuela's right to claim an EEZ from

Aves Island.  The United States has established an EEZ around Maro Reef in the Northwest

Hawaiian Islands, Palmyra Atoll, Kingman Reef and around Howland and Baker.  (Exclusive

Economic Zone and Maritime Boundaries, 60 Fed. Reg. 43825, 43828, 43829 (Aug. 23, 1995);

Department of Defense, Maritime Claims Reference Manual, page 664 and Table C1.T286,

http://www.dtic.mil/whs/directives/corres/20051m_062305/United_States_America.doc; Van

Dyke deposition 45 - Attachment D).

Professor Van Dyke admits in his deposition, pages 121-122, 126 (Attachment D), that

among Pacific Island nations there will be "winners and losers" under his interpretation of

Article 121(3), necessarily suggesting that they have established EEZ's around uninhabited

islands that he would consider "rocks."  The admission that several Pacific Island nations have

established EEZ's off of features that he would consider "rocks" undercuts his position that state

practice supports his view.  Thus, contrary to Defendant's radical view that the United States

acted inconsistently with international law, it is Defendant that is out of step with the world

community.  Robert Smith, who was the nation's chief maritime geographer in the Department of

State throughout the time that UNCLOS was being formulated, also has stated that Howland and

Baker are not "rocks" under the definition of Article 121(3).  (Attachments C & F)  It is worth

mentioning that if Professor Van Dyke's view prevails – contrary to the meaning of Article

121(3) and despite State practice to the contrary – Pacific Island nations stand to lose tens of

thousands of square miles of their EEZs.

-15-

Fourth, Professor Van Dyke relies on maritime delimitation cases to support his view that Howland and Baker are rocks. (Declaration - Attachment E) As noted by Mr. Roach, none of these cases specifically addressed Article 121(3). Rather, they were cases under Article 74 of the Law of the Sea Convention, an entirely different body of law applying entirely different legal questions from those that have been raised in this case. Professor Van Dyke stated in his declaration, page 5, paragraph (d), that "the decisions made by both Nicaragua and Honduras that five small cays east of their coasts (Bobel Cay, Savanna Cay, Port Royal Cay, South Cay, and Edinburgh Cay) should generate only 12 nautical mile territorial seas, and should not generate EEZs". The judgment of the International Court of Justice in this case, Case Concerning Territorial and Maritime Dispute Between Nicaragua and Honduras in the Caribbean Sea, October 8, 2007, http://www.icj-cij.org/docket/files/120/14075.pdf?PHPSESSID=be185f20d250a4ace1f4068d9ad9963c, at paragraph 137 on page 40, states that these features "fall within the definition and regime of islands under Article 121" and "notes that the Parties do not claim for these islands any maritime areas beyond the territorial sea". (This point is repeated in paragraph 262 on page 72 of the Court's judgment.) However, in paragraph 303 on page 83 the Court observes that:

"As a 12-mile breadth of territorial sea has been accorded to these islands, it becomes apparent that the territorial sea attributed to the islands of Bobel Cay, Savanna Cay, Port Royal Cay and South Cay (Honduras) and Edinburgh Cay (Nicaragua) would lead to an overlap in the territorial sea of Nicaragua and Honduras in this area, both to the south and to the north of the 15th parallel."

-16-

Where the territorial seas from these islands overlap, there can be no EEZ measured from these islands. Accordingly, it is incorrect to state that Nicaragua and Honduras decided that these islands "should not generate EEZs". In short, Defendant mischaracterizes international tribunal decisions in an attempt to convey a false impression of the state of the law. This Court should not fall for Defendant's sleight of hand.

