# Attachment A

## DECLARATION OF J. ASHLEY ROACH

1.     My name is J. Ashley Roach. I am currently an attorney-adviser in the Office of the Assistant Legal Adviser for Oceans, International Environmental and Scientific Affairs, U.S. Department of State, where I have served since October 1988. I hold a Masters Degree in Public International Law and Comparative Law with highest honors from George Washington University Law School. I am also a retired Captain in the Judge Advocate General's Corps of the United States Navy. I have written extensively on matters related to the law of the sea, including (with Robert W. Smith) the book "United States Responses to Excessive Maritime Claims", second edition published by Martinus Nijhoff in 1996.

2.     The Office of the Legal Adviser, among other duties, provides legal advice and opinions to the Department of State and other government agencies on the law of the sea, including the interpretation and application of relevant treaties and customary international law.

3.     Among my responsibilities in the Office of Legal Adviser has been to provide legal advice on the United Nations Convention on the Law of the Sea, as well as interpretation of that Convention and international oceans law. I have assisted in the drafting of the official United States interpretations of the Convention.

4.     I am familiar with the various arguments raised by the defendant in this case and have read the Defendant's Motion to Dismiss for Lack of Subject Matter and In Rem Jurisdiction; the Memorandum of Points and Authorities in Support thereof; the undated Expert Report and Declaration dated October 26, 2007 of Professor Jon Van Dyke; the Declaration dated October 25, 2007 and Expert Report dated August 24, 2007 of Scott B. Edmonds; and the depositions of Professor Van Dyke taken on October 31, 2007 and Mr. Edmonds taken on November 1, 2007. I have also read the August 2007 report, the Expert Rebuttal Report dated September 24, 2007, and the deposition taken November 2, 2007 of Dr. Robert W. Smith.

5.     Pursuant to the decision of President Reagan announced on July 9, 1982 (II <u>Public Papers of the Presidents: Ronald Reagan, 1982</u> (1983), pages 911-912), the United States did not sign the United Nations Convention on the Law of the Sea (Law of the Sea Convention) during the period it was open for signature, i.e., from 10 December 1982 until 9 December 1984 (see article 305(2)). Although the Law of the Sea Convention (along with the 1994 Agreement Relating to the Implementation of Part XI of the Convention) was submitted to the United States Senate for its advice and consent on October 7, 1994 (Senate Treaty Document 103-39, http://lugar.senate.gov/sfrc/pdf/presidentialmessage.pdf ), the Senate has not yet given advice and consent, and the United States has not become a Party to the Convention. As such, the Convention is not a treaty for purposes of U.S. domestic law. Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss, page 5, lines 5-7, and page 16, line 10, incorrectly state that the United States has signed the Convention.

6.     As a threshold matter, it is my legal opinion that the Law of the Sea Convention is not invocable by the defendants in this case. With regard to the Law of the Sea Convention, the United States is not a Party. As such, the Convention is not a "treaty" under United States law

1

Attachment
A

and is therefore, by definition, not a self-executing treaty. Even if the United States were a Party to the Law of the Sea Convention, it would not be invocable by a defendant in a forfeiture case. As reflected in the December 19, 2007 report of the Senate Foreign Relations Committee, the Convention (with certain exceptions not applicable here) would not be self-executing and, in the view of both the Committee and the Executive Branch, the Convention would not "create private rights of action or other enforceable individual legal rights in U.S. courts." Convention on the Law of the Sea, S. Exec. Rep. No. 110-9, at 18 and 23 (110th Cong. 1st Sess. 2007). This is the most recent and official Executive Branch interpretation of the Convention. (See also United Nations Convention on the Law of the Sea, S. Exec. Rep. No. 108-10, at 15 and 20 (108th Cong., 2nd Sess. 2004), http://lugar.senate.gov/sfrc/pdf/seareport.pdf.)

7.      The Defendant and its experts assert that Howland and Baker Islands are "rocks" within the definition of article 121(3) of the Law of the Sea Convention (article 121(3)), and thus that the United States may not establish an Exclusive Economic Zone around them. It is my legal opinion that the Defendant and its experts are mistaken.

        a. Article 121(3) provides: "Rocks which cannot sustain human habitation or economic life of their own shall have no exclusive economic zone or continental shelf." It is clear, based on my review of the materials in this case, that the Defendant and Professor Van Dyke think that if there is no present human habitation on an island, then it "cannot sustain human habitation" and is thus a rock under article 121(3). See, e.g. Van Dyke Deposition 71-74, 77-78, 84, 116-120. The Defendant and Professor Van Dyke take the view that even if there had been habitation on an island in the past, if there is no habitation on the island today, then it is necessarily a rock. Id. In my opinion this is not a correct interpretation of article 121(3) and is contrary to the plain language of article 121(3). Article 121(3) uses the formulation "cannot sustain human habitation," not "do not support human habitation." The question posed by article 121(3) is whether the feature at issue is habitable. Contrary to the Defendant's view, there is no requirement that the feature actually be inhabited. A review of the history of Howland and Baker shows that both islands have been inhabited in the relatively recent past. Van Dyke Deposition 107-120 and Exhibits 8-15. Further, there is no evidence in the record that they will be uninhabited in the future. Accordingly, the Department of State does not view either island as a rock under article 121(3).

        b. The Defendant and Professor Van Dyke rely heavily on what they assert is "state practice" showing that Howland and Baker are rocks under article 121(3). Professor Van Dyke incorrectly portrays the facts and the concept of "state practice". State practice refers to the subsequent practice in the application of a treaty text which establishes the agreement of the parties regarding its application. It refers to the way a text is actually applied by the parties. If the practice is consistent and is common to, or accepted by, the parties, the subsequent practice is usually a good indication of what the parties understand the text to mean. Anthony Aust, Modern Treaty Law and Practice 194 (Cambridge University Press, 2000). Professor Van Dyke cites several cases involving disputes between countries as whether a particular feature is a rock under article 121(3). Van Dyke Declaration 15-19; Van Dyke Deposition 35-36, 51-54, citing Senkakus/Diaoyu Dao dispute; Okinotorishima dispute; Dokdo/Takeshima dispute, Spratly Islands dispute. The very fact that the proper characterization of these features is disputed

2

completely undercuts Professor Van Dyke's assertion that state practice shows that these features are "rocks" under article 121(3). It is entirely inappropriate to rely on disputed features as examples of state practice, for in each case there is a state taking exactly the opposite position. The one unambiguous example of state practice cited by Professor Van Dyke (Declaration 14-15, Deposition 29-34, 75-76), the UK's determination that Rockall is a rock and not an island, if anything, supports the U.S. view that Howland and Baker are not rocks. Rockall is a tiny, sheer-walled uninhabitable feature, a fraction of the size of Howland and Baker. Van Dyke Deposition 184 and Exhibits 2, 5, 25; Smith Deposition 102, 104.

      c. State practice supports the U.S. view that Howland and Baker are not rocks under article 121(3). There are many examples of relatively small, uninhabited features around or from which countries have established Exclusive Economic Zones. Of direct relevance to this case, Kiribati has claimed its EEZ measured in part from McKean Island, a feature quite similar to Baker Island. Edmonds Deposition 14-15 and Exhibits 1, 2 and 8; http://www.pacificislandtravel.com/Kiribati/about_destin/mckean.html. Other examples include France, which in the Pacific and Indian Oceans, has established EEZ's around islands in French Polynesia, French Southern Ocean islands (Kerguelen Islands), Australia around Heard Island; islands of the Mozambique Channel, and Clipperton Island; Fiji has established an EEZ around Ceva-i-Ra (Thjeva-i-Ra); Mexico has established an EEZ around Clarion and Roca Portida islets in the Pacific; Venezuela established an EEZ around Aves Island. (Van Dyke Deposition 23, 39; Smith Deposition 100) The United States gave full effect to Aves Islands in the Maritime Boundary Treaty between the United States and Venezuela of March 28, 1978, 23 U.S.T. 3100; in doing so, the United States recognized Venezuela's right to claim an EEZ from Aves Island. The United States has established an EEZ around Maro Reef in the Northwest Hawaiian Islands, Palmyra Atoll, Kingman Reef and around Howland and Baker. (60 Fed. Reg. 43825, 43828, 43829, Aug. 23, 1995; Department of Defense, Maritime Claims Reference Manual, page 664 and Table C1.T286, http://www.dtic.mil/whs/directives/corres/20051m_062305/United_States_America.doc; Van Dyke deposition 45) Professor Van Dyke admits in his deposition, pages 121-122, 126, that among Pacific Island nations there will be "winners and losers" under his interpretation of article 121(3), necessarily suggesting that they have established EEZ's around uninhabited islands that he would consider "rocks." The admission that several Pacific Island nations have established EEZ's off of features that he would consider "rocks" undercuts his position that state practice supports his view.

      d. Professor Van Dyke relies on maritime delimitation cases to support his view that Howland and Baker are rocks. (Declaration 19-20) None of these cases specifically addressed article 121(3). Rather, they were cases under article 74 of the Law of the Sea Convention, an entirely different body of law applying entirely different legal questions from those that have been raised in this case. Professor Van Dyke stated in his declaration, page 5, paragraph (d), that "the decisions made by both Nicaragua and Honduras that five small cays east of their coasts (Bobel Cay, Savanna Cay, Port Royal Cay, South Cay, and Edinburgh Cay) should generate only 12 nautical mile territorial seas, *and should not generate EEZs*" (emphasis added). The judgment of the International Court of Justice in this case, *Case Concerning Territorial and Maritime Dispute Between Nicaragua and Honduras in the Caribbean Sea,* October 8, 2007,

3

http://www.icj-
cij.org/docket/files/120/14075.pdf?PHPSESSID=be185f20d250a4ace1f4068d9ad9963c, at
paragraph 137 on page 40, states that these features "fall within the definition and regime of
islands under Article 121" and "notes that the Parties do not claim for these islands any maritime
areas beyond the territorial sea". (This point is repeated in paragraph 262 on page 72 of the
Court's judgment.) However, in paragraph 303 on page 83 the Court observes that:

> "As a 12-mile breadth of territorial sea has been accorded to these islands, it becomes
> apparent that the territorial sea attributed to the islands of Bobel Cay, Savanna Cay, Port
> Royal Cay and South Cay (Honduras) and Edinburgh Cay (Nicaragua) would lead to an
> overlap in the territorial sea of Nicaragua and Honduras in this area, both to the south and
> to the north of the 15[th] parallel."

Where the territorial seas from these islands overlap, there can be no EEZ measured from these
islands. Accordingly, it is incorrect to state that Nicaragua and Honduras decided that these
islands "should not generate EEZs".

e. Professor Van Dyke relies heavily on a separate opinion of Judge Budislav Vukas of
the International Tribunal for the Law of the Sea. (The *Volga* Case (Russian Federation v.
Australia), Case No. 11, Prompt Release, Judgment, Declaration of Judge Vukas, ITLOS Reports
2002; 42 International Legal Materials 178-181 (2003); http://www.itlos.org/start2_en.html (case
no. 11).) (Van Dyke Declaration 5-6; Van Dyke Deposition 23-26) Professor Van Dyke did not
mention that no other judge on the 21-judge Tribunal agreed with Judge Vukas' view on the rock
issue, which was not raised by Russia. The judgment of the Tribunal and the other three separate
opinions each accept that Heard Island and the McDonald Islands generated an EEZ. In an
earlier case before the Tribunal, Judge Vukas questioned whether the establishment of an EEZ
off the shores of the uninhabitable and uninhabited Kerguelen Islands was in accordance with the
Convention. The Tribunal's judgment and the six separate opinions each did not question the
validity of the EEZ around those islands. (The *Monte Confurco* Case (Seychelles v. France),
Case No. 6, Prompt Release, Judgment, Declaration of Judge Vukas,
http://www.itlos.org/start2_en.html (case no. 6).) Both of these cases involved prompt release of
fishing vessels arrested for violation of the EEZ regulations of Australia and France,
respectively. Most of the members of the Tribunal that heard both cases were, like Judge Vukas,
government delegates to the Third UN Conference on the Law of the Sea.

f. The definition of a nation's boundaries, including its EEZ, is a uniquely sovereign
determination. This determination is not subject to challenge by a defendant in a forfeiture case.
Only another sovereign may challenge such an establishment of an EEZ.

g. Not only has Kiribati has not challenged the establishment by the United States of its
EEZ off of Baker and Howland Islands, but it has agreed in such establishment. Smith Expert
Rebuttal Report page 3 paragraph 10. Kiribati has agreed that the vessel was not fishing in the
Kiribati EEZ at the time alleged in the complaint (Van Dyke Deposition Exhibit 7; Attachment 1,
the same telegram from the U.S. Embassy in Suva, prepared in the course of the Embassy's
diplomatic mission, to the Department of State, retrieved by the custodian of the telegram).

4

h. The Defendant and its experts assert that their interpretation of article 121(3) reflects customary international law. The United States has not said that their interpretation of article 121(3) is customary international law. It is a sovereign decision, not a decision of a defendant in a forfeiture case, as to whether a particular provision of the Law of the Sea Convention reflects customary international law. Whether article 121(3) is customary international law is beside the point, since the Defendant's interpretation of article 121(3) is clearly not customary international law. It conflicts with the plain language of the Convention, the practice of other nations, and the Executive Branch's declaration of its EEZ which was previously announced in the Federal Register (60 Fed. Reg. 43825, 43828, 43829, Aug. 23, 1995; *reprinted in* Department of Defense, Maritime Claims Reference Manual, page 664 and Table C1.T286, http://www.dtic.mil/whs/directives/corres/20051m_062305/United_States_America.doc.)

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of December 2007, Washington, D.C.

J. ASHLEY ROACH

Attachment as stated.