Fifth, Professor Van Dyke relies heavily on a separate opinion of Judge Budislav Vukas of the International Tribunal for the Law of the Sea. (The Volga Case (Russian Federation v. Australia), Case No. 11, Prompt Release, Judgment, Declaration of Judge Vukas, ITLOS Reports 2002; 42 International Legal Materials 178-181 (2003); http://www.itlos.org/start2_en.html (then follow "Proceedings and Judgement" hyperlink to "List of Cases" hyperlink to case no. 11).) (Van Dyke Declaration - Attachment E; Van Dyke Deposition 23-26 - Attachment D) Professor Van Dyke did not mention that no other judge on the 21-judge Tribunal agreed with Judge Vukas' view on the rock issue, which was not raised by Russia. The judgment of the Tribunal and the other three separate opinions each accept that Heard Island and the McDonald Islands generated an EEZ. In an earlier case before the Tribunal, Judge Vukas questioned whether the establishment of an EEZ off the shores of the uninhabitable and uninhabited Kerguelen Islands was in accordance with the Convention. The Tribunal's judgment and the six separate opinions each did not question the validity of the EEZ around those islands. (The Monte Confurco Case (Seychelles v. France), Case No. 6, Prompt Release, Judgment, Declaration of Judge Vukas, http://www.itlos.org/start2_en.html (case no. 6).) Both of these cases involved prompt release of fishing vessels arrested for violation of the EEZ regulations of Australia and France, respectively. As Mr. Roach observes, most of the members of the Tribunal that heard both cases were, like

-17-

Judge Vukas, government delegates to the Third UN Conference on the Law of the Sea. Again, in an attempt to portray its position as within the mainstream, Defendant neglects to inform this Court that it is relying on an isolated position.

It entirely incorrect to conclude that Howland and Baker Islands are "rocks" under Article 121(3). It is noteworthy that no State has ever raised such an argument with regard to these islands, which share characteristics with many of the islands throughout the Pacific. Indeed, neighboring Kiribati has not challenged the establishment by the United States of its EEZ off of Baker and Howland Islands. Smith Expert Rebuttal Report pages 1-4 (Attachment B). Kiribati has agreed that the vessel was not fishing in the Kiribati EEZ at the time alleged in the complaint (Van Dyke Deposition Exhibit 7; Attachment 1, the same telegram from the U.S. Embassy in Suva, prepared in the course of the Embassy's diplomatic mission, to the Department of State, retrieved by the custodian of the telegram). Roach Declaration at page 4g (Attachment A). In sum, the one State that has the most direct interest in whether the United States has properly established an EEZ off of Howland and Baker Islands has not protested the validity of that U.S. EEZ. This Court should not lose sight of the significance of this fact. Defendant claims that it was in the waters of Kiribati, postures that it is standing for the rights of Kiribati, and implies that Kiribati would endorse the defense. The fact that Kiribati did not do so illustrates the fallacy of Defendant's argument.

Finally, the Court should consider the implications of Defendant's argument that an uninhabited island necessarily is a rock under Article 121(3). Under Defendant's reasoning, a country would lose jurisdiction if it decided -- as the United States has done -- to make outlying islands a nature preserve and not to develop the land for residential, industrial or commercial use.

-18-

This would not only be bad policy, but could not have been the intent of the drafters of Article 121(3) -- for many of the other provisions of the Convention are specifically designed to protect and preserve the marine environment. For this and all of the above reasons, the Court should reject Defendant's erroneous and misguided attempt to deprive the United States of its legitimate maritime jurisdiction.

## V.  CONCLUSION

Defendant's legal arguments are without merit and serve only to demonstrate a deceptive and inadequate effort on the part of the Defendant to further evade the laws of the United States. Those laws are designed to protect and manage its Pacific Ocean resources.  Defendant has chosen not to comply with those laws, and once caught, has presented sweeping and outlandish arguments to escape the consequences of its illegal actions.  Defendant further demonstrates a disregard for the law and international relations and norms.  Defendant's baseless Motion should be denied.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI


*Jessica Cruz for*
MIKEL W. SCHWAB
Assistant U.S. Attorney

Paul Ortiz
Senior Attorney
Office of General Counsel
National Oceanic and Atmospheric Administration
501 West Ocean Blvd.
Suite 4470
Long Beach, California 90802
Tel: 562 980 4069

-19-