5

**Roach, J Ashley**

| | |
|---|---|
| **From:** | Sheils, Megan G |
| **Sent:** | Tuesday, December 11, 2007 5:07 PM |
| **To:** | Roach, J Ashley |
| **Subject:** | UNCLASS requested cable |
| **Attachments:** | messages[13].txt |

Hi Ash,
Here is the cable you requested. Have a good evening!
Megan Sheils, MLS
Librarian
A/ISS/Diplomatic Research Service (Pilot)
DiplomaticResearch@state.sgov.gov
SheilsMG@state.sgov.gov
(202) 261-8437

This e-mail is <u>unclassified</u> based on the definitions provided in E.O. 12958

**Our mission is to meet the information needs of our customers and the United States Government**



messages[13].txt
(7 KB)

1



United States Department of State



*Washington, D.C. 20520*
*www.state.gov*

messages13

Current Class: UNCLASSIFIED
Current Handling: n/a
Document Number: 2007SUVA00121

Page: 1

Channel: n/a

<<◇>>

ACTION OES-00

| INFO | LOG-00 | EEB-00 | AMAD-00 | INL-00 | DINT-00 | EAP-00 | UTED-00 |
|------|--------|--------|---------|--------|---------|--------|---------|
|      | TEDE-00 | IO-00 | OIC-00 | EPAU-00 | SP-00 | FMP-00 | EPAE-00 |
|      | SAS-00 | FA-00 | SWCI-00 | /000w |  |  |  |

------------------8314AA  212236Z /38

P 211348Z FEB 07
FM AMEMBASSY SUVA
TO SECSTATE WASHDC PRIORITY 3805
CCGDFOURTEEN HONOLULU HI PRIORITY
DEPT OF JUSTICE WASHDC
USDOC WASHDC
AMEMBASSY MAJURO

UNCLAS SUVA 000121

COMMERCE FOR NOAA GCEL/SW-PI

E.O. 12958: N/A
TAGS: EFIS, PHSA, PBTS, KR, FQ, HQ, RM
SUBJECT: KIRIBATI: F/V MARSHALLS 201 WAS OVER THE LINE

REF: REO MURPHY-AUSA SCHWAB TELCONS AND E-MAILS OF 02/21/07 AND
PREVIOUS

1. Kiribati Ministry of Foreign Affairs Permanent Secretary Elliot
Ali (the highest ranking career official in the ministry) told
embassy Suva on February 22, 2007, that the government of Kiribati
would not/not make a submission in U.S. court proceedings against
the F/V MARSHALLS 201 (Civil Case 06-00030) in support of the
defendant's claim to have been fishing in Kiribati's EEZ. Ali's
comments came after reviewing the complaint filed with the U.S.
District Court for Guam and after consulting with the Kiribati
Ministry of Fisheries and Marine Resources Development (MFMRD).

2. On February 19, 2007, MFMRD Vessel Monitoring System (VMS)
Officer Ioneba Temoai provided us with an electronic snapshot of F/V
MARSHALLS 201's VMS track for the period August 2006-February 2007.
This track first records the vessel as being inside Kiribati's
(Phoenix Islands) EEZ at 1:28 A.M. on September 8, 2006, having
crossed from the U.S. (Howland and Baker) EEZ, and last records it
in Kiribati's EEZ at 9:38 P.M. on September 8 headed back into the
U.S. EEZ. Ioneba's message, which we have forwarded to the U.S.
Attorney's office in Guam, says that the snapshot indicates that the
vessel was not in Kiribati waters during the "incident." Foreign

Current Class: UNCLASSIFIED

Page: 1

Current Class: UNCLASSIFIED
Current Handling: n/a
Document Number: 2007SUVA00121

Page: 2

Channel: n/a

Page 1

Case 1:06-cv-00030    Document 121-2    Filed 12/28/2007    Page 8 of 38

messages13

Affairs' Ali reiterated that position to us.

3. Background: According to information provided by the U.S.
Attorney's office in Guam (ref), The U.S. Coast Guard arrested the
RMI-flagged F/V MARSHALLS 201 on 9 September 2006 after it was
observed fishing within the U.S. EEZ around Howland and Baker
Islands on 7 and 9 September.  The U.S. Attorney's office, via NOAA
and the Department (OES/OMC), asked for post's assistance in
determining if the government of Kiribati planned to support the
defense assertion that the locations where the F/V MARSHALLS 201 was
observed fishing were, in fact, within Kiribati's claimed EEZ.  The
bottom line is that it does not and has, in fact, reached the
opposite conclusion, that the vessel was in U.S. waters as alleged
in the complaint.
Dinger


NNNN

Current Class: UNCLASSIFIED                                    Page: 2

Page 2

Case 1:06-cv-00030    Document 121-2    Filed 12/28/2007    Page 9 of 38

# Attachment B

# REPORT ON THE
## MARSHALLS 201 SEPTEMBER 2006
## INCIDENT AND ITS RELATIONSHIP
## TO THE UNITED STATES 200 NAUTICAL MILE
## EXCLUSIVE ECONOMIC ZONE LIMIT

### DR. ROBERT W. SMITH[1]
### AUGUST, 2007

## Summary

1. This paper examines the fishing enforcement, boarding and investigation by the United States Coast Guard against the fishing vessel MARSHALLS 201 on 9 September 2006. This report analyzes the location of this enforcement action with regards to the exclusive economic zone limit claimed and published by the United States. The conclusions reached are 1) the limits of the U.S. exclusive economic zone have been published in the official U.S. *Federal Register* and available to the international community, and, 2) the location where the U.S. Coast Guard reports that the Marshall 201 was fishing illegally is within the U.S. exclusive economic zone.

## The Enforcement Action

2. On 9 September 2006 the Marshall 201, a foreign fishing vessel flagged in the Marshall Islands, was detected fishing illegally in U.S. waters by the U.S. Coast Guard (USCGC Walnut). The location of the violation was reported by the Coast Guard at:

**02-05.667 S., 175- 59.531W.**[2]

This location is southeast of Baker Island, a U.S. possession in the central Pacific Ocean. The location is more than two nautical miles inside the U.S. exclusive economic limit.[3]

## The United States claim to an Exclusive Economic Zone

3. The United States claim to an exclusive economic zone (EEZ) was made by Presidential Proclamation No. 5030 on March 10, 1983. The outer limit of the EEZ is a line established in "such a manner that each point on it is 200 nautical miles from the baseline from which the breadth of the territorial sea is measured."[4] In areas where the

---

[1] My resume is attached in the Annex to this Report.
[2] Summary of ECDIS Data Log From 091931Z SEP 2006 to 100130Z SEP 2006, p. 201-642.
[3] The calculation was performed, in my presence, by the Navigator of the USCGC Healy (WAGB-20), 28 August 2007 on a Sperry VMS, ECDIS-N.
[4] *Federal Register*, Vol. 60, No. 163, August 23, 1995, at 43825.

**Attachment
B**

United States EEZ overlap the EEZ claims of foreign neighboring States the United States has stated the following:

"The Government of the United States of America has been, is, and will be, engaged in consultations and negotiations with governments of neighboring countries concerning the delimitation of areas subject to the respective jurisdiction of the United States and of these countries.

The limits of the exclusive economic zone of the United States as set forth below are intended to be without prejudice to any negotiations with these countries or to any positions which may have been or may be adopted respecting the limits of maritime jurisdiction in such areas."[5]

4. The limit of the United States EEZ seaward of Howland and Baker Islands is described in the 1995 *Federal Register* notice as follows:[6]

"The seaward limit of the exclusive economic zone is a line 200 nautical miles from the baseline from which the territorial sea is measured, except to the southeast and south of the Howland and Baker Islands the limit of the exclusive economic zone shall be determined by straight lines connecting the following points:

1.  0° 14' 30" N., 173° 08' 00" W.
2.  0° 14' 32" S., 173° 27' 28" W.
3.  0° 43' 52" S., 173° 45' 30" W.
4.  1° 04' 06" S., 174° 17' 41" W.
5.  1° 12' 39" S., 174° 31' 02" W.
6.  1° 14' 52" S., 174° 34' 48" W.
7.  1° 52' 36" S., 175° 34' 51" W.
8.  1° 59' 17" S., 175° 45' 29" W.
9.  2° 17' 09" S., 176° 13' 58" W.
10. 2° 32' 51" S., 176° 38' 59" W.
11. 2° 40' 26" S., 176° 51' 03" W.
12. 2° 44' 49" S., 176° 58' 01" W.
13. 2° 44' 53" S., 176° 58' 08" W.
14. 2° 56' 33" S., 177° 16' 43" W.
15. 2° 58' 45" S., 177° 26' 00" W.",

---

[5] *Ibid.*

[6] *Ibid.* at 43829. Prior to the 1983 EEZ Proclamation, the U.S. had implemented the Magnuson Fishery Conservation and Management Act on 7 March 1977 which claimed an exclusive fishery zone off the 50 U.S. states and off its territories and possessions. The geographic description of the outer limit of the exclusive fishing zone was published in Public Notice 526, *Federal Register*, Vol. 42, No. 44, March 7, 1977, 12937-40. The *Federal Register* notice has been updated on several occasions and the most current edition that provides geographic coordinates defining the outer limit of the United States exclusive economic zone limit is *Federal Register*, Vol. 60, No. 163, August 23, 1995, 43825-43829. This notice cites all the earlier *Federal Register* notices. It is the 1995 *Federal Notice* that will be cited in this report.

5. The international community was put on notice by the publishing of the geographical coordinates in the **Federal Register** and it was expected that any users were responsible to know the extent of the United States EEZ off the 50 U.S. states and the territories and possessions of the United States. I understand that U.S. law (title 44 U.S. Code Section 1507) provides that publication of a document, such as the US EEZ limits, in the **Federal Register** is sufficient to give notice of the contents of the document to a person subject to or affected by it.

6. Any ship navigating in the high seas, such as in the area of the U.S. EEZ limit to the southeast of Howland and Baker islands, would have a Global Positioning System (GPS) and or a GPS-based plotter on board. At the time of the enforcement action, the MARSHALLS 201 had this equipment available for use by the captain and crew of the vessel.[7] Thus, using the list of geographical coordinates, as given in paragraph 4 above, a navigator knows precisely where he was with regards to the United States EEZ limit.

7. This list of 15 points shown in paragraph 4 above is a median line between the United States (Howland and Baker Islands) and Kiribati (which include Gardner Island, McKean Island and Canton Island). A median line is that line which is equally distant along its entire length between the coastlines of the two States. The median line, as defined in paragraph 4 above, was calculated using the best information available that depicted the coastlines of the United States and Kiribati.

## Map of Claimed and Potential Maritime Zones in the Central and South Pacific

8. The map titled, "Claimed and Potential Maritime Zones in the Central and South Pacific," as found on the MARSHALL 201, was first made by the author in the late 1980s, following the completion of a Pacific regional fisheries negotiations. It is a small-scale map with a geographical range from 29 degrees North latitude to 28 degrees South latitude and from 130 degrees West longitude to 135 degrees East longitude. It depicts the Limit of Treaty on Fisheries Between the Governments of Certain Pacific Island States and the Government of the United States of America, the 200 nautical mile exclusive economic zones, 200 nautical mile fishery jurisdictions, claimed archipelagic waters, negotiated maritime boundaries, potential maritime boundaries (with hypothetical median lines shown), and the United States Exclusive Economic Zone limits. There is a legend that lists the negotiated maritime boundaries with the date of signature and the date the treaty entered into force, if applicable. There is also a listing for those States claiming Exclusive Economic Zones and those claiming an Exclusive Fishing Zone.

9. This map of claimed and potential maritime zones in the central and south Pacific has been updated three times, with the 3rd revision dated July 2001. The primary reason for the updates was to show more agreed maritime boundaries. The intent of the map was, first and foremost, to provide United States government officials an illustrative map of the region and to show the extent of the newly-agreed upon Pacific fishery treaty. It has also been used by U.S. government officials to gain a general understanding of

---

[7] Condition and Evaluation Survey Report by Jurgen Unterberg. GUA-J-06-2842-CS

where U.S. maritime jurisdiction is exercised in this region. While the scale of the map does not allow precise plotting of positions, one purpose of the map was to show the general areas of all claimed EEZs and fishery zones in the Pacific. Actual boundaries take on no dimension.[8]

10. This map was produced by the State Department. However, the official claim by the United States to an exclusive economic zone is the list of geographic coordinates published in the *Federal Register*. This map has never been sold as a commercial product or intended to be used for navigational purposes. It was produced for illustrative purposes only. Over the years, copies of this illustrative map were requested by non-U.S. entities and printing of additional copies accompanied map revisions. It is believed that the map likely was distributed at certain international meetings, such as at the annual meeting of the Pacific fisheries treaty to illustrate EEZ areas within the fishery treaty area. The extent of the distribution of this map is unknown to the author.

## Kiribati EEZ Claim

11. The Government of Kiribati claimed a 200 nautical mile exclusive economic zone in its Maritime Zones (Declaration) Act, 1983, No. 7 of 16 May 1983. In areas where the Kiribati EEZ overlaps that of its neighboring foreign States its EEZ claim extends to the median line. Specifically, its 1983 law states, in Article 7(5):

"Where the median line is less than 200 nautical miles from the line which the breadth of the territorial sea is to be measured, the outer limits of the exclusive economic zone extend to the median line."

12. During my career at the State Department, from 1975 to March 2006, I was not aware of any diplomatic correspondence from the Government of Kiribati complaining about the median line that the United States established for the limits of its exclusive economic zone in the areas adjacent to Kiribati.

---

[8] As Professor Brownlie correctly points out in his treatise on African boundaries, "... a boundary has no breadth...."Ian Brownlie. *African Boundaries, A Legal and Diplomatic Encyclopedia*. C. Hurst and Company, London, 1979, pg.3.

Compensation:

    1. Study, review, reports, and report generations - $240 hour.

    2. Testimony:

        a. Depositions - $240 hour

        b. Trial - $ 1,080 half day.

        c. Trial - $ 2,160 full day.

# Annex

# Curriculum Vitae of

# DR. ROBERT W. SMITH

## PROFESSIONAL EXPERIENCE

### CURRENT: GEOGRAPHIC CONSULTANT AND ADVISOR

Advise on all aspects of ocean policies and planning including developing strategies for exploring and exploiting offshore resources in an environmentally sound manner. Provide geographical and technical expertise for maritime boundary delimitation and arbitration, offshore jurisdictional claims, sovereignty disputes, and the development of offshore energy resources. Write position papers to support policy decisions on the rational development and management of marine resources. Provide technical and geographical expert testimony in domestic and international courts. Clients include the Government of Guyana, British Gas-Thailand, ExxonMobil, International Mapping Associates, the U.S. Department of Justice, and several international law firms.

### 1975-2006 GEOGRAPHER, U.S. DEPARTMENT OF STATE

As the U.S. government expert on maritime boundary and jurisdictional issues, I assisted in the development and implementation of U.S. ocean policy. I was responsible for the technical and geographical aspects of negotiating U.S. bilateral maritime boundaries and establishing U.S. claims to marine jurisdiction. In this role, I coordinated the U.S. effort to develop technically accurate and precise boundaries and outer limits for the territorial sea, contiguous zone, exclusive economic zone, and the continental shelf. For the establishment of U.S. maritime limits, I assured that all U.S. claims were in accordance to the international law of the sea principles using modern charting techniques. I represented the U.S. Government at international meetings and conferences, including United Nations meetings, on subjects of my expertise.

My State Department career was spent in two offices: in the Office of The Geographer (1975-87) where I served as the Chief of the International Boundary and Resource Division where I managed several geographic analysts and then I became the Special Assistant of Ocean Affairs and Policy Planning. From 1987 to March 2006 I was the geographer for the Office of Oceans Affairs. Throughout my State Department career I oversaw and was the principle author of the State Department's *Limits in the Seas* studies, in which analyses are given on the state practice of maritime claims and boundaries. Other related experiences during my State Department career included:

**United States Representative to:**

> United Nations 13th States Parties Meeting for the Law of the Sea Convention, 2003
> Caribbean Maritime Boundary Conference (Mexico City), 2003
> United Nations Conference on Maritime Boundary Delimitation, 1999
> United Nations Conference on the Continental Shelf, 1993 and 1995
> United Nations Conference on the Maritime Baseline, 1987
> International Hydrographic Organization Law of the Sea Group of
>     Technical Experts, 1985

United States Department of State Representative to Department of the Interior's Outer
      Continental Shelf Advisory Committee, 2002-2006

Member, National Security Council Interagency Committee on the U.S.
      Baseline, 1975-2006

**United States Delegations**

      **Head of Delegation:** Major Maritime Powers Meeting: 1998-Tokyo,
        1997-London

      **Delegation Member:** numerous bilateral and multilateral
        negotiations, including maritime boundaries, International Court
        of Justice boundary case (U.S. vs. Canada Gulf of Maine case,
        1984), fisheries, and law of the sea meetings.

**United States Expert Witness in Supreme Court cases:**

      U.S. vs. Alaska (1985, 1980)
      U.S. vs. Louisiana (Mississippi, 1986)
      U.S. vs. Maine (Mass., 1982)
      U.S. vs. Maine (R.I., 1981)

**United States Department of State Deputy Member:** United States
      Board on Geographic Names (1979-83)

## TEACHING

2004 – 2005:   **Georgetown University,** Adjunct Professor
        Course taught: Political Geography of the Oceans

2005-07, 2002 **Rhodes Academy,** Lecturer
        (Law of the Sea course, Rhodes, Greece)

1991- 2005   **International Boundary Research Unit,** Instructor: maritime boundary
        workshops (Durham, England and London, England – about 7 times)

1994        **World Affairs Program,** Royal Viking Cruise Line, Lecturer

1976- 1980   **George Mason University,** Adjunct Professor
        Courses taught: Marine resource management, world
        geography

1974-75      **University of North Carolina, Chapel Hill,** Instructor
        Course taught: cultural geography

1972        **University of Rhode Island,** Instructor
        Course taught: political geography

## OTHER PROFESSIONAL ACTIVITIES

**Expert Witness,** on behalf of the Government of Guyana, in the Republic of Guyana vs. Republic of Suriname Maritime Boundary Arbitration, under Annex VII of the United Nations Convention on the Law of the Sea (March-December 2006)

**Board of Advisors:** International Boundary Research Unit (IBRU), University of Durham, England (1990-2001)

**Advisory Board,** *Geopolitics* (1989-1995)

**Secretary,** International Geographical Union Marine Geography Study Group (1986-87)

**Editorial Board,** *The Virginia Geographer* (1982-86)

**Member, Advisory Council** at the Conference of International Straits of the World, Bellagio, Italy (1976)

## HONORS

Department of State Superior Honor Award; 2000, 1984
Department of State Meritorious Honor Award; 1988, 1977
Department of Justice Commendation; 1989

## EDUCATION

**University of North Carolina, Chapel Hill**
PhD, Geography, 1980
Dissertation: "A Geographical Analysis of the North Sea Continental Shelf Cases"
**University of Rhode Island**
MA, Geography, 1973
Thesis: An Analysis of the Concept "Strategic Quality of International Straits": A Geographical Perspective with Focus on Petroleum Tanker Transit and on the Malacca Strait

**Bucknell University**
BA, Political Science, 1971

## LECTURES AND SPEECHES

"The United States- Mexico 'Western Gap" Treaty", Law of the Sea Institute conference, Harte Institute, Texas A&M, Corpus Christi, March 2007.

"The Need for Offshore Certainty: The State of Affairs of Maritime Boundaries in the Caribbean," International Conference on Achieving Fiscal Stability in Upstream Oil and Gas, Houston, November 2006.

"Maritime Boundary Negotiations: National Considerations and the U.S.- Mexico Experience," International Conference on Advanced International Boundary Disputes in Oil and Gas, London (June 2006)

"Maritime Claims and Boundaries in the Arctic", Columbia University (January 2006)

"Hot Spots of Maritime Boundary Disputes — Global Impact on Oil and Gas Interests," Conference on International Border Dispute Resolution, Houston, (September 2004)

"Maritime Boundary Negotiations: National Considerations", Advisory Board on the Law of the Sea Conference, International Hydrographic Organization, Monaco (October, 2003)

"Political Geography of the Oceans", Woodrow Wilson School of Public and International Affairs, Princeton University, (November 2002)

"Issues in International Oceans Policy", University of Virginia School of Law (March, 2002-07)

"Future of Islands: Delimitation and Development," SEAPOL conference on Ocean Governance and Sustainable Development, Bangkok (March 2001)

"International Maritime Boundaries: Impact on Oil and Gas Interests," Resolving International Border Disputes, Global Business Network Ltd, London, 2000.

"Geography and U.S. ocean policy", Bucknell University (March 2002, April 1989)

"Baselines: Normal, Straight, and Archipelagic", Institute of Petroleum, International conference on "Oil Under Troubled Waters: An Introduction to Maritime Jurisdiction and Boundary Disputes", London (November 2000)

"International Maritime Boundaries: Impact on Oil and Gas Interests," Global Business Network Limited, "Resolving International Border Disputes", (London, July 2000)

"United States – Canada Maritime Boundaries: A Study of Negotiations, Arbitration, and Management", Korea Maritime Institute Conference on Marine Policy and the Korea Economy: Issues and Opportunities, (Seoul, Korea, October 1998)

"Navigation Considerations in East Asian Waters," Geopolitics and International Boundaries Research Centre's Conference on Island and Maritime Disputes of South East Asia (London, May 1993)

"United States – Russia Maritime Boundary", International Boundary Conference, Durham University (Durham, England, July 1991)

"The State Practice of National Maritime Claims and the Law of the Sea," University of Virginia School of Law conference on "State Practice and the 1982 Law of the Sea Convention, (Cascais, Portugal, April 1990)

"Navigation and Overflight Rights in the Law of the Sea," Cannon Air Force Base (April 1986)

"Law of the Sea and the United States," Bucknell University (April 1986)

"The Geopolitics of the Arctic," 52nd annual meeting of the Assoc. of American Geographers (Detroit, April 1985)

"National Claims and the Geography of the Arctic," Law of the Sea Institute Conference (San Francisco, September 1984)

"U.S.-Canadian Maritime Relations" and "Geographical Aspects of Foreign Affairs," Bucknell University (October 1984)

"Political Geography and the law of the sea," East Stroudsburg State College (Sept. 1980)

"Geographic influences on the political and economic development in the Pacific," Bucknell University (October 1979)

"National Maritime Claims," International Studies Association 20th annual conference (Toronto, March 1979)

"Geography of Maritime boundary delimitation," Assoc. of American Geographers' annual meeting (New Orleans, April 1978)

## PUBLICATIONS

### Books

David A. Colson and Robert W. Smith (eds). *International Maritime Boundaries*, Vol. V, The American Society of International Law, Martinus Nijhoff Publishers, March 2005

Jonathan I. Charney and Robert W. Smith (eds). *International Maritime Boundaries*, Vol. IV, The American Society of International Law, Martinus Nijhoff Publishers, 2002.

J. Ashley Roach and Robert W. Smith, *United States Responses to Excessive Maritime Claims*, 2nd edition, Martinus Nijhoff Publishers, 1996.

J. Ashley Roach and Robert W. Smith, *Excessive Maritime Claims*. International Law Studies Vol. 66, U.S. Naval War College, 1994.

Robert W. Smith. *Exclusive Economic Zone Claims, An Analysis and Primary Documents*. Martinus Nijhoff Publishers, 1986.

### Monographs

Robert W. Smith and Bradford L. Thomas, *Island Disputes and the Law of the Sea: An Examination of Sovereignty and Delimitation Disputes*. Maritime Briefing Volume 2 Number 4, International Boundaries Research Unit, 1998.

Robert W. Smith, "National Maritime Claims: 1958-85," *Geographic Research Study No. 20*, 1985, Office of The Geographer, U.S. Department of State

## Book Chapters

With J. Ashley Roach. "Caspian Sea Boundaries," in *International Maritime Boundaries*, Vol. V, Colson and Smith (eds), Martinus Nijhoff Publishers, 2005

With J. Ashley Roach. "Kazakhstan - Russia", "Azerbaijan - Russia", "Azerbaijan - Kazakhstan", "Azerbaijan - Kazakhstan Russia" in *International Maritime Boundaries*, Vol. V, Colson and Smith (eds), Martinus Nijhoff Publishers, 2005

With George Taft, "Legal Aspects of the Continental Shelf" (chapter 3) in, Peter J. Cook and Chris M. Carleton (eds), *Continental Shelf Limits: The Scientific and Legal Interface.* Oxford University Press, 2000.

With J. Ashley Roach, "Navigational Rights and Responsibilities in International Straits," (Chapter 14) in *The Straits of Malacca*, Hamzah Ahmad (ed), Pelanduk Publications, 1997.

"Joint Development Zones: A Review of Past Practice and Thoughts on the Future," in *Sustainable Development and Preservation of the Oceans: The Challenges of UNCLOS and Agenda 21.* Mochtar Kusuma-Atmadja, Thomas A. Mensah, and Bernard Oxman (eds). The Law of the Sea Institute, 1995.

"United States – Russia Maritime Boundary," In Maritime Boundaries, Volume 5 of World Boundaries, Gerald H. Blake (ed) (Routledge, 1994), 91-102.

"Cuba-United States," "Mexico-United States," "Cook Islands- United States," "New Zealand (Tokelau) – United States," in *International Maritime Boundaries*, Vol. I, Charney and Alexander (eds), Martinus Nijhoff Publishers, 1993.

"Navigational Issues in the Law of the Sea," (Chapter 6) in *Maritime Issues in the 1990s*, Dalchoong Kim et al (eds). Institute of East ad West Studies, Yonsei University, 1992.

"United States – Russia Maritime Boundary," International Boundary Research Unit international conference, 1991.

"Establishing Maritime Boundaries: The United States Experience," In *International Boundaries and Boundary Conflict Resolution*, C.Grundy-Warr (ed), International Boundary Research Unit, Durham, England, 1990.

"Geographic Considerations in Maritime Boundary Delimitations" (Chapter1) in Dorinda G. Dallmeyer and Louis DeVorsey, Jr (eds). *Rights to Oceanic Resources.* Martinus Nijhoff Publishers, 1989.

"Global Maritime Claims: The Current Status," (Chapter 1) in *Global Ocean Politics*, Dalchoong Kim, Choon-ho Park and Seo-Hang Lee (eds), Institute of East and West Studies, Yonsei University, 1989.

"National Claims and the Geography of the Arctic," Law of the Sea Institute's San Francisco conference, 1984.

"The Effect of Extended Maritime Jurisdiction on Land Sovereignty Disputes," in *The 1982 Convention on the Law of the Sea.* Albert Koers and Bernard Oxman (eds), Law of the Sea Institute, 1983.

With Robert D. Hodgson, "Unilateralism: The Wave of the Future?" (Chapter 9) in Law of the Sea: *Conference Outcomes and Problem of Implementation.* Edward Miles and John King Gamble (eds) Ballinger Publishing Company, 1976.

With Robert D. Hodgson, "Boundaries of the Economic Zone" (Chapter 10) in Law of the Sea: *Conference Outcomes and Problem of Implementation.* Edward Miles and John King Gamble (eds) Ballinger Publishing Company, 1976.

"Coastal Planning and Carteret (North Carolina) Fishermen," in *Carrying Capacity: A Basis for Coastal Planning.* D Godschalk and F. Parker (eds), Univ. of North Carolina Press, 1974.

## Articles

With J. Ashley Roach "Straight Baselines: The Need for a Universally Applied Norm," *Ocean Development and International Law,* 31: 47-80, 2000

"National Maritime Claims," *Ocean Development and International Law,* Vol. 20, 1989, 83-103.

"A Geographical Primer to Maritime Boundary-Making," *Ocean Development and International Law,* Vol. 12:1/2, 1982, 1-22.

"Maritime Boundaries of the United States," *The Geographical Review,* Vol. 71, 1981, 395–410.

"Trends in National Maritime Claims," *Professional Geographer,* 32(2), 1980, 216-223.

With Robert D. Hodgson, "Boundary Issues Created By Extended National Marine Jurisdictions," *The Geographical Review.* Vol. 69, No. 4, October 1979, 423-433.

With Robert D. Hodgson, "The Informal Single Negotiating Text (Committee II): A Geographical Perspective," *Ocean Development and International Law Journal,* Volume 3, Number 3, 1976, 225-259.

"The Political Geography of the Marine Environment," *The Geographical Bulletin,* Vol 10, 1975.

"An Analysis of the Strategic Attributes of International Straits: A Geographical Perspective," *Maritime Studies and Management,* 1974.

"Oceanborne Shipment of Petroleum and the Impact of Straits on VLCC Transit, *Maritime Studies and Management,* 1973.

Author (or co-author) of following U.S. Department of State, *Limits in the Seas* studies:
No. 36- National Claims to Maritime Jurisdiction (4th-8th revisions)
No. 62- Continental Shelf Boundary: India-Indonesia, August 25, 1975.
No. 63- Continental Shelf Boundary: Iran- UAE (Dubai), September 30, 1975.
No. 64- Continental Shelf Boundary: Argentina-Uruguay, October 24, 1975.
No. 67- Continental Shelf Boundary: Iran-Oman, January 1, 1976.
No. 68- Territorial Sea and Continental Shelf Boundary: Guinea-Bissau – Senegal, March 15, 1976.
No. 69- Maritime Boundary: Colombia-Ecuador, April 1, 1976.

No. 71- Continental Shelf Boundary: Finland-Sweden, June 16, 1976.
No. 73- Maritime Boundary: Brazil-Uruguay, September 30, 1976.
No. 74- Maritime Boundary: FRG-GDR, October 5, 1976.
No. 75- Continental Shelf Boundary and Joint Development Zone: Japan – Republic of
   Korea, September 2, 1977.
No. 76- Straight Baselines: Cuba, October 28, 1977.
No. 77- Maritime Boundaries: India-Sri Lanka, February 16, 1978.
No. 78- Maritime Boundary: India-Maldives and Maldives' Claimed Economic Zone,
   July 24, 1978.
No. 79- Maritime Boundaries: Colombia-Panama, November 3, 1978.
No. 82- Straight Baselines: Korea, January 22, 1979.
No. 84- Maritime Boundary: Colombia-Costa Rica, February 15, 1979.
No. 85- Maritime Boundary: The Gambia-Senegal, March 23, 1979.
No. 86- Maritime Boundary: Chile-Peru, July 2, 1979.
No. 88- Maritime Boundary: Ecuador-Peru, October 2, 1979.
No. 90- Continental Shelf Boundary: Italy-Spain, May 14, 1980.
No. 91- Maritime Boundary: United States-Venezuela, December 16, 1980.
No. 92- Territorial Waters Boundary: Kenya-Tanzania, May 15, 1981.
No. 93- Continental Shelf Boundaries: India-Indonesia-Thailand, August 17, 1981.
No. 94- Continental Shelf Boundaries: The Persian Gulf, September 11, 1981.
No. 95- Maritime Boundary: France (Reunion) –Mauritius, April 16, 1982.
No. 97- Maritime Boundaries: Costa Rica – Panama, December 6, 1982.
No. 98- Archipelagic Straight Baselines: Sao Tome and Principe, November 1, 1983.
No. 100- Maritime Boundaries- United States- Cook Islands and United States- New Zealand
   (Tokelau), December 30, 1983.
No. 101- Fiji's Maritime Claims, November 30, 1984.
No. 103- Straight Baselines, Colombia, April 30, 1985.
No. 104- Maritime Boundary: Cuba-Mexico, September 10, 1985.
No. 105- Maritime Boundaries: Colombia- Dominican Republic and Netherlands-Venezuela,
   January 22, 1986.
No. 106- Developing Standard Guidelines for Evaluating Straight Baselines, with P. Bernhardt
   and G. Greiveldinger, August 31, 1987.
No. 107- Straight Baselines: U.S.S.R. (Pacific, Sea of Japan, Sea of Okhotsk, and Bering Sea),
   September 30, 1987.
No. 108- Maritime Boundaries of the World (rev.1), November 30, 1990.
No. 109- Continental Shelf Boundary: Turkey-USSR and Straight Baselines: USSR (Black Sea),
   with D.Dzurek, September 28, 1988.
No. 110- Maritime  Boundary: Cuba-United States, February 21, 1990.
No. 111- Straight Baseline: Costa Rica, August 17, 1990.
No. 112- United States Responses to Excessive Maritime Claims, with A. Roach, March 9, 1992.
No. 113- Straight Baseline Claims: Djibouti and Oman, April 22, 1992.
No. 114- Iran's Maritime Claims, March 16, 1994.
No. 115- United States- United Kingdom Maritime Boundaries in the Caribbean, April 11, 1994.
No. 116- Straight Baseline Claims: Albania and Egypt, May 6, 1994.
No. 117- Straight Baseline Claim: China, July 9, 1196.
No. 118- Straight Baseline Claim: Pakistan, December 20, 1996.
No. 119- Maritime Boundary: Niue- United States, July 30, 1997.
No. 120- Straight Baseline and Territorial Sea Claim: Japan, April 30, 1998.
No. 121- Straight Baseline and Territorial Sea Claim: South Korea, September 30, 1998.
No. 122- Straight Baseline Claim: Thailand, with S. Morison, September 8, 2000.
No. 123- Uruguay's Maritime Claims, with S. Morison, November 27, 2000.
No. 124- Straight Baseline Claim: Honduras, June 28, 2001.

No. 125: Jamaica's Maritime Claims and Boundaries, February 4, 2004.
No. 126: Maldives Maritime Claims and Boundaries, September 8, 2005.
No. 127: Taiwan's Maritime Claims with A. Roach, November 15, 2005

August 2007
dr_rwsmith@yahoo.com

12. If you were a Cabinet Secretary, would you hire this person to be a key member of your staff?

13. What would you expect this candidate to be doing in 15 to 20 years?

## Privacy Act and Paperwork Reduction Act Statements

Pursuant to the Freedom of Information Act (5 U.S.C. 552, as amended) and the Privacy Act (5 U.S.C. 552a) the President's Commission on White House Fellowships operates its competitive application process and collects personal information for its use in evaluating applicants under authority of Executive Order 11183, as amended. Submission of the information is voluntary; however, failure to furnish all the requested information may result in delay or elimination of consideration for a Fellowship. All files, records, and other material submitted by or in behalf of any applicant, or collected or obtained with regard to an applicant, are used by those persons associated with the Commission for the purpose of screening and evaluating applications. The information may also be disclosed to a congressional office in response to an inquiry from that office made at the request of that individual. Executive Order 9397 provides for the collection of Social Security Numbers to identify individual records. Furnishing your Social Security Number is voluntary; however, failure to do so may delay the processing of your application.

This request is in accordance with the clearance requirements of the Paperwork Reduction Act (44 U.S.C. 3507). The information is being collected in order to evaluate your qualifications for a Fellowship. Your response is required to make this determination. Public reporting burden for this collection of information is estimated to average five (5) hours per response, including time for reviewing instructions, gathering the requested personal evaluations, and completing the application. Please send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the President's Commission on White House Fellowships, Washington, DC 20415.

## Records Retention

The application forms of persons selected as White House Fellows may be circulated to appropriate Executive Branch officials incident to placing Fellows in assignments for the Fellowship year and subsequently may be retained, along with other applicant file materials, by the Commission in its permanent files on persons who are selected as White House Fellows. These permanent records are accessible to the individuals concerned.

Sixty days after a notice has been mailed to an applicant advising that he or she has been eliminated from the competition, all materials in the applicant's file will be destroyed and this procedure will be repeated after each stage of the selection process.

The Commission cannot assume responsibility for the return of applications or supporting documents. Applicants are therefore advised to retain copies of their application forms and not to submit irreplaceable documents or other materials with applications.

(FR Doc. 95–20947 Filed 8–22–95; 8:45 am)

BILLING CODE 6325–01–M

# DEPARTMENT OF STATE

[Public Notice 2237]

## Exclusive Economic Zone and Maritime Boundaries; Notice of Limits

By Presidential Proclamation No. 5030 made on March 10, 1983, the United States established an exclusive economic zone, the outer limit of which is a line drawn in such a manner that each point on it is 200 nautical miles from the baseline from which the breadth of the territorial sea is measured.

The Government of the United States of America has been, is, and will be, engaged in consultations and negotiations with governments of neighboring countries concerning the delimitation of areas subject to the respective jurisdiction of the United States and of these countries.

The limits of the exclusive economic zone of the United States as set forth below are intended to be without prejudice to any negotiations with these countries or to any positions which may have been or may be adopted respecting the limits of maritime jurisdiction in such areas. Further, the limits of the exclusive economic zone set forth below are without prejudice to the outer limit of the continental shelf of the United States where that shelf extends beyond 200 nautical miles from the baseline in accordance with international law.

The following notices have been published which have defined the United States maritime boundaries and fishery conservation zone established March 1, 1977: Public Notice 506, **Federal Register**, Vol. 41, No. 214, November 4, 1976, 48619–20; Public Notice 526, **Federal Register**, Vol. 42, No. 44, March 7, 1977, 12937–40; Public Notice 544, **Federal Register**, Vol. 42, No. 92, May 12, 1977, 24134; Public Notice 4710–01, **Federal Register**, Vol. 43, No. 7, January 11, 1978, 1658; Public Notice 585, **Federal Register**, Vol. 43, No. 7, January 11, 1978, 1659; Public Notice 910, **Federal Register**, Vol. 49, No. 155, August 9, 1984, 31973.

This Public Notice supersedes all limits defined in the above Public Notices.

Therefore, the Department of State on behalf of the Government of the United States hereby announces the limits of the exclusive economic zone of the United States of America, within which the United States will exercise its sovereign rights and jurisdiction as permitted under international law, pending the establishment of permanent maritime boundaries by mutual agreement in those cases where a boundary is necessary and has not already been agreed.

Publication of a notice on this subject which is effective immediately upon publication is necessary to effectively exercise the foreign affairs responsibility of the Department of State. (See Title 5 U.S.C. 553 (a)(1)(B).)

Unless otherwise noted, the coordinates in this notice relate to the Clarke 1866 Ellipsoid and the North American 1927 Datum ("NAD 27"). Unless otherwise specified, the term "straight line" in this notice means a geodetic line.

## U.S. Atlantic Coast and Gulf of Mexico

In the Gulf of Maine area, the limit of the exclusive economic zone is defined by straight lines connecting the following coordinates[1]:

1. 44°46′35.346″ N., 66°54′11.253″ W.
2. 44°44′41″ N., 66°56′17″ W.
3. 44°43′56″ N., 66°56′26″ W.
4. 44°39′13″ N., 66°57′29″ W.
5. 44°36′58″ N., 67°00′36″ W.
6. 44°33′27″ N., 67°02′37″ W.
7. 44°30′38″ N., 67°02′38″ W.
8. 44°29′03″ N., 67°03′42″ W.
9. 44°25′27″ N., 67°02′16″ W.
10. 44°21′43″ N., 67°02′33″ W.
11. 44°14′06″ N., 67°00′38″ W.
12. 44°11′12″ N., 67°16′46″ W.
13. 42°53′14″ N., 67°44′35″ W.
14. 42°31′08″ N., 67°28′05″ W.
15. 40°27′05″ N., 65°41′59″ W.

Between points 15 and 16, the limit of the exclusive economic zone is 200 nautical miles seaward from the baseline from which the territorial sea is measured.

In the area of the Blake Plateau, the Straits of Florida, and Eastern Gulf of Mexico, the limit of the exclusive economic zone shall be determined by

---

[1] The limits of the U.S. exclusive economic zone from points 1 to 12 in areas adjacent to Canada do not correspond to limits of the Canadian fishery zone as defined in the Canada Gazette of January 1, 1977, due to the dispute between the United States and Canada relating to the sovereignty over Machias Seal Island and North Rock. The line defined by points 12 through 15 reflects the International Court of Justice award of October 14, 1984, establishing a United States-Canada maritime boundary, pursuant to the Treaty between the Government of Canada and the Government of the United States of America to Submit to Binding Dispute Settlement the Delimitation of the Maritime Boundary in the Gulf of Maine Area, TIAS 10204.

DEPOSITION EXHIBIT
2

straight lines connecting the following coordinates:

16. 28°17′10″ N. 79°36′45″ W
17. 28°17′10″ N. 79°41′24″ W
18. 27°52′54″ N. 79°28′36″ W
19. 27°26′00″ N. 79°31′38″ W
20. 27°16′12″ N. 79°34′18″ W
21. 27°11′53″ N. 79°34′56″ W
22. 27°05′58″ N. 79°35′19″ W
23. 27°00′27″ N. 79°35′17″ W
24. 26°55′15″ N. 79°34′39″ W
25. 26°53′57″ N. 79°34′27″ W
26. 26°45′45″ N. 79°32′41″ W
27. 26°44′29″ N. 79°32′23″ W
28. 26°43′39″ N. 79°32′20″ W
29. 26°41′11″ N. 79°32′01″ W
30. 26°38′12″ N. 79°31′33″ W
31. 26°36′29″ N. 79°31′07″ W
32. 26°35′20″ N. 79°30′50″ W
33. 26°34′50″ N. 79°30′46″ W
34. 26°34′10″ N. 79°30′38″ W
35. 26°31′11″ N. 79°30′15″ W
36. 26°29′04″ N. 79°29′53″ W
37. 26°25′30″ N. 79°29′58″ W
38. 26°23′28″ N. 79°29′55″ W
39. 26°23′20″ N. 79°29′54″ W
40. 26°18′56″ N. 79°31′55″ W
41. 26°15′25″ N. 79°33′17″ W.
42. 26°15′12″ N. 79°33′23″ W
43. 26°08′08″ N. 79°35′53″ W
44. 26°07′46″ N. 79°36′09″ W
45. 26°06′58″ N. 79°36′35″ W
46. 26°02′51″ N. 79°38′22″ W
47. 25°59′29″ N. 79°40′03″ W
48. 25°59′15″ N. 79°40′08″ W
49. 25°57′47″ N. 79°40′38″ W
50. 25°56′17″ N. 79°41′06″ W
51. 25°54′03″ N. 79°41′38″ W
52. 25°53′23″ N. 79°41′46″ W.
53. 25°51′53″ N. 79°41′59″ W
54. 25°49′32″ N. 79°42′16″ W
55. 25°48′23″ N. 79°42′23″ W
56. 25°48′19″ N. 79°42′24″ W
57. 25°46′25″ N. 79°42′44″ W
58. 25°46′15″ N. 79°42′45″ W.
59. 25°43′39″ N. 79°42′48″ W
60. 25°42′30″ N. 79°42′48″ W
61. 25°40′36″ N. 79°42′27″ W
62. 25°37′23″ N. 79°42′27″ W
63. 25°37′07″ N. 79°42′22″ W
64. 25°31′02″ N. 79°42′12″ W
65. 25°27′58″ N. 79°42′11″ W
66. 25°24′03″ N. 79°42′12″ W
67. 25°22′20″ N. 79°42′20″ W
68. 25°21′28″ N. 79°42′08″ W
69. 25°16′51″ N. 79°41′21″ W
70. 25°15′56″ N. 79°41′31″ W.
71. 25°10′38″ N. 79°41′31″ W.
72. 25°09′50″ N. 79°41′36″ W
73. 25 09′02″ N. 79°41′45″ W
74. 25°03′53″ N. 79°42′30″ W
75. 25°02′58″ N. 79°42′57″ W
76. 25°00′28″ N. 79°44′06″ W
77. 24°59′01″ N. 79°44′49″ W
78. 24 55′26″ N. 79°45′58″ W
79. 24°44′16″ N. 79°49′25″ W
80. 24°43′02″ N. 79°49′39″ W
81. 24°42′34″ N. 79°50′51″ W
82. 24°41′45″ N. 79°52′58″ W
83. 24°38′30″ N. 79°59′59″ W.

* The line defined by points 113 through 139 is that line delimited in the maritime boundary treaty signed with Cuba, December 16, 1977, Senate Executive H. 96th Cong., 1st Sess. The treaty has been applied provisionally since January 1, 1978.

84. 24°36′25″ N. 80°03′52″ W
85. 24°33′16″ N. 80°12′44″ W
86. 24°33′03″ N. 80°13′22″ W
87. 24°32′11″ N. 80°15′17″ W.
88. 24°31′25″ N. 80°16′56″ W
89. 24°30′55″ N. 80°17′48″ W
90. 24°30′12″ N. 80°19′22″ W
91. 24°30′04″ N. 80°19′45″ W
92. 24°29′36″ N. 80°21′06″ W
93. 24°28′16″ N. 80°24′36″ W
94. 24°28′04″ N. 80°25′11″ W
95. 24°27′21″ N. 80°27′21″ W
96. 24°26′28″ N. 80°29′31″ W
97. 24°25′05″ N. 80°32′23″ W
98. 24°23′28″ N. 80°36′10″ W
99. 24°22′31″ N. 80°38′57″ W
100. 24°22′05″ N. 80°39′52″ W
101. 24°19′29″ N. 80°45′22″ W
102. 24°19′14″ N. 80°45′48″ W
103. 24°18′36″ N. 80°46′50″ W
104. 24°18′33″ N. 80°46′55″ W
105. 24°09′49″ N. 80°59′48″ W
106. 24°09′46″ N. 80°59′52″ W
107. 24°08′56″ N. 81°01′08″ W
108. 24°03′28″ N. 81°01′52″ W
109. 24°08′24″ N. 81°01′58″ W
110. 24°07′26″ N. 81°03′07″ W
111. 24°02′18″ N. 81°09′06″ W.
112. 23°59′58″ N. 81°11′16″ W
113. 23°55′50″ N. 81°12′55″ W
114. 23°53′50″ N. 81°19′44″ W.
115. 23°50′50″ N. 81°30′00″ W.
116. 23°50′00″ N. 81°40′00″ W.
117. 23°49′03″ N. 81°50′00″ W.
118. 23°49′03″ N. 82°00′12″ W
119. 23°49′40″ N. 82°10′00″ W.
120. 23°51′12″ N. 82°25′00″ W
121. 23°51′12″ N. 82°40′00″ W
122. 23°49′40″ N. 82°48′54″ W
123. 23°49′30″ N. 82°51′12″ W
124. 23°49′22″ N. 83°00′00″ W
125. 23°49′50″ N. 83°15′00″ W.
126. 23°51′20″ N. 83°25′50″ W
127. 23°52′25″ N. 83°33′02″ W
128. 23°54′02″ N. 83°41′36″ W
129. 23°55′45″ N. 83°48′12″ W.
130. 23°58′36″ N. 84°00′00″ W
131. 24°09′35″ N. 84°29′28″ W.
132. 24°13′18″ N. 84°38′40″ W
133. 24°16′39″ N. 84°46′08″ W.
134. 24°23′28″ N. 85°00′00″ W.
135. 24°26′35″ N. 85°06′20″ W.
136. 24°38′55″ N. 85°31′55″ W.
137. 24°44′15″ N. 85°43′12″ W.
138. 24°53′55″ N. 86°00′00″ W.
139. 25°12′25″ N. 86°33′12″ W.

Between points 139 and 140, the limit of the exclusive economic zone is 200 nautical miles seaward from the baseline from which the territorial sea is measured.

In the central Gulf of Mexico, the limit of the exclusive economic zone is determined by straight lines connecting the following coordinates:[1]

140. 25°41′56.52 88″ N. 88°23′05.54″ W

[1] The lines defined by points 140, 142 and 143–146 reflect the exchange of Notes Effecting Agreement on the provisional Maritime Boundary with Mexico done on November 24, 1976, TIAS 9805, 29 UST 196. The U.S. Mexico Maritime Boundary Treaty, signed on May 4, 1978, Senate Executive F, 96th Congress, 1st Sess. defines boundary using the same turning points

141. 25°46′52.00″ N. 90°29′41.00″ W
142. 25°42′13.05″ N. 91°05′24.89″ W

Between points 142 and 143, the limit of the exclusive economic zone is 200 nautical miles seaward from the baseline from which the territorial sea is measured.

In the western Gulf of Mexico, the limit of the exclusive economic zone is determined by straight lines connecting the following coordinates:

143. 25°59′48.28″ N. 93°26′42 19″ W
144. 26°00′30.00″ N. 95°39′26 00″ W
145. 26°00′31 00″ N. 96°48′29.00″ W
146. 25°58′30 57″ N. 96°55′27 37″ W

From point 146, the limit of United States jurisdiction is the territorial sea boundary with Mexico established by the United States of America and the United Mexican States in Article V(A) and annexes of the Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary, signed at Mexico City, November 23, 1970, and entered into force April 18, 1972, TIAS No. 7313, 23 UST 371.

## U.S. Pacific Coast (Washington, Oregon, and California)

In the area seaward of the Strait of Juan de Fuca, the limit of the exclusive economic zone shall be determined by straight lines connecting the points with the following coordinates:[4]

1. 48°29′37.19″ N. 124°43′33.19″ W
2. 48°30′11″ N. 124°47′13″ W
3. 48°30′22″ N. 124°50′21″ W.
4. 48°30′14″ N. 124°54′52″ W
5. 48°29′57″ N. 124°59′14″ W
6. 48°29′44″ N. 125°00′06″ W
7. 48°28′09″ N. 125°05′47″ W
8. 48°27′10″ N. 125°08′25″ W
9. 48°26′47″ N. 125°09′12″ W
10. 48°20′16″ N. 125°22′48″ W.
11. 48°18′22″ N. 125°29′58″ W
12. 48°11′05″ N. 125°53′48″ W.
13. 47°49′15″ N. 126°40′57″ W
14. 47°36′47″ N. 127°11′58″ W
15. 47°22′00″ N. 127°41′23″ W
16. 46°42′05″ N. 128°51′56″ W
17. 46°31′47″ N. 129°07′39″ W

Between point 17 and 18, the limit of the exclusive economic zone is 200 nautical miles seaward from the baseline from which the breadth of the territorial sea is measured. In the area off the Southern California coast, the limit of the exclusive economic zone shall be determined by straight lines connecting the following points:[5]

[4] The limit of the U.S. exclusive economic zone from points 1 to 17 adjacent to Canada in the area seaward of the Strait of Juan de Fuca do not correspond to limits of the Canadian fishery zone as defined in the Canada Gazette of January 1, 1977

[5] The line defined by points 18 through 21 reflect the Exchange of Notes Effecting Agreement on the Provisional Maritime Boundary with Mexico done on November 24, 1976. The U.S. Mexico Maritime

18  30°32'31.20" N  121°51'58.37" W
19  31°07'58.00" N  118°36'18.00" W
20  32°37'37.00" N  117°49'31.00" W
21  32°35'22.11" N  117°27'49.42" W

From point 21 to the coast, the limit of United States jurisdiction is the territorial sea boundary with Mexico established by the United States of America and the United Mexican States in Article V(B) and annexes of the Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary, signed at Mexico City, November 23, 1970, and entered into force April 18, 1972.

## Alaska

Off the coast of Alaska, in the area of the Beaufort Sea, the limit of exclusive economic zone shall be determined by straight lines, connecting the following coordinates:[6]

1.  69°38'48.88" N  140°59'52.7" W
2.  69°38'52" N  140°59'51" W
3.  69°39'37" N  140°59'01" W
4.  69°40'10" N  140°58'34" W
5.  69°41'30" N  140°57'00" W
6.  69°46'25" N  140°49'45" W
7.  69°47'54" N  140°47'07" W
8.  69°51'40" N  140°42'37" W
9.  70°09'26" N  140°19'22" W
10.  70°11'30" N  140°18'09" W
11.  70°29'07" N  140°09'51" W
12.  70°29'19" N  140°09'45" W
13.  70°37'31" N  140°02'47" W
14.  70°48'26" N  139°52'32" W
15.  70°58'02" N  139°47'16" W
16.  71°01'15" N  139°44'24" W
17.  71°11'58" N  139°33'58" W
18.  71°23'10" N  139°21'46" W
19.  72°12'18" N  138°26'19" W
20.  72°46'39" N  137°30'02" W
21.  72°56'49" N  137°34'08" W

Between point 21 and point 22, the limit of the exclusive economic zone is 200 nautical miles seaward from the baseline from which the territorial sea is measured. In the Chukchi Sea, Bering Strait, and northern Bering Sea, the limit of the exclusive economic zone shall be determined by straight lines connecting the following coordinates:[7]

22.  72°46'29" N  168°58'37" W
23.  65°30'00" N  168°58'37" W
24.  65°19'58" N  168°21'35" W
25.  65°09'51" N  169°44'34" W
26.  64°59'41" N  170°07'23" W

27.  64°49'26" N  170°30'06" W
28.  64°39'08" N  170°54'20" W
29.  64°28'46" N  171°15'14" W
30.  64°18'20" N  171°27'40" W
31.  64°07'50" N  172°00'00" W
32.  63°59'27" N  172°18'39" W
33.  63°51'01" N  172°38'13" W
34.  63°42'33" N  172°55'42" W
35.  63°34'01" N  173°14'07" W
36.  63°25'27" N  173°32'27" W
37.  63°16'50" N  173°50'42" W
38.  63°08'11" N  174°08'52" W
39.  62°59'29" N  174°26'58" W
40.  62°50'44" N  174°44'59" W
41.  62°41'56" N  175°02'56" W
42.  62°33'06" N  175°20'48" W
43.  62°24'13" N  175°38'36" W
44.  62°15'17" N  175°56'19" W
45.  62°06'19" N  176°13'59" W
46.  61°57'13" N  176°31'34" W
47.  61°48'14" N  176°49'04" W
48.  61°39'08" N  177°06'31" W
49.  61°29'59" N  177°23'53" W
50.  61°20'47" N  177°41'11" W
51.  61°11'33" N  177°58'26" W
52.  61°02'17" N  178°15'36" W
53.  60°52'57" N  178°32'42" W
54.  60°43'35" N  178°49'45" W
55.  60°34'11" N  179°06'44" W
56.  60°24'44" N  179°23'38" W
57.  60°15'14" N  179°40'28" W
58.  60°11'39" N  179°46'49" W

Between points 58 and 59 the limit of the exclusive economic zone is 200 nautical miles seaward from the baseline from which the territorial sea is measured. In the southern Bering Sea and north Pacific Ocean, the limit of the exclusive economic zone shall be determined the straight lines connecting the following coordinates:

59.  56°16'31" N  174°00'19" E
60.  56°15'07" N  173°56'56" E
61.  56°04'34" N  173°41'08" E
62.  55°55'59" N  173°25'22" E
63.  55°43'22" N  173°09'37" E
64.  55°32'42" N  172°53'55" E
65.  55°21'59" N  172°38'14" E
66.  55°11'14" N  172°22'36" E
67.  55°00'26" N  172°06'59" E
68.  54°49'36" N  171°51'24" E
69.  54°38'43" N  171°35'51" E
70.  54°27'48" N  171°20'20" E
71.  54°16'50" N  171°04'50" E
72.  54°05'50" N  170°49'22" E
73.  53°54'47" N  170°33'56" E
74.  53°43'42" N  170°18'31" E
75.  53°32'34" N  170°05'29" E
76.  53°21'48" N  169°52'32" E
77.  53°10'49" N  169°39'46" E
78.  52°59'48" N  169°26'53" E
79.  52°48'46" N  169°14'12" E
80.  52°37'43" N  169°01'36" E
81.  52°26'38" N  168°49'05" E
82.  52°15'31" N  168°36'39" E
83.  52°01'23" N  168°24'17" E
84.  51°53'14" N  168°12'01" E
85.  51°42'03" N  167°59'49" E
86.  51°30'51" N  167°47'42" E
87.  51°22'13" N  167°38'28" E

From point 87 to point 88, the limit of the exclusive economic zone is 200 nautical miles from the baseline from which the territorial sea is measured.

From point 88, the southern limit of the exclusive economic zone off the coast of Alaska shall be determined by straight lines connecting the following coordinates:[8]

88.  53°28'27" N  138°45'20" W
89.  54°00'01" N  135°45'57" W
90.  54°07'30" N  134°56'24" W
91.  54°12'43" N  134°25'03" W
92.  54°12'57" N  134°23'47" W
93.  54°15'40" N  134°10'49" W
94.  54°20'33" N  133°49'21" W
95.  54°22'01" N  133°44'24" W
96.  54°30'06" N  133°16'58" W
97.  54°31'02" N  133°14'00" W
98.  54°30'42" N  133°11'28" W
99.  54°30'10" N  133°07'43" W
100.  54°30'03" N  133°07'00" W
101.  54°28'32" N  132°56'26" W
102.  54°28'25" N  132°55'54" W
103.  54°27'23" N  132°50'42" W
104.  54°27'07" N  132°49'35" W
105.  54°26'00" N  132°44'12" W
106.  54°24'54" N  132°39'46" W
107.  54°24'34" N  132°38'16" W
108.  54°24'39" N  132°26'51" W
109.  54°24'41" N  132°24'35" W
110.  54°24'41" N  132°24'29" W
111.  54°24'52" N  132°23'39" W
112.  54°21'51" N  132°02'54" W
113.  54°26'41" N  131°49'28" W
114.  54°28'18" N  131°45'20" W
115.  54°30'32" N  131°38'01" W
116.  54°29'53" N  131°33'48" W
117.  54°36'53" N  131°19'22" W
118.  54°39'09" N  131°16'17" W
119.  54°40'52" N  131°13'54" W
120.  54°42'11" N  131°13'17" W
121.  54°46'16" N  131°04'43" W
122.  54°45'39" N  131°03'06" W
123.  54°44'12" N  130°59'44" W
124.  54°43'46" N  130°58'55" W
125.  54°43'00" N  130°57'41" W
126.  54°42'34" N  130°57'09" W
127.  54°42'27" N  130°56'18" W
128.  54°41'26" N  130°53'39" W
129.  54°41'21" N  130°53'18" W
130.  54°41'05" N  130°49'17" W
131.  54°41'06" N  130°48'31" W
132.  54°40'46" N  130°45'51" W
133.  54°40'41" N  130°44'59" W
134.  54°40'42" N  130°44'43" W
135.  54°40'03" N  130°42'22" W
136.  54°39'48" N  130°41'35" W
137.  54°39'14" N  130°39'18" W
138.  54°39'54" N  130°38'58" W
139.  54°41'09" N  130°38'58" W
140.  54°42'22" N  130°38'26" W
141.  54°42'47" N  130°38'06" W
142.  54°42'58" N  130°37'57" W
143.  54°43'00" N  130°37'55" W
144.  54°43'15" N  130°37'44" W
145.  54°43'24" N  130°37'39" W

Boundary Treaty, signed on May 4, 1978, defines the boundary using five turning points.

The limit of the U.S. exclusive economic zone does not adjacent to Canada in the Beaufort Sea do not correspond to limits of the Canadian fishery zone as defined in the Canada Gazette of January 1, 1977.

The line defined by points 22, 58 and 59–87 is a line delimited in the maritime boundary treaty signed with the former Soviet Union now applicable to Russia, June 1, 1990. Senate Treaty Doc. 102-22, and applied provisionally pending the exchange of instruments of ratification, by an exchange of notes effective June 15, 1990.

[*] The limit of the U.S. exclusive economic zone, and seaward of the Dixon Entrance do not correspond to the limits of the Canadian fishery zone, as defined in the Canada Gazette of January 1, 1977. Where the named boundaries published by the United States and Canada leave an unclaimed area within Dixon Entrance, the United States will exercise fishery management jurisdiction to the Canadian claimed line where that line is situated southward of the United States claimed line, until such time as a permanent maritime boundary with Canada is established in the Dixon Entrance.

146. 54°43′30.15″ N, 130°37′37.01″ W

## Caribbean Sea

The seaward limit of the exclusive economic zone around the Commonwealth of Puerto Rico and the Virgin Islands of the United States is a line 200 nautical miles from the baseline from which the breadth of the territorial sea is measured, except that to the east, southeast, and west, the limit of the exclusive economic zone shall be determined by straight lines connecting the following coordinates:[1]

1. 21°48′33″ N, 65°50′31″ W
2. 21°41′20″ N, 65°49′13″ W
3. 20°58′05″ N, 65°40′30″ W
4. 20°46′56″ N, 65°38′14″ W
5. 19°57′29″ N, 65°27′21″ W
6. 19°37′29″ N, 65°20′57″ W
7. 19°12′25″ N, 65°06′08″ W
8. 18°45′14″ N, 65°00′22″ W
9. 18°41′14″ N, 64°59′33″ W
10. 18°29′22″ N, 64°53′50″ W
11. 18°27′36″ N, 64°53′22″ W
12. 18°25′22″ N, 64°52′39″ W
13. 18°24′31″ N, 64°52′19″ W
14. 18°23′51″ N, 64°51′50″ W
15. 18°23′43″ N, 64°51′23″ W
16. 18°23′37″ N, 64°50′18″ W
17. 18°23′48″ N, 64°49′42″ W
18. 18°24′11″ N, 64°49′01″ W
19. 18°24′29″ N, 64°47′57″ W
20. 18°24′18″ N, 64°47′00″ W
21. 18°23′14″ N, 64°46′37″ W
22. 18°22′38″ N, 64°45′21″ W
23. 18°22′40″ N, 64°44′42″ W
24. 18°22′42″ N, 64°44′36″ W
25. 18°22′37″ N, 64°44′24″ W
26. 18°22′40″ N, 64°43′42″ W
27. 19°22′30″ N, 64°43′36″ W
28. 18°22′25″ N, 64°42′58″ W
29. 18°22′27″ N, 64°42′28″ W
30. 18°22′16″ N, 64°42′03″ W
31. 18°22′33″ N, 64°40′59″ W
32. 18°21′58″ N, 64°40′15″ W
33. 18°21′51″ N, 64°38′22″ W
34. 18°21′22″ N, 64°38′16″ W
35. 18°20′39″ N, 64°38′32″ W
36. 18°19′16″ N, 64°38′13″ W
37. 18°19′07″ N, 64°38′16″ W
38. 18°17′21″ N, 64°39′37″ W
39. 18°16′43″ N, 64°39′41″ W
40. 18°11′31″ N, 64°38′58″ W
41. 18°03′03″ N, 64°38′03″ W
42. 18°02′57″ N, 64°29′35″ W
43. 18°02′52″ N, 64°27′03″ W
44. 18°02′30″ N, 64°21′08″ W
45. 18°02′31″ N, 64°20′08″ W
46. 18°02′01″ N, 64°15′39″ W
47. 18°00′12″ N, 64°02′29″ W
48. 17°59′58″ N, 64°01′02″ W
49. 17°58′47″ N, 63°57′00″ W
50. 17°57′51″ N, 63°53′53″ W
51. 17°56′37″ N, 63°53′20″ W
52. 17°39′48″ N, 63°54′54″ W
53. 17°37′15″ N, 63°55′11″ W
54. 17°30′28″ N, 63°55′57″ W
55. 17°11′43″ N, 63°58′00″ W
56. 17°05′07″ N, 63°58′42″ W
57. 16°44′49″ N, 64°01′08″ W
58. 16°43′22″ N, 64°06′31″ W
59. 16°43′10″ N, 64°06′59″ W
60. 16°42′40″ N, 64°08′06″ W
61. 16°41′43″ N, 64°10′07″ W
62. 16°35′19″ N, 64°23′39″ W
63. 16°23′30″ N, 64°45′54″ W
64. 15°39′31″ N, 65°58′41″ W
65. 15°30′10″ N, 66°07′09″ W
66. 15°14′06″ N, 66°19′57″ W
67. 14°55′48″ N, 66°34′30″ W
68. 14°56′06″ N, 66°51′40″ W
69. 14°58′27″ N, 67°04′19″ W
70. 14°58′45″ N, 67°05′17″ W
71. 14°58′58″ N, 67°06′11″ W
72. 14°59′10″ N, 67°07′10″ W
73. 15°02′32″ N, 67°23′40″ W
74. 15°05′07″ N, 67°36′23″ W
75. 15°10′38″ N, 68°03′46″ W
76. 15°11′06″ N, 68°09′21″ W
77. 15°12′33″ N, 68°27′32″ W
78. 15°12′51″ N, 68°28′56″ W
79. 15°46′48″ N, 68°26′04″ W
80. 17°21′30″ N, 68°17′53″ W
81. 17°38′01″ N, 68°16′46″ W
82. 17°50′24″ N, 68°16′11″ W
83. 17°56′07″ N, 68°15′52″ W
84. 18°02′28″ N, 68°15′40″ W
85. 18°06′10″ N, 68°15′27″ W
86. 18°07′27″ N, 68°15′33″ W
87. 18°09′12″ N, 68°14′53″ W
88. 18°17′06″ N, 68°11′28″ W
89. 18°19′20″ N, 68°09′40″ W
90. 18°22′42″ N, 68°06′57″ W
91. 18°24′39″ N, 68°04′58″ W
92. 18°25′25″ N, 68°04′09″ W
93. 18°28′08″ N, 68°00′59″ W
94. 18°31′27″ N, 67°56′57″ W
95. 18°32′58″ N, 67°55′07″ W
96. 18°34′34″ N, 67°52′53″ W
97. 18°54′37″ N, 67°46′21″ W
98. 19°00′42″ N, 67°44′25″ W
99. 19°06′00″ N, 67°41′24″ W
100. 19°19′03″ N, 67°38′19″ W
101. 19°21′20″ N, 67°38′01″ W
102. 19°59′45″ N, 67°31′52″ W
103. 20°00′59″ N, 67°31′33″ W
104. 20°01′17″ N, 67°31′29″ W
105. 20°02′49″ N, 67°31′04″ W
106. 20°03′30″ N, 67°30′52″ W
107. 20°09′39″ N, 67°29′11″ W
108. 20°48′18″ N, 67°17′50″ W
109. 21°22′48″ N, 67°02′34″ W
110. 21°30′18″ N, 66°59′05″ W
111. 21°33′47″ N, 66°57′30″ W
112. 21°51′24″ N, 66°19′30″ W

Navassa Island. The limits of the exclusive economic zone around Navassa Island remain to be determined.

## Central and Western Pacific

Northern Mariana Islands and Guam. The seaward limit of the exclusive

economic zone is 200 nautical miles from the baseline from which the breadth of the territorial sea is measured, except that to the north of the Northern Mariana Islands, the limit of the exclusive economic zone shall be determined by straight lines connecting the following points [10]

1. 23°53′35″ N, 145°05′46″ E
2. 23°44′32″ N, 144°54′05″ E
3. 23°33′52″ N, 144°40′23″ E
4. 23°16′11″ N, 144°17′47″ E
5. 22°50′13″ N, 143°44′57″ E
6. 22°18′13″ N, 143°05′02″ E
7. 21°53′58″ N, 142°35′03″ E
8. 21°42′14″ N, 142°20′39″ E
9. 21°40′08″ N, 142°18′05″ E
10. 21°28′21″ N, 142°03′45″ E
11. 20°58′24″ N, 141°27′33″ E
12. 20°52′51″ N, 141°20′54″ E

and, except that to the south of Guam, the limit of the exclusive economic zone shall be determined by straight lines connecting the following points:

13. 11°38′25″ N, 147°44′42″ E
14. 11°36′53″ N, 147°31′03″ E
15. 11°31′48″ N, 146°55′19″ E
16. 11°27′15″ N, 146°25′34″ E
17. 11°22′13″ N, 145°52′36″ E
18. 11°17′31″ N, 145°22′38″ E
19. 11°13′32″ N, 144°57′26″ E
20. 11°13′23″ N, 144°56′29″ E
21. 10°57′03″ N, 143°26′53″ E
22. 10°57′30″ N, 143°03′09″ E
23. 11°52′33″ N, 142°15′28″ E
24. 12°54′00″ N, 141°21′48″ E
25. 12°54′17″ N, 141°21′33″ E
26. 12°57′34″ N, 141°19′17″ E
27. 13°06′32″ N, 141°12′53″ E

Hawaii and Midway Island. The seaward limit of the exclusive economic zone is 200 nautical miles from the baselines from which the territorial sea is measured.

Johnston Atoll. The seaward limit of the exclusive economic zone is 200 nautical miles from the baselines from which the territorial sea is measured.

American Samoa. The seaward limit of the exclusive economic zone shall be determined by straight lines connecting the following points [11].

1. 11°02′17″ S, 173°44′48″ W.

[9] The line defined by points 1–12 constitutes the line of delimitation between the maritime zones of the United States and Japan as reflected in an Exchange of Notes effective July 5, 1994. Points 1–12 are on the World Geodetic System 1984 (WGS 84). In this regard, users should be aware that the Government of Japan defines points 1–12 on the Tokyo Datum and the coordinate values will differ slightly from those published in this Notice.

[11] The line defined by points 1–8 is that line delimited in the maritime boundary treaty with New Zealand that Tokelau signed at Atafu on December 2, 1980, was instrumented, and entered into force on September 3, 1983. TIAS 10775. The line defined by points 8–32 is that line defined on the maritime boundary treaty with the Cook Islands signed at Rarotonga on June 11, 1980, was entered into force on September 8, 1983. TIAS 10774. Points 1–32 are on the World Geodetic System 1972 (WGS 72).

Case 1:06-cv-00030    Document 121-2    Filed 12/28/2007    Page 28 of 38

2. 14°46′15″ S. 173°03′53″ W.
3. 16°25′26″ S. 172°11′01″ W.
4. 16°17′50″ S. 171°50′58″ W.
5. 16°15′17″ S. 171°15′32″ W.
6. 16°10′18″ S. 170°16′10″ W.
7. 10°07′52″ S. 169°46′50″ W.
8. 10°01′26″ S. 168°31′25″ W.
9. 10°12′44″ S. 168°31′02″ W.
10. 10°12′49″ S. 168°31′02″ W.
11. 10°52′31″ S. 168°29′42″ W.
12. 11°02′40″ S. 168°29′21″ W.
13. 11°43′53″ S. 168°27′58″ W.
14. 12°01′55″ S. 168°10′24″ W.
15. 12°28′40″ S. 167°25′20″ W.
16. 12°41′22″ S. 167°11′01″ W.
17. 12°57′51″ S. 166°52′21″ W.
18. 13°11′25″ S. 166°37′02″ W.
19. 13°14′03″ S. 166°34′03″ W.
20. 13°21′25″ S. 166°25′42″ W.
21. 13°35′44″ S. 166°09′19″ W.
22. 13°44′56″ S. 165°58′44″ W.
23. 14°03′50″ S. 165°37′20″ W.
24. 15°00′09″ S. 165°22′07″ W.
25. 15°14′04″ S. 165°18′29″ W.
26. 15°38′47″ S. 165°12′03″ W.
27. 15°44′58″ S. 165°10′36″ W.
28. 16°08′42″ S. 165°34′12″ W.
29. 16°18′30″ S. 165°41′29″ W.
30. 16°23′29″ S. 165°45′11″ W.
31. 16°45′30″ S. 166°01′39″ W.
32. 17°33′28″ S. 166°38′35″ W.
33. 17°31′45″ S. 166°42′07″ W.
34. 16°56′20″ S. 168°26′05″ W.
35. 16°37′55″ S. 168°19′19″ W.
36. 16°37′36″ S. 169°19′12″ W.
37. 16°34′58″ S. 169°55′59″ W.
38. 16°39′17″ S. 170°19′09″ W.
39. 16°18′46″ S. 171°12′29″ W.
40. 16°49′33″ S. 171°17′03″ W.
41. 16°13′29″ S. 171°37′41″ W.
42. 16°04′47″ S. 171°42′37″ W.
43. 15°58′20″ S. 171°46′06″ W.
44. 15°50′48″ S. 171°50′23″ W.
45. 15°50′12″ S. 171°50′44″ W.
46. 15°14′19″ S. 171°37′37″ W.
47. 15°01′58″ S. 171°31′37″ W.
48. 14°46′48″ S. 171°24′21″ W.
49. 14°27′02″ S. 171°14′46″ W.
50. 14°06′18″ S. 171°04′48″ W.
51. 14°03′28″ S. 171°04′06″ W.
52. 14°03′27″ S. 171°03′05″ W.
53. 14°03′05″ S. 171°02′24″ W.
54. 13°56′54″ S. 170°59′34″ W.
55. 13°54′30″ S. 170°58′20″ W.
56. 13°53′43″ S. 170°57′57″ W.
57. 13°50′40″ S. 170°56′24″ W.
58. 13°13′56″ S. 170°44′20″ W.
59. 13°09′03″ S. 170°42′39″ W.
60. 12°36′18″ S. 170°30′44″ W.
61. 12°36′11″ S. 170°31′35″ W.
62. 12°35′21″ S. 170°36′26″ W.
63. 12°29′47″ S. 171°08′24″ W.
64. 12°27′27″ S. 171°17′20″ W.
65. 12°23′34″ S. 171°25′18″ W.
66. 12°17′36″ S. 171°37′14″ W.
67. 12°14′01″ S. 171°44′20″ W.
68. 12°13′40″ S. 171°44′47″ W.
69. 12°05′27″ S. 172°00′50″ W.
70. 11°54′56″ S. 172°22′30″ W.
71. 11°49′55″ S. 172°23′20″ W.
72. 11°19′49″ S. 172°18′17″ W.
73. 11°26′56″ S. 173°08′40″ W.
74. 11°22′08″ S. 173°15′50″ W.
75. 11°02′28″ S. 173°44′32″ W.
76. 11°02′17″ S. 173°44′48″ W.

Palmyra Atoll-Kingman Reef. The seaward limit of the exclusive economic zone is 200 nautical miles from the baseline from which the territorial sea is measured, except that to the southeast of Palmyra Atoll and Kingman Reef the limit of the exclusive economic zone shall be determined by straight lines connecting the following points:

1. 7°55′04″ N. 159°22′29″ W.
2. 7°31′05″ N. 159°39′30″ W.
3. 7°09′43″ N. 159°54′35″ W.
4. 6°33′40″ N. 160°19′51″ W.
5. 6°31′37″ N. 160°21′18″ W.
6. 6°25′51″ N. 160°25′40″ W.
7. 6°03′05″ N. 160°41′42″ W.
8. 5°44′12″ N. 160°55′13″ W.
9. 4°57′25″ N. 161°28′19″ W.
10. 4°44′38″ N. 161°37′18″ W.
11. 3°54′25″ N. 162°12′56″ W.
12. 2°39′50″ N. 163°05′14″ W.

Wake Island. The seaward limit of the exclusive economic zone is 200 nautical miles from the baseline from which the territorial sea is measured, except that to the south of Wake Island the limit of the exclusive economic zone shall be determined by straight lines connecting the following points:

1. 17°56′15″ N. 169°54′00″ E.
2. 17°46′02″ N. 169°31′18″ E.
3. 17°37′47″ N. 169°12′53″ E.
4. 17°11′18″ N. 168°13′30″ E.
5. 16°41′31″ N. 167°07′39″ E.
6. 16°02′45″ N. 165°43′30″ E.

Jarvis Island. The seaward limit of the exclusive economic zone is 200 nautical miles from the baseline from which the territorial sea is measured, except that to the north and east of Jarvis Island, the limit of the exclusive economic zone shall be determined by straight lines connecting the following points:

1. 2°01′00″ N. 162°22′00″ W.
2. 2°01′42″ N. 162°01′35″ W.
3. 2°03′20″ N. 161°41′33″ W.
4. 2°02′30″ N. 161°36′20″ W.
5. 2°00′13″ N. 161°22′24″ W.
6. 1°50′18″ N. 160°20′42″ W.
7. 1°48′46″ N. 159°58′20″ W.
8. 1°43′31″ N. 159°39′27″ W.
9. 0°58′53″ N. 158°59′04″ W.
10. 0°46′58″ N. 158°48′24″ W.
11. 0°12′36″ N. 158°18′06″ W.
12. 0°00′17″ S. 158°07′27″ W.
13. 0°24′23″ S. 157°49′44″ W.
14. 0°25′44″ S. 157°48′43″ W.
15. 0°58′15″ S. 157°24′32″ W.
16. 2°13′26″ S. 157°08′24″ W.
17. 3°10′40″ S. 158°10′30″ W.

Howland and Baker Islands. The seaward limit of the exclusive economic zone is a line 200 nautical miles from the baseline from which the territorial sea is measured, except to the southeast and south of Howland and Baker Islands the limit of the exclusive economic zone shall be determined by straight lines connecting the following points:

1. 0°14′36″ N. 173°08′00″ W.

2. 0°14′32″ S. 173°27′28″ W.
3. 0°43′52″ S. 173°45′30″ W.
4. 1°04′06″ S. 174°17′41″ W.
5. 1°12′39″ S. 174°31′02″ W.
6. 1°14′52″ S. 174°34′48″ W.
7. 1°52′36″ S. 175°34′51″ W.
8. 1°59′17″ S. 175°45′29″ W.
9. 2°17′09″ S. 176°13′58″ W.
10. 2°32′51″ S. 176°38′59″ W.
11. 2°40′26″ S. 176°51′03″ W.
12. 2°44′49″ S. 176°58′01″ W.
13. 2°44′53″ S. 176°58′08″ W.
14. 2°56′33″ S. 177°16′43″ W.
15. 2°58′45″ S. 177°26′00″ W.

Dated. August 10, 1995

David A. Colson,

*Deputy Assistant Secretary for Oceans*

[FR Doc. 95–20794 Filed 8–22–95 8:45 am]

**BILLING CODE 4710–09–M**

---

# DEPARTMENT OF STATE IN CONJUNCTION WITH DEPARTMENT OF THE INTERIOR

[Public Notice 2243]

## Participation in Working Group To Elaborate a U.N. Declaration on Indigenous Rights

The Economic and Social Council (ECOSOC) of the United Nations has approved establishment of an open-ended, inter-sessional working group of the Commission on Human Rights to elaborate a draft declaration on indigenous rights. The goal of the Working Group is to prepare a declaration for consideration and adoption by the General Assembly during the International Decade of the World's Indigenous People (1994–2004). [The Working Group will consider the draft prepared by the independent experts who comprise the Working Group on Indigenous Populations, which is entitled "United Nations draft declaration on the rights of indigenous peoples."]

ECOSOC also approved adoption of a special procedure to authorize participation in the Working Group by organizations of indigenous people, including tribal governments, not in consultative status with ECOSOC. Interested organizations should apply to the Coordinator of the International Decade at the following address: The Honorable Ibrahima Fall, Assistant Secretary General for Human Rights, Human Rights Center, Office of the United Nations in Geneva, Palais des Nations, 8–14 Avenue de la Paix, 1211 Geneva, Switzerland.

Applications must include the following information about the organization concerned:

(a) The name, headquarters or seat, address and contact person for the organization;

## Proclamation 5030 by the President of the United States of America on the Exclusive Economic Zone of the United States of America, 10 March 1983

WHEREAS the Government of the United States of America desires to facilitate the wise development and use of the oceans consistent with international law;

WHEREAS international law recognizes that, in a zone beyond its territory and adjacent to its territorial sea, known as the exclusive economic zone, a coastal State may assert certain sovereign rights over natural resources and related jurisdiction; and

WHEREAS the establishment of an exclusive economic zone by the United States will advance the development of ocean resources and promote the protection of the marine environment, while not affecting other lawful uses of the zone, including the freedoms of navigation and overflight, by other States;

NOW, THEREFORE, I, RONALD REAGAN, by the authority vested in me as President by the Constitution and laws of the United States of America, do hereby proclaim the sovereign rights and jurisdiction of the United States of America and confirm also the rights and freedoms of all States within an exclusive economic zone, as described herein.

The exclusive economic zone of the United States is a zone contiguous to the territorial sea, including zones contiguous to the territorial sea of the United States, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands (to the extent consistent with the Covenant and the United Nations Trusteeship Agreement), and United States overseas Territories and possessions. The exclusive economic zone extends to a distance 200 nautical miles from the baseline from which the breadth of the territorial sea is measured. In cases where the maritime boundary with a neighbouring State remains to be determined, the boundary of the exclusive economic zone shall be determined by the United States and other State concerned in accordance with equitable principles.

Within the exclusive economic zone, the United States has, to the extent permitted by international law, (a) sovereign rights for the purpose of exploring, exploiting, conserving and managing natural resources, both living and non-living, of the sea-bed and subsoil and the superjacent waters and with regard to other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents and winds; and (b) jurisdiction with regard to the establishment and use of artificial islands, and installations and structures having economic purposes, and the protection and preservation of the marine environment.

This Proclamation does not change existing United States policies concerning the continental shelf, marine mammals and fisheries, including highly migratory species of tuna which are not subject to United States jurisdiction and require international agreements for effective management.

The United States will exercise these sovereign rights and jurisdiction in accordance with the rules of international law.

Without prejudice to the sovereign rights and jurisdiction of the United States, the exclusive economic zone remains an area beyond the territory and territorial sea of the United States in which all States enjoy the high seas freedoms of navigation, overflight, the laying of submarine cables and pipelines, and other internationally lawful

National legislation - DOALOS/OLA - United Nations

DEPOSITION
EXHIBIT
4

uses of the Sea.

  IN WITHNESS THEREOF, I have hereunto set my hand this tenth day of March, in the year of our Lord nineteen hundred and eighty-three, and of the Independence of the United States of America the two hundred and seventh.

THE WHITE HOUSE
Office of the Press Secretary



 

Country List  World Factbook Home

# The World Factbook

## United States Pacific Island Wildlife Refuges





DEPOSITION
EXHIBIT
5

Case 1:06-cv-00030   Document 121-3   Filed 12/28/2007   Page 32 of 38

## Introduction    United States Pacific Island Wildlife Refuges

**Background:**   The following US Pacific island territories constitute the Pacific Remote
Islands National Wildlife Refuge Complex and as such are managed by
the Fish and Wildlife Service of the US Department of Interior. These
remote refuges are the most widespread collection of marine- and
terrestrial-life protected areas on the planet under a single country's
jurisdiction. They protect many endemic species including corals, fish,
shellfish, marine mammals, seabirds, water birds, land birds, insects, and
vegetation not found elsewhere.

*Baker Island:* The US took possession of the island in 1857, and its
guano deposits were mined by US and British companies during the
second half of the 19th century. In 1935, a short-lived attempt at
colonization began on this island but was disrupted by World War II and
thereafter abandoned. The island was established as a National Wildlife
Refuge in 1974.

*Howland Island:* Discovered by the US early in the 19th century, the
island was officially claimed by the US in 1857. Both US and British
companies mined for guano until about 1890. In 1935, a short-lived
attempt at colonization began on this island, similar to the effort on
nearby Baker Island, but was disrupted by World War II and thereafter
abandoned. The famed American aviatrix Amelia EARHART
disappeared while seeking out Howland Island as a refueling stop during
her 1937 round-the-world flight; Earhart Light, a day beacon near the
middle of the west coast, was named in her memory. The island was
established as a National Wildlife Refuge in 1974.

*Jarvis Island:* First discovered by the British in 1821, the uninhabited
island was annexed by the US in 1858, but abandoned in 1879 after tons
of guano had been removed. The UK annexed the island in 1889, but
never carried out plans for further exploitation. The US occupied and
reclaimed the island in 1935 until it was abandoned in 1942 during
World War II. The island was established as a National Wildlife Refuge
in 1974.

*Johnston Atoll:* Both the US and the Kingdom of Hawaii annexed
Johnston Atoll in 1858, but it was the US that mined the guano deposits
until the late 1880s. Johnston and Sand Islands were designated wildlife
refuges in 1926. The US Navy took over the atoll in 1934, and
subsequently the US Air Force assumed control in 1948. The site was
used for high-altitude nuclear tests in the 1950s and 1960s, and until late
in 2000 the atoll was maintained as a storage and disposal site for
chemical weapons. Munitions destruction is now complete. Cleanup and
closure of the facility was completed by May 2005. The Fish and
Wildlife Service and the US Air Force are currently discussing future
management options; in the interim, Johnston Atoll and the three-mile
Naval Defensive Sea around it remain under the jurisdiction and
administrative control of the US Air Force.

*Kingman Reef:* The US annexed the reef in 1922. Its sheltered lagoon
served as a way station for flying boats on Hawaii-to-American Samoa
flights during the late 1930s. There are no terrestrial plants on the reef,
which is frequently awash, but it does support abundant and diverse
marine fauna and flora. In 2001, the waters surrounding the reef out to 12

nm were designated a US National Wildlife Refuge.

*Midway Islands:* The US took formal possession of the islands in 1867. The laying of the trans-Pacific cable, which passed through the islands, brought the first residents in 1903. Between 1935 and 1947, Midway was used as a refueling stop for trans-Pacific flights. The US naval victory over a Japanese fleet off Midway in 1942 was one of the turning points of World War II. The islands continued to serve as a naval station until closed in 1993. Today the islands are a National Wildlife Refuge and are the site of the world's largest Laysan albatross colony.

*Palmyra Atoll:* The Kingdom of Hawaii claimed the atoll in 1862, and the US included it among the Hawaiian Islands when it annexed the archipelago in 1898. The Hawaii Statehood Act of 1959 did not include Palmyra Atoll, which is now partly privately owned by the Nature Conservancy with the rest owned by the Federal government and managed by the US Fish and Wildlife Service. These organizations are managing the atoll as a wildlife refuge. The lagoons and surrounding waters within the 12 nm US territorial seas were transferred to the US Fish and Wildlife Service and designated as a National Wildlife Refuge in January 2001.

**Geography**     **United States Pacific Island Wildlife Refuges**

**Location:** Oceania
*Baker Island:* atoll in the North Pacific Ocean 1,830 nm (3,389 km) southwest of Honolulu, about half way between Hawaii and Australia
*Howland Island:* island in the North Pacific Ocean 1,815 nm (3,361 km) southwest of Honolulu, about half way between Hawaii and Australia
*Jarvis Island:* island in the South Pacific Ocean 1,305 nm (2,417 km) south of Honolulu, about half way between Hawaii and the Cook Islands
*Johnston Atoll:* atoll in the North Pacific Ocean 717 nm (1,328 km) southwest of Honolulu, about one-third of the way from Hawaii to the Marshall Islands
*Kingman Reef:* reef in the North Pacific Ocean 930 nm (1,722 km) south of Honolulu, about half way between Hawaii and American Samoa
*Midway Islands:* atoll in the North Pacific Ocean 1,260 nm (2,334 km) northwest of Honolulu near the end of the Hawaiian Archipelago, about one-third of the way from Honolulu to Tokyo
*Palmyra Atoll:* atoll in the North Pacific Ocean 960 nm (1,778 km) south of Honolulu, about half way between Hawaii and American Samoa

**Geographic coordinates:**
*Baker Island:* 0 13 N, 176 28 W
*Howland Island:* 0 48 N, 176 38 W
*Jarvis Island:* 0 23 S, 160 01 W
*Johnston Atoll:* 16 45 N, 169 31 W
*Kingman Reef:* 6 23 N, 162 25 W
*Midway Islands:* 28 12 N, 177 22 W
*Palmyra Atoll:* 5 53 N, 162 05 W

**Map references:** Oceania

**Area:** total - 6,959.41 sq km; emergent land - 22.41 sq km; submerged - 6,937 sq km

Case 1:06-cv-00030          Document 121-2          Filed 12/28/2007          Page 34 of 38

*Baker Island:* total - 129 sq km; emergent land - 2.1 sq km; submerged - 127 sq km
*Howland Island:* total - 139 sq km; emergent land - 2.6 sq km; submerged - 136 sq km
*Jarvis Island:* total - 152 sq km; emergent land - 5 sq km; submerged - 147 sq km
*Johnston Atoll:* total - 276.6 sq km; emergent land - 2.6 sq km; submerged - 274 sq km
*Kingman Reef:* total - 1,958.01 sq km; emergent land - 0.01 sq km; submerged - 1,958 sq km
*Midway Islands:* total - 2,355.2 sq km; emergent land - 6.2 sq km; submerged - 2,349 sq km
*Palmyra Atoll:* total - 1,949.9 sq km; emergent land - 3.9 sq km; submerged - 1,946 sq km

**Area - comparative:** *Baker Island:* about two and a half times the size of The Mall in Washington, DC
*Howland Island:* about three times the size of The Mall in Washington, DC
*Jarvis Island:* about eight times the size of The Mall in Washington, DC
*Johnston Atoll:* about four and a half times the size of The Mall in Washington, DC
*Kingman Reef:* a little more than one and a half times the size of The Mall in Washington, DC
*Midway Islands:* about nine times the size of The Mall in Washington, DC
*Palmyra Atoll:* about 20 times the size of The Mall in Washington, DC

**Land boundaries:** none

**Coastline:** *Baker Island:* 4.8 km
*Howland Island:* 6.4 km
*Jarvis Island:* 8 km
*Johnston Atoll:* 34 km
*Kingman Reef:* 3 km
*Midway Islands:* 15 km
*Palmyra Atoll:* 14.5 km

**Maritime claims:** *territorial sea:* 12 nm
*exclusive economic zone:* 200 nm

**Climate:** *Baker, Howland, and Jarvis Islands:* equatorial; scant rainfall, constant wind, burning sun
*Johnston Atoll and Kingman Reef:* tropical, but generally dry; consistent northeast trade winds with little seasonal temperature variation
*Midway Islands:* subtropical with cool, moist winters (December to February) and warm, dry summers (May to October); moderated by prevailing easterly winds; most of the 1,067 mm (42 in) of annual rainfall occurs during the winter
*Palmyra Atoll:* equatorial, hot; located within the low pressure area of the Intertropical Convergence Zone (ITCZ) where the northeast and

southeast trade winds meet, it is extremely wet with between 4,000-5,000 mm (160-200 in) of rainfall each year

**Terrain:** low and nearly level sandy coral islands with narrow fringing reefs that have developed at the top of submerged volcanic mountains, which in most cases rise steeply from the ocean floor

**Elevation extremes:** *lowest point:* Pacific Ocean 0 m
*highest point:* Baker Island, unnamed location - 8 m; Howland Island, unnamed location - 3 m; Jarvis Island, unnamed location - 7 m; Johnston Atoll, Sand Island - 10 m; Kingman Reef, unnamed location - less than 1 m; Midway Islands, unnamed location - 13 m; Palmyra Atoll, unnamed location - 2 m

**Natural resources:** terrestrial and aquatic wildlife

**Land use:** *arable land:* 0%
*permanent crops:* 0%
*other:* 100% (2005)

**Natural hazards:** *Baker, Howland, and Jarvis Islands:* the narrow fringing reef surrounding the island can be a maritime hazard
*Kingman Reef:* wet or awash most of the time, maximum elevation of less than 1 m makes Kingman Reef a maritime hazard
*Midway Islands, Johnston, and Palmyra Atolls:* NA

**Environment - current issues:** *Baker, Howland, and Jarvis Islands, and Johnston Atoll:* no natural fresh water resources
*Kingman Reef:* none
*Midway Islands and Palmyra Atoll:* NA

**Geography - note:** *Baker, Howland, and Jarvis Islands:* scattered vegetation consisting of grasses, prostrate vines, and low growing shrubs; primarily a nesting, roosting, and foraging habitat for seabirds, shorebirds, and marine wildlife
*Johnston Atoll:* Johnston Island and Sand Island are natural islands, which have been expanded by coral dredging; North Island (Akau) and East Island (Hikina) are manmade islands formed from coral dredging; the egg-shaped reef is 34 km in circumference
*Kingman Reef:* barren coral atoll with deep interior lagoon; closed to the public
*Midway Islands:* a coral atoll managed as a national wildlife refuge and open to the public for wildlife-related recreation in the form of wildlife observation and photography
*Palmyra Atoll:* the high rainfall and resulting lush vegetation make the environment of this atoll unique among the US Pacific Island territories; it supports one of the largest remaining undisturbed stands of Pisonia beach forest in the Pacific

# People                **United States Pacific Island Wildlife Refuges**

**Population:** no indigenous inhabitants

Case 1:08-cv-00030    Document 121-2    Filed 12/28/2007    Page 36 of 38

*note:* public entry is by special-use permit from US Fish and Wildlife Service only and generally restricted to scientists and educators; visited annually by US Fish and Wildlife Service
*Johnston Atoll:* in previous years, an average of 1,100 US military and civilian contractor personnel were present; as of May 2005 all US government personnel had left the island
*Midway Islands:* approximately 40 people make up the staff of US Fish and Wildlife Service and their services contractor living at the atoll
*Palmyra Atoll:* four to 20 Nature Conservancy and US Fish and Wildlife staff

## Government          United States Pacific Island Wildlife Refuges

**Country name:**   *conventional long form:* none
*conventional short form:* Baker Island; Howland Island; Jarvis Island; Johnston Atoll; Kingman Reef; Midway Islands; Palmyra Atoll

**Dependency status:**   unincorporated territories of the US; administered from Washington, DC, by the Fish and Wildlife Service of the US Department of the Interior as part of the National Wildlife Refuge system
*note on Palmyra Atoll:* incorporated Territory of the US; partly privately owned and partly federally owned; administered from Washington, DC, by the Fish and Wildlife Service of the US Department of the Interior; the Office of Insular Affairs of the US Department of the Interior continues to administer nine excluded areas comprising certain tidal and submerged lands within the 12 nm territorial sea or within the lagoon

**Legal system:**   the laws of the US, where applicable, apply

**Flag description:**   the flag of the US is used

## Economy          United States Pacific Island Wildlife Refuges

**Economy - overview:**   no economic activity

## Transportation  United States Pacific Island Wildlife Refuges

**Airports:**   *Baker Island:* one abandoned World War II runway of 1,665 m covered with vegetation and unusable
*Howland Island:* airstrip constructed in 1937 for scheduled refueling stop on the round-the-world flight of Amelia EARHART and Fred NOONAN; the aviators left Lae, New Guinea, for Howland Island but were never seen again; the airstrip is no longer serviceable
*Johnston Atoll:* one closed and not maintained
*Kingman Reef:* lagoon was used as a halfway station between Hawaii and American Samoa by Pan American Airways for flying boats in 1937 and 1938
*Midway Islands:* 3 - one operational (2,409 m paved); no fuel for sale except emergencies
*Palmyra Atoll:* 1 - 1,846 m unpaved runway; privately owned (2006)

| Ports and terminals: | *Baker, Howland, and Jarvis Islands, and Kingman Reef:* none; offshore anchorage only |
| | *Johnston Atoll:* Johnston Island |
| | *Midway Islands:* Sand Island |
| | *Palmyra Atoll:* West Lagoon |

## Military

**United States Pacific Island Wildlife Refuges**

**Military - note:** defense is the responsibility of the US

## Transnational Issues

**United States Pacific Island Wildlife Refuges**

**Disputes - international:** none

This page was last updated on 20 September, 2007

Case 1:06-cv-00030     Document 121-2     Filed 12/26/2007